Nathan Nicholson Wyo. Bar #7-5078
Travis W. Koch Wyo. Bar #7-5418
**KOCH LAW, P.C**.
P.O. Box 2660
Cheyenne, WY 82004
(307) 426-5010
(307)426-4927 (fax)
tkoch@kochlawpc.com
nnicholas@kochlawpc.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation, | ) ) ) | Case No. 2:26-cv-00018 |
| | ) | |
| *Plaintiffs*, | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) ) | |
| PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual, | ) ) ) ) ) | |
| *Defendants*. | ) ) | |

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

    I.    Forced Reset Triggers ................................................................................ 2

    II.    Patent Owner ABC and Exclusive Licensee RBT ................................... 3

        A.    The Asserted Patents ..................................................................... 3

        B.    RBT's FRT-15 Forced Reset Trigger Products ........................... 5

    III.    The Defendants' Public Campaign to Flood the Market with Infringing Copies of RBT's FRT-15L3 ...................................................................................... 7

        A.    Defendants Manufacture and Distribute the Copycat Partisan Disruptor Products ...................................................................................... 7

        B.    In Recent Days, Partisan Necessitates This Motion by Publicly Detailing Its Widespread, Deliberate Infringement Campaign ................................. 8

        C.    The Defendants Falsely Advertise Their Accused Disruptor Product ...... 12

ARGUMENT ................................................................................................................ 14

    I.    Legal Standards ......................................................................................... 15

    II.    The Plaintiffs Are Likely to Succeed on the Merits ............................... 15

        A.    The Plaintiffs Are Likely to Succeed on Their Patent Infringement Claims ...................................................................................... 16

            1.    The Plaintiffs Own All Substantial Rights in the Asserted Patents ........................................................................ 16

            2.    The Asserted Patents Are Valid and Enforceable ........................ 16

            3.    The Defendants' Accused Disruptor Product Likely Infringes the Asserted Patents ........................................................................ 17

        B.    The Plaintiffs Are Likely to Succeed on Their False Advertising Claim . 19

III.    The Plaintiffs Will Suffer Irreparable Harm Without the Requested Injunctive Relief.................................................................................................................... 20

IV.    The Balance of Equities Tips in RBT's Favor....................................................... 22

V.    The Public Interest Favors the Requested Relief.................................................. 23

VI.    The Court Should Require No Security, or Alternatively, Nominal Security ...... 24

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Lab'ys v. Andrx Pharms., Inc.*,
  473 F.3d 1196 (Fed. Cir. 2007).................................................................16

*Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*,
  604 F.3d 1354 (Fed. Cir. 2010).................................................................16

*AMVAC Chem. Corp. v. Aceto Agric. Chems. Corp.*,
  No. 1:08-CV-1617-CC, 2008 WL 2456076 (N.D. Ga. May 8, 2008) ........................17, 21, 23

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015).................................................................23

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
  678 F.3d 1314 (Fed. Cir. 2012).................................................................22

*Avvo Inc. v. Liang*,
  No. 16-CV-892, 2016 WL 8738247 (D. Ariz. Apr. 4, 2016) .................................22

*Biles v. Schneider*,
  No. 19-CV-48, 2019 WL 13222745 (D. Wyo. Mar. 26, 2019) .............................15

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
  825 F.2d 1461 (10th Cir. 1987) .................................................................24

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
  269 F.3d 1149 (10th Cir. 2001) .................................................................21

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
  796 F.3d 1312 (Fed. Cir. 2015).................................................................16

*Fred Hutchinson Cancer Rsch. Ctr. v. BioPet Vet Lab, Inc.*,
  No. 2:10CV616, 2011 WL 1119565 (E.D. Va. Mar. 1, 2011) .........................16, 21

*Hybritech Inc. v. Abbot Lab'ys*,
  849 F.2d 1446 (Fed. Cir. 1988).................................................................22

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ......................17

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
  848 F.3d 1358 (Fed. Cir. 2017).................................................................22

*Miche Bag, LLC v. Thirty One Gifts LLC*,
No. 2:10-CV-781 TS, 2010 WL 3629686 (D. Utah Sept. 13, 2010)
.................................................................................................17, 18, 20, 23

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*,
106 F.4th 1369 (Fed. Cir. 2024) ........................................................15

*Oakley, Inc. v. Sunglass Hut Int'l*,
316 F.3d 1331 (Fed. Cir. 2003).........................................................17

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
429 F.3d 1364 (Fed. Cir. 2005).........................................................18

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)..........................................18

*Rare Breed Triggers, Inc. et al. v. Firearm Systems LL et al.*,
No. 2:25-cv-04938-SMB (D. Ariz.).....................................................8

*Resolution Trust Corp. v. Cruce*,
972 F.2d 1195 (10th Cir. 1992) .........................................................15

*Revision Military, Inc. v. Balboa Mfg. Co.*,
700 F.3d 524 (Fed. Cir. 2012)...........................................................15

*Speight v. Gordon*,
582 F. Supp. 3d 897 (D. Wyo. 2022) ..................................................15

*Syntex (USA) LLC v. Apotex Inc.*,
Nos. C 01-02214 MJJ, C 05-02116 MJJ, 2006 WL 1390435 (N.D. Cal. May
18, 2006) .........................................................................................23

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)..........................................................18

*Tinnus Enters., LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017)..........................................................21

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
748 F.3d 1159 (Fed. Cir. 2014)..........................................................22

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
805 F.2d 351 (10th Cir. 1986) ...........................................................22

*Windsurfing Int'l v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986)...........................................................23

*Winnebago Tribe of Nebraska v. Stovall*,
    341 F.3d 1202 (10th Cir. 2003) ..................................................................24

