# EXHIBIT AA



# Declaration of Samir P. Warty, Ph.D.

# In Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction

ABC IP, LLC, a Delaware limited liability company, and Rare Breed Triggers, Inc., a Texas corporation,

**Plaintiffs,**

v.

Peak Tactical, LLC d/b/a Partisan Triggers, a Wyoming limited liability company, and Nicholas Norton, an individual,

**Defendants.**

Submitted by:

Samir P. Warty, Ph.D.
January 16, 2026
United States District Court
District of Wyoming
Case No. 1:26-cv-00018

**Table of Contents**

I.     Qualifications and Assignment ................................................................... 3

II.    Economic Characteristics of the Relevant Market .................................... 4

III.   Economic Mechanisms of Harm from Alleged Infringement ................. 6

    A.     Lost Sales and Permanent Market Displacement ............................. 6

    B.     Distribution and Channel Disruption ............................................... 8

    C.     Price Erosion and Reference Pricing Effects ................................... 9

    D.     Economic Effects of Uncertainty and Market Confusion............... 11

IV.    Reputational Harm ................................................................................... 12

V.     Inadequacy of Monetary Damages ........................................................ 15

VI.    Preliminary Context Regarding Materiality (Non-Quantified) ........... 16

VII.   Conclusion................................................................................................ 18

## I.    Qualifications and Assignment

1.    My name is Samir P. Warty. I am a Director at Secretariat Advisors, LLC ("Secretariat"), a global economic consulting firm specializing in expert testimony, economic analysis, and valuation in complex litigation matters. I have over 15 years of experience in economic and litigation consulting. I have provided consulting support and led teams in a variety of matters in the areas of statistics and econometrics, general commercial litigation, and intellectual property. I have also been retained in multiple client engagements and testified as an expert on statistics, sampling, and extrapolation.[1] A detailed summary of my qualifications is provided in **Appendix 1**.

2.    I have been asked by counsel for Plaintiffs ABC IP, LLC and Rare Breed Triggers, Inc. (collectively, "Plaintiffs") to evaluate the nature and characteristics of economic harm associated with Defendants' alleged conduct regarding the design, production, marketing, and sale of the Partisan Disruptor Trigger for purposes of Plaintiffs' request for preliminary injunctive relief.[2] My opinions address whether the alleged conduct can cause immediate and irreparable economic harm and whether such harm would be inadequately remedied by monetary damages awarded at the conclusion of litigation.

3.    I do not offer legal opinions and do not opine on infringement, validity, or willfulness. I do not quantify damages at this stage. My opinions are based on my professional experience; my review of the Complaint filed in this action and publicly available information; and well-established principles in economics and judicial precedent addressing irreparable harm.[3] A complete list of documents and sources upon which I relied appears in **Appendix 2** to this declaration.

---

[1] Secretariat is compensated at $800 per hour for my time, with lower hourly rates for assisting staff. I am an employee of Secretariat. Neither my compensation nor Secretariat's compensation is contingent on the opinions I express or the outcome of this litigation.

[2] I understand Plaintiffs have also retained Mr. Brian Luettke to examine the Partisan Disruptor Trigger and compare it to U.S. Patent Nos. 10,514,223; 11,724,003; 12,036,336; and 12,274,807. *See* Declaration of Brian Luettke, January 16, 2026 ("Luettke Declaration"), ¶ 2.

[3] *ABC IP, LLC, and Rare Breed Triggers, Inc., v. Peak Tactical, LLC d/b/a Partisan Triggers, and Nicholas Norton*, Complaint for Patent Infringement, False Patent Marking, and False Advertising, January 15, 2026 ("Complaint").

## II.  Economic Characteristics of the Relevant Market

4.   It is my understanding that the products at issue are durable or semi-durable consumer goods that operate within a narrow and specialized product category, namely forced reset trigger ("FRT") mechanisms for AR-pattern firearms.[4,5] From an economic perspective, such markets are best characterized as differentiated niche markets, not commodity markets. Economic theory recognizes that competition in differentiated niche markets differs materially from competition in broad commodity markets because substitution patterns are discrete rather than continuous: a competing product can rapidly displace an incumbent supplier and, in doing so, permanently alter the competitive landscape.[6] Unlike commodity markets where customers routinely switch among multiple sellers based primarily on price, differentiated niche markets often exhibit sharp tipping behavior, meaning that once a substitute gains traction, adoption can accelerate rapidly as customers and intermediaries converge on a single preferred alternative.[7]

5.   In such markets, competitive position is shaped by a combination of price and non-price factors, including access to distribution channels and perceptions of brand identity by dealers and consumers. The economics literature recognizes that when non-price attributes play a

---

[4] Luettke Declaration, ¶¶ 12, 15.

[5] Complaint, ¶¶ 33, 43, 79.

[6] *See* Berry, Steven T. and Philip A. Haile, "Identification in Differentiated Products Markets Using Market Level Data," Cowles Foundation Discussion Paper No. 1744, January 2010, updated February 2010 ("Models of discrete choice between differentiated products play a central role in the modern empirical literature in industrial organization (IO) and are used in a wide range of other applied fields of economics."), available at https://cowles.yale.edu/sites/default/files/2022-09/d1744.pdf, accessed January 11, 2026; "Commodity Substitution, Sample Space and New Goods," Chapter 9, International Monetary Fund ("[E]volutionary commodities are defined as continuations of the service flow of exi[s]ting ones."), available at https://www.imf.org/external/np/sta/tegeipi/ch9.pdf, accessed January 11, 2026; "The Role of Substitution in Commodity Demand," The World Bank ("Substitution among commodities is a complex process and can take place at short- and long-term horizons as well as within and across commodity groups."), available at https://thedocs.worldbank.org/en/doc/727481572033451039-0050022019/original/ CMOOctober2019SpecialFocus.pdf, accessed January 11, 2026.

[7] Tisdell, Clem, and Irmi Seifl, "Niches and economic competition: implications for economic efficiency, growth and diversity," *Structural Change and Economic Dynamics* 15 (2004): 119-135, at 126 ("A successful (niche) segmentation strategy has several advantages for producers. A firm can reduce the intensity of competition by targeting and securing a defensible segment in the market. In doing so, it can virtually exclude substitute products of new entrants. However, the strategy also has risks in a competitive market. These narrow markets are often vulnerable to the changes in taste and demand. Moreover, if demand grows and profits increase beyond a certain point, mass marketers may find new ways to enter the market and compete.").

central role in purchasing decisions, early displacement can lead to durable changes in customer behavior and supplier relationships that do not readily reverse even if the original supplier later reasserts its position.[8] As a result, competitive harm in such markets is not limited to foregone margins on individual sales, but includes longer-term erosion of market position.

