Jeffrey S. Pope (Wyo. State Bar #7-4859)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Phone: 307.778.4200
jspope@hollandhart.com

Andrew Orr (Wyo. State Bar #7-6235)
HOLLAND & HART LLP
P.O. Box 68
Jackson, WY 83001
Phone: 307.739.9741
acorr@hollandhart.com

Timothy Getzoff (admitted *pro hac vice*)
Randy Roeser (*pro hac vice* to be filed)
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, CO 80302
Phone: 303.473.2700
tgetzoff@hollandhart.com
jrroeser@hollandhart.com

Paul Swanson (admitted *pro hac vice*)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Phone: 303.295.8000
pdswanson@hollandhart.com

ATTORNEYS FOR DEFENDANTS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas Corporation,<br><br>    Plaintiffs,<br><br>vs.<br><br>PEAK TACTICAL, LLC, d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,<br><br>    Defendants. | Civil Action No. 2:26-cv-00018-KHR |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND BACKGROUND ..................................................................1

    A.    Lack of Infringement of the Asserted Patents..............................................1

    B.    The '067 Patent ............................................................................................2

    C.    Invalidity of the Asserted Patents ................................................................3

    D.    Lack of Irreparable Harm.............................................................................4

    E.    Procedural and Litigation History................................................................4

II.   ARGUMENT .......................................................................................................5

    A.    Legal Standard For Temporary Restraining Order and Preliminary
        Injunction. ....................................................................................................5

    B.    Plaintiffs Have Failed To Show A Likelihood Of Success On The Merits. ............6

        1.    Plaintiffs Are Unlikely To Succeed On Their Patent Infringement
                Claim. .............................................................................................6

        2.    Plaintiffs are Unlikely to Succeed on Their False Advertising
                Claim. ...........................................................................................14

    C.    Plaintiffs Have Failed To Show Irreparable Harm. ..............................................16

        1.    Plaintiffs' Delay Defeats Its Claim Of Irreparable Harm. .......................16

        2.    Plaintiffs Have Failed To Substantiate Any Likely Harm That
                Would Not Be Redressable By Money Damages. .....................................19

    D.    The Balance of Hardships Disfavors Injunctive Relief. .......................................22

    E.    Public Interest Does Not Favor An Injunction. ....................................................23

    F.    Injunctive Relief Against Partisan Would Necessitate a Substantial Bond..........23

III.  CONCLUSION..................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*ABC IP, LLC et al. v. AR-TT LLC et al.*,
No. 2:26-cv-00014 (E.D. Wash., filed Jan. 13, 2026) ............................................18

*ABC IP, LLC et al. v. Cloak Industries, Inc. et al.*,
No. 1:26-cv-00001 (D. Idaho, filed Jan. 5, 2026).................................................17

*ABC IP, LLC et al. v. Hawkphin Sales, LLC et al.*,
No. 4:26-cv-00015 (S.D. Iowa, filed Jan. 7, 2026)...............................................17

*ABC IP, LLC et al. v. Optics Planet, Inc.*,
No. 1:26-cv-1072 (N.D. Ill., filed Jan. 29, 2026) ................................................18

*ABC IP, LLC et al. v. SGC LLC et al.*,
No. 2:26-cv-00085 (D. Ariz., filed Jan. 7, 2026).................................................18

*ABC IP, LLC et al. v. WebCorp, Inc. et al.*,
No. 4:26-cv-00018 (E.D. Mo., filed Jan. 7, 2026)................................................18

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012)..........................................................................16

*Aristocrat Techs. Inc. v. Light & Wonder, Inc.*,
2024 U.S. Dist. LEXIS 183142 (D. Nev. Sept. 20, 2024) ....................................25

*Colo. Mont. Wyo. State Area Conference of the NAACP v. United States Election
Integrity Plan*,
Civil Action No. 22-cv-00581-PAB, 2022 U.S. Dist. LEXIS 65823 (D. Colo. 2022)............16

*Dine Citizens Against Ruining Our Env't v. Jewell*,
839 F.3d 1276 (10th Cir. 2016) ...........................................................................5

*Ericsson, Inc. v. Harris Corp.*,
352 F.3d 1369 (Fed. Cir. 2003)...........................................................................20

*Fairchild Semiconductor Corp. v. Nintendo Co. Ltd.*,
30 USPQ2d 1657 (W.D. Wash. 1994), aff'd, 39 F.3d 1197 (Fed. Cir. 1994)
(unpublished) ...................................................................................................9

*GTE Corp. v. Williams*,
731 F.2d 676 (10th Cir. 1984) .......................................................................16, 18

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007).............................................................................................6

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995)............................................................................9

*Mead Johnson & Co. v. Abbott Labs.*,
  201 F.3d 883 (7th Cir. 2000) ...................................................................24, 25

*Microsoft Corp v. Very Competitive Computer Prods. Corp.*,
  671 F. Supp. 1250 (N.D. Cal. 1987) ..............................................................25

*Nat'l Oilwell Varco, Ltd. P'ship v. Black Diamond Oilfield Rentals, LLC*,
  No. CIV-24-1258-D, 2025 U.S. Dist. LEXIS 65717 (W.D. Okla. Apr. 7, 2025) ..................18

*Natera, Inc. v. NeoGenomics Labs., Inc.*,
  106 F.4th 1369 (Fed. Cir. 2024) ......................................................................5

*O2 Micro International Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)........................................................................9

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013).......................................................................21

*Rare Breed Triggers Inc. et al. v. Firearm Systems LLC et al.*,
  No. 2:25-cv-04938 (D. Ariz., filed Dec. 23, 2025)................................................17

*Speight v. Gordon*,
  582 F. Supp. 3d 897 (D. Wyo. 2022).................................................................6

*Studio 010, Inc. v. Dig. Cashflow LLC*,
  Civil Action No. 2:20-cv-01018-RAJ, 2020 U.S. Dist. LEXIS 116814 (W.D. Wash.
  July 2, 2020)................................................................................................18

*Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc.*,
  967 F.3d 1339 (Fed. Cir. 2020).......................................................................19

*Utah Gospel Mission v. Salt Lake City Corp.*,
  316 F.Supp.2d 1201 (D. Utah 2004)................................................................18

*Well Cell Glob. LLC v. Calvit*,
  No. 2023-1229, 2023 U.S. App. LEXIS 25006 (Fed. Cir. 2023) ...........................19

*Wilderness Workshop v. BLM*,
  531 F.3d 1220 (10th Cir. 2008) .......................................................................5

## Statutes

15 U.S.C. § 1125(a)(1)(B) ................................................................................14

35 U.S.C. § 103................................................................................................3

35 U.S.C. § 103(a) ................................................................................................6

**O**THER **A**UTHORITIES

Fed. R. Civ. P. 65(c) .............................................................................................23

Defendants Peak Tactical LLC, d/b/a Partisan Triggers and Nicholas Norton, (collectively "Partisan"), by and through their undersigned counsel, respectfully submit this response in opposition to Plaintiffs' Memorandum In Support of Their Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 7) (hereinafter "Plaintiffs' Motion").

