# Declaration of Scott W. Cragun

January 30, 2026

*ABC IP, LLC and Rare Breed Triggers, Inc. v. Peak Tactical, LLC d/b/a Partisan Triggers and Nicholas Norton*

United States District Court, District of Wyoming, Case No. 2:26-cv-00018



## ASSIGNMENT

1.  I have been retained as an expert by Holland & Hart LLP, counsel for Peak Tactical, LLC, doing business as Partisan Triggers, and Nicholas Norton (collectively, "Defendants"). ABC IP, LLC and Rare Breed Triggers, Inc. (collectively, "Plaintiffs") allege that Defendants, through sales of its Disruptor trigger mechanism, infringe Plaintiffs' United States Patent Numbers: 10,514,223; 11,724,003; 12,036,336; and 12,274,807 (collectively, "Asserted Patents").[1] Plaintiffs further allege Defendants conduct false patent marking and false advertising.[2]

2.  On January 16, 2026, Samir P. Warty, Ph.D. ("Warty") submitted a Declaration in this matter in "Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction" ("Warty Declaration"). Warty was asked by counsel for Plaintiffs "to evaluate the nature and characteristics of economic harm associated with Defendants' alleged conduct regarding the design, production, marketing, and sale of the Partisan Disruptor Trigger for purposes of Plaintiffs' request for preliminary injunctive relief."[3] Warty's "opinions address whether the alleged conduct can cause immediate and irreparable economic harm and whether such harm would be inadequately remedied by monetary damages awarded at the conclusion of litigation."[4]

3.  I have been asked to review the Warty Declaration and, based on my experience in determining economic harm and damages in patent litigation matters, provide my independent opinions regarding Warty's opinions and, assuming Defendants have committed the alleged wrongful acts,

---

[1] Complaint for Patent Infringement, False Patent Marking, and False Advertising, January 15, 2026 ("Complaint"), pgs. 1-2, 6, 14-70.
[2] Complaint, pgs. 70-73.
[3] Warty Declaration, ¶2.
[4] Warty Declaration, ¶2.



1

provide my opinion of whether Plaintiffs can be adequately compensated or made whole through monetary damages that may be awarded at the conclusions of this litigation.[5]

## CREDENTIALS AND COMPENSATION

4. I am a Principal with HKA Global Limited ("HKA"), a global consulting firm that provides dispute resolution, expert witness, litigation, and risk mitigation services. I have consulted with a variety of companies regarding damages issues in litigation as well as various non-litigation financial issues. I have consulted with numerous publicly traded and closely held companies in a variety of industries including agriculture, computers, consumer products, electronics, healthcare, oil and gas, semiconductors, software, and telecommunications. I have provided valuation, financial, economic, and accounting consulting services, including economic valuation of intellectual property such as copyrights, patents, trademarks, and trade secrets, to counsel and client companies. These services have included analysis of sales, costs, profits, license agreements, markets, and other related financial information. My consulting services have included analysis and testimony regarding the calculation of damages in numerous patent infringement, false patent marking, and false advertising matters as well as irreparable harm related to preliminary injunctions in patent infringement matters. Attached as Exhibit 1 to this report is my curriculum vitae and a list of presentations and articles that I have authored. Attached as Exhibit 2 to this report is a list of cases in which I have testified in the last four years.

5. HKA is being compensated for its involvement in this matter based upon hourly billing rates. HKA is charging $545 per hour for time I spend consulting and assessing damages as well as time that I

---

[5] For purposes of this declaration and as identified in my declaration, I assumed, without confirmation, that certain of Warty's opinions are factual, such as his opinions regarding the economic characteristic of the relevant market. As additional information is provided in this case, such as discovery documents and deposition testimony, I reserve the right to critique and/or offer alternative opinions if warranted, to the Warty opinions I assumed are factual.



may spend testifying related to my analysis. HKA's compensation is not contingent upon the outcome of this litigation.

## INFORMATION REVIEWED

6.   Exhibit 3 lists the documents and other information I reviewed and considered in preparing this declaration including the Warty Declaration, the information cited by Warty, and publicly available information. Discovery has not commenced in this case and additional pertinent information may be produced, including documents and deposition testimony. Accordingly, I may review this additional information and modify or supplement my opinions as necessary. The discussion below is based on my review of the limited information available as of the date of this declaration.[6]

## IRREPARABLE HARM ANALYSIS

7.   In the Warty Declaration, Warty concluded that "the alleged conduct at issue can cause immediate, ongoing, and compounding economic harm" and "these harms include permanent loss of sales opportunities, disruption of distribution channels, price erosion, reputational effects, and distortion of market expectations, each of which, individually and collectively, may result in economic injury that cannot be reliably reversed or fully compensated through monetary damages awarded at the conclusion of litigation."[7] Below I discuss the economic harms identified by Warty.

**Permanent Loss of Sales Opportunities**

8.   Warty opined that in "markets for durable or semi-durable goods, lost sales caused by substitution are generally permanent rather than deferred" and "when a customer purchases a competing product and satisfies their need for its core functionality, that purchase exhausts the relevant

---

[6] If this case moves forward, I may be asked to provide additional independent expert analysis regarding Plaintiffs' damages resulting from Defendants' alleged wrongful acts and reserve the right to update my analysis and modify my opinions based on discovery of documents, deposition testimony, and other information that becomes available.

