UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation, and<br><br>   *Plaintiffs*,<br>v.<br><br>PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,<br><br>   *Defendants*. | Case No. 2:26-cv-00018-KHR<br><br>**DECLARATION OF MICHAEL STAKES** |

I, Michael Stakes, declare and state as follows:

1. I submit this declaration in support of Defendants Opposition to Plaintiffs' Memorandum in Support of Their Motion for Temporary Restraining Order and Preliminary Injunction in this action.

2. I am the named inventor of U.S. Patent No. 9,146,067 ("the '067 Patent") and the designer behind the Tac-Con 3MR trigger, produced by the company I co-founded, Tactical Fire Control, Inc. ("Tac-Con").

3. On December 2, 2025, I assigned ownership of '067 Patent to Dark Flame Innovations, LLC.

4. On December 23, 2025, Plaintiffs in the present case, Rare Breed Triggers, Inc. and ABC IP, LLC, filed a lawsuit in the United States District Court for the District of Arizona against me personally, Firearm Systems LLC, and a named John Doe defendant repeatedly referred to as Partisan Triggers throughout the Complaint. *Rare Breed Triggers, Inc. v. Firearm Systems LLC*, Case No. 2:25-cv-04938-SMB. In that lawsuit, Plaintiffs asserted the same claims as those alleged

**DECLARATION OF MICHAEL STAKES – Page 1**

here: namely infringement of U.S. Patent No. 10,514,223 ("the '223 Patent"); U.S. Patent No. 11,724,003 ("the '003 Patent"), 12,036,336 ("the '336 Patent"), and 12,274,807 ("the '807 Patent"), and falsely advertising that the Partisan Disruptor (the product at issue in this case) practices my '067 Patent and that it is an "assisted reset trigger."

**I. BACKGROUND**

5. I grew up taking things apart and putting them back together, and I formalized that curiosity through engineering coursework. I completed an electrical engineering degree through a community college partnership program with Northern Illinois University and a computer science minor. My physics courses, especially mechanics and dynamics, gave me the analytical foundation to understand energy transfer, kinematics, and timing in mechanical systems like firearm fire-control groups.

6. I began my professional career in electrical engineering and quickly realized I wanted to build and run something of my own. I started an auto glass business, worked hands-on for years, and kept sketchbooks of mechanical ideas. That combination of engineering fundamentals and real-world problem solving is what ultimately led me to the 3MR.

7. The origin story and motivation behind the 3MR was to save lives.

8. In 2012, my cousin, then a U.S. Customs and Border Protection officer, was involved in a live firefight during the course of his employment. His AR-15 failed under stress because the disconnector hung up on the hammer and would not allow the trigger assembly to reset to fire the next shot. The failure was not theoretical; it happened while rounds were being exchanged. That event changed my priorities. I decided to solve the specific, life-or-death problem of a trigger that would reliably and rapidly reset under cycling, so the next round would be ready without requiring the operator to fully release the trigger.

2

9. I went to a gun store in Phoenix, Arizona, bought an AR-pattern rifle, took the lower apart, and taught myself the exact kinematics of the standard fire-control group. I began with pencil drawings, mapping the hammer, trigger nose, disconnector, selector geometry, and the carrier surfaces that actuate them, and then moved the design into CAD once I had the geometry and lever ratios I wanted. The trigger design that emerged was the reset-lever concept that became the Tac-Con 3MR: using the energy of the bolt carrier/hammer interaction during cycling to positively drive the trigger back to its set position, then free it to be pulled again only when the action is in battery.

**II. CONCEPTION, DESIGN DECISIONS, AND WHY THE 3MR WAS INNOVATIVE**

10. From the outset, the 3MR was designed to do two things at once: a) assist/force the trigger's return to the set position using cycling energy transferred through a reset lever, and b) keep the mechanism semi-automatic and safe, i.e., one shot per trigger function and no release until the firearm is ready.

11. To make the system selectable between three different modes--safe, standard semi-automatic, and a third mode with positive reset—I designed the reset lever to pivot off the underside of the selector and interact with the trigger/disconnector assembly. I did not hard-couple a fixed reset surface directly to the trigger body because that would eliminate selectability, increase stress concentrations, and invite durability issues. The reset lever I designed allowed three positions with clear, repeatable geometry.