*Wyoming Beverages, Inc. v. Core-Mark Int'l, Inc.*,
    No. 17-CV-116-F, 2018 WL 8221068 (D. Wyo. Jan. 4, 2018) ...............................19

**Statutes**

15 U.S.C. § 1125(a)(1)(B) .....................................................................19

35 U.S.C. § 112(d) ..........................................................................14

35 U.S.C. § 271(a) ..........................................................................17

35 U.S.C. § 283 .............................................................................15

**Other Authorities**

Fed. R. Civ. P. 65(a) .......................................................................15

Fed. R. Civ. P. 65(c) .......................................................................24

## **INTRODUCTION**

Defendants' brazen, widespread, and publicly-acknowledged infringement campaign must stop. Their strategy of flooding the market with the Partisan Disruptor trigger—a cheap knockoff of Rare Breed's patented trigger—stands to immediately inflict irreparable damage to Plaintiffs.



**Partisan Disruptor**  **Rare Breed FRT-15L3**

**Partisan Disruptor**  **Rare Breed FRT-15L3**

This Motion, triggered by Partisan's recent public boasts detailing its deliberate infringement spree, asks for immediate action to halt the irreparable damage. All applicable TRO and preliminary injunction factors are met. The Court should preserve the status quo and enjoin the infringing triggers.

***First***, success on the merits is clear. On patent infringement, ABC owns four asserted patents exclusively licensed to RBT. Expert analysis confirms the Defendants' Partisan Disruptor infringes every patent—it's a blatant copy, with only superficial cosmetic tweaks to its housing.

Defendants, fully aware of these patents and the impending suit, have mounted no challenge to validity or enforceability. On false advertising, Partisan makes two false statements designed to manufacture the Disruptor's legitimacy: (1) the Disruptor is an assisted reset trigger rather than a forced reset trigger, and (2) the Disruptor is covered by, and implements, the '067 Patent issued to its engineer, Michael Stakes. Both statements are wrong and mislead consumers.

**Second**, irreparable harm is unfolding now. These durable triggers mean every infringing sale robs RBT of a lifelong customer. Price erosion and Partisan's public smears tarnish Plaintiffs' reputation and goodwill. Money damages and an injunction at the end of a protracted litigation will not suffice. Partisan is a startup and serious doubts plague Defendants' ability to make Plaintiffs whole.

**Third**, equities demand relief. Plaintiffs are bearing losses while Defendants are flooding the market with apparent impunity, shielded by their self-proclaimed patent insurance and lacking any right to profit from their continued theft of Plaintiff's intellectual property.

**Fourth**, the public interest strongly favors injunctive relief. The DOJ has already acknowledged publicly that, for public safety and IP protection reasons, the public interest favors the enforcement of the Plaintiffs' patents. The public interest cannot favor flooding the market with cheap knockoff triggers that greatly increase the rate of firing a rifle.

<u>**STATEMENT OF FACTS**</u>

## I.    Forced Reset Triggers

This case involves forced reset triggers ("FRTs") made for semi-automatic rifles. The federal government has previously regulated and closely monitors FRTs because they are designed to increase a rifle's rate of fire. *See* Ex. A. An FRT operates by mechanically resetting the trigger after each shot, allowing the user to take faster follow-up shots without manually releasing pressure on the trigger. Ex. A.

FRTs are distinct from other categories of trigger mechanisms. For example, in a traditional semi-automatic trigger mechanism, for each shot, a user manually pulls the trigger and releases the trigger to reset it. Ex. A. As another example, in a fully automatic mechanism, a user can fire at a fast rate without resetting the trigger between each shot. Ex. A. As yet another example, an assisted reset trigger is one that only partially—rather than fully—resets the trigger.

## II.    Patent Owner ABC and Exclusive Licensee RBT

### A.    The Asserted Patents

ABC owns the four asserted patents, U.S. Patent Nos. 10,514,223 ("'223 Patent"), 11,724,003 ("'003 Patent"), 12,036,336 ("'336 Patent"), and 12,274,807 ("'807 Patent") (collectively, "asserted patents"),[1] generally directed to FRTs that can be retrofitted into existing semi-automatic rifles. *See infra* Statement of Facts ("SOF") § II.B; Dkt. 1, Exs. A–D. All four asserted patents are titled "Firearm Trigger Mechanism," and all asserted claims are drawn to a firearm "trigger mechanism."[2] ABC exclusively licenses the asserted patents to RBT, who designs, makes and sells implementing products (discussed further below). Exs. B, C.

The '223 Patent is the earliest asserted patent, filed in 2018 and issued in 2019, and is unrelated to the other asserted patents. '223 Patent, Cover Page. The '223 Patent describes and claims a semi-automatic rifle trigger mechanism involving a hammer, a trigger member, and a locking bar. '223 Patent, Abstract, cl. 4. As shown in Figures 3 and 4, when the trigger is pulled, the hammer contacts the firing pin, thereby causing the ammunition cartridge to discharge. '223 Patent, Figs. 3–4, 2:59–64, 4:35–5:22. This discharge causes the bolt carrier (52) to move rearward,

---

[1] The '223, '003, '336, and '807 Patents are attached to the Complaint (Dkt. 1) as Exhibits A–D, respectively.

[2] The "asserted claims" for purposes of this brief are '223 Patent claim 4, '003 Patent claim 4, '336 Patent claim 3, and '807 Patent claim 1. Plaintiffs reserve the right to assert additional claims in this case to the extent permissible under the law and rules.

and a lower surface of the bolt carrier pushes against the hammer (18), which in turn forces the trigger (via trigger member 26) to return to its reset position. '223 Patent, Figs. 4–5, 5:23–54. A locking bar (62) prevents the trigger member from being pulled again by the user until the bolt carrier (52) has returned to the original or "in-battery" position. '223 Patent, Figs. 4–5, 5:23–54.