6.    Courts evaluating requests for injunctive relief have repeatedly recognized that market share loss and competitive displacement in specialized markets can constitute irreparable harm, particularly where the market is limited in size and the number of meaningful sales opportunities is finite.[9] From an economic standpoint, when each sale represents a meaningful share of total market demand, the loss of those sales during the pendency of litigation has an outsize and potentially permanent impact that cannot be reliably offset through later monetary compensation.

7.    Based on my review of the pleadings and publicly available materials, it is my understanding that the market for FRT mechanisms is narrow, highly visible, and intermediated through a limited set of specialized firearms distributors and dealers that cater to an enthusiast customer base. Products in this category are marketed and sold through a small number of well-known online and brick-and-mortar retailers, where pricing, availability, and brand identity are transparent and readily compared by consumers and dealers alike. Because distributors and dealers in this segment routinely highlight specific trigger designs and manufacturers in marketing materials, product listings, training content, and customer guidance, competitive displacement tends to occur at the level of named products and suppliers rather than through gradual or diffuse substitution. In such an environment, the

---

[8] Bronnenberg, Bart J., and Jean-Pierre Dube, "The Formation of Consumer Brand Preferences," NBER Working Paper Series (2016), p. 33 ("Brand experiences early in life have persistent effects on a consumer's brand choice behavior throughout her lifetime. … Consequently, consumers often consider only a small subset of the available products."), available at https://www.nber.org/system/files/working_papers/w22691/w22691.pdf, accessed January 11, 2026.

[9] *See*, for example, *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975 (Fed. Cir. 1996), available at https://law.justia.com/cases/federal/appellate-courts/F3/103/970/518304/, accessed January 11, 2026 ("Because of the very nature of a patent, which provides the right to exclude, see Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1456, 7 USPQ2d 1191, 1200 (Fed. Cir. 1988) (stating that 'the principle value of the patent is its statutory right to exclude'), infringement of a valid patent inherently causes irreparable harm in the absence of the above or similar exceptions.").

introduction and active distribution of an allegedly infringing trigger through established channels can rapidly redirect dealer attention, shelf space, and customer demand toward the competing product, thereby altering purchasing patterns and channel relationships in ways that are difficult to reverse once established.

## III.    Economic Mechanisms of Harm from Alleged Infringement

### A.  Lost Sales and Permanent Market Displacement

8.    In markets for durable or semi-durable goods, lost sales caused by substitution are generally permanent rather than deferred. Unlike consumable goods, which may be repurchased frequently, durable goods are typically acquired on a one-time or infrequent basis. Functional overlap across competing products can promote operational and economic substitutability, particularly when the overlap pertains to core functionality not otherwise available on the market.[10] As a result, when a customer purchases a competing product and satisfies their need for its core functionality, that purchase exhausts the relevant demand opportunity. Even if the original supplier later prevails in litigation, the customer has no economic reason to repurchase the displaced product. This principle is well established in the economics literature addressing durable goods competition and intertemporal substitution.[11]

9.    When functionally similar accessory products also are compatible with a common set of base products, the accessories compete more directly for the same installed base, which further

---

[10] I understand that the Partisan Disruptor and Rare Breed FRT-15L3™ products are functionally identical and virtually indistinguishable once installed in a firearm. *See* Luettke Declaration, ¶ 11. Further, I understand that the alleged conduct relates to the core functionality of the products rather than peripheral or cosmetic features, and that the same functionality is not available in non-infringing alternative products. *See* Luettke Declaration, ¶¶ 34, 37, 39.

[11] Coase, R.H., "Durability and Monopoly," *Journal of Law and Economics* 15, no. 1 (1972): 143-149, at 144 ("With complete durability [of a good], the price becomes independent of the number of suppliers and is thus always equal to the competitive price."), (using land as an illustrative durable asset to analyze intertemporal substitution). The underlying logic, that a durable good purchase exhausts future demand and that substitution today does not generate offsetting future sales, has been widely applied in the economics literature to durable and semi-durable goods more generally.

increases their substitutability for customers.[12] That is, overlapping compatibility expands the set of customers for whom competing accessory products are viable alternatives.

10. Economic theory further recognizes that substitution in durable goods markets is often front-loaded: competitive entry captures demand that would otherwise have accrued to the incumbent, and that demand does not "return" after the period of competition ends.[13] These effects are magnified in narrow or specialized markets, where the total pool of potential customers is limited and sales opportunities are finite. In such markets, each lost sale represents a meaningful portion of total demand, and displacement early in the market lifecycle can permanently alter competitive outcomes. Once customers adopt a substitute product, network effects, familiarity, and switching costs further reduce the likelihood of later reversion to the original supplier.[14]

11. Beyond the permanence of individual lost sales, substitution during the pendency of litigation can alter the competitive baseline against which future market interactions occur. From an economic perspective, competition is dynamic: market share influences dealer attention, customer awareness, and expectations about which products are likely to remain available and supported. When substitution persists over time, these secondary effects can reshape the incumbent's competitive position in ways that are not reversed simply by a later change in legal outcome.

12. Accordingly, in the context of durable goods sold in a constrained or specialized market, ongoing substitution during litigation creates a risk of cumulative economic harm that extends beyond the initial lost transaction. Even if monetary damages could later be

---

[12] I understand that the Partisan Disruptor and Rare Breed FRT-15L3™ products are compatible with the same types of AR-pattern firearms. *See* Luettke Declaration, ¶¶ 11, 13-15. *See also* "The Disruptor FRT - Partisan Triggers," available at https://partisantriggers.com/the-disruptor/, accessed January 11, 2026, and "FRT 15L3 Trigger For Sale | 24 Hours Delivery | Premium FRT," available at https://rarebreedstrigger.com/shop/frt-15l3-trigger/, accessed January 11, 2026.

[13] Coase, R.H., "Durability and Monopoly," *Journal of Law and Economics* 15, no. 1 (1972): 143-149.

[14] Bronnenberg, Bart J., and Jean-Pierre Dube, "The Formation of Consumer Brand Preferences," NBER Working Paper Series (2016) ("Brand experiences early in life have persistent effects on a consumer's brand choice behavior throughout her lifetime. … Consequently, consumers often consider only a small subset of the available products."), available at https://www.nber.org/system/files/working_papers/w22691/w22691.pdf, accessed January 11, 2026.

estimated for discrete sales, such damages would not restore the competitive conditions that existed before displacement began. This dynamic erosion of competitive position provides an economic basis for concluding that later monetary relief may be insufficient to prevent lasting harm during the pendency of the case. The risk of permanent displacement is not hypothetical: Defendants advertise the Partisan Disruptor Trigger as being available now through distributors currently selling the product.[15]

### B. Distribution and Channel Disruption

13. In specialized product markets, manufacturers often rely on a limited number of distributors and dealers to reach end customers.[16] Distribution networks are not merely conduits for price transmission but are central to a supplier's competitive position: intermediaries invest in inventory, training, customer service, and marketing that are tailored to specific products and brands. Economic research on switching costs and network effects shows that once intermediaries adopt a competing product, a combination of switching costs, sunk investments, and coordination effects can make such shifts *sticky* and difficult to reverse because dealers and resellers face costs, both monetary and reputational, when switching back.[17]

14. Dealers who adopt a competing product may reorganize key aspects of their business around that product, including inventory management, sales and marketing efforts, staff training, and customer education. Distributors, in turn, may commit to product-specific inventory positions, compliance diligence, and supplier relationships that determine which products

---

[15] *See*, for example, "Where to Find - Partisan Triggers", available at https://partisantriggers.com/where-to-find/, accessed January 11, 2026.