## I.    INTRODUCTION AND BACKGROUND

Plaintiffs have rushed into court waving patents of dubious validity, asserting flawed infringement positions, and sidestepping Defendants' own patent that Plaintiffs themselves previously tried to buy and now infringe. In support of their request for extraordinary relief, Plaintiffs rely on one expert who is not an expert in this field and has never performed a patent infringement analysis, and another who has never done a patent damages analysis.

Plaintiffs' effort to demonstrate imminent irreparable harm omits its widespread litigation campaign (in which preliminary injunctive relief was not sought), its delay in filing the instant suit, and its misguided attempt to improperly monopolize a market. Plaintiffs' efforts fall far short of meeting their heavy burden and their motion should be denied.

### A.    Lack of Infringement of the Asserted Patents

Even a cursory review of the four asserted patent claims reveals that the orientation, movement, and timing of all the myriad components within the trigger mechanism are specific and particular. Yet Plaintiffs' infringement analysis is superficial at best.  As with his analysis of the '067 Patent (discussed below), Plaintiffs' expert's infringement analysis consists of simply reciting the various claim elements and stating that each one is satisfied.  His color-coded pictures notwithstanding, he fails to meaningfully explain or describe the timing, motion, and condition of the multiple components of the Disruptor trigger in order to explain *how* each claim element is met.

Although it appears that Plaintiffs' expert has never actually performed a patent infringement analysis, he at least concedes the legal necessity of performing claim construction to determine the scope of a patent's coverage.  Yet, his opinion nonetheless asks the Court to skip that step by arguing that no constructions are necessary.

In any event, as explained in detail below and in the attached Declarations of John Nixon and Michael Stakes, the Disruptor trigger does *not* infringe the Asserted Patents, as the operation of the Disruptor trigger does not satisfy several requirements in the asserted claims.

### B.    The '067 Patent

Plaintiffs' Motion tries to preemptively avoid the implications of U.S. Patent No. 9,146,067 ("the '067 Patent"), which long predates all of Plaintiffs' patents, by arguing that Defendants' Disruptor product does not practice this patent and that Defendants' public statements to the contrary amount to "false advertising."  Plaintiffs' support for their position consists of their proffered expert (1) listing out the claim elements for the '067 Patent, (2) stating "I have analyzed" Plaintiffs' FRT-15L3 and Defendants' Disruptor triggers, and (3) concluding they "do not have any features that satisfy the above requirement as recited by the above limitations."  Plaintiffs' showing on this issue could not be more conclusory and lacking in substance.

As shown in detail below, the Disruptor trigger indeed practices the '067 Patent, as does Plaintiff's FRT triggers, meaning that Plaintiffs are infringing the '067 Patent.  In this litigation, Defendants will be asserting counterclaims against Plaintiffs for infringement of the '067 Patent and potentially additional claims for improper market monopolization.

Moreover, *on two separate occasions* prior to this suit, Rare Breed affirmatively contacted Michael Stakes (the inventor and original owner of the '067 Patent) in an attempt to purchase and acquire the '067 Patent rights. Both times Mr. Stakes rebuffed Rare Breed's attempts.  Rare

Breed's repeated, acute interest in acquiring the '067 Patent reflects its concern in protecting itself from an infringement claim as well as to assist in fueling its litigation campaigns.

### C.    Invalidity of the Asserted Patents

The impact and relevance of the '067 Patent does not stop with the fact that Plaintiffs are infringing. The technology disclosed and claimed in the '067 Patent occurred as early as 2013, four years before the earliest of Plaintiffs' Asserted Patents. The '067 Patent is not only senior technology to the Asserted Patents, it constitutes highly material prior art. Michael Stakes also commercialized his '067 Patent with his TacCon 3MR trigger, which he made, and sold, and was the subject of multiple published articles in the 2014-2016 time frame.

Yet, the '067 Patent (and the TacCon 3MR) were *never* disclosed to or considered by the patent examiner when Plaintiffs' earliest patent (the '223 Patent) was examined and approved, meaning the patent issued without any comparison of this prior art to the application. And, although the '067 Patent (but not the 3MR) was disclosed during prosecution of the other three Asserted Patents, it was one of 147 different patents that were sent to the examiner. The examiner's failure to substantively review or apply the '067 Patent (likely a function of the limited time afforded to examiners) is revealed in the fact that the later three Asserted Patents received no substantive office action whatsoever based on prior art.  Indeed, not even the '223 Patent (which is prior art to the other three patents) generated a substantive office action, despite the clear overlap in technology as shown by Plaintiffs' own claim charts.

As discussed in detail below and in the attached Declaration of John Nixon and Michael Stakes, the four claims asserted by Plaintiffs suffer from serious if not fatal obviousness issues under 35 U.S.C. § 103.  Had the available prior art been considered by the examiner during prosecution, these patents likely never would have issued.

### D.    Lack of Irreparable Harm

Plaintiffs base their claim for irreparable harm on conclusory assertions of categories of potential harm, without making an actual showing that any such harm is likely here.  In fact, Plaintiffs' primary evidence for arguing irreparable harm—that the triggers are "durable" goods subject to one-time purchases by customers—actually refutes Plaintiffs' position, as any lost sales would be fully compensable by lost profit monetary damages.

While Plaintiffs' proffered expert has apparently never worked in the patent damages space before, Defendants' declaration of Scott Cragun (a 20+ year expert in calculating patent damages) explains the categories of recoverable damages that would be at issue in this case and how such harm would be calculable as opposed to irreparable.