[7] Warty Declaration, ¶36.



demand opportunity."[8] Warty further opined that "[e]ven if the original supplier later prevails in litigation, the customer has no economic reason to repurchase the displaced product."[9]

9.  Warty did not acknowledge that, based on the nature of the products at issue as described by him, Plaintiffs would be made whole for permanent lost sales as a result of Defendants' alleged infringement or other alleged wrongful acts. If the sale of an infringing product "exhausts the relevant demand opportunity" as Warty posits, then there are no additional sales or sales opportunities that would be lost beyond the single lost sale.[10] Lost sales, and related lost profits, are a well-established measure of damages for patent infringement.[11] The American Institute of Certified Public Accountants' (AICPA) instructs that "one consistent theme in calculating infringement damages across the different types of intellectual property is the entitlement of the owner to recover lost profits due to the infringer's conduct . . . [which] are calculated based on the profits that the intellectual property owner would have made from the sale of additional units, 'but for' the infringement."[12]

10. I understand that the following legal principles govern when a patent owner may recover lost profits. To be entitled to lost profits damages, "the patent owner must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales."[13] The "but for" analysis involves consideration of the relevant market as it would have developed

---

[8] Warty Declaration, ¶8.
[9] Warty Declaration, ¶8.
[10] Warty Declaration, ¶8.
[11] *Calculating Damages in Intellectual Property Disputes; AICPA & CIMA Forensic and Valuation Services Practice Aid, Fourth Edition* (2020), pgs. 29-30.
[12] *Calculating Damages in Intellectual Property Disputes; AICPA & CIMA Forensic and Valuation Services Practice Aid, Fourth Edition* (2020), pg. 29.
[13] *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1577 (Fed. Cir. 1989).



absent the infringement to determine what additional sales plaintiff would have made "but for" the infringement.[14]

11. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.* ("*Panduit*") provides guidance in the determination of whether purchasers of the defendant's infringing products would have purchased plaintiff's patented products had the defendant not infringed the asserted patents.[15] I understand that the four-prong test set forth in *Panduit* has been commonly used by the courts to assess lost profit issues and provides guidelines for analyzing whether a Plaintiff would have made the sales absent the infringement. As set forth in *Panduit*, the patent owner must demonstrate:

   - Demand for the patented product;
   - Absence of acceptable non-infringing alternatives;
   - Manufacturing and marketing capacity to exploit the demand; and
   - The profit the patent holder would have made.[16]

12. Warty did not opine there is no demand for the patented features covered by the Asserted Patents. Under the first *Panduit* factor, I understand demand for the patented product can be established by sales of products that encompass the patented invention, which, assuming infringement, would include forced reset trigger ("FRT") mechanism sales by both the Plaintiffs and Defendants.[17]

13. Warty cited to the January 16, 2016 Declaration of Brian Luettke ("Luettke Declaration"), retained by Plaintiffs' counsel, to state that Plaintiffs' FRT-15L3 trigger mechanism and Defendants' Disruptor trigger mechanism "are functionally identical and virtually indistinguishable once installed in a firearm" and "the alleged [wrongful] conduct relates to the core functionality of the products rather than peripheral or cosmetic features, and that the same functionality is not available in non-

---

[14] *Grain Processing Corporation v. American Maize-Products Company*, 185 F.3d 1341 (Fed. Cir. 1999).
[15] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).
[16] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).
[17] *DePuy Spine, Inc. et al. v. Medtronic Sofamor Danek, Inc. et al.*, 567 F.3d 1314, 1330 (Fed. Cir. 2009); Warty Declaration, ¶4.



infringing alternative products."[18] Essentially, Warty identified the relevant market to consider as a two-supplier market with no acceptable non-infringing alternatives. I understand that "[w]hen the patent owner and infringers were the only suppliers of the patented product, it is reasonable to infer that the patent owner would have made the sales made by the infringers."[19]

14. Warty did not opine Plaintiffs lack the manufacturing and marketing capacity to make the sales claimed lost to Defendants. Warty also did not opine Plaintiffs would not be able to demonstrate the profit they would have made on their lost sales. To the extent Plaintiffs permanently lost sales, the lost sales are not irreparable but, rather, compensable by a lost profits damages calculation. If the *Panduit* factors are met, Plaintiffs can be made whole for each sale permanently lost as a result of Defendants' alleged wrongful acts through a monetary damages award of lost profits.

15. Regarding permanent market displacement, Warty also opined:

> Accordingly, in the context of durable goods sold in a constrained or specialized market, ongoing substitution during litigation creates a risk of cumulative economic harm that extends beyond the initial lost transaction. Even if monetary damages could later be estimated for discrete sales, such damages would not restore the competitive conditions that existed before displacement began. This dynamic erosion of competitive position provides an economic basis for concluding that later monetary relief may be insufficient to prevent lasting harm during the pendency of the case. The risk of permanent displacement is not hypothetical: Defendants advertise the Partisan Disruptor Trigger as being available now through distributors currently selling the product.[20]

16. However, Warty did not adequately acknowledge that in the Complaint, Plaintiffs requested the Court to issue a "permanent injunction enjoining Defendants . . . from infringement or contributing to the infringement of each of the Asserted Patents."[21] With a Court issued injunction at the end of the litigation, after an award of lost profits for permanently lost "discrete sales," the "competitive conditions that existed before displacement began" would be restored. This is especially evident in

---

[18] Warty Declaration, ¶8 (fn 10); Luetkke Declaration, at ¶¶11, 34, 37, 39.
[19] *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed. Cir. 1987).
[20] Warty Declaration, ¶12.
[21] Complaint, pg. 74.



**Declaration of Scott W. Cragun**
*ABC IP, LLC and Rare Breed Triggers, Inc. v.*
*Peak Tactical, LLC d/b/a Partisan Triggers and Nicholas Norton*

the relevant market identified by Warty, where Defendants would be removed from the two-supplier market, with only the Plaintiffs remaining, and no other acceptable non-infringing alternatives available to FRT mechanism consumers. Plaintiffs' market displacement would not be permanent and, therefore, would not be irreparable.