12. Over the course of my development of the 3MR, I created several versions, depicted below, culminating in the commercial embodiment of the 3MR. In one of my earliest 3MR prototypes, designed in 2012, I positioned the reset lever immediately adjacent to the disconnector, as depicted in the individual images below.







13. I pursued a "drop-in" module architecture, with a housing that located the parts and used the standard hammer and trigger pins to retain the assembly, because real users needed a robust, plug-and-play solution. While the '067 Patent claims focus on the core reset-lever

mechanics and selector geometry (including travel-limiting stops), the commercial 3MR that shipped to customers was built in a housing and installed as a self-contained module.

14. The Firearms Technology Branch of ATF examined the 3MR in 2013. In its October 8, 2013, letter, ATF confirmed exactly how the design works and that its function complied with the definition of a semi-automatic weapon: the reset lever "pivots forward, and the hammer engages/contacts the lever during the cycling of the rifle. In this position, the hammer contacts the reset lever during cocking, which applies force to the trigger, forces the shooter's finger forward, and allows the trigger to reset rapidly." ATF's testing concluded the 3MR "functioned only semi automatically during both the field test and live-firing." That is the mechanism I invented, patented as the '067 Patent, and made and sold to the public as the 3MR trigger.

15. Shortly after receiving ATF confirmation, Tac-Con launched on November 12, 2013. We produced and sold the first batch of 3MR triggers in 2013–2014. Industry press and NRA publications covered the product in early 2014, repeatedly describing the same concept: a positive/reset-assisted semi-automatic trigger that uses bolt-carrier energy to drive a faster reset.

16. During production and fulfillment of the first batches of the 3MR in 2013–2014, some customers reported they could "outrun" the trigger, meaning they applied trigger input faster than the action could safely complete its cycle, which can lead to phenomena like light strikes or hammer follow. In 2015–2016, I developed an out-of-battery safety (a locking/gating member) that would mechanically block trigger release until the bolt carrier returned to a closed, in-battery state. This is the same gating component and function that Plaintiffs now recite as a "locking member moved by the bolt carrier as it reaches a substantially in-battery position." We did not commercialize that prototype because, candidly, we were concerned ATF would view the

5

aggregate effect as too near "simulated automatic fire," and our determination was to stay within the law. But the prototype was built and tested before the 2017 priority date of Plaintiffs' earliest patent, and long before the 2022 priority dates of the later asserted patents.

17. The out-of-battery safety (or "gating device") that I built into the 3MR was based on old and well-known technology. Upon hearing that the 3MR was experiencing the issue described above, adding an out-of-battery safety was a well-known and obvious way to address that issue. Out-of-battery safety mechanisms have been commonly used for many decades in fully automatic weapons, so there was nothing inventive on my part by simply adding this known technology to the 3MR to address the "outrun" trigger issue.

### III. THE '067 PATENT, PLAINTIFFS & THE ASSERTED PATENTS

18. With the assistance of a patent attorney, I filed my application for the '067 Patent on June 17, 2013, and it issued on September 29, 2015.

19. The '067 Patent describes the core reset-lever architecture and three-position selector, and claim 19 expressly recites the selector-based adjustment of trigger travel distances via aligned stops. In substance, the '067 Patent generally discloses and claims:

   a. A trigger body with a trigger nose (sear) and a trigger tail;

   b. A disconnector with a hook that engages/releases the hammer during cycling;

   c. A reset lever in mechanical communication with the trigger/disconnector that transfers cycling energy to reset the trigger rapidly;

   d. A safety/selector with three positions—safe, standard semi-automatic, and assisted/positive reset mode—and geometry that adjusts trigger travel via stops aligned with the trigger tail (distances D1 and D2); and

   e. The hammer with a trigger notch and a disconnect notch that interface with the trigger nose and disconnector.