**FIG. 5**

'233 Patent, Fig. 5 (showing the bolt carrier 52 forcing the hammer 18 and trigger 26 back into its reset position).

The '003, '336, and '807 Patents are related and share a common specification, as the '336 and '807 Patents are continuations of the '003 Patent. Dkt. 1, Exs. B–D ('003, '336, and '807 Patents, respectively). These three patents were filed and issued between 2022 and 2025. *See id.* These patents all describe and claim a device similar to that of the '223 Patent, but with the additional feature that it "provides a 'three position' trigger mechanism having safe, standard semi-

automatic, and forced reset semi-automatic positions." '003 Patent, 2:34–37, Figs. 7 (safe), 8A-8D (standard semi-automatic), and 9A-9D (forced reset semi-automatic).

B.     **RBT's FRT-15 Forced Reset Trigger Products**

RBT markets an "FRT-15" product line (shown below) made up of three high-durability forced reset triggers implementing the asserted patents.  The FRT-15 and FRT-15L2 both have two operating modes—(1) safe, and (2) forced reset—and thus implement the '223 Patent.  Ex. D. The FRT-15 and FRT-15L2 triggers do not allow the user the option of a traditional (i.e., non-forced reset) operating mode.  RBT also markets the FRT-15L3, which adds a third, selectable option for the traditional operating mode.  This trigger is more expensive than the other two models, reflecting the value customers place on being able to select between the traditional and forced reset operating modes.  Ex. A.  The FRT-15L3 can also be retrofitted into existing AR-15 style rifles.

| RBT Product | Image | Positions | Patent(s) | Price |
|---|---|---|---|---|
| FRT-15 |  | 2 | '223 | $275 |

5

| RBT Product | Image | Positions | Patent(s) | Price |
|---|---|---|---|---|
| FRT-15L2 |  | 2 | '223 | $285 |
| FRT-15L3 |  | 3 | '223, '003, '336, and '807 | $450 |

In May 2025, RBT settled litigation with the U.S. Department of Justice ("DOJ") over whether the use of an FRT qualifies a rifle as a "machinegun." *See* Ex. E (Office of the Attorney General, *Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers* (May 16, 2025), https://www.justice.gov/opa/pr/department-justice-announces-settlement-litigation-between-federal-government-and-rare-breed (last visited Jan. 10, 2026)). The settlement was reached on condition that Rare Breed will (1) "significantly advance public safety with respect to FRTs" by, *inter alia*, "enforc[ing] its patents to prevent infringement that could threaten public safety," and (2) "promote the safe and responsible use of its products." *Id.*

### III. The Defendants' Public Campaign to Flood the Market with Infringing Copies of RBT's FRT-15L3

#### A. Defendants Manufacture and Distribute the Copycat Partisan Disruptor Products

Defendants manufacture and distribute the accused Partisan Disruptors. Except for cosmetic features in the outer housing that are irrelevant to the claimed inventions, the Partisan Disruptor is a direct copy of RBT's FRT-15L3 (see below) that one of their distributors, Firearm Systems, sells for $299—***$150 (or 33%) cheaper*** than RBT's FRT-15L3. Ex. F.

 

| **RBT FRT-15L3** | **Accused Partisan Disrupter** |

Defendants are the source of these copycat products. Ex. G. Partisan clearly knows about RBT's asserted patents because Partisan has posted ***three out of four—the '223, '003, and '336 Patents— on its own website*** in a so-called "FRT Legal Library." Ex. H. Partisan was apparently formed in mid-2025, as it created its website in April 2025 around the time RBT settled with the DOJ. Ex. I.

**B.** **In Recent Days, Partisan Necessitates This Motion by Publicly Detailing Its Widespread, Deliberate Infringement Campaign**

Partisan necessitated the instant motion by posting openly, just days ago, about its ongoing, widespread, and deliberate infringement campaign in a popular online firearm forum called AR15.com. Ex. J. Although Partisan had also posted in fall 2025 (discussed below), it did not reveal until its recent online statements that its Disruptor product is a copycat of *RBT's FRT-15L3* product.

On January 7, 2026, Partisan posted (forming a forum thread) on AR15.com, where Partisan (1) ties its infringement campaign to RBT's product and RBT's lawsuit against Firearm Systems LLC (one of Partisan's Disruptor dealers), *see Rare Breed Triggers, Inc. et al. v. Firearm Systems LL et al.*, No. 2:25-cv-04938-SMB (D. Ariz.)), and (2) and reveals it has begun flooding the market with infringing products. More specifically, Partisan

- states it is presently in the process of shipping thousands of accused triggers to dealers throughout the United States: "This week, we've shipped thousands of triggers to dealers, with thousands more going out by week's end."

- acknowledges the complaint filed in Arizona linking Partisan with the John Doe defendant:

  - "As many know, RBT named us as a John Doe d/b/a Partisan Triggers in an Arizona suit filed December 23, 2025."

- states it expected, and was preparing for, a lawsuit initiated by RBT since at least September 2025: "Partisan Triggers previously introduced ourselves here. In it, we detailed our preparations for the inevitable lawsuit from Rare Breed Triggers/ABC IP (RBT)."

- states its belief that RBT is a "public/private partnership" it "opposes": "As stated on our website, we oppose public/private partnerships that exist only to your detriment."

- states its refusal to cease making and distributing the accused Disruptor products even despite litigation:

  - "RBT excels at bullying small companies, often run by young men who have barely gotten their feet under them in life, through aggressive lawfare

to bankrupt and break them. It's easy to feel invincible when facing under-resourced opponents while relying on powerful allies. Rest assured, this won't work against us."

    o   "You and our dealers can trust we won't be bullied or back down. . . . We are here for the long haul, so strap in, folks—this may turn into a wild ride. Thumbs up, let's do this."