[16] *See* "7 Types of Distributors (Plus Considerations for Choosing One)," Indeed, December 11, 2025 ("Exclusive distribution is the approach of using limited sales outlets only available in specific locations or stores with the mindset of creating rarity and exclusivity of an item or brand. It is most common for marketing and distributing luxury brands, though a variety of brands and products use exclusive distributors sometimes. ... Exclusive distribution deals allow greater control over contract negotiations, rates and product distribution because fewer entities are involved."), available at https://www.indeed.com/career-advice/career-development/types-of-distributors, accessed January 11, 2026.

[17] Farrell, Joseph and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects," *Working Paper* (2006) ("Switching costs and network effects bind customers to vendors if products are incompatible, locking customers or even markets in to early choices."), available at https://www.nuff.ox.ac.uk/economics/papers/2006/w7/Farrell_KlempererWP.pdf, accessed January 11, 2026.

are broadly available to the market. Once either level of the distribution chain has invested in these product-specific capabilities, those investments may not readily transfer back to the original supplier's product even if the competing product is later enjoined. This is especially true in markets where brand familiarity, dealer confidence, and distributor support jointly influence purchasing behavior; once dealers and distributors have shifted focus and relationships toward a competitor, the original supplier's access to those same channels can be materially weakened.

15.    The industrial organization literature on switching costs recognizes that competitive displacement caused by patent infringement can have durable economic effects when intermediaries make product-specific investments. In the market for firearm trigger mechanisms, distributors and dealers typically incur sunk, product-specific costs tied to particular designs and suppliers, including inventory commitments, product training, marketing materials, customer education, and diligence relating to legal and regulatory exposure.[18] When an allegedly infringing trigger displaces the patented product in dealer channels, intermediaries may reallocate shelf space, promotional effort, and customer guidance toward the infringing alternative. These product-specific investments create switching costs that make subsequent reversion economically unattractive even if the infringing product is later enjoined. As a result, patent-driven displacement from established distribution channels can durably reconfigure dealer incentives and purchasing behavior, producing long-lived economic harm that cannot be reliably reconstructed or undone through *ex post* monetary compensation.

### C. Price Erosion and Reference Pricing Effects

16.    Entry of a competing product can exert downward pressure on prices, particularly in markets where pricing is visible or transparent and where customers and intermediaries use price as an anchor in purchase decisions. In such environments, price becomes a reference point, a benchmark against which future transactions are judged. When a new entrant offers a similar

---

[18] Klemperer, Paul, "Competition When Consumers Have Switching Costs: An Overview with Applications to Industrial Organization, Macroeconomics, and International Trade," *Review of Economic Studies* 62, no. 4 (1995): 515–539.

product at a lower price, that lower price tends to become a reference for dealers and end customers alike.[19] Further, the incumbent may immediately suffer lost sales to the extent that such pricing differences divert customers to the new entrant, *e.g.*, if pricing differences are perceived to reflect factors other than product quality or reliability. Economic research shows that when prices fall in a competitive setting, they often persist at or near the lower level even after competitive conditions change, because buyers adjust their expectations and renegotiate future purchases around the new reference point.[20]

17. This phenomenon, known as price erosion, can have durable effects on a firm's pricing power, *i.e.*, its ability to sustain higher prices in future negotiations. Once buyers internalize a lower reference price, firms may find it difficult to return to prior price levels without losing sales. Economic studies of price behavior emphasize that price erosion is not necessarily temporary; it can create sticky pricing benchmarks, particularly in markets with transparent competitive information and frequently repeated transactions.[21]

18. From an economic standpoint, even temporary price reductions triggered by the presence of a competing product can have long-term consequences for a firm's revenue and competitive position if those reductions reset buyer expectations and recalibrate reference prices. This effect is distinct from a short-term volume or promotional discount as it reflects an adjustment in how market participants value products and negotiate terms over time.

19. Courts evaluating requests for injunctive relief in patent and unfair competition contexts have recognized that price erosion may constitute irreparable harm where it cannot be

---

[19] I understand that the Partisan Disruptor is marketed at a substantially lower price point than the Rare Breed FRT-15L3™. *See*, for example, "New! Partisan Triggers The Disruptor Rifle Trigger Up to $25.00 Off w/ Free S&H — 2 models," OpticsPlanet, available at https://www.opticsplanet.com/partisan-triggers-the-disruptor-rifle-trigger.html, accessed January 14, 2016; and "FRT-15L3™ Forced Reset Trigger for the AR-15," Rare Breed Triggers, available at https://rarebreedtriggers.com/product/frt-15l3-2/, accessed January 14, 2026.

[20] Nagle, Thomas T. and Georg Müller, *The Strategy and Tactics of Pricing,* 6th ed. (New York: Routledge, 2018), p. 19 ("In the terminology of economics, good [pricing] policies enable prices to change along the demand curve without changing expectations in ways that cause the demand elasticity to 'shift' adversely for future purchases.").

[21] *See,* for example, Funaki, Yukihiko, *et al.*, "Price stickiness and strategic uncertainty: An experimental study," *Journal of Economic Dynamics and Control* 180 (2025), at abstract ("We find persistent price stickiness when prices are strategic complements and fully anticipated shocks lower the equilibrium price.").

reliably reversed or reconstructed through monetary damages.[22] Indeed, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions,"[23] particularly when the lower price becomes the market norm and cannot be unwound by a damage award alone.[24]

### D. Economic Effects of Uncertainty and Market Confusion

20.    Building on the general market sensitivities described above, the allegations in this case include conduct that may give rise to uncertainty and market confusion by affecting perceptions regarding brand identity and legitimacy of products in the market. From an economic perspective, perceived uncertainty operates as a form of non-price risk that directly enters dealer and consumer decision-making. Uncertainty and market confusion can materially alter expected payoffs associated with purchasing, reselling, or stocking a product. Buyers or intermediaries faced with uncertainty may rationally postpone purchases, substitute toward alternatives perceived as lower risk, or reduce inventory commitments altogether.[25] The perception of patent protection (e.g., communicated through "patented" or "patent pending" markings in advertising) can be attractive to consumers as a source of perceived quality and legitimacy in the market.[26]

---

[22] See *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336 (Fed. Cir. 2013) (recognizing *price erosion* among "valid grounds" for irreparable harm in a competitive patent case), available at https://www.casemine.com/ judgement/us/5914e688add7b0493490efcd?utm, accessed January 11, 2026.