### E.    Procedural and Litigation History

Prior to filing the instant lawsuit, Plaintiffs filed six (6) prior lawsuits against Defendants' dealers, all asserting the same patent infringement claims based on the same patents against the same Disruptor product.  All of these cases predate the instant case and remain pending. Yesterday, the day before this opposition was filed, Plaintiffs sued a seventh dealer. In none of these cases did Plaintiffs seek a temporary restraining order (TRO) or preliminary injunction. Plaintiffs' decision to file multiple duplicative lawsuits against other parties in other federal districts on the same issues belies their claim to immediate and irreparable harm in this case.

In fact, Plaintiffs' propensity for filing litigation against *any* seller or maker who makes *any* type of after-market trigger mechanism or component is striking.  Over the last 12 months, Plaintiffs have filed over 25 patent infringement lawsuits in which they have asserted some combination of their patents against various dealers, sellers or makers of triggers or related components. While eight of these cases (including the one at bar) assert the same patents against the same Disruptor product, the others include different trigger mechanisms and assert additional

patents. All of these cases are ongoing at present, with two pending motions to consolidate the cases by a Judicial Panel on Multidistrict Litigation[1]. One of the patents frequently asserted by Plaintiffs (although not in the present case) has been challenged in an Inter Partes Review (IPR) proceeding at the USPTO, with the USPTO recently deciding that this challenge should proceed to a merits-based institution decision. Plaintiffs' tactics of filing piece meal, duplicative lawsuits in scattershot fashion call into question the actual merits of any of these suits.

## II.    ARGUMENT

### A.    Legal Standard for Temporary Restraining Order and Preliminary Injunction.

Under Tenth Circuit law, a party requesting a temporary restraining order must establish "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *See Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). For preliminary injunctions seeking to enjoin patent infringement, Federal Circuit law turns on the same factors. *Natera, Inc. v. NeoGenomics Labs., Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024).

Temporary restraining orders are "an extraordinary remedy," so "the movant's right to relief must be clear and unequivocal." *Dine Citizens*, 839 F.3d at 1281 (*quoting Wilderness Workshop v. BLM*, 531 F.3d 1220, 1224 (10th Cir. 2008)). "When addressing a motion for temporary restraining order, the court applies the same standard as it applies to a motion for

---

[1] Despite seeking a TRO and PI in this Court, Plaintiffs are simultaneously seeking to divest this Court of jurisdiction by seeking MDL consolidation of its cases in its preferred venue of Texas.

preliminary injunction." *Speight v. Gordon*, 582 F. Supp. 3d 897, 902–03 (D. Wyo. 2022) (internal quotation marks omitted).

**B.    Plaintiffs Have Failed to Show a Likelihood of Success on the Merits.**

    **1.    Plaintiffs are Unlikely to Succeed on Their Patent Infringement Claim.**

        (1)    <u>Plaintiffs Cannot Show Likely Validity: The Prior Art Discloses the Claimed Features.</u>

35 U.S.C. § 103(a) "forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). "For over a half century, the Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.'" *Id.*, at 415-16. Accordingly, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id*. at 416.

The story of the Tac-Con 3MR and the '067 Patent should be dispositive on validity. Long before Plaintiffs' asserted priority dates (2017 for the '223 Patent; 2022 for the '003, '336, and '807 Patents), the 3MR was conceived, designed, classified by ATF, commercialized, and publicly described as a drop-in AR-15 fire-control module that achieves a "positive reset" by transferring energy from the bolt carrier through the fire-control parts to drive the trigger back to set. Mr. Stakes explains that he developed the reset-lever architecture in 2012–13 specifically to ensure rapid and reliable reset, filed the '067 Patent on June 17, 2013, received an ATF letter on October 8, 2013 confirming operation in semi-automatic mode, and launched the 3MR commercially in November 2013 with extensive trade-press coverage in 2014–15 (Stakes ¶¶ 10–

17). The ATF described the mechanism exactly as used and understood at the time: "the hammer contacts the reset lever during cocking, which applies force to the trigger, forces the shooter's finger forward, and allows the trigger to reset rapidly" (Stakes ¶ 14). The trade press likewise reported that in the third selector position, "positive reset" is "achieved by transferring the force from the bolt carrier through the trigger assembly to assist the trigger back onto the sear" (Nixon ¶¶ 37–46).

Mr. Nixon's analysis shows that all the material claim limitations Plaintiffs now assert were already disclosed by virtue of the 3MR product and the '067 Patent. The '067 Patent depicts and describes the standard AR hammer/trigger/disconnector architecture (hammer pivot 42; trigger pivot 28; disconnector pivotally coupled to the trigger), the three-position selector (safe; standard semi; assisted/forced reset), and the assisted reset mode in which the hammer's rearward movement during cycling actuates the reset lever to drive the trigger back to set (Nixon ¶¶ 37–46; 70–81; Exhibits 11–14). In addition, decades-old references disclosed the "locking member" gating function that Plaintiffs now tout: for example, Browning's 1900 patent teaches an inertia-piece that "temporarily locks the catch" and prevents unlocking until the action completes forward travel, and Hyde's 1945 patent teaches safety means "for holding the cocking member … against release" and automatic return to operative position. (Nixon ¶¶ 27–35).

Moreover, Bonner (also filed before the relevant priority dates), teaches four embodiments of an automatic reset of a trigger member, including (as shown in FIG. 19) a one-piece trigger member with an integral contact surface ("trigger surface 39") that forces the trigger to be reset upon interaction with the hammer spring force. (Nixon ¶ 34). Additional early patents (Michal I and Michal II) likewise disclose cycle-driven forward movement of the trigger and release only upon completion of counter-recoil. (*Id*. ¶¶ 28–34).

In view of all this prior art, Plaintiffs' claimed "novelty" is illusory. Their additions (an out-of-battery safety and combining the reset lever and trigger member into one piece) were widely known, long disclosed features that the Asserted Patents adopted in an obvious way. Mr. Stakes himself developed and tested an out-of-battery gating device for the 3MR in 2015–16 to address heavy use, before the earliest of Plaintiffs' applications, and confirms that such gating devices have been standard for generations (Stakes ¶¶ 16–17). He further explains that machining the reset lever and trigger member as a single piece is a minor packaging change that does not change the operation or function of the mechanism; Bonner confirms this by showing four different embodiments achieving this mechanism, including with FIG. 19 directly showing the trigger member including a contact surface. (Stakes ¶¶ 22–24; Nixon ¶¶ 28–35).