**Disruption of Distribution Channels**

17. Regarding disruption of distribution channels, Warty stated:

> In specialized product markets, manufacturers often rely on a limited number of distributors and dealers to reach end customers. Distribution networks are not merely conduits for price transmission but are central to a supplier's competitive position: intermediaries invest in inventory, training, customer service, and marketing that are tailored to specific products and brands. Economic research on switching costs and network effects shows that once intermediaries adopt a competing product, a combination of switching costs, sunk investments, and coordination effects can make such shifts sticky and difficult to reverse because dealers and resellers face costs, both monetary and reputational, when switching back.[22]

"In the market for firearm trigger mechanisms," Warty opined "distributors and dealers typically incur sunk, product-specific costs tied to particular designs and suppliers, including inventory commitments, product training, marketing materials, customer education, and diligence relating to legal and regulatory exposure."[23] Warty further opined "[w]hen an allegedly infringing trigger displaces the patented product in dealer channels, intermediaries may reallocate shelf space, promotional effort, and customer guidance toward the infringing alternative."[24]

18. Wart's opinions regarding claimed potential irreparable harm to Plaintiffs' relationships with distributors and dealers does not appear relevant in this litigation. Rare Breed Triggers, Inc.'s ("Rare Breed Triggers") website states that Rare Breed Triggers does not currently "offer wholesale or dealer pricing" and "may explore dealer and distributor relationships in the future."[25]

---

[22] Warty Declaration, ¶13.
[23] Warty Declaration, ¶15.
[24] Warty Declaration, ¶15.
[25] https://rarebreedtriggers.com/faqs/.



19. To the extent Rare Breed Triggers sells FRT mechanisms to dealers and distributors, or would have started to sell FRT mechanisms to dealers and distributors during the pendency of this litigation, Warty's opinions regarding disruption of distribution channels are contrary to and inconsistent with his opinions regarding the economic characteristics of the relevant market.[26] Warty stated "the products at issue are durable or semi-durable consumer goods that operate within a narrow and specialized product category, namely forced reset trigger ('FRT') mechanisms for AR-pattern firearms."[27] Regarding the products at issue, Warty opined "[f]rom an economic perspective, such markets are best characterized as differentiated niche markets, not commodity markets" and "competition in differentiated niche markets differs materially from competition in broad commodity markets because substitution patterns are discrete rather than continuous."[28] Warty further opined that in differentiated niche markets, "a competing product can rapidly displace an incumbent supplier and, in doing so, permanently alter the competitive landscape" and "once a substitute gains traction, adoption can accelerate rapidly as customers and intermediaries converge on a single preferred alternative."[29]

20. Regarding the economic characteristics of the relevant market, Warty also opined:

> . . . the market for FRT mechanisms is narrow, highly visible, and intermediated through a limited set of specialized firearms distributors and dealers that cater to an enthusiast customer base. Products in this category are marketed and sold through a small number of well-known online and brick-and-mortar retailers, where pricing, availability, and brand identity are transparent and readily compared by consumers and dealers alike. Because distributors and dealers in this segment routinely highlight specific trigger designs and manufacturers in marketing materials, product listings, training content, and customer guidance, competitive displacement tends to occur at the level of named products and suppliers rather than through gradual or diffuse substitution.[30]

---

[26] Warty Declaration, ¶¶4-7.
[27] Warty Declaration, ¶4.
[28] Warty Declaration, ¶4.
[29] Warty Declaration, ¶4.
[30] Warty Declaration, ¶7.



Warty concluded that "[i]n such an environment, the introduction and active distribution of an allegedly infringing trigger through established channels can rapidly redirect dealer attention, shelf space, and customer demand toward the competing product."[31]

21. If this litigation continues through trial and is resolved in favor of the Plaintiffs, Defendants would be removed from the market. At that time, based on Warty's identification of the economic characteristics of the relevant market, Plaintiffs will be able to "rapidly displace" the incumbent Defendants, the adoption of Plaintiffs' product "can accelerate rapidly," and Plaintiffs FRT mechanisms distributed "through established channels can rapidly redirect dealer attention, shelf space, and customer demand toward" Plaintiffs' FRT mechanisms. The disruption of Plaintiffs distribution channels would not be permanent and, therefore, not irreparable.[32]

**Price Erosion**

22. Citing to Plaintiffs' website promoting its FRT-15L3 trigger mechanism and citing to one price example of a distributor's website promoting Defendants' Disrupter trigger mechanism, Warty stated he understands "the Partisan Disruptor is marketed at a substantially lower price point than the Rare Breed FRT-15L3."[33] Citing a 2013 Federal Circuit case, Warty stated "[c]ourts evaluating requests for injunctive relief in patent and unfair competition contexts have recognized that price erosion may constitute irreparable harm where it cannot be reliably reversed or reconstructed through monetary damages."[34] This statement by the Federal Circuit recognizes that there are economic situations where price erosion damages can "be reliably reversed or reconstructed through monetary damages."[35]

---

[31] Warty Declaration, ¶7.
[32] Warty Declaration, ¶¶4, 7.
[33] Warty Declaration, ¶16 (fn 19).
[34] Warty Declaration, ¶19.
[35] Warty Declaration, ¶19.



23. If this litigation continues through trial and is resolved in Plaintiffs' favor, price erosion economic harm suffered by Plaintiffs can be awarded as monetary damages. The AICPA instructs that the "measure of lost profits damages can be based on a combination of elements, such as the following:"

- Lost unit sales
- Lower unit sales prices
- Higher costs, such as increased production and/or marketing costs
- Lost sales on ancillary (convoyed) products that are typically sold with the infringed product[36]

Because the relevant market as posited by Warty is a two-supplier market, with only the Plaintiffs and Defendants competing for sales of FRT mechanisms, which "are functionally identical and virtually indistinguishable once installed in a firearm," price erosion damages would not be difficult to quantify.[37] For each proven lost sales, Plaintiffs' lost profits can be determined by applying Plaintiffs' pre-litigation market price to the lost units to account for market price erosion, thus making Plaintiffs whole for the lost sales and price erosion resulting from the alleged infringement and other wrongful acts.[38] Assuming Plaintiffs were required to lower their FRT mechanism prices to effectively compete with Defendants' lower FRT mechanism prices during the pendency of the litigation, the difference between Plaintiffs' actual prices during the litigation and Plaintiffs' pre-litigation prices before the litigation can be awarded as price erosion lost profits damages, thus making Plaintiffs whole.[39]

---

[36] Calculating Damages in Intellectual Property Disputes; AICPA & CIMA Forensic and Valuation Services Practice Aid, Fourth Edition (2020), pg. 29.
[37] Warty Declaration, ¶8 (fn 10); Luettke Declaration, ¶11.
[38] Calculating Damages in Intellectual Property Disputes; AICPA & CIMA Forensic and Valuation Services Practice Aid, Fourth Edition (2020), pg. 44.
[39] Calculating Damages in Intellectual Property Disputes; AICPA & CIMA Forensic and Valuation Services Practice Aid, Fourth Edition (2020), pg. 44.