20.   I provide annotated depictions of the 3MR detailing its components below:



21.   Plaintiffs' Asserted Patents and products recite these same, ordinary AR-pattern parts (hammer, trigger member, sear/nose, disconnector with hook, springs, pins, and a safety selector) and the same three positions (safe, standard semi-automatic, and forced/positive reset semi-automatic). The Asserted Patents add a "locking member" (i.e., an out-of-battery safety or gating device) that is spring-biased and moved by the bolt carrier "as the bolt carrier reaches a substantially in-battery position." As noted above, I built and tested an out-of-battery gating

7

prototype in 2016, before Plaintiffs' 2017 and 2022 filings, and that specific device has existed in firearm trigger mechanisms for generations.

22. In my opinion based on my years of experience and knowledge in designing trigger mechanisms, the only mechanical change in Plaintiffs' asserted designs compared to the '067 Patent (and its 3MR commercial embodiment) is that they combine the reset lever and trigger body into a single piece or rigid contact surface, and add in the well-known out-of-battery safety/selector, which, as described above, has been a staple in the industry for decades. Machining two pieces into a single piece is a minor packaging change or design choice; it does not change how the mechanism operates. Both systems use cycling energy to move the trigger forward toward reset and then permit a new firing only when the action is closed. Functionally, they achieve the same result with only slightly different part geometry.

23. In addition to my own '067 Patent and the commercial Tac-Con 3MR, I am aware of the Bonner patent (US 9,829,263). Bonner confirmed that, by 2015, industry practitioners were already teaching reset mechanisms in which the hammer's rearward movement during cycling contacts a surface associated with the trigger to drive the trigger back to its set position. Bonner teaches four embodiments of an automatic reset of a trigger member, including (as shown in FIG. 19) a trigger member with an integral contact surface ("trigger surface 39") that forces the trigger to be reset upon interaction with the hammer spring force. Bonner expressly recognized that the trigger's contact surfaces were a matter of design choice and could be done either as an integral portion of the trigger body or as a separate insert, and that the same components could be "arranged and designed in a wide variety of different configurations." Taken together with my 3MR design, this reference demonstrates that there were known designs with a trigger member having an

integral contact surface, among other designs, that all perform in the same, predictable way to achieve a cycling-driven reset of the trigger.

24. While I did not commercialize a one-piece, combined trigger-body/reset-lever design, the feasibility of such a one-piece approach was apparent to me at the time as it would not have changed the fundamental operation of the device. The Bonner patent confirms this. It would have been a straightforward variation of the reset-lever architecture I disclosed in the '067 Patent, i.e., a design choice that functions in the same known way. Before the priority dates of the Asserted Patents, I evaluated such integrated designs and, based on then-current ATF regulations and enforcement posture, I made a deliberate decision not to pursue them because I was concerned they would be deemed to simulate automatic fire and be classified as illegal machine guns. My focus was on delivering a reliable, rapid-reset semi-automatic trigger that complied with the law, which is why I stayed with the selectable reset-lever architecture and did not pursue a one-piece design. I am aware, however, that just last summer, the ATF approved Rare Breed's trigger design, after a long, multi-year battle.

25. In 2021, Mr. Lawrence DeMonico owner or former owner of Rare Breed Triggers, Inc. called me personally seeking to purchase Tac-Con and its patents. I declined. Then, in 2025, Rare Breed called me a second time, this time through Josh Baker, an individual associated with Rare Breed, and asked again if I would sell Rare Breed my patents. Again, I declined. I have preserved the text messages and communications reflecting those efforts.

26. After those attempts to purchase, Plaintiffs started selling their own trigger products to the public and pursued patents that were filed years after my patents. In my view, the new patents claim the same core forced-reset/reset-assisted technology that the 3MR taught years earlier, plus the optional out-of-battery gating I had prototyped in 2016. In fact, in arguing that their products

9

are lawful, Plaintiffs have publicly pointed to the ATF's 2013 letter, which was addressed to my 3MR products. The chronology is straightforward: my invention and commercial product came first; Plaintiffs' filings and products came later.

27. In other words, the technology at issue did not originate with Plaintiffs. My reset-lever concept and three-position, positive-reset semi-automatic mode were invented and commercialized years before Plaintiffs' claims. The out-of-battery gating device Plaintiffs now emphasize was prototyped by me well before their 2017 and 2022 filings and is an old idea in firearm design. The Asserted Patents and products present a minor design variation (effectively changing two pieces into one-piece) but otherwise use the same components that operate the same way to produce a forced or assisted reset trigger mechanism.