- states it has a substantial patent insurance policy to indemnify its dealers: "Dealers are indemnified under our substantial insurance policy—covering the Disruptor alongside our upcoming releases, and worth multiples of RBT's claimed millions in litigation costs from their prior lawsuits."

- asks readers for support in the litigation:

    o   "We have no plans or need for donations; support us by spreading the word or buying our triggers."

    o   "We would like to ask you to do something. If you have useful information on RBT (or related parties) for this lawsuit, PM us on ARFCOM to share it. We feel very confident in our preparations, but we are aware that there is always the possibility someone may know something we've missed. We hope they see this and want to help."

Ex. K.

    In the ensuing thread, Partisan later

- summarizes its discussions with its counsel about its positions on issues in the case: "After some discussions with our legal team, we have decided to make a few things clear, out here in public. . . ."

- shows flippancy towards its infringement campaign and invites a lawsuit: "Do your homework and sue us in the right venue boys, you're just...so disappointing right now."

Ex. K.

    This recent thread is a follow-up from Partisan's separate AR15.com thread started in September 2025. There, Partisan did not specifically say that it was using RBT's FRT15-L3 design, but did convey it was mimicking an existing design, sought an IP lawyer's advice, and procured intellectual property-related insurance. Partisan specifically

- states it is a new company formed to sell triggers: "Partisan Triggers is a new company configured to incubate the development of innovative triggers and access high quality, high volume manufacturing in order to bring the best possible value for money to the end user."

- states it is copying an existing trigger design that it learned about several months earlier: "Several months ago, Partisan Triggers was shown a new trigger design by @Ben and his weapons company. It promised to be a unique match grade FRT with a light, clean trigger pull and superb reliability over thousands of rounds on a given unit. A deal was done to bring this trigger to market, and Ben was asked to take on the role of public relations spokesman for the company."

- states it decided *not* to release the product at that time because of risk of patent infringement: "After much consideration, however, we have decided not to release his particular trigger for the time being. Due to the legal actions being taken by a certain FRT company and their Axis of partners, we are deeply concerned about losing control of the design. We don't believe anyone can patent a concept that was developed nearly a century ago, but others do and think they already have. They also think their patents are actually valid and we are damn sure they will try to claim Ben's design falls within their IP rights, steal it and attempt to incorporate it into their open patent applications through amendments. Their track record is all the evidence required to support this opinion."

- describes its lawyer's advice and states that Partisan procured intellectual property-related insurance: "The new approach has required several long months of intensive work with IP attorneys and insurance companies. It involved hiring special Counsel who have a history of winning billion dollar IP suits. The result is robust insurance coverage and an official Advice Of Counsel Letter that painstakingly covers every detail of concern in the current FRT IP landscape. This Letter, longer than most printed copies of a dictionary, details the legality of releasing our own version of an older trigger which we believe is not protected by any valid patent."

- reassures its customers and dealers that they will not face liability for purchasing or distributing Partisan's trigger product: "It has taken a while and cost a lot of money but we finally have everything needed on the legal side in place. Our distributors and dealers are financially covered for frivolous lawsuits. Even our customers are protected. We are ready to rumble."

- again demonstrates flippancy toward its infringement campaign: "Get plenty of popcorn ready – it's likely to be highly entertaining."

- repeatedly states its plans to distribute a massive number of infringing products by the holidays in 2025 in order to fully satisfy market demand:

  o "Our full release is set to occur in time for the holidays, and in such quantities that you won't have to worry about back orders or whether you can find and receive a trigger in short order."

- "You can be assured we will keep to our timeline as stated previously...you'll have plenty of time to order and receive as many triggers as your heart desires well ahead of the holiday season, and you aren't going to need to worry about whether you need to add express shipping."

- "There will be a substantial number of units available on release day. Enough that we don't need to worry about throttling sales so that everyone can get one."

- "That said, we must sadly inform you that we are pushing back the release a month to ensure sufficient supply is available to meet demand. This is the sort of delay inherent in the beast that is gearing up and manufacturing on a mass scale."

- "Many of your favorite big time retailers/distributors will have our product."

- "How many units are we getting ready to ship? A lot of them [showing picture depicting cards corresponding to the number of infringing products]."

- "Those cards don't even fully represent the initial release."

- "Relatively small scale cottage industry production is a lot easier and straightforward than large scale mass production. The wait will be worth it."

- "@PartisanTriggers are these going to be available at brick and mortar retailers?" "Yes."

- "We fully agree that the more FRTs in circulation, the better."

- "Everything is set for Monday[, December 15, 2025]. Most of the retailers launching Monday are regional brick and mortar locations. There will be a major online retailer selling and shipping Monday, as well as several more major retailers as they receive their shipments throughout the week. We will post the online retailer shipping Monday at 0900 EST. You can also expect a number of review videos to go live Monday."

- states that a large number of infringing products have already been sold and distributed: "A large number of sales and reviewer samples have already gone out, including to a pretty well known guy who has posted in this thread."

- states its infringement campaign has been carefully planned:

  - "Our (not mine, our) words were chosen carefully and vetted with our legal team prior to the OP."

  - "[E]very part of this project has been preplanned."

- states the intention to conceal its business dealings from an intellectual property owner:

    - "[W]e won't be posting any of the brick and mortar locations unless they ask us to, as none of them want a bogus C&D letter from someone suing everyone and their mother. It is a hassle, and they know our trigger will sell regardless."

    - "Shroud with deception everything you do."

- advertises its infringing product's price, quality, and features:

    - "It is a three position cassette style trigger, and better than the RB trigger across the board."