[23] See *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336 (Fed. Cir. 2013), available at https://www.casemine.com/judgement/us/5914e688add7b0493490efcd?utm, accessed January 11, 2026.

[24] *See* National Research Council, *Reference Manual on Scientific Evidence*, 3rd ed. (Washington, DC: The National Academies Press, 2011), p. 441 ("In more complicated situations, the damages analysis may need to focus on how an entire industry would be affected by the defendant's wrongdoing."), available at https://www.fjc.gov/sites/ default/files/materials/21/SciMan3D01.pdf, accessed January 11, 2026.

[25] Londono, Juan M., *et al.*, "Costs of Rising Uncertainty," Federal Reserve, available at https://www.federalreserve.gov/econres/notes/feds-notes/costs-of-rising-uncertainty-20250424.html, accessed January 11, 2026 ("Three effects of rising uncertainty are common across measures: (1) delayed or reduced investment and hiring, (2) more cautious consumer behavior, and (3) tighter credit conditions. Facing uncertainty, firms and households tend to postpone investment and larger purchases preferring to shepherd their resources until the underlying conditions are clearer.").

[26] *See*, for example, Anderson, J. Jonas, "Nontechnical Disclosure," *Vanderbilt Law Review* 69, no. 6 (2016):1573-1602, at 1594 ("Obtaining (and advertising) one's patent informs the world that what one has done is innovative/ well-made/sexy."), available at  https://cdn.vanderbilt.edu/vu-wp0/wp-content/uploads/sites/89/2016/11/

21. From an economic standpoint, the effects of uncertainty and market confusion are particularly difficult to observe or measure after the fact because the relevant counterfactual—how demand and channel relationships would have evolved in the absence of uncertainty—is fundamentally unobservable. Once uncertainty has altered purchasing patterns, inventory decisions, and dealer behavior, there are no reliable *ex post* market signals that allow reconstruction of the demand path that would have occurred under stable conditions. Economic research further shows that when consumers or intermediaries face uncertainty or misinformation, demand adjustments occur through belief updating and switching behavior that shift the future position of the demand curve. Because these adjustments operate through expectations, reputation, and perceived risk rather than through contemporaneous price changes alone, subsequent market data cannot reliably reveal the demand that would have existed absent the confusion. As a result, the economic effects of uncertainty and market confusion are inherently path-dependent and not readily amenable to retrospective quantification.[27]

## IV.  Reputational Harm

22. Reputational harm in differentiated niche markets can have broader economic consequences for market participants. In such markets, dealers and end customers generally consider not only the price and quality of a product but also its brand identity and perceived legitimacy when making purchasing decisions. When a product becomes associated with uncertainty or negative perceptions, this association can extend beyond a single item into broader perceptions of the supplier's entire product line or brand. From an economic perspective, this phenomenon reduces demand not only for the specific product at issue but also for the supplier's related offerings that share technological, brand, or channel associations.

---

30103806/Nontechnical-Disclosure.pdf, accessed January 16, 2026;  Billy, Alexander and Neel Sukhatme, "Perception Pending: What Do Patents Signal to Consumers?" *Journal of Empirical Legal Studies* 22, no. 2 (2025): 163-184, at 163 ("In an online randomized experiment, we demonstrate how increasing the salience of patent status heightens consumers' beliefs that products are innovative and well made."), available at https://repository.law.umich.edu/facarticles/3111/, accessed January 16, 2026.

[27] Shapiro, Carl, "Consumer Information, Product Quality, and Seller Reputation," *FTC Bureau of Economics Working Paper* No. 42 (1980), pp. 1, 6–7, 11–12, 23, available at https://www.ftc.gov/system/files/documents/reports/consumer-information-product-quality-seller-reputation/wp042.pdf, accessed January 11, 2026.

23.    Economists describe this phenomenon as reputational harm, where uncertainty or negative signals associated with one product contaminate perceptions of related products or the supplier. In a competitive context, such contamination alters the information environment facing dealers and consumers, leading them to update expectations about quality and risk. Because these updated expectations influence future purchasing behavior, reputational harm is path-dependent, that is, once buyer confidence is undermined, restoring it is difficult even if the underlying uncertainty is later resolved.[28]

24.    From a behavioral economics perspective, reputational effects are magnified when they involve products that are marketed as premium or differentiated. Research on reputational capital in markets demonstrates that trust, perceived legitimacy, and risk perceptions are integral components of economic value and market stability.[29] Firms with high reputational capital may command pricing power and dealer loyalty, whereas those with low reputational capital may face reduced willingness to pay and limited distribution access.

25.    Courts have long recognized that loss of goodwill and reputational injury constitute classic forms of irreparable harm in the context of injunctive relief, particularly where compensatory damages would depend on speculative reconstruction of buyer perceptions or lost intangible assets. Judicial commentary emphasizes that harms such as damaged reputation and loss of customer confidence are "difficult to quantify" and not readily susceptible to later monetary compensation precisely because they involve expectations and relationships that cannot be recreated after the fact.[30]

---

[28] *See* Jia, Justin, Jia Li, and Weixin Liu, "Expectation-based consumer purchase decisions: behavioral modeling and observations," *Marketing Letters* (2022): 1-17, at abstract ("Expectations play important roles in consumers' purchase decisions. Among many types of expectations, consumers often form expectations on future market conditions when purchasing goods or services."), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9676804, accessed January 11, 2026.

[29] Rindova, Violina P. *et al.*, "Being Good or Being Known: An Empirical Examination of the Dimensions, Antecedents, and Consequences of Organizational Reputation," *Academic of Management Journal* 48, no. 6 (2005): 1033-1049, at 1033 ("The concept of reputation, defined as stakeholders' perceptions about an organization's ability to create value relative to competitors, has received considerable attention from organizational scholars [and]...research has demonstrated unambiguously that a favorable organizational reputation is associated with economic benefits.").

[30] See *Porous Media Corporation v. Pall Corporation,* 173 F.3d 1109 (8th Cir. 1999), at fn. 12 ("Reputational damages are often difficult to quantify."), available at https://law.justia.com/cases/federal/appellate-courts/F3/173/1109/548152/, accessed January 11, 2026.