The prosecution histories reinforce that the Patent Office never rigorously tested these claims against the 3MR and '067 Patent. For the '223 Patent, the examiner allowed the claims without consideration of the 3MR or '067 Patent, believing that other references did not disclose that "the contact of the hammer with the trigger member will force such from the released position to the set position." But he was unaware of and thus did not consider Bonner, the '067 Patent, or the extensive 3MR trade-press record (Nixon ¶¶ 62–69). For the '003/'336/'807 Patents, the examiner was presented with 147 references, issued no prior art office actions, and, in the '807 Patent's case, deemed the claims "not patentably distinct" from the earlier filings "because they claim substantially the same firearm trigger mechanism with safety selector moving between safe, standard semiautomatic and forced reset semi-automatic." (*Id.* ¶¶ 66–69). As Mr. Nixon concludes, "under a proper, thorough invalidity analysis … the Asserted Patents will be found invalid as either anticipated or rendered obvious." (*Id.* ¶¶ 70–81).

Plaintiffs' suggestion that Defendants "never attacked validity" proves nothing; Defendants had no reason to preemptively challenge patents their product does not infringe, and when sued, Defendants have now presented detailed invalidity contentions grounded in the 3MR product, the '067 Patent, and the longstanding gating and reset art.

(2)    Plaintiffs' Patent Claims Require Claim Construction.

"An infringement analysis entails two steps." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). "The first step is determining the meaning and scope of the patent claims asserted to be infringed*." Id.* "The second step is comparing the properly construed claims to the device accused of infringing." *Id.*

At the threshold, Plaintiffs cannot meet their burden to establish that the Disruptor infringes the Asserted Patents without the Court first resolving the disputed claim scope. The Asserted Claims contain multiple terms of degree and cycle-timing predicates that bear directly on the infringement analysis, including at least "substantially in-battery position." As Mr. Nixon explains, this term governs when, and in what mechanical state, the claimed structures must exist: matters that cannot be left to the jury under a generic "plain meaning" banner (Nixon ¶¶ 82–88, 99–103). For example, the "substantially in-battery position" claim element is a timing gate for when a "locking member" transitions from blocking to permissive, and the phrase reasonably admits more than one meaning in an AR-pattern cycle. (*Id.* ¶¶ 85–88, 98–104).

"When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro International Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see also Fairchild Semiconductor Corp. v. Nintendo Co. Ltd.*, 30 USPQ2d 1657, 1659 (W.D. Wash. 1994), aff'd, 39 F.3d 1197 (Fed. Cir. 1994) (unpublished) ("Before the elements of the claims can be applied to the accused device, the court must establish their meaning. … This is known as 'claim construction' or 'claim interpretation.'").  Plaintiffs'

suggestion that no construction is required is belied by the text of their claims and by the technical record here (Nixon ¶¶ 82–88, 98–104). At minimum, this unresolved claim scope dispute precludes a likelihood-of-success determination at this preliminary stage.

(3)     Plaintiffs Have Not Shown Likely Infringement.

Putting aside the claim construction issue explained above, Plaintiffs' infringement showing rests on a single, conclusory declaration by Mr. Luettke. As Mr. Nixon explains, Mr. Luettke lacks design and engineering experience in AR-pattern fire-control mechanisms and has not demonstrated any experience applying patent claim analysis methodology to physical devices (Nixon ¶¶ 15–21). His "claim charts" largely recite the claim language and point to colorized images without the necessary, element-by-element mechanical analysis of component geometry, movement, timing, and interaction, particularly for the cycle-timing limitations and the "set position" state (Dkt. Nos. 7-23 to 7-26). These bare bones assertions fall far below the requisite support for establishing infringement of the Asserted Claims.

Setting aside Plaintiffs' sparse infringement support, the Disruptor simply does not infringe. In the standard semi-automatic mode, each of the Asserted Claims uses materially identical "whereupon" timing language that ties disconnector capture to the hammer's rearward pivot caused by the bolt carrier's rearward movement. For example, the claims recite: "whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that ***said disconnector hook catches said hammer hook***, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said ***set positions*** so that the user can pull said trigger member to fire the firearm" ('807 Patent, claim 1 (emphasis added); '336 Patent, claim 3 (same); '003 Patent, claim 4 (same)).

Based on Mr. Nixon's analysis of the Disruptor Accused Product, during the hammer's rearward pivot with the trigger held (i.e., during the claimed event), the disconnector does *not* "catch" the hammer hook. As shown in Semi-Auto Non-Infringement Fig. 1, below, indicated in the red circle, the Disruptor Accused Product's disconnector's camming interface contacts/deflects during rearward travel, but it does not transition into a positive latch state. (Nixon ¶¶ 89–97).

**Semi-Auto Non-Infringement Fig. 1**     **Semi-Auto Non-Infringement Fig. 2**

   

In the Disruptor, engagement between the disconnector hook and the hammer hook can occur only later, with subsequent user action (release/re-pull as the cycle permits). *See* Semi-Auto Non-Infringement Fig. 2 (depiction of no disconnector/hammer hook engagement prior to subsequent user action). Because the Asserted Claims expressly require that "rearward movement of the bolt carrier" and the hammer's "rearward pivoting" result "such that said disconnector hook catches said hammer hook" at that time, and the Disruptor does not do this,

this limitation is not met. ('807 Patent, claim 1; '336 Patent, claim 3; '003 Patent, claim 4; Nixon ¶¶ 89–97).