24. Regarding price erosion, Warty also opined "[o]nce buyers internalize a lower reference price, firms may find it difficult to return to prior price levels without losing sales."[40] However, as identified by Warty, the relevant market is a "differentiated niche market" and not a "commodity market."[41] As described by Warty, differentiated niche markets are unlike commodity markets where "customers routinely switch among multiple sellers based primarily on price."[42] If this litigation continues through trial and is resolved in Plaintiffs favor, the two-supplier market becomes a one-supplier market with no alternatives.[43] In such a market absent any direct competition, Plaintiffs would have little or no barriers to increasing its prices back to pre-litigation levels.[44]

25. In a monopoly market, such as a market where a patent prevents competitors from entering the market and consumers have no alternative products to switch to, the monopolist has market power and control over the price of the product. "It is well known that when there are many buyers but a single 'monopoly' supplier—say, a patent holder or trademark holder—it can influence the supply or price of a good or product, " "[t]he monopolist will adjust the price so that profit is maximized given the amount that is demanded at that price," and "[t]his price will be higher than in a competitive market."[45]

26. In contrast to his opinions regarding the difficulty of Plaintiffs' FRT mechanisms returning to prior price levels, Warty opined "durable goods are typically acquired on a one-time or infrequent basis" and "when a customer purchases a competing product and satisfies their need for its core functionality, that purchase exhausts the relevant demand opportunity."[46] If this litigation continues

---

[40] Warty Declaration, ¶17.
[41] Warty Declaration, ¶4.
[42] Warty Declaration, ¶4.
[43] Warty Declaration, ¶8 (fn 10); Luettke Declaration, ¶¶34, 37, 39.
[44] Warty Declaration, ¶8 (fn 10); Luettke Declaration, ¶¶11, 34, 37, 39.
[45] Slottje, Daniel, *Economic Damages in Intellectual Property*," (New Jersey: John Wiley & Sons, 2006), pg. 125.
[46] Warty Declaration, ¶8.



**Declaration of Scott W. Cragun**
*ABC IP, LLC and Rare Breed Triggers, Inc. v.*
*Peak Tactical, LLC d/b/a Partisan Triggers and Nicholas Norton*

through trial and is resolved in Plaintiffs favor, many, if not the majority, of consumers purchasing FRT-15L3 trigger mechanisms from Plaintiffs after the pendency of the litigation would be first time purchasers making their "one-time" purchase of a durable good, with little or no knowledge of prior FRT-15L3 trigger mechanism prices, and would expectedly not be impacted by Plaintiffs' return to pre-litigation FRT-15L3 trigger mechanism prices.[47]

27. Further, the Plaintiffs' FRT-15L3 trigger mechanisms and Defendants' Disruptor trigger mechanisms are designed to be installed on AR-15 rifles.[48] Warty did not acknowledge that AR-15 rifles are expensive to consumers and generally are presumably purchased by less price sensitive or price conscious consumers. AR-15 entry level rifles cost $500 to $1,000, AR-15 mid-tier rifles cost $1,000 to $1,500, and AR-15 high-end rifles cost $1,500 to $3,000.[49] Assuming Plaintiffs were required to lower their FRT mechanism prices to effectively compete with Defendants' lower FRT mechanism prices during the pendency of the litigation, the presumably less price sensitive consumers that demand FRT mechanisms for their AR-15 rifles would expectedly be minimally impacted by Plaintiffs' return to their pre-litigation market prices after the conclusion of the litigation.

**Reputational Effects**

28. Warty opined that "[r]eputational harm in differentiated niche markets can have broader economic consequences for market participants" and that "[i]n such markets, dealers and end customers generally consider not only the price and quality of a product but also its brand identity and perceived legitimacy when making purchase decisions."[50] Warty further opined "[c]ourts have long recognized that loss of goodwill and reputational injury constitute classic forms of irreparable harm in the context of injunctive relief" and "[i]n intellectual property cases specifically, courts have held

---

[47] Warty Declaration, ¶¶8, 17.
[48] Luettke Declaration, ¶¶14-15.
[49] https://blog.primaryarms.com/guide/how-much-does-an-ar15-cost/.
[50] Warty Declaration, ¶22.



that reputational effects beyond the directly accused product can support injunctive relief where the plaintiff would suffer harm to customer goodwill and channel confidence that cannot be adequately remedied through damages awards."[51] Warty provided a general discussion of reputational harm and loss of goodwill but did not provide a discussion of, or identify examples of, reputational harm and loss of goodwill that would be suffered by Plaintiffs as a result of Defendants alleged wrongful acts.[52]

29. Based on Defendants allegedly entering the market offering infringing FRT mechanisms, and Defendants allegedly falsely claiming its FRT mechanisms are covered by patents, which are "functionally identical and virtually indistinguishable once installed in a firearm" to Plaintiffs' FRT mechanisms, Warty may be inferring that Plaintiffs will suffer reputational harm or loss of goodwill as result of losing their reputation as the innovator in the market with patented FRT mechanisms.[53] However, if this litigation continues through trial and is resolved in Plaintiffs' favor, the Plaintiffs' reputation and goodwill as the innovator in the market offering patented FRT mechanism will be restored, and potentially improved or enhanced, as a result of the successful litigation. Therefore, potential reputational harm or loss of goodwill related to Plaintiffs' status as a market innovator is not irreparable.