## IV.   PERSONAL TESTING OF THE RELEVANT PRODUCTS

28. I personally installed and tested both the Partisan Disruptor and Rare Breed's FRT-15L3, using controlled fixtures and calipers to measure the selector-stop geometry and trigger travel distances. In both products, the selector presents different stop surfaces aligned with the trigger tail, producing two distinct travel distances. The second distance is less than the first, and shortens the amount of reset necessary for the trigger to return to a firing position. That is precisely the relationship recited in claim 19 of the '067 Patent and described in the patent's specification: the selector's second position reduces travel so the tail contacts a closer stop, arresting movement earlier. My tests confirmed that the Partisan Disruptor practices claim 19, and that Plaintiffs' product does as well.

## V.   INDUSTRY USAGE AND TERMINOLOGY

29. In the marketplace and in regulatory descriptions, including ATF's 2013 letter, the phrases "assisted reset," "forced reset" and "positive reset" have been used interchangeably to describe the same underlying phenomenon: the firearm's cycling transfers energy through the

fire-control parts to urge the trigger forward toward its reset position more aggressively than the baseline trigger return spring alone. My 3MR was consistently described in those terms a decade ago. In fact, the '067 Patent uses the phrase "assisted reset" as opposed to "forced reset," mainly because that term was my personal preferred nomenclature. I have seen both terms used interchangeably in the literature and articles that describe these triggers. In my view there is no meaningful or mechanical difference between the two terms.

30. Specifically, multiple industry publications characterized the 3MR's third selector mode as providing a "positive reset" and explained that the reset was "achieved by transferring the force from the bolt carrier through the trigger assembly to assist the trigger back onto the sear." Others described the reset in terms of applying force to the trigger and "forc[ing] the shooter's finger forward" during cycling so the trigger can "reset rapidly." In my experience, those are not distinct technical categories; they are different labels for the same cycling-driven reset behavior in a semi-automatic fire-control group.

31. The industry's descriptions of my 3MR illustrate the point. Articles in mainstream outlets like American Rifleman, Gun Digest, Small Arms Review, and Shooting Illustrated all used this "positive/assisted/forced" reset language to describe the 3MR's operation, and they did so years before the priority dates of the Asserted Patents. The nomenclature varied, but the physics and the intended semi-automatic operation did not. Below is a list of contemporaneous articles covering the Tac-Con 3MR in this way:

    a. American Rifleman, "Tac Con 3MR Trigger System" (Jan. 14, 2014) https://www.americanrifleman.org/content/tac-con-3mr-trigger-system/;

b. Gun Digest (Elwood Shelton), "Tac Con 3MR Triggers Aiming at Speed, Accuracy" (Jan. 2, 2014) https://gundigest.com/gun-reviews/gun-accessories/tac-con-3mr-trigger;

c. Small Arms Review (Todd Burgreen), "Tactical Fire Control Tac Con 3MR Trigger: Hype or True Enhancement?" (Feb. 21, 2014) https://archive.smallarmsreview.com/display.article.cfm?idarticles=2429;

d. Small Arms Review (Chris A. Choat), "TAC CON 3MR Trigger" (May 16, 2014) https://archive.smallarmsreview.com/display.article.cfm?idarticles=2646;

e. Shooting Illustrated, "Tac Con Introduces AR 15 and AK Platform Triggers" (Nov. 25, 2014) https://www.shootingillustrated.com/content/tac-con-introduces-ar-15-and-ak-platform-triggers/;

f. Shooting Illustrated, "TacCon's 3MR Trigger" (May 15, 2015) https://www.shootingillustrated.com/content/taccon-3mr-trigger/; and

g. Shooting Sports Retailer, "Video review: Tac Con 3MR trigger" (Sept. 4, 2014) https://www.shootingsportsretailer.com/gear/video-review-tac-con-3mr-trigger-1.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on <u>30th of January</u>, in Phoenix, Arizona.

_____
Michael Stakes