    - "Target price is $200 or just a little north of there."

    - "This trigger is going to be a very good trigger, and great value for your dollars."

    - "It would be shocking if you find a better quality FRT at a comparable price. We are confident that you will find it to be the gold standard."

- thanks viewers for ample promotion the post has received: "Appreciate those who are keeping the thread bumped daily."

Ex. J.

Based on its own website and forum posts, Partisan has made clear that it has already intentionally flooded the market with its infringing Disruptor products. *See* Exs. F, K. The Defendants are therefore engaged in a widespread and ongoing campaign of deliberate infringement.

### C.     The Defendants Falsely Advertise Their Accused Disruptor Product

Partisan robustly and widely markets its Disruptor product, including on various pages on its website. *See, e.g.*, Ex. L (Partisan Triggers, https://partisantriggers.com/ (last visited Jan. 16, 2026), advertising the Disruptor); Ex. M (The Disruptor, https://partisantriggers.com/the-disruptor/ (last visited Jan. 16, 2026)). There, Partisan provides links on its website to nine separate firearm dealers, Ex. F (Partisan Triggers Disruptor FRT, https://firearmsystems.net/ (last visited

Jan. 10, 2026)), and even invites anyone to become a dealer: "Interested in becoming of a dealer of Partisan Triggers? Email us at Sales@PartisanTriggers.com," Ex. N. A consumer can go to these dealers' websites from anywhere in the country and purchase a Disruptor. *See, e.g.*, Ex. O (Partisan Disruptor AR-15 FRT, https://firearmsystems.net/product/partisan-disruptor-ar-15-frt/ (last visited Jan. 16, 2026), showing button to "Add to cart"); Ex. P (The Partisan Disruptor AR15 Forced Reset Trigger, https://cloak-industries.com/product/partisan-disruptor-frt/ (last visited Jan. 16, 2026) ("ADD TO CART")).

Even though Partisan's Disruptor is a copy of RBT's FRT-15L3 forced reset trigger, Partisan incorrectly describes the Disruptor on its website as an "***assisted*** reset trigger," Ex. M— which is a different type of trigger altogether. Ex. Q, ¶ 16. In particular, where a forced reset trigger uses a mechanism to ***fully*** reset the trigger, an assisted reset trigger's mechanism only ***partially*** resets the trigger. As Mr. Luettke explains in his declaration, both RBT's FRT-15L3 and Partisan's accused Disruptor are ***forced*** reset triggers because (1) the Partisan is a copy of the FRT-15L3, and (2) and their mechanisms fully return the trigger to the reset state. Ex. Q, ¶¶ 11, 16. Notably, Partisan's dealers' websites, and some portions of Partisan's own website, correctly describe the Disruptor as a forced reset trigger. *See, e.g.*, Dkt. 1, Ex. J; Ex. O, (Partisan Disruptor AR-15 FRT, https://firearmsystems.net/product/partisan-disruptor-ar-15-frt/ (last visited Jan. 16, 2026) ("3 Position Drop-In Forced Reset Trigger")); Ex. P (The Partisan Disruptor AR15 Forced Reset Trigger, https://cloak-industries.com/product/partisan-disruptor-frt/ (last visited Jan. 16, 2026)). Partisan's advertisement of the Disruptor as an ***assisted*** reset trigger is therefore false and misleads consumers about the nature, design, and operation of the Disruptor product.

Partisan also tells the public that its Disruptor implements, and is covered by, U.S. Patent No. 9,146,067 ("'067 Patent"), which issued to Partisan's employee Michael Stakes. Ex. M ("The

Disruptor (US Patent 9146067) is an assisted reset trigger . . . ."); Ex. G (stating Michael Stakes is "Group Engineer" at Partisan); Ex. R, Cover Page (listing Michael Stakes as Applicant and Inventor). However, as Mr. Luettke explains, that too is incorrect, and the FRT-15L3 and Disruptor *do not practice* any claim of the '067 Patent. Ex. Q, ¶ 46. The '067 Patent's independent claims 1, 4, 8, 11, and 15—and thus all their dependent claims, 35 U.S.C. § 112(d)—all require a "reset lever" that is struck by a hammer. *See* Ex. R, 19:11-12, 19:27-40 (independent cl. 1);[3] 19:53-54, 20:4-17 (independent cl. 4); 20:35-36, 20:50-62 (independent cl. 8); 21:9-10, 21:25-37 (independent cl. 11); 21:55-56, 22:5-17 (independent cl. 15); Ex. Q, ¶ 42. The FRT15-L3 and Disruptor products do not have any such component. Ex. Q, ¶ 43. Claim 19 (the only remaining claim) requires a selector that permits different amount of trigger travel for different selected operating modes, Ex. R, 22:41-64 (independent cl. 19); Ex. Q, ¶ 44, and neither the FRT-15L3 nor the Disruptor feature any such differences. Ex. Q, ¶ 45. Therefore, Partisan's advertisement that its Disruptor product practices the '067 Patent is false and misleads consumers.

Given that Partisan copied the FRT-15L3, and that its own employee is the named inventor on the '067 Patent, Partisan can hardly be unaware of what it is doing—i.e., making incorrect public statements about the nature and legitimacy of its product to attract and syphon RBT's customers.

## ARGUMENT

The Court should grant a TRO and a preliminary injunction to preserve the status quo throughout this litigation because all applicable factors are satisfied.

---

[3] Claims that depend from an independent claim include all the requirements of the independent claim. 35 U.S.C. § 112(d).