26.    In intellectual property cases specifically, courts have held that reputational effects beyond the directly accused product can support injunctive relief where the plaintiff would suffer harm to customer goodwill and channel confidence that cannot be adequately remedied through damages awards.[31] Such reputational impairment can also give rise to price erosion, as discussed above, as reduced perceptions of quality or differentiation exert downward pressure on market prices, producing durable economic harm that is not readily quantifiable and may persist even after liability is adjudicated.[32] Likewise, price erosion can itself lead to reputational harm to the higher-priced retailer by signaling lower perceived quality or unreasonably high pricing, thereby weakening brand value and positioning in the market.[33]

27.    Given these economic and judicial understandings, reputational effects present economic harm that cannot be fully isolated or reconstructed through observed price or sales outcomes alone. Although such effects ultimately influence future cash flows, they do so by altering expectations, risk perceptions, and channel relationships in ways that may not be reliably disentangled from other market dynamics after the fact. As a result, even comprehensive *ex*

---

[31] Tambaro, Louis, "Commercial Litigation Stop! … In the Name of Injunctions: The Benefits of Seeking Temporary Restraints and Injunctive Relief in Intellectual Property Disputes and Measures for Litigation Avoidance," Offit Kurman, April 29, 2025 ("Intellectual property is often the backbone of a company's identity, growth, and success. Whether it's a unique product design, a trademarked logo, or a trade secret that fuels innovation, IP represents a competitive edge that must be protected. Unfortunately, when IP is stolen, misused, or infringed upon, the consequences can be severe, ranging from lost revenue and market share to irreparable damage to the company's reputation. ...[B]usinesses do not have to wait for a full trial to start protecting their rights. In cases of IP infringement or misuse, courts offer remedies like temporary restraints and injunctive relief."), available at https://www.offitkurman.com/offit-kurman-blogs/injunctive-relief-ip-disputes, accessed January 11, 2026.

[32] *See* National Research Council, *Reference Manual on Scientific Evidence*, 3rd ed. (Washington, DC: The National Academies Press, 2011), p. 441 ("Price erosion is a common issue in quantifying intellectual property damages. However, price erosion may be an issue in many other commercial disputes. For example, a plaintiff may argue that the disparagement of its product due to false advertising has eroded the product's price."), and fn. 26, citing *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081 (7th Cir. 1994) ("finding that the plaintiff's damages only consisted of lost profits before consideration of price erosion, prejudgment interest, and costs due to the presence of other competitors who would keep prices low"), available at https://www.fjc.gov/sites/default/files/materials/21/SciMan3D01.pdf, accessed January 11, 2026.

[33] *See* "Price Erosion: What Is It, and How Do You Stop It?" GreyScout, February 13, 2024 ("Naturally, consumers enjoy steeply discounted brand-name products. However, while low prices can be great for consumers, they can damage a brand's reputation and how the market perceives its products."), available at https://greyscout.com/price-erosion-what-is-it-and-how-do-you-stop-it/, accessed January 14, 2026. *See also* Langer, Daniel, "Luxury Unfiltered: The true cost of cutting luxury prices," Luxury Daily, September 11, 2024 ("A key principle in luxury is that perceived value is far more important than actual value. The minute a brand offers a discount, it sends a signal that the original price was inflated or unjustified."), available at https://www.luxurydaily.com/luxury-unfiltered-the-true-cost-of-cutting-luxury-prices/, accessed January 15, 2026.

*post* damages analysis may be unable to measure these effects with sufficient precision, and monetary damages alone may not adequately remedy the resulting harm, supporting the need for prompt injunctive relief.

## V.    Inadequacy of Monetary Damages

28.    Even with full discovery, it is often not possible, particularly at the preliminary injunction stage, to reconstruct with precision what sales were lost due to substitution by a competitor, which customers were deterred by perceived uncertainty, or how prices would have evolved absent the alleged conduct. Dynamic markets are shaped by interactions among customers, intermediaries, and competitors over time, making the counterfactual path of demand inherently unobservable at any given point in time. Economists refer to this as the *ex post* reconstruction problem: because one cannot directly observe the world that would have existed in the absence of the alleged conduct, early attempts to attribute specific lost sales or pricing effects necessarily involve uncertainty. While subsequent discovery and analysis may permit estimation of damages using accepted economic methods, the inability to reliably isolate and measure these effects in real time underscores why monetary damages are often inadequate to prevent ongoing harm during the pendency of litigation. This limitation is well-recognized in the literature on market dynamics and inference under uncertainty, which emphasizes the difficulty of identifying causal effects after outcomes have been altered by competing influences.[34]

29.    Moreover, the economic harm described above, including lost sales, channel disruption, price erosion, and reputational effects, is non-linear: it accumulates and compounds as time goes on. Each additional period of alleged infringement increases the likelihood that competitive displacement will become entrenched, that price expectations will be reset at lower levels, and that dealer and consumer perceptions of risk and uncertainty will solidify. Because these effects interact, the overall harm is not simply additive but path-dependent:

---

[34] *See*, for example, Healy, Paul M. *et al.*, "Market Competition, Earnings Management, and Persistence in Accounting Profitability Around the World," *Review of Accounting Studies (forthcoming)* (2014) ("While our results [for accounting returns mean reversion] are consistent with economic theory, we recognize that it is difficult to attribute causality, especially given various alternative channels that drive competitive forces in an economy (*e.g.*, government regulation).", available at https://dash.harvard.edu/server/api/core/bitstreams/ 7312037d-586c-6bd4-e053-0100007fdf3b/content, accessed January 11, 2026.

earlier harms magnify later ones, and harms at each point in time affect the baseline from which future harms accrue. This path dependence means that later monetary relief cannot fully undo cumulative market effects incurred over time, even if damages are calculated accurately at the end of litigation.[35]

30. Courts evaluating requests for injunctive relief have consistently held that where damages would require speculative reconstruction of lost sales, channel effects, or market conditions, monetary relief is inadequate. For example, lost profits and loss of goodwill can be inherently difficult to measure when they stem from market uncertainty that evolves over time.[36] This principle reflects a recognition that money damages cannot fully restore what has been lost, such as customer relationships, distribution channels, or competitive positioning, and that retrospective quantification cannot reliably replicate the dynamic competitive landscape that would have existed in the absence of the alleged wrongful act.

31. Accordingly, from an economic perspective, the inadequacy of monetary damages is grounded in fundamental limitations of measurement and reconstruction in real markets, and not merely in uncertainty about specific numbers. When harms are structural, path-dependent, and interactive, retrospective compensation cannot unwind the cumulative effects of displacement, erosion, and reputational change.

## VI.    Preliminary Context Regarding Materiality (Non-Quantified)

32. It is my understanding that the alleged conduct concerns a product category that is central to Plaintiffs' competitive positioning. In economic terms, harm to core products, *i.e.*, those that generate a significant share of revenue, market reputation, or strategic advantage, can have

---

[35] On path dependence and cumulative effects in economic systems, *see* David, Paul A., "Clio and the Economics of QWERTY," *American Economic Review* 75, no. 2 (1985): 332–337, at 332 ("...it is sometimes not possible to uncover the logic (or illogic) of the world around us except by understanding how it got that way. A *path-dependent* sequence of economic changes is one of which important influences upon the eventual outcome can be exerted by temporally remote events, including happenings dominated by chance elements rather than systematic forces."), available at https://www.jstor.org/stable/1805621, accessed January 11, 2026.