Additionally, these asserted claims require that, in the standard semi-automatic position, "rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook," before the user releases the trigger to free the hammer and allow re-engagement of the sear surfaces. (*See, e.g.*, '807 Patent, claim 1; '336 Patent, claim 3; '003 Patent, claim 4). This language ties disconnector capture to the rearward pivot event caused by the bolt carrier's rearward movement. In the Accused Product, during the hammer's rearward pivot with the trigger held, at the time specified in the claims, the disconnector does not "catch" the hammer hook. The disconnector's camming interface contacts/deflects during rearward travel, but it does not transition into a positive latch state. In the Accused Product, capture of the hammer by the disconnector occurs, if at all, only *after* the carrier travels forward (return stroke) and presents the geometry for engagement, and only with continued user input and/or sustained trigger pressure to maintain the relative positions necessary for the disconnector hook to engage the hammer. It does not catch on rearward movement. (Nixon ¶¶ 89–97).

In addition, in the forced reset mode, the Asserted Claims require that the hammer's rearward pivot "caus[es] said trigger member to be forced to said set position," followed by permissive firing "thereafter when the bolt carrier reaches the substantially in battery position." ('807 Patent, claim 1; '336 Patent, claim 3; '003 Patent, claim 4). The patents themselves define the "set position" in the claims' "wherein" clause as the state "wherein **said sear and sear catch are in engagement** in said set positions of the hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member." ('807 Patent, claim 1; '336 Patent, claim 3; '003 Patent, claim 4) (emphasis added).

In the Disruptor, depicted below, when the hammer's rearward movement imparts the forced reset impulse, the trigger member is driven forward, but at that stage ***the trigger sear and hammer sear catch are not in engagement*** and the locking/gating member remains in its blocking orientation:

**Disruptor Forced Reset Non-Infringement Fig. 1**



In the Disruptor, the user cannot "pull said trigger member to fire the firearm" at that point, which is required in the patent claim; instead, permissive firing only occurs later, after the bolt carrier returns to its in-battery position and the hammer sear catch reaches engagement with the trigger sear. Thus, at the claimed time of the forced reset impulse, the Disruptor is not in the patents' defined "set position," and the "causing … to be forced to said set position" requirement is not satisfied. ('807, claim 1; '336, claim 3; '003, claim 4; Nixon ¶¶ 89–97).

The same "set position" problem exists in the '223 Patent's claim 4, which likewise requires that "the trigger member hav[e] a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position." ('223 Patent, claim 4). As noted above, the claims

define "set position" as sear/sear catch engagement in the set state and non-engagement in the released state. In the Disruptor, at the time of hammer to trigger contact (i.e., when the hammer is displaced by the bolt carrier and imparts the forced reset impulse), the sear and sear catch are *not* engaged and firing is not permissive; instead, the locking member remains in its blocking orientation until the carrier returns toward substantially in battery. Because the '223 Patent's claim requires "the contact causing the trigger member to be forced to the set position," and the Disruptor is not in the defined "set position" at the time of that contact, this limitation is likewise not met. ('223 Patent, claim 4; Nixon ¶¶ 89–97).

Lastly, to the extent Plaintiffs rely on the "substantially in-battery position" gate in the locking member clauses to argue that this particular "set" element is satisfied, the parties' dispute over what that phrase encompasses and when unlocking must occur confirms that construction is required before any infringement assessment can proceed. (Nixon ¶¶ 85–88, 98–104).

### 2.    Plaintiffs are Unlikely to Succeed on Their False Advertising Claim.

Plaintiffs' false advertising theory rests on two assertions: (1) that Partisan "falsely" describes the Disruptor as an "assisted reset trigger" rather than a "forced reset trigger," and (2) that Partisan "falsely" states the Disruptor practices the '067 Patent. Neither claim is likely to succeed on the merits. *See* 15 U.S.C. § 1125(a)(1)(B) (requiring that a commercial advertising or promotion "misrepresents" the nature, characteristics or qualities of a product).

First, as both Nixon and Stakes explain, industry and regulatory usage treats "assisted reset," "forced reset," and "positive reset" as interchangeable descriptors for the same underlying, cycling-driven reset phenomenon. The '067 Patent, the senior technology to all of Plaintiffs' patents, repeatedly uses the term "assisted reset" to describe this function. The ATF's 2013 letter describing the 3MR states that during cycling, "the hammer contacts the reset lever … which applies force to the trigger, forces the shooter's finger forward, and allows the trigger to reset

14

rapidly." (Stakes ¶¶ 29–31; Nixon ¶¶ 105–114). Contemporary trade press explicitly described the 3MR's third mode as providing "positive reset" "achieved by transferring the force from the bolt carrier through the trigger assembly to assist the trigger back onto the sear." (*Id.*). Mr. Stakes further explains that, in practice and in the literature, "assisted reset" and "forced reset" are used synonymously to describe the same class of mechanisms; the difference is semantics, not mechanics. (Stakes ¶¶ 29–31). Given the undisputed context, Plaintiffs cannot show that labeling the Disruptor as "assisted reset" is materially false or misleading.

Second, Plaintiffs' contention that it is "false" to say the Disruptor practices the '067 Patent is directly contradicted by Defendants' analysis. As Mr. Nixon explains, claim 19 of the '067 Patent requires a selector with different stop positions that adjust the trigger travel distance in different modes. (Nixon ¶¶ 115–125). Mr. Stakes measured both products and confirmed that, in the Disruptor, the selector presents different stop surfaces aligned with the trigger tail in different positions, and the second position produces a shorter travel distance than the first—precisely as claim 19 requires. (Stakes ¶ 28; Nixon ¶¶ 115–125). Mr. Luettke offers only a bare, unsupported assertion to the contrary; he discloses no measurements, photographs, or analysis. (Nixon ¶¶ 115–125). On this record, Plaintiffs cannot establish likely falsity; the Disruptor does in fact practice '067 Patent claim 19. In fact, based on Mr. Stakes's testing and Mr. Nixon's analysis, for the same reasons the Disruptor practices claim 19 of the '067 Patent, Plaintiffs' FRT-15L3 product infringes this claim. (Nixon ¶¶ 126–129).

In short, Plaintiffs have not carried their burden to show a likelihood of success on either their patent or false-advertising claims. The unresolved claim-construction disputes, substantial validity questions, and concrete non-infringement positions identified above, coupled with the

evidence that the Disruptor accurately describes its reset mode and practices the '067 Patent, defeat Plaintiffs' request for the extraordinary remedy of a TRO or preliminary injunction at this stage.