**Distortion of Market Expectations**

30. Warty opined "the allegations in this case include conduct that may give rise to uncertainty and market confusion by affecting perceptions regarding brand identity and legitimacy of products in the market" and "[u]ncertainty and market confusion can materially alter expected payoffs associated with purchasing, reselling, or stocking a product."[54] However, Plaintiffs lost sales resulting from this

---

[51] Warty Declaration, ¶¶25-26.
[52] Warty Declaration, ¶¶22-27.
[53] Warty Declaration, ¶8 (fn 10); Luettke Declaration, ¶11.
[54] Warty Declaration, ¶20.



alleged market confusion, especially in a claimed two-supplier market with no non-infringing alternatives, can be awarded to the Plaintiffs, making them whole. For example, assuming FRT mechanism dealers, distributors, or consumers were motivated to purchase Defendants' Disruptor trigger mechanism as a result of Defendants' alleged false patent marking, if this litigation continues through trial and is resolved in Plaintiffs' favor, the alleged ill-gotten sales can be awarded as lost sales to the Plaintiffs, making the Plaintiffs whole.[55]

31. Further, if this litigation continues through trial and is resolved in Plaintiffs' favor, any market confusion of who is the patent owner or innovator in the market is resolved, especially if Defendants are removed from the market through a permanent injunction. For example, assuming certain FRT mechanism dealers, distributors, or consumers held off purchasing either Plaintiffs' FRT-15L3 trigger mechanism or Defendants' Disruptor trigger mechanism because they were confused of which supplier was the provider of patented products and which supplier was the supplier of infringing products, or which supplier is the innovator and which supplier is the imitator or copycat, if the litigation resolves in Plaintiffs' favor, these FRT mechanism dealers, distributors, or consumers would expectedly move forward with purchasing FRT-15L3 mechanisms from Plaintiffs because there would be no more market innovator ambiguity.

---

[55] Warty's cited support for his statement that the "perception of patent protection (e.g., communicated through 'patented' or 'patent pending' markings in advertising) can be attractive to consumers as a source of perceived quality and legitimacy in the market" included a Michigan Law study that concluded "consumers are not more inclined to buy patented products" and, based on "data spanning over 4 years, [the authors] find no evidence that consumers respond to increased patent salience" and while "consumers view patented products as more innovative and well made, these positive attributes do not necessarily translate into heightened purchasing behavior." (Warty Declaration ¶20 (fn 26); Billy, Alexander and Sukhatme, Neel, *Perception Pending: What Do Patents Signal to Consumers?,* Journal of Empirical Legal Studies 22, no. 2 (2025): 163-184 (https://repository.law.umich.edu/facarticles/3111/)).



## ADEQUACY OF MONETARY DAMAGES

32. Based on an assumption that Defendants committed the wrongful acts, my analysis set forth above, the information available to date in this litigation, and my experience in the determining economic harm and damages, in my opinion, Plaintiffs' economic harm potentially resulting from the Defendants' alleged wrongful acts can be measured and an award of monetary damages can adequately compensate Plaintiffs for their economic harm at the conclusion of this litigation. As set forth in my analysis above, my opinion that monetary damages can adequately compensate Plaintiffs for economic harm resulting from the alleged Defendants' wrongful acts is supported by Warty's opinions regarding the economic characteristics of the relevant market, including: the absence of non-infringing alternatives in the relevant market;[56] the relevant market is a two-supplier market (with only Plaintiffs and Defendants);[57] the relevant market is a differentiated niche market;[58] the products at issue are durable or semi-durable consumer goods;[59] durable goods are typically acquired on a one-time or infrequent basis;[60] and competing products can rapidly displace an incumbent supplier.[61] In my opinion, prompt injunctive relief is not economically necessary in this case.

## OTHER ANALYSIS

33. This declaration represents my analysis, opinions, and conclusions at this time and is based on information available to me as of the date of this declaration. I understand that discovery in this case is ongoing; therefore, I may be asked to review certain additional information, documents, and/or testimony produced subsequent to the issuance of this declaration. If additional relevant

---

[56] Warty Declaration, ¶8 (fn 10); Luettke Declaration, ¶¶ 34, 37, 39.
[57] Warty Declaration, ¶8 (fn 10); Luettke Declaration, ¶¶ 34, 37, 39.
[58] Warty Declaration, ¶4.
[59] Warty Declaration, ¶4.
[60] Warty Declaration, ¶8.
[61] Warty Declaration, ¶4.



information or testimony becomes available to me, or the legal issues in the case are narrowed, I reserve the opportunity to revise or supplement my analysis, opinions, and conclusions. I may also testify at a hearing or trial regarding any related matter raised by either party if asked to do so by the Court or the parties' attorneys. In connection with my testimony in this action, I may use as exhibits various documents produced in this litigation, which refer or relate to the matters discussed in this declaration. In addition, I may create or assist in the creation of certain demonstrative exhibits to assist me in providing testimony. I have not yet selected or created such exhibits. This declaration is intended solely this litigation and is not to be used for any other purpose.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 30th day of January, 2026



Scott W. Cragun



**Exhibit 1**

CURRICULUM VITAE
# SCOTT W. CRAGUN
## PRINCIPAL

## QUALIFICATIONS

MBA, Brigham Young University, USA
BA, Communications, University of Utah, USA
Certified Licensing Professional (CLP)

## MEMBERSHIPS

Member, Licensing Executives Society (LES)
Member, Utah State Bar Intellectual Property Section CLE Committee

## PROFILE

**Scott W. Cragun** has over 27 years of experience in financial and litigation consulting. He specializes in intellectual property (IP) damages analysis and calculations, including lost profit calculations, reasonable royalty determinations, and other intellectual property quantitative analyses such as valuations.