## I.  Legal Standards

The patent statue authorizes this Court to grant injunctive relief "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  "When addressing a motion for temporary restraining order, the court applies the same standard as it applies to a motion for preliminary injunction." *Speight v. Gordon*, 582 F. Supp. 3d 897, 902–03 (D. Wyo. 2022) (internal quotation marks omitted) (quoting *Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1289 (D. Kan. 2018)).  Such relief may be granted to preserve the status quo pending a determination of the action on the merits. *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992); Fed. R. Civ. P. 65(a).

"[A] preliminary injunction enjoining patent infringement pursuant to 35 U.S.C. § 283 'involves substantive matters unique to patent law and, therefore, is governed by the law of [the Federal Circuit].'"  *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525 (Fed. Cir. 2012) (quoting *Hybritech Inc. v. Abbot Lab'ys*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988)).  To obtain a preliminary injunction, the moving party must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024).  The purpose of a TRO is to maintain the status quo until a preliminary injunction hearing can be held.  *Biles v. Schneider*, No. 19-CV-48, 2019 WL 13222745, at *1 (D. Wyo. Mar. 26, 2019).

## II.  The Plaintiffs Are Likely to Succeed on the Merits

The Plaintiffs are likely to succeed on the merits.  As for Plaintiffs' patent infringement claims, the evidence establishes that ABC owns the asserted patents and RBT is their exclusive licensee, that the accused Disruptor meets all the asserted claims and is a copycat of RBT's FRT-15L3 patent-implementing product, and that the Defendants have never raised a substantial

question of invalidity or unenforceability despite being aware of the asserted patents. *E.g.*, *Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007). As for Plaintiffs' false advertising claims, the evidence establishes that Partisan willfully makes public false statements about the design and legitimacy of the Disruptor to syphon RBT's would-be FRT-15L3 customers.

## A. The Plaintiffs Are Likely to Succeed on Their Patent Infringement Claims

### 1. The Plaintiffs Own All Substantial Rights in the Asserted Patents

An assignee and exclusive licensee have standing to sue for patent infringement. *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1358–59 (Fed. Cir. 2010). Here, ABC has standing because it owns all substantial rights to the asserted patents based on the following assignments:

| Execution Date | Assignments of the '223 Patent | Exhibit |
|---|---|---|
| Sept. 26, 2018 | Named inventor Jeffrey Cooper Rounds to Wolf Tactical LLC | Ex. S (Reel/Frame 46989/0991) |
| May 7, 2020 | Wolf Tactical, LLC to Rare Breed Triggers, LLC | Ex. T (Reel/Frame 52893/0732) |
| Dec. 8, 2020 | Rare Breed Triggers, LLC to ABC IP, LLC | Ex. U (Reel/Frame 71006/0717) |

| Execution Date | Assignments of the '003, 336, and '807 Patents | Exhibit |
|---|---|---|
| Oct. 21, 2022 | Inventor Mladen Thomas Strbac to ABC IP, LLC | Ex. V (Reel/Frame 61499/0329) |

RBT also has standing as the exclusive licensee of the asserted patents. Ex. B; Ex. C.

### 2. The Asserted Patents Are Valid and Enforceable

The asserted patents are also valid and enforceable. The asserted patents are presumed valid at every stage of litigation. *E.g.*, *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015). To avoid a TRO and/or preliminary injunction, the Defendants must raise a "substantial question of invalidity," and if they do, then "the burden shifts back to the patentee to present contrary evidence that they are likely to succeed at trial on the validity issue." *Fred*

*Hutchinson Cancer Rsch. Ctr. v. BioPet Vet Lab, Inc.*, No. 2:10CV616, 2011 WL 1119565, at *2 (E.D. Va. Mar. 1, 2011) (citing *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009)) (cleaned up).

To date, the Defendants have not challenged any of the asserted patents' validity, despite being aware of the asserted patents and knowing that this case was forthcoming. As mentioned above, Partisan's website expressly lists the '223, '003, and '336 Patents as part of a "FRT Legal Library." *See supra* SOF, § III.A. Fully aware of the patents and their application to Defendants' FRT products, the Defendants have had the opportunity to challenge the asserted patents but have not done so. The asserted patents' presumption of validity, combined with the lack of any showing of a meritorious invalidity or enforceability defense, is sufficient to establish a reasonable likelihood that the patents are valid and enforceable. *AMVAC Chem. Corp. v. Aceto Agric. Chems. Corp.*, No. 1:08-CV-1617-CC, 2008 WL 2456076, at *1 (N.D. Ga. May 8, 2008); *Miche Bag, LLC v. Thirty One Gifts LLC*, No. 2:10-CV-781 TS, 2010 WL 3629686, at *3 (D. Utah Sept. 13, 2010).

### 3. The Defendants' Accused Disruptor Product Likely Infringes the Asserted Patents

Determining the likelihood of infringement involves a two-step analysis:[4] first, a court construes the patent claims; second, the court compares the construed claims to the accused product. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

*First*, claim construction is a question of law for the Court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The Federal Circuit has "frequently stated that the words of a claim are generally given their ordinary

---

[4] Infringement also requires a lack of authorization for the accused conduct. 35 U.S.C. § 271(a) ("[W]hoever **without authority** makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." (emphasis added)). Here, this requirement is met because neither ABC nor RBT has ever authorized the Defendants' infringing conduct.

and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art . . . at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (quotation omitted). Since *Phillips*, that court has explained that the plain meaning of claim language should govern absent certain limited circumstances, namely: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Here, the asserted claim language should carry its plain and ordinary meaning. The asserted patents contain no lexicography or disavowal that would require assigning any different meaning. *See generally* '223 Patent; '003 Patent.[5] Moreover, because the claims "use language in its ordinary, rather than technical, sense," construing the claims should involve "the application of the widely accepted meaning of commonly understood words." *Miche*, 2010 WL 3629686, at *2 (quoting *Phillips*, 415 F.3d at 1314); Ex. Q (showing claim language met by the Defendants' accused Partisan Disrupter product).