[36] *See*, for example, Johnson, Jeannie D., "Goodwill - an eternal controversy. (Accounting)," The CPA Journal Online, April 1993 ("In the excess profits approach, goodwill is the difference between the combined company's profits over normal earnings for a similar business. Under this definition, the present value of the projected future excess earnings is determined and recorded as goodwill. This concept is very difficult to measure since future earnings have no certainty."), available at http://archives.cpajournal.com/old/14152806.htm, accessed January 11, 2026.

disproportionate effects on firm value and competitive sustainability relative to harm affecting peripheral offerings. The importance of a product's core functionality to end-user adoption and dealer support means that once a competing product offering that core functionality gains traction during the pendency of litigation, expectations and channel commitments shift in ways that are path-dependent and costly to reverse. Research in pricing strategy demonstrates that core products often serve as anchors for pricing, brand identity, customer loyalty, and channel commitments, and damage to these anchors can propagate across a firm's entire portfolio of offerings.[37]

33. This disproportionate effect arises because core products often shape expectations and coordination among dealers, intermediaries, and end customers, thereby influencing future purchasing patterns and strategic commitments. Economic research on path dependence and expectation-driven market dynamics shows that early displacement of a focal product can alter long-term beliefs, inform subsequent inventory and promotion decisions, and affect complementary adoption behavior. When a core product faces competitive displacement, these expectation shifts can propagate beyond immediate transactions to influence future strategic decisions by customers and intermediaries, including inventory commitments, promotional support, and cross-selling behavior.[38]

34. From an economic perspective, prompt injunctive relief helps prevent the accumulation of harms that become entrenched once market expectations and relationships have shifted. In dynamic markets, early displacement and altered buyer expectations are path-dependent: once intermediaries and customers reallocate attention, inventory, and trust to alternative

---

[37] *See* "Instilling Brand and Core Values into Your Pricing Strategy," FintastIQ, January 31, 2025 ("Pricing isn't just about numbers—it's a reflection of your brand's story and the values you stand for. Companies that align pricing with their identity create stronger customer loyalty and stand out in competitive markets."), available at https://www.fintastiq.com/blog/instilling-brand-and-core-values-into-your-pricing-strategynbsp, accessed January 11, 2026.

[38] For the role of core products and expectation effects in dynamic markets, see David, Paul A., "Clio and the Economics of QWERTY," *American Economic Review* 75, no. 2 (1985): 332–337 (path dependence and lock-in effects), available at https://www.jstor.org/stable/1805621, accessed January 11, 2026. *See also* Jia, Justin, Jia Li, and Weixin Liu, "Expectation-based consumer purchase decisions: behavioral modeling and observations," *Marketing Letters* (2022): 1-17, at abstract ("Expectations play important roles in consumers' purchase decisions. Among many types of expectations, consumers often form expectations on future market conditions when purchasing goods or services."), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9676804/, accessed January 11, 2026.

products, the opportunity to preserve prior competitive position diminishes. Economic models of path dependence and irreversible commitment show that once a new equilibrium is reached in response to competitive entry, reversing that equilibrium becomes increasingly costly or infeasible even if later legal developments favor the incumbent.[39]

35.   Courts have acknowledged that injury to a plaintiff's competitive position in products central to its business, particularly where that position influences future expectations and relationships, may justify injunctive relief precisely because it cannot be fully remedied with money.[40] Although I do not express a damages opinion at this stage, consideration of product centrality and the economic consequences of displacement reinforces why remedial actions that prevent entrenched harm are appropriate.

## VII.  Conclusion

36.   Based on my experience as an economist, my review of the materials provided and publicly available sources, and well-established principles in economics, it is my opinion that the alleged conduct at issue can cause immediate, ongoing, and compounding economic harm. As described above, these harms include permanent loss of sales opportunities, disruption of distribution channels, price erosion, reputational effects, and distortion of market expectations, each of which, individually and collectively, may result in economic injury that cannot be reliably reversed or fully compensated through monetary damages awarded at the conclusion of litigation.

---

[39] On path dependence and irreversible commitment in competition, see Arthur, W. Brian, "Competing Technologies, Increasing Returns, and Lock-In by Historical Events," *Economic Journal* 99, no. 394 (1989): 116–131, at 116 ("Modern, complex technologies often display increasing returns to adoption in that the more they are adopted, the more experience is gained with them, and the more they are improved. When two or more increasing-return technologies 'compete' then, for a 'market' of potential adopters, insignificant events may by chance give one of them an initial advantage in adoptions. This technology may then improve more than the others, so it may appeal to a wider proportion of potential adopters. It may therefore become further adopted and further improved. Thus a technology that by chance gains an early lead in adoption may eventually 'corner the market' of potential adopters, with the other technologies become locked out."), available at https://www.jstor.org/stable/2234208, accessed January 11, 2026.

[40] See *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) (" ...the Patent Act...provides that courts 'may' grant injunctive relief 'on such terms as it may deem reasonable to prevent or restrain infringement…'."), available at https://supreme.justia.com/cases/federal/us/547/388/, accessed January 11, 2026.

37.     From an economic perspective, the risk of irreparable harm is heightened where, as here, competitive displacement and altered expectations occur in a narrow market. Further, given the apparent market availability of the Partisan Disruptor Trigger, the risk of irreparable harm is not merely prospective but immediate and compounding. Once customers, dealers, and intermediaries adjust behavior in response to perceived uncertainty or competitive substitution, those adjustments may become entrenched. In such circumstances, retrospective damages (even if substantial) cannot restore the competitive position or market conditions that would have existed absent the alleged conduct.

38.     Accordingly, it is my opinion that prompt injunctive relief is economically necessary to prevent the accumulation and entrenchment of harm that would otherwise persist throughout the pendency of this action and beyond.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 16th day of January, 2026.


**Samir P. Warty, Ph.D.**


Secretariat Advisors, LLC
155 N Wacker Drive, Suite 3950
Chicago, IL 60606

# Appendix 1



**Samir P. Warty**, Ph.D.

Director

155 N Wacker Drive, Suite 3950
Chicago, IL 60606
email: swarty@secretariat-intl.com

Samir P. Warty is a Director at Secretariat Advisors and specializes applying econometric methods and statistical, economic, and financial theory to solve complex problems arising in business disputes. He has testified as an expert on statistical sampling and statistical modeling. He provides consulting and expert support in all phases of the litigation cycle, from pretrial discovery and strategy to expert report, deposition, and trial. Dr. Warty has conducted large-scale data analyses on a variety of statistics and sampling, finance, and general commercial litigation matters. His advisory experience includes designing and analyzing statistical sampling, survey, and extrapolation methodologies; calculating damages, including in online data privacy class-action litigation; critiquing advanced statistical models; and analyzing and valuing complex financial instruments.

Prior to joining Secretariat, Dr. Warty worked for more than a decade in the economic, litigation, and strategy consulting industry.