### C.    Plaintiffs Have Failed to Show Irreparable Harm.

In order to obtain a TRO or preliminary injunction, Plaintiffs must show they are likely to suffer substantial and immediate irreparable harm that cannot be redressed by monetary damages. *See Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). A delay in seeking a TRO undermines a plaintiff's claim of irreparable harm. *See GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) ("delay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction."); *Colo. Mont. Wyo. State Area Conference of the NAACP v. United States Election Integrity Plan*, Civil Action No. 22-cv-00581-PAB, 2022 U.S. Dist. LEXIS 65823, *5 (D. Colo. 2022) ("Waiting three months to file this lawsuit and seek a TRO, however, is not consistent with plaintiffs' allegations that they are facing imminent harm.").

Here, Plaintiffs' claim of irreparable harm fails for several reasons: (1) Plaintiff inexplicably delayed in filing the instant suit, filing six (6) other lawsuits against Defendants' dealers (none of which sought a TRO or PI), before finally filing the instant suit *months* after Defendants' products were publicly announced and available for sale; and (2) any harm that may be suffered by Plaintiffs are redressable by monetary damages, and Plaintiffs' arguments that the harm at issue in this case is "irreparable" does not withstand scrutiny.

### 1.    Plaintiffs' Delay Defeats Its Claim of Irreparable Harm.

Defendants' Disruptor product was initially advertised in September 2025, on the website www.AR15.com, a widely known website for customers and aficionados in the firearms market. Defendants posted a lengthy announcement of the forthcoming Partisan FRT, referring to Plaintiffs' litigious approach and describing at a high level why Defendants were ready to bring the Partisan FRT to market. (Woods ¶ 26). This announcement received tens of thousands of

views and spawned months of commentary, responses and questions by third parties. *Id.* Plaintiffs admit they were aware of this posting at the time. Plaintiffs' Motion at 9.  Plaintiffs' Motion claims that Defendants stated more recently that its Disruptor is a "copycat of RBT's FRT-15L3 product" (Motion at 8), but Defendants never said anything remotely to this effect. Instead, Defendants' public postings (starting in September 2025) merely recognized Rare Breed's hyper-aggressive litigation tactics and that, true to form, it expected one here.  *See* Plaintiffs' Motion at 8-9, Ex. K.

Having received no objection by Plaintiffs, Defendants started making sales through dealers on November 15, 2025, and started shipping product on or around December 15, 2025, events that were widely known and discussed on AR15.com, other on-line forums, and Defendants' own website, which went live to dealers[2] on November 15, 2025 and to the public on December 15, 2025. (Woods ¶ 27).

Despite being on notice of Defendants' upcoming Disruptor product for months (since September 2025), Plaintiffs took no action to prevent the launch of the Disruptor trigger or send any objection or notice to Defendants until this lawsuit. (Woods ¶ 28).  Instead, Plaintiffs allowed the triggers to hit the market and, when they finally took action in late December 2025, decided to file suit *not* against Defendants but against Defendants' independent dealers. In fact, Plaintiffs sued seven (7) different dealers, in different cases and federal districts throughout the country, claiming infringement of the Disruptor trigger.  In none of those duplicative, piecemeal cases did Plaintiffs seek a TRO or PI.[3]

---

[2] Defendants only sell through licensed or professional firearm dealers; they do not sell through their website or direct-to-consumer. Plaintiffs only sell direct-to-consumer through its website.

[3] Plaintiffs not only sued the independent dealers; they also personally named the owner/operator of each dealer in disregard of the corporate entity. The cases are *Rare Breed Triggers Inc. et al. v. Firearm Systems LLC et al.*, No. 2:25-cv-04938 (D. Ariz., filed Dec. 23, 2025); *ABC IP, LLC*

Apparently dissatisfied with their initial "sue the dealers" strategy, Plaintiffs then pivoted and, on January 15, 2026, finally filed suit against Defendants, the actual maker and seller of the Disruptor trigger, filing their Motion for TRO and PI the following day on January 16, 2026.

Plaintiffs' months-long delay severely undercuts if not defeats their claim of "immediate and substantial" irreparable harm sufficient to justify the extraordinary relief of a TRO or even a PI.  *See GTE Corp*, 731 F.2d at 679; *Nat'l Oilwell Varco, Ltd. P'ship v. Black Diamond Oilfield Rentals, LLC*, No. CIV-24-1258-D, 2025 U.S. Dist. LEXIS 65717, at *8 (W.D. Okla. Apr. 7, 2025) (quoting *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F.Supp.2d 1201, 1221 (D. Utah 2004) ("Any unnecessary delay in seeking relief may be viewed as inconsistent with a claim that plaintiff is suffering great injury or, in the case of preliminary injunctive relief, that there is an urgent need for immediate relief and that a judgment would be rendered ineffective unless some restraint is imposed on defendant pending an adjudication on the merits."); *Studio 010, Inc. v. Dig. Cashflow LLC*, Civil Action No. 2:20-cv-01018-RAJ, 2020 U.S. Dist. LEXIS 116814, at *5-6 (W.D. Wash. July 2, 2020) ("Plaintiff's [three-week] delay in seeking a TRO further undermines its claim of immediate irreparable harm.").

Here, Plaintiffs decision to wait *months* until after Defendants' Disruptor triggers had hit the market (despite widespread knowledge throughout the firearm community that the products were upcoming), make no objection whatsoever to Defendants, take the time to first sue six of Defendants' dealers (without seeking TRO or PI relief), and then finally get around to filing this

---

*et al. v. Cloak Industries, Inc. et al.*, No. 1:26-cv-00001 (D. Idaho, filed Jan. 5, 2026); *ABC IP, LLC et al. v. Hawkphin Sales, LLC et al.*, No. 4:26-cv-00015 (S.D. Iowa, filed Jan. 7, 2026); *ABC IP, LLC et al. v. SGC LLC et al.*, No. 2:26-cv-00085 (D. Ariz., filed Jan. 7, 2026); *ABC IP, LLC et al. v. WebCorp, Inc. et al.*, No. 4:26-cv-00018 (E.D. Mo., filed Jan. 7, 2026); *ABC IP, LLC et al. v. AR-TT LLC et al.*, No. 2:26-cv-00014 (E.D. Wash., filed Jan. 13, 2026); *ABC IP, LLC et al. v. Optics Planet, Inc.*, No. 1:26-cv-1072 (N.D. Ill., filed Jan. 29, 2026).

action against Defendants months later, all severely undermine Plaintiffs' claim to immediate and irreparable harm. They watched and waited and waived the right to injunctive relief.