Scott has provided financial analysis and expert witness testimony regarding patent, trademark, trade dress, trade secret, copyright, false advertising, and unfair competition issues. He has assisted in license negotiations and conducted royalty compliance reviews.

During his career, Scott has been significantly involved with company and law firm personnel in identifying relevant market, financial, and economic information and developing damages scenarios. His industry experience includes the agriculture, automotive, computer, consumer products, electronics, healthcare, oil and gas, semiconductor, software, and telecommunications sectors.

## PUBLICATIONS & PAPERS

"**The 'Analytical Approach' as a Technique to Determine a Reasonable Royalty**" (Chapter 11), Co-author, in D. Slottje, ed. *Economic Damages in Intellectual Property: A Hands-On Guide to Litigation*, Wiley, *2006*

## PRESENTATIONS & SPEAKING ENGAGEMENTS

"**Recent Trends in Intellectual Property Damages**," Panel Overview, Utah State Bar Intellectual Property Summit, Salt Lake City, Utah, USA, *February 2022*

"**Apportionment in Determining Reasonable Royalty Damages**," Speaker, David K. Winder Intellectual Property American Inn of Court, Salt Lake City, Utah, USA, *March 2021*

"**Intellectual Property Valuation and Damages**," Guest Lecturer, Management Program (New Venture Mechanics), The University of Texas at Austin, Austin, Texas, USA, *October 2018*

"**Intellectual Property Valuation and Damages**," Guest Lecturer, Management Program (Entrepreneurship Practicum), The University of Texas at Austin, Austin, Texas, USA, *October 2018*

"**Patent Infringement: Practical Guide and Best Practices to Prove Royalty Damages**," Webcast, The Knowledge Group, *December 2016*

"**Recent Trends in Patent Infringement Litigation and Damages**," Panel Overview, Utah State Bar Intellectual Property Summit, Salt Lake City, Utah, USA, *February 2012*

"**Recent Trends in Patent Infringement Damages**," Speaker, Utah State Bar Intellectual Property Section, Salt Lake City, Utah, USA, *June 2011*



**Exhibit 1**

"**Patent Infringement Damages and Expert Reports**," Guest Lecturer, Brigham Young University, Law School, Utah, Provo, Utah, USA, *March 2010*

"**Patent Infringement Damages**," Guest Lecturer, Brigham Young University, Law School, Provo, Utah, USA, *March 2008*

"**Patent Law Remedies & Patent Damages**," Guest Lecturer, University of Utah, Law School, Salt Lake City, Utah, USA, *November 2007*

"**Recent CAFC Decisions Affecting Damages in Intellectual Property Cases**," Speaker, Utah State Bar Intellectual Property Section, Salt Lake City, Utah, USA, *June 2006*

"**Intellectual Property Law**," Guest Lecturer, Law Program, Salt Lake Community College, Salt Lake City, Utah, USA, *March 2006*

"**Intellectual Property Law**," Guest Lecturer, Law Program, Salt Lake Community College, Salt Lake City, Utah, USA, *November 2005*

"**Patent Infringement Damages Case Study**," Guest Lecturer, Economics Program, Southern Methodist University, Dallas, Texas, USA, *September 2005*

"**Economics of Patent Infringement Damages**," Guest Lecturer, Economics Program, Southern Methodist University, Dallas, Texas, USA, *September 2004*

"**Twenty Years of Damage Decisions under CAFC**," Speaker, Utah State Bar Intellectual Property Section, Salt Lake City, UT, USA, *August 2001*

"**Valuations in Litigation**," Guest Lecturer, MBA Program, University of Houston, Houston, Texas, USA, *July 2001*

"**Financial Consulting in Litigation**," Guest Lecturer, MBA Program, University of Houston, Houston, Texas, USA, *February 2001*



Exhibit 2

# SCOTT W. CRAGUN
## Testimony Experience

| Year | Client | Forum | Action or Proceeding | Description |
|------|--------|-------|---------------------|-------------|
| 2025 | SnapRays, LLC d/b/a SnapPower | N.D. Texas | SnapRays, LLC d/b/a SnapPower v. American Tack & Hardware Co., Inc. | Deposition |
| 2025 | RMR Home Solutions LLC d/b/a ProTaxAppeal and Rick Robin | N.D. Illinois | RMR Home Solutions LLC d/b/a ProTaxAppeal and Rick Robin v. Daniel Farris | Deposition |
| 2025 | Rail Scale, Inc. | S.D. Texas | Rail Scale, Inc. v. Weighing Technologies, Inc. d/b/a WT Rail, Case No. 4:21-cv-03698 | Deposition, Trial |
| 2025 | Rail Scale, Inc. | E.D. Tennessee | Rail Scale, Inc. v. Wingfield Scale & Measure, LLC, Case No. 1:21-cv-00287 | Deposition |
| 2025 | Seattle Metropolitans Hockey LLC | W.D. Washington | Seattle Metropolitans Hockey LLC v. Seattle Hockey Partners LLC, Case No. 2:23-cv-01989 | Deposition |
| 2024 | Rebel Creamery LLC | E.D. New York | Van Leeuwen Ice Cream LLC v. Rebel Creamery LLC, Case No. 1:21-cv-02356 | Deposition, Trial |
| 2024 | Stampin' Up!, Inc. | D. Utah | Stampin' Up!, Inc. v. Dollar Tree, Inc., Dollar Tree Stores, Inc., Dollar Tree Management, LLC, Dollar Tree Distributing, Inc., Dollar Tree Sourcing Company, LLC, and Greenbrier International, Inc., Case No. 2:23-cv-00423 | Deposition |
| 2024 | Pitchfork Ranch, LLC | N.D. Texas | The Pitchfork Land and Cattle Company v. Pitchfork Ranch, LLC, Case No. 5:23-cv-00205 | Deposition |
| 2024 | Yita LLC and Jinrong (SH) Automotive Accessory Industrial Development Co., Ltd. | Patent Trial and Appeal Board | Yita LLC and Jinrong (SH) Automotive Accessory Industrial Development Co. Ltd. v. MacNeil IP LLC, Case No. IPR2023-00173 | Deposition |
| 2024 | Yita LLC and Jinrong (SH) Automotive Accessory Industrial Development Co., Ltd. | Patent Trial and Appeal Board | Yita LLC and Jinrong (SH) Automotive Accessory Industrial Development Co. Ltd. v. MacNeil IP LLC, Case No. IPR2023-00172 | Deposition |