**Second**, technical expert Brian Luettke's declaration comparing the claim language to the Defendants' accused Partisan Disrupter product shows infringement. Ex. Q, ¶¶ 26–38; *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005); *Miche*, 2010 WL 3629686, at *2–3 (granting a temporary restraining order after the court compared the asserted claims—read in light of definitions supplied by the plaintiff—to the accused products). Mr. Luettke's expert declaration shows infringement by mapping each claim limitation of at least one claim of each asserted patent onto the corresponding aspects and features of the Defendants' accused Partisan Disrupter product. *See* Ex. W (mapping each limitation of claim 4 of the '223 Patent onto the

---

[5] The '003, '336, and '807 Patents share a common specification.

corresponding features of the Defendants' accused Partisan Disrupter product); Ex. X (same for claim 4 of the '003 Patent); Ex. Y (same for claim 3 of the '336 Patent); Ex. Z (same for claim 1 of the '807 Patent). The Plaintiffs' comparison is more than sufficient to show a likelihood of success on the merits of infringement.

### B. The Plaintiffs Are Likely to Succeed on Their False Advertising Claim

False advertising under 15 U.S.C. § 1125(a)(1)(B) "requires the plaintiff to allege the false or misleading statements were made in commercial advertising or promotion." *Wyoming Beverages, Inc. v. Core-Mark Int'l, Inc.*, No. 17-CV-116-F, 2018 WL 8221068, at *13 (D. Wyo. Jan. 4, 2018); 15 U.S.C. § 1125(a)(1)(B). Section 1125(a)(1)(B) provides in relevant part:

> Any person who, on or in connection with any goods . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her . . . goods . . . or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

Partisan falsely describes its Disruptor product in at least two respects in its website's widely-available public advertisements. *First*, Partisan repeatedly incorrectly calls the Disruptor an "assisted reset trigger" on its website. *See supra* SOF, § III.C. As Mr. Luettke explains, this is wrong, and instead the Disruptor is a forced reset trigger. Ex. Q, ¶ 16. The difference is not academic, because the two triggers are designed and operate in different ways: whereas a forced reset trigger uses a mechanism to *fully* reset the trigger, an assisted reset trigger's mechanism only *partially* resets the trigger. *Id.* Certain parts of Partisan's own website, and its dealers' websites, confirm that the Disruptor is actually a forced reset trigger. *See supra* SOF, § III.C. It cannot be both types.

**Second**, Partisan incorrectly claims that the Disruptor is covered by the '067, on which Partisan's employee Michael Stakes is a named inventor. *See supra* SOF, § III.C; Ex. Q, ¶¶ 46–47. This public assertion tends to increase the legitimacy of the product from a consumer's perspective, Ex. AA, ¶ 20, and therefore serves as a marketing statement designed to attract customers to buy Partisan's accused Disruptor.

These statements in Partisan's public commercial advertising harm RBT. For the reasons discussed further below and in Dr. Warty's declaration, Partisan's syphoning of RBT's FRT15-L3 customers is likely to cause RBT irreparable harm. *See infra* § III. For these reasons, the Plaintiffs are likely to succeed on their claim for false advertising.

## III. The Plaintiffs Will Suffer Irreparable Harm Without the Requested Injunctive Relief

The Plaintiffs have already suffered and, absent the requested relief, will suffer more irreparable harm from "price erosion, loss of market share, harm to its reputation, and a loss of business opportunities"—factors which "[t]he Federal Circuit has held . . . can constitute irreparable harm." *Miche*, 2010 WL 3629686, at *3 & n.27 (collecting cases). This is especially so here since Defendants' product appears to be nothing more than a cheap knockoff of Plaintiffs' product and since Defendants have begun flooding the market with thousands of additional units in response to this lawsuit, as discussed above. *See supra* SOF, § III.B.

As economic expert Dr. Samir Warty's declaration explains, the risk of irreparable harm to RBT is acute given the durable, long-lasting nature of the products in question. Ex. AA, ¶¶ 4, 8, 12. A rifle owner likely only needs to buy one trigger product for the life of his or her rifle—which can survive generations. Ex. Q, ¶ 12, Ex. AA, ¶ 8. Moreover, because the triggers can be retrofitted onto any existing AR-15 style rifle, a customer can buy one trigger and use it across multiple rifles already in his or her possession—albeit not simultaneously. Ex. Q, ¶¶ 13–15, Ex.

AA, ¶ 9.  For these reasons, the Defendants' sales of infringing triggers likely translate directly into permanently lost sales, customers, and business opportunities for RBT, and RBT is unlikely to ever make up those losses.  Ex. AA, ¶¶ 8–15.  Courts have recognized the irreparable harm in such circumstances.  *E.g.*, *BioPet Vet Lab, Inc.*, 2011 WL 1119565, at *4.

Further, because its accused Disrupters are sold at prices such as $300, the Defendants are eroding RBT's $450 price by a sizable margin of 33% (or $150).  Ex. AA, ¶¶ 16–18.  The Defendants' pricing has already diverted and will continue to divert a significant number of RBT's customers.  *See* Ex. AA, ¶¶ 5 (price factors play a role in competitive position), 16.  As explained above, RBT is unlikely to ever regain those diverted customers and sales.  Ex. AA, ¶¶ 8, 10–12.

The Plaintiffs have also already suffered and will continue to suffer reputational harm and loss of goodwill.  The Defendants' undercutting of RBT's price by itself harms RBT's reputation by incorrectly suggesting to customers that RBT's pricing is uncompetitive.  Ex. AA, ¶ 26.  The Defendants have also popularized labeling RBT as a "bully" and "Rare Greed" instead of "Rare Breed" in key public forums such as AR15.com.  *See* Ex. AA, ¶¶ 16, 26 (harm resulting from perceived unreasonable pricing).  Courts have recognized reputational damage as irreparable harm favoring injunctive relief.  *See, e.g.*, *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156–57 (10th Cir. 2001); *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1208 (Fed. Cir. 2017); *AMVAC*, 2008 WL 2456076, at *1.