## EDUCATION

- Ph.D., Econometrics and Statistics, The University of Chicago Booth School of Business
- M.S., Statistics, University of Washington
- B.S., Mathematics (with honors), The University of Chicago

## EXPERT DESIGNATION & TESTIMONY

- *Ex Parte James Harris, Jr.*, 412th District Court, Brazoria County, Texas, Cause No. 67063-B, Expert Report filed October 11, 2024, Court Testimony given October 14, 2024.
- *Robert Galbraith et al. v. City of Buffalo et al.*, U.S. District Court, Western District of New York, Civil Action No.: 23-CV-00814, Expert Report filed on December 22, 2023.
- *Stan Schiff, M.D., Ph.D. et al. v. Liberty Mutual Fire Insurance Co. and Libert Mutual Insurance Company*, Superior Court of the State of Washington, King County, No. 17-2-11676-9 SEA, Expert Declaration filed December 2, 2019
- *City of Fort Lauderdale v. CFS Funeral Services, Inc.*, U.S. District Court, Southern District of Florida, Case No. 18-62708-CIV, Expert Report filed October 11, 2019.

## REPRESENTATIVE EXPERIENCE

### Statistics and Sampling

- Analyzed statistical sampling irregularities in jury selection in support of a writ of habeas corpus application in Texas state court (pro bono—submitted expert report; testified in open court).
- Rebutted statistical sampling, survey, and extrapolation methodologies proffered by plaintiffs in support of a motion to remand under Local Controversy exception of the Class Action Fairness Act (submitted expert report).

- Rebutted class-wide damages and statistical sampling methodologies in litigation involving medical provider reimbursements under property/casualty personal injury protection (PIP) insurance (submitted expert report).
- Rebutted statistical sampling and extrapolation methodologies used to estimate damages in breach of contract litigation in the funeral services industry (submitted expert report).
- Developed statistical bootstrapping and jump-diffusion process modeling algorithms and Monte Carlo methods to value peaking supply contracts for natural gas supply stored at liquefied natural gas (LNG) facilities.
- Developed statistical sampling and extrapolation methodologies to assess the validity of invoices at issue in a fee-shifting dispute.
- Supported an academic expert in developing statistical sampling and extrapolation methodologies to estimate the proportion of warranty claims subject to commercial damages.
- Supported an academic expert in critiquing statistical properties and theoretic foundations of automated valuation models (AVMs) for residential real estate.
- Evaluated the statistical sampling methodology in an analysis of collateral for residential mortgage-backed securities (RMBS).

## Surveys and Experimental Studies

- Oversaw the design, fielding, and analysis of a survey assessing consumer perceptions of the advertising and marketing related to credit and other financial products.
- Critiqued the survey methodology used to evaluate alleged consumer confusion in a trademark infringement dispute.

## General Commercial Damages

- Critiqued the feasibility and appropriateness of a proposed class-wide methodology for calculating disgorgement of profit damages and economic harm in online data privacy litigation.
- Supported an appraisal expert in critiquing residential real estate appraisals in breach of contract and RICO litigation.
- Critiqued the valuation methodology used to calculate damages in trademark infringement litigation.
- Estimated damages in fraud and breach of contract litigation in the personal care product industry.
- Estimated damages in trade secrets misappropriation litigation in the financial services industry.

## Securities, Financial Products, and Financial Institutions

- Supported an academic expert in critiquing class damages methodology related to alleged securities fraud in the marketing and sale of digital assets.
- Supported government and academic experts in assessing damages and causation in multiple fair lending actions brought by county and municipal governments.
- Analyzed the valuation, risk, and performance of non-agency RMBS under counterfactual macroeconomic conditions using industry-standard software tools from Andrew Davidson & Co. and Intex.
- Assessed claims of market manipulation and mispricing in the settlement of interest rate derivatives contracts.

- Oversaw the valuation of a commercial real estate capital markets and brokerage services firm in an appraisal action following its acquisition by a strategic acquirer.
- Evaluated accounting issues and tax asset valuation in tax and breach of contract litigation concerning supervisory goodwill in a supervised merger of financial institutions.
- Evaluated banking sector issues, including deposit insurance, bank resolution, and recapitalization, in a class action alleging violations of international investment treaties.
- Advised on the selection and implementation of a replacement benchmark rate for LIBOR.
- Supported industry and academic experts in assessing issues of custom and practice and compensation in the venture capital industry.
- Assessed issues of custom and practice regarding a broker's duty of best execution.

**Intellectual Property**

- Analyzed the impact of a potential technology import ban on the public interest in a U.S. International Trade Commission (USITC) investigation.

## PUBLICATIONS

- "Sequential Bayesian Learning for Stochastic Volatility with Variance-Gamma Jumps in Returns," with Hedibert F. Lopes and Nicholas G. Polson. *Applied Stochastic Models in Business and Industry*. 2018; 34; 460-479.
- *Inference for Cholesky Stochastic Volatility via Sequential Monte Carlo*, The University of Chicago Booth School of Business Working Paper

## WORK HISTORY

- **Secretariat Advisors LLC**, Chicago, IL (2026 – Present)
  Director
  Damages and Valuation | Economic and Litigation Consulting
- **Analysis Group, Inc.**, Chicago, IL (2013 – 2025)
  Vice President
  Economic and Litigation Consulting
- **The University of Chicago Booth School of Business**, Chicago, IL (2008 – 2013)
  Lecturer | Researcher
  Teaching and Economic Research
- **Analysis Group, Inc.**, Chicago, IL and Boston, MA (2005 – 2008)
  Associate
  Economic and Litigation Consulting

## ASSOCIATIONS

- Member, American Economic Association
- Member, American Statistical Association

# Appendix 2

## Materials Relied Upon

### Case Law

- *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336 (Fed. Cir. 2013), available at https://www.casemine.com/judgement/us/5914e688add7b0493490efcd?utm, accessed January 11, 2026.

- *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), available at https://supreme.justia.com/cases/federal/us/547/388/, accessed January 11, 2026.

- *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975 (Fed. Cir. 1996), available at https://law.justia.com/cases/federal/appellate-courts/F3/103/970/518304/, accessed January 11, 2026.

- *Porous Media Corporation v. Pall Corporation*, 173 F.3d 1109 (8th Cir. 1999), available at https://law.justia.com/cases/federal/appellate-courts/F3/173/1109/548152/, accessed January 11, 2026.

### Expert Report

- Declaration of Brian Luettke, January 16, 2026.

### Legal Filing

- *ABC IP, LLC and Rare Breed Triggers, Inc. v. Peak Tactical, LLC d/b/a Partisan Triggers, and Nicholas Norton*, Complaint for Patent Infringement, False Patent Marking, and False Advertising, January 15, 2026.

### Literature

- Anderson, J. Jonas, "Nontechnical Disclosure," *Vanderbilt Law Review* 69, no. 6 (2016):1573-1602, available at https://cdn.vanderbilt.edu/vu-wp0/wp-content/uploads/sites/89/2016/11/30103806/Nontechnical-Disclosure.pdf, accessed January 16, 2026,

- Arthur, W. Brian, "Competing Technologies, Increasing Returns, and Lock-In by Historical Events," *Economic Journal* 99, no. 394 (1989): 116-131, available at https://www.jstor.org/stable/2234208, accessed January 11, 2026.