## 2. Plaintiffs Have Failed to Substantiate any Likely Harm that Would not be Redressable by Money Damages.

Plaintiffs argue that they are or will suffer losses in the form of "price erosion, loss of market share, harm to its reputation, and loss of business opportunities." Brief at 20.  While Plaintiffs are correct that these types of harm potentially *can* be irreparable, a plaintiff cannot rely on speculation or unsubstantiated assertions in satisfying its burden, but instead must present actual evidence that such harm is likely.  *See Well Cell Glob. LLC v. Calvit,* No. 2023-1229, 2023 U.S. App. LEXIS 25006, at *8-9 (Fed. Cir. 2023) (reversing grant of preliminary injunction where fact that plaintiff's reputation "risked" being damaged and that such harm was "possible" was insufficient); *Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc.*, 967 F.3d 1339, 1349-50 (Fed. Cir. 2020) ("Though we have recognized that price erosion and loss of market share may in some cases be irreparable injuries, a bare assertion of irreparable harm is never sufficient to prove such harm or justify the "extraordinary remedy" of a preliminary injunction.").

To support its claim, Plaintiffs rely on their expert's opinion that the trigger products are "durable goods" that are essentially one-time purchases that last a lifetime. Plaintiffs' Motion at 20-21; Ex. AA , ¶ 8.  Based on this premise, the expert jumps to the conclusion that Defendants' sales of the accused infringing triggers equates to "permanent lost sales, customers, and business opportunities."  This is, however, illogical on its face.  Assuming *arguendo* that Defendants' sale of a Disruptor trigger takes a sale away from Plaintiffs, Plaintiffs would be made whole by recovering their lost profits for that sale.  According to Plaintiffs and their expert, each sale is a one-time sale that lasts a lifetime.  As emphasized by Plaintiffs' expert, "when a customer purchases a competing product and satisfies their need for its core functionality, that purchase

**exhausts** the relevant demand opportunity." Ex. AA ¶ 8 (emphasis added).  As such, a lost sale by Plaintiff is the *only* sale that Plaintiffs will have lost, as the demand opportunity has been exhausted and, by definition, there are no other sales opportunities at issue.  *See* Motion at 20 (even emphasizing that "a customer can buy one trigger and use it across multiple rifles").

Thus, because the products at issue are one-time or one-off sales that do not lead to future or additional sales, any lost sales suffered would be fully compensated by a simple lost profits calculation. (Cragun ¶ 9).  A lost profits calculation is a well-established measure of patent infringement damages that would make Plaintiffs whole. (*Id.* ¶¶ 9-14).

In addition, Plaintiffs' expert affirmatively states that this particular niche market is readily accessible to entrants, and that sales are easily captured by new entrants.  Ex. AA, ¶ 4.  As such, in the event Plaintiff prevails at trial and obtains a permanent injunction, according to their own expert's description of the market, Plaintiffs will be able to quickly recapture all sales going forward.  Again, money damages for lost sales between now and trial would be readily calculable and fully compensate Plaintiffs, as there are no lost "relationships" or "opportunities" at issue. (Cragun ¶¶ 15-16).

Plaintiffs also raise the issue of price erosion, noting that the Disruptor trigger is sold at a lower price than Plaintiffs' triggers.  However, Plaintiffs provide no evidence that price erosion is anything more than a possibility.  Despite Defendants' product already being on the market for several months, Plaintiffs make no claim of any price erosion or noticeable loss or decline in sales whatsoever.

Moreover, particularly in a limited or two-supplier market as Plaintiffs' expert asserts is the case here (Ex. AA, ¶8, fn. 10), price erosion (if it occurs) is readily calculable and redressable by monetary damages.  *See Ericsson, Inc. v. Harris Corp.,* 352 F.3d 1369, 1378 (Fed. Cir. 2003)

(upholding jury award of price erosion damages and explaining criteria); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 711 F.3d 1348, 1378, 1379-80 (Fed. Cir. 2013) ("Lost revenue caused by a reduction in the market price of a patented good due to infringement is a legitimate element of compensatory damages. … We thus recognize the economic principle of 'price erosion' in calculating compensatory damages for patent infringement."); *see also* Cragun ¶¶ 22-23 (explaining the calculation of price erosion in a two-supplier market).[4]

Plaintiffs' expert appears to have no experience whatsoever in calculating monetary damages in a patent case and, thus, is not in a position to know the extent to which losses are calculable and recoverable.  As noted in the cases cited above and the Cragun Declaration, monetary damages in patent cases are extensively explained in the case law and allow for multiple aspects of recovery including lost profits, reasonable royalty, price erosion, loss of convoyed sales, and other elements of monetary damages. (Cragun ¶¶ 14, 22-26).

Plaintiffs next argue that sales of the Disruptor trigger will hurt Plaintiffs' reputation, but again this claim is conclusory and speculative.  To be clear, there is no claim that customers will be confused between the two products.  If Plaintiffs' products are superior, they will enjoy whatever reputational advantage flows therefrom.  If on the other hand the Disruptor is viewed as superior in the market, then Plaintiffs' complaint is connected not to any infringement but to its own inferior product.  (Cragun ¶¶ 28-29). In fact, to the extent there has been public reviews and commentary on the parties' respective products, Defendants' Disruptor's reviews have been more favorable than Rare Breed's.  (Woods ¶¶ 36-39).

---

[4] Plaintiffs' expert also raises the issue of "disruption of distribution channels" (Ex. AA, ¶ 13), apparently unaware that Rare Breed does not sell through dealers or distributors.

Finally, Plaintiffs make the unsupported assertion that an injunction is warranted because "there is no sound reason to believe that the Defendants would be able to satisfy a money judgment." Brief at 22. Plaintiffs, notably, provide no support for this assertion, which makes the converse equally true: there is no sound reason to believe Defendants would *not* be able to satisfy a money judgment. Moreover, after independent risk-assessment, Lloyd's issued two insurance policies of $5 million each for infringement claims related to Defendants' trigger, which would supplement Defendants' profits (detailed below) in satisfying any monetary judgment, if that should ever come to pass. (Woods ¶¶ 25, 30-33).