Exhibit 2

# SCOTT W. CRAGUN
## Testimony Experience

| Year | Client | Forum | Action or Proceeding | Description |
|------|--------|-------|----------------------|-------------|
| 2022 | Monson Fruit Company, Inc. | E.D. Washington | Her Majesty the Queen in Right of Canada as Represented by the Minister of Agriculture and Agri-Food v. Van Well Nursery, Inc., Monson Fruit Company, Inc., Gordon Goodwin, and Sally Goodwin, Case No. 2:20-cv-00181 | Deposition |
| 2021 | Wing Enterprises, Inc., d/b/a Little Giant Ladder Systems | D. Minnesota | Wing Enterprises, Inc., d/b/a Little Giant Ladder Systems v. Tricam Industries, Inc., Case No. 0:17-cv-01769 | Trial |
| 2021 | Softketeers, Inc. | C.D. California | Softketeers, Inc. v. Regal West Corporation d/b/a Regal Logistics, Vu Ho Inc., Thai Tran Inc., Don Mai Inc., Randy Neeves, Vu Ho, Thai Quoc Tran, Don Mai, and Trung Ngoc Doan, Case No. 8:19-cv-00519 | Deposition, Trial |
| 2021 | Gerry Spence Trial Institute, Gerald L. Spence, John Zelbst, Rex Parris, Joseph H. Low, Ken Spence | D. Wyoming | The Trial Lawyers College v. Gerry Spence Trial Institute, Gerald L. Spence, John Zelbst, Rex Parris, Joseph H. Low, Ken Spence, John Joyce, and Daniel Ambrose, Case No. 1:20-cv-00080 | Deposition |
| 2020 | Snap Lock Industries, Inc. | D. Nevada | Snap Lock Industries, Inc. v. Swisstrax Corporation, Case No. 2:17-cv-02742 | Deposition |
| 2019 | Daniel Todd Edwards and Mil Agro, Inc. | S.D. New York | Balchem Corporation and Albion Laboratories, Inc. v. Daniel Todd Edwards and Mil Agro, Inc., Case No. 7:18-cv-02677 | Deposition |
| 2018 | Parah, LLC and Ozonics, LLC | D. Kansas | Parah, LLC and Ozonics, LLC v. MoJack Distributors, LLC d/b/a Scent Crusher, Case No. 6:18-cv-1208 | Hearing |



Exhibit 2

# SCOTT W. CRAGUN
## Testimony Experience

| Year | Client | Forum | Action or Proceeding | Description |
|------|--------|-------|----------------------|-------------|
| 2018 | New Bright Jet Lighting (Shenzhen) Co., Ltd., Interest Plus Investments Limited, Chien Ho Tsai | C.D. California | Anthony California, Inc. v. Fire Power Co., Ltd., New Bright Jet Lighting (Shenzhen) Co., Ltd., Interest Plus Investments Limited; Chien Tsai Tsai, Chien Ho Tsai, James Moran, M & M Sales, Inc., and Direct Lighting LLC, Case No. 5:15-cv-876 | Trial |
| 2018 | Nox Medical ehf | D. Delaware | Nox Medical ehf v. Natus Neurology Inc., Case No. 1:15-cv-00709 | Deposition, Trial |
| 2017 | Uniclass Technology Co., Ltd., Electronic Technology Co., Ltd. of Dongguan Uniclass, Airlink 101, Phoebe Micro Inc., and Broadtech International Co., Ltd. d/b/a Linkskey, Black Box Corporation, and Black Box Corporation of Pennsylvania | C.D. California | ATEN Technology, Co. Ltd. v. Uniclass Technology Co., Ltd., Electronic Technology Co., Ltd. of Dongguan Uniclass, Airlink 101, Phoebe Micro Inc., and Broadtech International Co., Ltd. d/b/a Linkskey, Black Box Corporation, and Black Box Corporation of Pennsylvania, Case No. 2:15-cv-04424 | Deposition, Trial |
| 2014 | Tom Lalor and Bumper Boy, Inc. | W.D. Washington | Radio Systems Corporation and Innotek, Inc. v. Tom Lalor and Bumper Boy, Inc., Case No. 2:10-cv-00828 | Deposition, Trial |
| 2009 | Harris Research, Inc. | S.D. California | Mytee Products, Inc. v. Harris Research, Inc., Case No. 3:06-cv-01854 | Trial |



Exhibit 3

**ABC IP, LLC and Rare Breed Triggers, Inc.**
**v. Peak Tactical, LLC d/b/a Partisan Triggers and Nicholas Norton**
**Information Reviewed and Considered**

**Legal Documents**

Complaint for Patent Infringement, False Patent Marking, and False Advertising, January 15, 2026

**Legal Documents**

Declaration of Brian Luettke, January 16, 2026
Declaration of Samir P. Warty, Ph.D. in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, January 16, 2026

**Publicly Available Information**

Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1327 (Fed. Cir. 1987)
DePuy Spine, Inc. et al. v. Medtronic Sofamor Danek, Inc. et al., 567 F.3d 1314, 1330 (Fed. Cir. 2009)
Douglas Dynamics, LLC v. Buyers Products Co., 717 F.3d 1336 (Fed. Cir. 2013)
eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)
Grain Processing Corporation v. American Maize-Products Company, 185 F.3d 1341 (Fed. Cir. 1999)
Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1456, 7 USPQ2d 1191, 1200 (Fed. Cir. 1988)
Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978)
Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 975 (Fed. Cir. 1996)
Porous Media Corporation v. Pall Corporation, 173 F.3d 1109 (8th Cir. 1999)
State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1577 (Fed. Cir. 1989)