Irreparable harm to RBT is immediate and ongoing.  Distributors are currently selling the infringing Disruptor product.  Ex. AA, ¶¶ 12 ("The risk of permanent displacement is not hypothetical: Defendants advertise the Partisan Disruptor Trigger as being available now through distributors currently selling the product."), 28–29, 36.  RBT has established "a likelihood of substantial and immediate irreparable injury," and preliminary injunctive relief is an appropriate

remedy. *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (internal quotation marks omitted) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).

Moreover, a money damages award will not adequately compensate RBT. There is no sound reason to believe that the Defendants would be able to satisfy a money judgment; Defendants may well seek to evade efforts to stop infringement and simply migrate infringing conduct to a separate business or location. *See Avvo Inc. v. Liang*, No. 16-CV-892, 2016 WL 8738247, at *2 (D. Ariz. Apr. 4, 2016); Ex. J ("Shroud with deception everything you do . . . ."). This circuit has found irreparable harm where, as here, there is reason to believe damages may be difficult to collect. *See, e.g.*, *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) ("Difficulty in collecting a damage judgment may support a claim of irreparable injury.").

## IV. The Balance of Equities Tips in RBT's Favor

The Court must weigh the "harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017). Generally, this factor will be dispositive only if the balance tips heavily in favor of the accused infringer. *Hybritech Inc.*, 849 F.2d at 1457–58 (affirming grant of preliminary injunction and explaining "we never have required, as a prerequisite to awarding preliminary injunctive relief, that the district court expressly find the existence of this factor").

The Plaintiffs' harms detailed above are severe and threaten the long-term viability of their business. Beyond reputational damage, the Plaintiffs have lost and will continue to lose customers and revenue because of the Defendants' campaign to undercut RBT with infringing copies. *See, e.g.*, *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014) (noting loss

of business to a "new entrant selling a likely-infringing product" was a relevant consideration under balance of equities factor).

In contrast, "light weight" should be accorded to the Defendants' "desire to continue distribution of an infringing product." *AMVAC*, 2008 WL 2456076, at *2; *see also Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). Defendants would not suffer any legally cognizable harm in light of the fact that their actions sought to be restrained are contrary to law and would maintain the status quo. Moreover, because Partisan Triggers has procured patent insurance, the Defendants are at minimal if any risk of harm from the preliminary injunction. *See supra* SOF, § III.B. The balance of equities favors injunctive relief.

## V.    The Public Interest Favors the Requested Relief

The public interest strongly favors enjoining the Defendants' conduct. "[T]he public interest strongly favors enforcement and protection of patent rights." *Syntex (USA) LLC v. Apotex Inc.*, Nos. C 01-02214 MJJ, C 05-02116 MJJ, 2006 WL 1390435, at *3 (N.D. Cal. May 18, 2006); *see also AMVAC*, 2008 WL 2456076, at *2 ("[P]ublic policy favors protection of the rights secured by the valid patents" (citation and quotation marks omitted)). This is even more true when the patent owner practices its own patents, as the Plaintiffs do here. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015) ("[T]he public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."). In a typical patent case, absent "some critical public interest that would be injured by the grant[] of preliminary relief," the public interest favors granting TRO and preliminary injunctive relief. *Miche*, 2010 WL 3629686, at *3 (citing *Hybritech Inc.*, 849 F.2d at

23

1458). No critical public interest would be injured by preliminarily enjoining the Defendants' infringing conduct during this case.

To the contrary, permitting the Defendants to flood the market with the accused 3-position forced reset triggers at severely reduced prices serves no legitimate public interest, and only contradicts the public interest. The DOJ under President Biden restricted the use of these trigger products, and similarly the DOJ under President Trump has permitted RBT to market its triggers *on condition that* RBT (1) "enforce its patents to prevent infringement that could threaten public safety," and (2) "promote the safe and responsible use of its products." Ex. E. In other words, the government has already recognized that enforcement of Plaintiffs' patents is in the public interest.

## VI. The Court Should Require No Security, or Alternatively, Nominal Security

Under Rule 65(c), the movant is required to give security only "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A bond may not be required if there is no evidence the party will suffer damages from the injunction. *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987). The Defendants have not shown and cannot show it would suffer damage if the Court were to grant the requested relief and thus maintain the status quo in this case. Defendants only began marketing their infringing products in late 2025, so the status quo is a market without their low-priced knockoff.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the Plaintiffs' Motion for a TRO and preliminary injunction on the terms described in the Motion and proposed order.

Dated: January 16, 2026

Respectfully submitted,

By: /s/ Travis W. Koch
Nathan Nicholas, Wyo. Bar #7-5078
Travis W. Koch, Wyo. Bar #7-5418
**KOCH LAW, P.C.**
P.O. Box 2660
Cheyenne, WY 82003
(307) 426-5010
(307) 426-4927 (fax)
tkoch@kochlawpc.com
nnicholas@kochlawpc.com

Ben Christoff (DC Bar 1025635)
**FISH & RICHARDSON P.C.**
1000 Maine Avenue SW, Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070
christoff@fr.com

Matthew A. Colvin (TX Bar 24087331)
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
colvin@fr.com

*Attorneys for Plaintiffs*
*Rare Breed Triggers and*
*ABC IP, LLC*

25

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, a copy of the foregoing was filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record.

_/s/ Travis W. Koch_____
Travis W. Koch

.