- Berry, Steven T. and Philip A. Haile, "Identification in Differentiated Products Markets Using Market Level Data," Cowles Foundation Discussion Paper No. 1744, January 2010, updated February 2010, available at https://cowles.yale.edu/sites/default/files/2022-09/d1744.pdf, accessed January 11, 2026.

- Billy, Alexander and Neel Sukhatme, "Perception Pending: What Do Patents Signal to Consumers?" *Journal of Empirical Legal Studies* 22, no. 2 (2025): 163-184, available at https://repository.law.umich.edu/cgi/viewcontent.cgi?article=4115&context=facarticles, accessed January 16, 2026.

- Bronnenberg, Bart J., and Jean-Pierre Dube, "The Formation of Consumer Brand Preferences," NBER Working Paper Series (2016), available at https://www.nber.org/system/files/working_papers/w22691/w22691.pdf, accessed January 11, 2026.

- Coase, R.H., "Durability and Monopoly," *Journal of Law and Economics* 15, no. 1 (1972): 143-149.

- David, Paul A., "Clio and the Economics of QWERTY," *American Economic Review* 75, no. 2 (1985): 332–37.

## Materials Relied Upon

- Farrell, Joseph and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects," *Working Paper* (2006), available at https://www.nuff.ox.ac.uk/economics/papers/2006/w7/Farrell_KlempererWP.pdf, accessed January 11, 2026.

- Funaki, Yukihiko, et al., "Price stickiness and strategic uncertainty: An experimental study," *Journal of Economic Dynamics and Control* 180 (2025).

- Healy, Paul M. et al., "Market Competition, Earnings Management, and Persistence in Accounting Profitability Around the World," *Review of Accounting Studies (forthcoming)* (2014), available at https://dash.harvard.edu/server/api/core/bitstreams/7312037d-586c-6bd4-e053-0100007fdf3b/content, accessed January 11, 2026.

- Jia, Justin, Jia Li, and Weixin Liu, "Expectation-based consumer purchase decisions: behavioral modeling and observations," *Marketing Letters* (2022): 1-17, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9676804/, accessed January 11, 2026.

- Klemperer, Paul, "Competition When Consumers Have Switching Costs: An Overview with Applications to Industrial Organization, Macroeconomics, and International Trade," *Review of Economic Studies* 62, no. 4 (1995): 515–539.

- Langer, Daniel, "Luxury Unfiltered: The true cost of cutting luxury prices," Luxury Daily, September 11, 2024, available at https://www.luxurydaily.com/luxury-unfiltered-the-true-cost-of-cutting-luxury-prices/, accessed January 15, 2026.

- Londono, Juan M., et al., "Costs of Rising Uncertainty," Federal Reserve, available at https://www.federalreserve.gov/econres/notes/feds-notes/costs-of-rising-uncertainty-20250424.html, accessed January 11, 2026.

- Nagle, Thomas T. and Georg Müller, *The Strategy and Tactics of Pricing*, 6th ed. (New York: Routledge, 2018).

- Rindova, Violina P. et al., "Being Good or Being Known: An Empirical Examination of the Dimensions, Antecedents, and Consequences of Organizational Reputation," *Academic of Management Journal* 48, no. 6 (2005): 1033-1049.

- Shapiro, Carl, "Consumer Information, Product Quality, and Seller Reputation," *FTC Bureau of Economics Working Paper* No. 42 (1980), available at https://www.ftc.gov/system/files/documents/reports/consumer-information-product-quality-seller-reputation/wp042.pdf, accessed January 11, 2026.

- Tisdell, Clem, and Irmi Seifl, "Niches and economic competition: implications for economic efficiency, growth and diversity," *Structural Change and Economic Dynamics* 15 (2004): 119-135.

**Publicly Available / Websites**
- "7 Types of Distributors (Plus Considerations for Choosing One)," Indeed, December 11, 2025, available at https://www.indeed.com/career-advice/career-development/types-of-distributors, accessed January 11, 2026.

- "Commodity Substitution, Sample Space and New Goods," Chapter 9, International Monetary Fund, available at https://www.imf.org/external/np/sta/tegeipi/ch9.pdf, accessed January 11, 2026.

- "FRT 15L3 Trigger For Sale | 24 Hours Delivery | Premium FRT," available at https://rarebreedstrigger.com/shop/frt-15l3-trigger/, accessed January 11, 2026.

- "FRT-15L3™ Forced Reset Trigger for the AR-15," Rare Breed Triggers, available at https://rarebreedtriggers.com/product/frt-15l3-2/, accessed January 14, 2026.

## Materials Relied Upon

- "Instilling Brand and Core Values into Your Pricing Strategy," FintastIQ, January 31, 2025, available at https://www.fintastiq.com/blog/instilling-brand-and-core-values-into-your-pricing-strategynbsp, accessed January 11, 2026.

- "New! Partisan Triggers The Disruptor Rifle Trigger Up to $25.00 Off w/ Free S&H — 2 models," OpticsPlanet, available at https://www.opticsplanet.com/partisan-triggers-the-disruptor-rifle-trigger.html, accessed January 14, 2016.

- "Price Erosion: What Is It, and How Do You Stop It?" GreyScout, February 13, 2024, available at https://greyscout.com/price-erosion-what-is-it-and-how-do-you-stop-it/, accessed January 14, 2026.

- "The Disruptor FRT - Partisan Triggers," available at https://partisantriggers.com/the-disruptor/, accessed January 11, 2026.

- "The Role of Substitution in Commodity Demand," The World Bank, available at https://thedocs.worldbank.org/en/doc/727481572033451039-0050022019/original/CMOOctober2019SpecialFocus.pdf, accessed January 11, 2026.

- "Where to Find - Partisan Triggers", available at https://partisantriggers.com/where-to-find/, accessed January 11, 2026.

- Johnson, Jeannie D., "Goodwill - an eternal controversy. (Accounting)," The CPA Journal Online, April 1993, available at http://archives.cpajournal.com/old/14152806.htm, accessed January 11, 2026.

- National Research Council, *Reference Manual on Scientific Evidence*, 3rd ed. (Washington, DC: The National Academies Press, 2011), available at https://www.fjc.gov/sites/default/files/materials/21/SciMan3D01.pdf, accessed January 11, 2026.

- Tambaro, Louis, "Commercial Litigation Stop! … In the Name of Injunctions: The Benefits of Seeking Temporary Restraints and Injunctive Relief in Intellectual Property Disputes and Measures for Litigation Avoidance," Offit Kurman, April 29, 2025, available at https://www.offitkurman.com/offit-kurman-blogs/injunctive-relief-ip-disputes, accessed January 11, 2026.