### D.    The Balance of Hardships Disfavors Injunctive Relief.

Granting Plaintiffs' requested injunction would likely shutter Defendants' entire business. Defendants' business only sells the Disruptor triggers. (Woods ¶¶ 34-35). An injunction would put dozens of employees out of work, and create consequential havoc to the various people who are working in Defendants' business. Even with a sizeable bond as discussed below, the damage to Defendants would indeed be extreme and irreparable, as Defendants likely would not be able to survive in a shuttered state until trial. (*Id.* ¶¶ 9-10, 12-13, 34).

For its part, the absence of an injunction would force Plaintiffs to accept competition in the marketplace. And if their patents are invalid *or* the Disruptor products do not infringe, such competition would be entirely fair. At present, Defendants appear to be the only significant competitor to Plaintiffs in the market, as Plaintiffs' litigation campaign has effectively eliminated any other seller of consequence in the market. As stated *supra*, in the event Plaintiffs prevail in their claims at trial, they can be made whole by monetary damages. And if Plaintiffs do not prevail at trial, the only hardship to Plaintiffs is *lawful* competition in the marketplace.

### E.   Public Interest Does Not Favor an Injunction.

Where there is no viable claim for patent infringement as explained above, there is no public interest in enjoining any activity. On the other hand, Defendants are operating a successful business that provides a competitive product to the public. Shutting down Defendants' business would greatly harm the public interest.

Prior to Defendants' launch, based on Plaintiffs' expert's analysis (and due to its scattershot litigation efforts), Plaintiff essentially enjoyed a monopoly in the after-market triggers for firearms. (Ex. AA fn.10, Cragun ¶ 25). As such, Plaintiffs have been able to charge the public monopolistic prices for their triggers, and essentially use the additional profits to continue fueling their litigation campaigns. The public interest is not served by such tactics and above-market prices but, instead, would be better served by competition.

### F.   Injunctive Relief Against Partisan Would Necessitate a Substantial Bond.

The Federal Rules are clear: no injunction or restraining order may issue without "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Given the substantial volume of purchase orders and sales Partisan has generated in less than three months after its public launch, substantial security would be required.

Nearly a year ago, when Partisan began assessing entry into the FRT market, it analyzed potential demand and sales volume in order to determine appropriate investment. (Woods ¶ 21). They then projected sales volumes based on different unit prices reflected in this table:

| Unit Pricing | Year One | Year Two | Year Three |
|---|---|---|---|
| Total Sales $200-250 per unit | 900,000 | 1,500,000 | 2,000,000 |
| Total Sale $300-350 per unit | 700,000 | 900,000 | 1,200,000 |
| Total Sales $400-450 per unit | 120,000 | 250,000 | 350,000 |
| Total Sales $500+ per unit | 30,000 | 60,000 | 90,000 |

(Woods ¶ 22). Ultimately, they set a price point between the $200-250 and $300-350 price ranges and thus projected sales between 700,000 and 900,000 units the first year, somewhere over 1 million in the second year, and upwards of 1.5 million in the third year. (Woods ¶ 23). Partisan's owners and partners have invested nearly $1.5 million in the company to date based on these projections. (Woods ¶ 24).

As of January 29, 2026, the company has accepted orders for more than 40,000 Disruptors, averaging weekly orders of roughly 3,500 units. (Woods ¶¶ 29-30).

Partisan expects its supply chain is equipped to produce and sell 1,680,000 FRTs within three years, with 480,000 this year and production and sales of 600,000 in the second and third years. (Woods ¶ 32). Based on the wholesale price of the trigger, that equates to $4,800,000 in gross profit to Peak Tactical in 2026 and $6,000,000 in 2027 and in 2028. (Woods ¶ 33).

An injunction would shut down Partisan's sales pending trial, and likely may shutter the doors of Partisan's affiliate companies permanently.  (Woods ¶¶ 34-35).  A bond must secure against the substantial harm Partisan will suffer if the Court ultimately dissolves that injunction.

"When setting the amount of security, district courts should err on the high side [since the enjoined party] still would have . . . to prove its loss, converting the 'soft' numbers to hard ones." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 887-88 (7th Cir. 2000) (rejecting bond measurement based only on out-of-pocket costs, and favoring $50 million bond). That is because "[a]n error in setting the bond too high . . . is not serious [whereas] an error in the other direction

produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.* (cleaned up). Courts often look to lost profits to set a bond amount. *Aristocrat Techs. Inc. v. Light & Wonder, Inc.*, 2024 U.S. Dist. LEXIS 183142, at *34 (D. Nev. Sept. 20, 2024) (awarding $1 million in lost profits). Even so, courts are understandably reluctant to award a bond for profits that "appear highly speculative." *Microsoft Corp v. Very Competitive Computer Prods. Corp.*, 671 F. Supp. 1250, 1259 (N.D. Cal. 1987).

Partisan respectfully requests a bond in an amount to at least cover its expected loss profits in 2026: $4,800,000, which does not account for sales in 2027 or beyond, nor would this address the collateral damage that would fall on Partisan's various companies, employees, and future business.

## III. CONCLUSION

For the reasons set forth above, Plaintiffs are entitled to no injunctive relief. Plaintiffs have failed to show a likelihood of success on the merits. Plaintiffs have shown no irreparable harm. Plaintiffs' Motion should be denied.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

Dated: January 30, 2025.

/s/ *Andrew Orr*
Andrew Orr (Wyo. State Bar #7-6235)
HOLLAND & HART LLP
P.O. Box 68
Jackson, WY 83001
Phone: 307.739.9741
acorr@hollandhart.com

Jeffrey S. Pope (Wyo. State Bar #7-4859)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Phone:  307.778.4200
jspope@hollandhart.com

Paul Swanson (pro hac vice)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Phone: 303.295.8000
pdswanson@hollandhart.com

Timothy Getzoff (pro hac vice)
Randy Roeser (pro hac vice to be filed)
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, CO 80302
Phone: 303.473.2700
tgetzoff@hollandhart.com
jrroeser@hollandhart.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2026, a copy of the foregoing was filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s/ Andrew Orr*

Andrew Orr