AICPA & CIMA, "Calculating Damages in Intellectual Property Disputes; AICPA & CIMA Forensic and Valuation Services Practice Aid, Fourth Edition" (2020), pgs. 29-30,44.
Anderson, J. Jonas, "Nontechnical Disclosure," Vanderbilt Law Review 69, no. 6 (2016):1573-1602 (https://cdn.vanderbilt.edu/vu-wp0/wpcontent/uploads/sites/89/2016/11/30103806/Nontechnical-Disclosure.pdf)
Arthur, W. Brian, "Competing Technologies, Increasing Returns, and Lock-In by Historical Events," Economic Journal 99, no. 394 (1989): 116-131 (https://www.jstor.org/stable/2234208)
Berry, Steven T. and Philip A. Haile, "Identification in Differentiated Products Markets Using Market Level Data," Cowles Foundation Discussion Paper No. 1744, January 2010, updated February 2010 (https://cowles.yale.edu/sites/default/files/2022-09/d1744.pdf)
Billy, Alexander and Neel Sukhatme, "Perception Pending: What Do Patents Signal to Consumers?" Journal of Empirical Legal Studies 22, no. 2 (2025): 163-184, (https://repository.law.umich.edu/cgi/viewcontent.cgi?article=4115&context=facarticles)
Bronnenberg, Bart J., and Jean-Pierre Dube, "The Formation of Consumer Brand Preferences," NBER Working Paper Series (2016), available at (https://www.nber.org/system/files/working_papers/w22691/w22691.pdf)
Coase, R.H., "Durability and Monopoly," Journal of Law and Economics 15, no. 1 (1972), pgs. 143-149
David, Paul A., "Clio and the Economics of QWERTY," American Economic Review 75, no. 2 (1985) (https://www.jstor.org/stable/1805621)
Farrell, Joseph and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects," Working Paper (2006) (https://www.nuff.ox.ac.uk/economics/papers/2006/w7/Farrell_KlempererWP.pdf)
Funaki, Yukihiko, et al., "Price stickiness and strategic uncertainty: An experimental study," Journal of Economic Dynamics and Control 180 (2025), at abstract
Healy, Paul M. et al., "Market Competition, Earnings Management, and Persistence in Accounting Profitability Around the World," Review of Accounting Studies (forthcoming) (2014) (https://dash.harvard.edu/server/api/core/bitstreams/7312037d-586c-6bd4-e053-0100007fdf3b/content)
Jia, Justin, Jia Li, and Weixin Liu, "Expectation-based consumer purchase decisions: behavioral modeling and observations," Marketing Letters (2022): 1-17 (https://pmc.ncbi.nlm.nih.gov/articles/PMC9676804/)
Klemperer, Paul, "Competition When Consumers Have Switching Costs: An Overview with Applications to Industrial Organization, Macroeconomics, and International Trade," Review of Economic Studies 62, no. 4 (1995), pgs. 515–539
Langer, Daniel, "Luxury Unfiltered: The true cost of cutting luxury prices," Luxury Daily, September 11, 2024, (https://www.luxurydaily.com/luxury-unfiltered-the-true-cost-ofcutting-luxury-prices/)
Londono, Juan M., et al., "Costs of Rising Uncertainty," Federal Reserve (https://www.federalreserve.gov/econres/notes/feds-notes/costs-of-rising-uncertainty-20250424.html)
Nagle, Thomas T. and Georg Müller, The Strategy and Tactics of Pricing, 6th ed. (New York: Routledge, 2018), p. 19
Rindova, Violina P. et al., "Being Good or Being Known: An Empirical Examination of the Dimensions, Antecedents, and Consequences of Organizational Reputation," Academic of Management Journal 48, no. 6 (2005), pg. 1033
Shapiro, Carl, "Consumer Information, Product Quality, and Seller Reputation," FTC Bureau of Economics Working Paper No. 42 (1980) (https://www.ftc.gov/system/files/documents/reports/consumer-information-product-quality-sellerreputation/wp042.pdf)
Slottje, Daniel, Economic Damages in Intellectual Property," (New Jersey: John Wiley & Sons, 2006), pg. 125
Tisdell, Clem, and Irmi Seifl, "Niches and economic competition: implications for economic efficiency, growth and diversity," Structural Change and Economic Dynamics 15 (2004), pg. 126

http://archives.cpajournal.com/old/14152806.htm
https://greyscout.com/price-erosion-what-is-it-and-how-do-you-stop-it/
https://partisantriggers.com/the-disruptor/
https://partisantriggers.com/where-to-find/
https://rarebreedstrigger.com/shop/frt-15l3-trigger/
https://rarebreedtriggers.com/faqs/
https://rarebreedtriggers.com/product/frt-15l3-2/

Exhibit 3

*ABC IP, LLC and Rare Breed Triggers, Inc.*
*v. Peak Tactical, LLC d/b/a Partisan Triggers and Nicholas Norton*
**Information Reviewed and Considered**

https://thedocs.worldbank.org/en/doc/727481572033451039-0050022019/original/CMOOctober2019SpecialFocus.pdf
https://www.fintastiq.com/blog/instilling-brand-and-core-values-into-your-pricing-strategynbsp
https://www.fjc.gov/sites/default/files/materials/21/SciMan3D01.pdf
https://www.imf.org/external/np/sta/tegeipi/ch9.pdf
https://www.indeed.com/career-advice/career-development/types-of-distributors
https://www.offitkurman.com/offit-kurman-blogs/injunctive-relief-ip-disputes
https://www.opticsplanet.com/partisan-triggers-the-disruptor-rifle-trigger.html
https://blog.primaryarms.com/guide/how-much-does-an-ar15-cost/