**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas Corporation, | |
|       Plaintiffs, | |
| vs. | Civil Action No. 2:26-cv-00018-KHR |
| PEAK TACTICAL, LLC, d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual, | |
|       Defendants. | |

---

**DECLARATION OF BEN WOODS IN REPONSE TO MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

I, Ben Woods, declare under penalty of perjury that the following facts are true and correct and within my personal knowledge:

1.　　My name is Ben Woods. I am the owner and sole manager of the Wyoming company Dark Flame Innovations, LLC ("DFI"), which operates alongside Peak Tactical, LLC ("Peak") and nonparty QOX Consulting, LLC ("QOX") to make, market, and sell the Partisan Disruptor assisted-reset trigger that is at issue in this litigation.

**PERSONAL BACKGROUND**

2.　　I enlisted in 2003 as a Fire Support Specialist. I attended Officer Candidate School for the Marine Corps in 2008, and after graduating from Southern Virginia University in December 2009 was commissioned as a Second Lieutenant in the Marine Corps.

3.　　As a Captain, I was selected to serve as a Warfighting Instructor at Quantico, a faculty position generally reserved for officers rated highest among their peers for integrity, character, and competence. At The Basic School I instructed newly commissioned officers during their six month training cycle in the ethics, rifle squad, and patrolling training packages.

4.      Among others, I hold a Foreign Security Force Advisor military occupational specialty. I have deployed to Afghanistan in 2014 as the Chief of Anti-Terrorism/Force Protection, NATO Training Mission Afghanistan, in 2015 to Africa as a Marine liaison, and after receiving a waiver for medical issues deployed in 2024 as a foreign advisor assigned to Security Assistance Group – Ukraine, where I served as a Fire Support Officer and as the Chief of Fires.

5.      In 2014 I was offered a commission as a Special Agent with the U.S. Department of State's Bureau of Diplomatic Security. In 2015 I transferred to the Marine Corps reserve, beginning my career as a Special Agent. As a federal law enforcement officer I served two years as a criminal investigator, three years as a member of the Secretary's Protective Detail, and as both Acting and assistant Regional Security Officer for the U.S. Mission Kazakhstan, where I directed law enforcement, security programs, personnel, and other operations in Astana and Almaty – including during the 2022 January uprisings.

6.      In December 2023, I was medically retired from the State Department while serving as a desk officer in the High Threat Programs office. With the Marine Corps Reserve I served multiple tours with special operations capable ANGLICOs as both a Firepower Controller and Supporting Arms Liaison Team Leader. I currently hold a commission as a Major in the Marine Corps Reserve.

7.      I hold a Type 10 Federal Firearms License as a Manufacturer of Destructive Devices and have served as firearms instructor for numerous government agencies from the federal to local level.

**CORPORATE STRUCTURE**

8.      DFI, Peak, and QOX were founded in or around spring 2025 to bring firearms accessories to market. Together, they operate the Partisan brand.  These entities work together to

handle the manufacture, assembly, packaging, sale, and delivery of the Disruptor triggers sold by Partisan Triggers.

9.      DFI owns the intellectual property associated with the Disruptor trigger, including the '067 patent that we acquired from Michael Stakes. In addition to me, DFI currently employs two other people, but at times, has employed more.

10.     Peak performs marketing and sales for the Partisan brand, and it is owned 49% by Defendant Nick Norton and 51% by QOX. In addition to Nick, Peak employs three other people.

11.     Partisan Triggers only sells to licensed firearm dealers or proven professional firearm businesses, who are listed on our website.  Partisan does not sell through its website or direct-to-consumer.

12.     QOX serves as the project manager and manufacturing coordinator for Partisan, and it is owned by Richard Seddon. In addition to Richard, QOX currently employs four other people, but at times, has employed more.  In addition to fulfillment, QOX also performs some assembly and packaging with JawsTec.

13.     QOX coordinates manufacturing through JawsTec LLC, which is independent from DFI, Peak, and QOX. It serves other firearms and firearm-accessories suppliers and has for many years. Partisan is one of its customers, and in addition to the 15 or so JawsTec personnel who support Partisan, JawsTec utilizes subcontractors in Arizona (plating), Pennsylvania (metal-injection molding), New Hampshire (assembly), and Idaho (assembly and packaging) that employ more than a dozen people in support of the Partisan Disruptor.

14.     In addition to my professional background, I have extensive hands-on experience with firearms both from my military service and as a long-standing personal interest. Through formal training and practical use, I am knowledgeable about firearms generally, including the

design and function of trigger mechanisms in AR-style rifles. I understand the core AR fire-control architecture: hammer, trigger body with a sear (trigger nose), and disconnector on the trigger pin; how those parts interact with the bolt carrier group during the firing cycle; the function of manual selectors (including three-position selectors that provide safe, standard semi-automatic, and a third mode that accelerates reset in the case of ART/FRT); and the role of out-of-battery safeties/interlocks that prevent release of either the trigger, or alternatively, the hammer until the action is closed. I am familiar with cycle-driven reset approaches in which energy from the carrier/hammer interaction drives the trigger forward toward reset, and with the ways those functions can be implemented (for example, via a trigger-mounted cam surface contacted by the hammer or an intermediate lever).

15.     DFI has an engineer, Jonathan Groff, who owns a Remington Model 11 semi-automatic shotgun. In connection with this matter, I personally inspected, and he took videos and photographs of, his Remington Model 11, documenting the operation of its out-of-battery safety and trigger reset mechanics. I provided these videos and photographs to our counsel and expert John Nixon for use in the invalidity analysis of the Asserted Patents, and they are true and correct depictions of the firearm and its operation.

**DEVELOPMENT OF THE PARTISAN BUSINESS**

16.     Partisan Triggers set out to design and sell an assisted reset trigger (ART, also known as a forced reset trigger or FRT) based on the technology originally developed by Michael Stakes. Recognizing that Mr. Stakes was a pioneer in this field and that his '067 patent provided the foundational requirements for a forced or assisted reset trigger mechanism, I reached out to Mr. Stakes and acquired his '067 patent, which is currently owned by my company DFI.

17.     Our design evolved from the TacCon 3MR trigger, as this was the original, proven commercial product that Stakes made and sold over 10 years ago.  In particular, it was important that our trigger possess a three-position selector as part of the design—safe, semi-automatic, and "enhanced" semi-automatic mode that uses the assisted reset function. The selector is a rotatable lever designed with different geometry depending on the mode, which allows the user to switch between modes in operation.

18.     We also used the "drop-in" module architecture, with a housing that located the parts and used the standard hammer and trigger pins to retain the assembly, in order to provide a robust, plug-and-play solution—just like the TacCon 3MR.

19.     After extensive engineering, testing, and design, we finalized the Disruptor trigger in August 2025 and began preparing for manufacturing and sales at scale.

**THE MARKET AND SALES**

20.     Based on publicly available figures we estimate there are roughly 30 million AR-15 rifles in the United States. It is one of the most popular firearms in the country.

21.     Nearly a year ago, when Partisan began assessing entry into the FRT market, we analyzed potential demand and sales volume in order to determine appropriate investment.

22.     We projected sales volumes for an FRT like the Disruptor based on different unit prices, reflected in this table:

| Unit Pricing | Year One | Year Two | Year Three |
|---|---|---|---|
| Total Sales $200-250 per unit | 900,000 | 1,500,000 | 2,000,000 |
| Total Sale $300-350 per unit | 700,000 | 900,000 | 1,200,000 |
| Total Sales $400-450 per unit | 120,000 | 250,000 | 350,000 |
| Total Sales $500+ per unit | 30,000 | 60,000 | 90,000 |

23. Ultimately, we set a price point between the $200-250 and $300-350 price ranges and thus projected sales between 700,000 and 900,000 units the first year, somewhere over 1 million in the second year, and upwards of 1.5 million in the third year.

24. Partisan's owners and partners including myself have invested nearly $1.5 million in the company to date based on these projections.

25. In preparation for our launch, we were fully aware of Rare Breed's hyper-aggressive litigation tactics, as they have filed lawsuits against anyone who has tried to introduce any competing trigger mechanism or component into the market, regardless of the merits of the case. I am aware that Rare Breed has filed about 25 lawsuits in the last year alone. For this reason, it seemed prudent to obtain litigation insurance, and we eventually settled on a policy for $5 million in coverage underwritten by Lloyd's, who specifically analyzed the merits of the patent issues before issuing the policy. Subsequently, when DFI acquired the '067 patent, Lloyd's re-underwrote our risk and agreed to issue an additional $5 million policy and reduce our self-insured retention from $750,000 to $150,000. Neither policy could be used unless we were sued first.

26. Our initial public launch occurred in September 2025, when we posted a lengthy announcement of our upcoming trigger, referring to Plaintiffs' litigious approach and describing at a high level why Defendants were ready to bring the Partisan FRT to market. We posted the announcement on www.AR15.com, which is the largest, most well-known public website for firearm collectors and aficionados on the internet. Attached as Exhibit 1 is a true and correct copy of the September 12, 2025 posting, which can also be viewed here:

https://www.ar15.com/forums/General/It-is-time-for-an-introduction-Edit-Nominate-charities-

now-/5-2813452/.  The posting has since received over 60,000 views and over 1,000 responses and comments.

27.  Our dealers started accepting orders on November 15, 2025, and we were fulfilling orders by December 15, 2025.  Similarly, our website went live to dealers on November 15, 2025, and live to the public on December 15, 2025.

28.  At no time prior to this lawsuit being filed did we receive any type of notice or objection by Rare Breed to our upcoming Disruptor trigger. Given Rare Breed's extremely aggressive litigation history, we fully expected that Rare Breed would at least send us a letter if not a lawsuit after our September 2025 announcement, but nothing came.

29.  Since our launch in November 2025, we have been averaging approximately 3,500 orders of our Disruptor trigger per week.

30.  Partisan began accepting purchase orders on November 15, 2025 and began fulfilling them in the middle of December. To date we have accepted purchase orders of just over 40,000 triggers.

31.  The sales that Partisan has made to date have been consistent with strong growth.

32.  Partisan expects the supply chain now is equipped to produce and sell 1,680,000 FRTs within three years, with 480,000 this year and production and sales of 600,000 in the second and third years.

33.  Based on the wholesale price of the trigger and the sales we have made to date, our sales projections equate to $4,800,000 in gross profit to Peak Tactical in 2026 and $6,000,000 in each of 2027 and 2028.

34.  An injunction would shut down production and sales of the Partisan Disruptor, block fulfillment of orders already accepted, and foreclose our efforts to promote this product

and build our demand base. It would also put dozens of people out of work and cause significant collateral damages to the lives of these workers who depend on this work for their families and livelihoods.

35.     Because the Disruptor trigger is the only product currently sold by our team of companies, an injunction would effectively shut down our entire company and deprive us of any revenues.  It is unlikely we could survive as a business while we awaited a trial and a final decision on the merits of this case. Even if we prevailed at trial, it would be a hollow victory as our business likely would be effectively gone at that point.

**PUBLIC PERCEPTION**

36.     Since the launch, the Disruptor has received consistently positive reviews from users and commentators.  Some of the reviewers have performed head-to-head comparisons between the Disruptor and the Rare Breed triggers, with the Disruptor consistently receiving superior reviews.

37.     There are a significant number of negative reviews of the Rare Breed FRT triggers, with users calling it "garbage," "junk," and even citing safety issues:

https://www.reddit.com/r/ar15/comments/1kyv4sm/hot_take_the_new_rarebreed_frt_is_absolute_garbage/

38.     We are aware of no such negative reviews for the Disruptor, which instead has been identified as having "flawless performance" and the "best option for consumers."

39.     In contrast, reviewers and commentators have stated that Disruptor is superior to the Rare Breed, has a better feel, particularly in semi-automatic mode.

https://www.youtube.com/watch?v=-win8we_MIo; https://www.youtube.com/watch?v=-

win8we_MIo&t=9s; https://www.youtube.com/watch?v=ImTgSLS9XWs&t=1s;

https://www.youtube.com/watch?v=QKewsAdtHpE&t=1s.

40.     Consumers are not alone in distrusting Rare Breed. In September 2023, the U.S.

District Court for the Eastern District of New York entered an injunction against Rare Breed's

sales of the FRT-15 in *U.S. v. Rare Breed Triggers, LLC*, et al., No. 23-cv-369. A true and

correct copy of that injunction is attached as Exhibit 2, and it reflects the judge's findings that,

among other things, Rare Breed used false company names—"Red Beard Treasures" and "Red

Barn Tools"—on mailing labels to evade government oversight and enforcement, pp. 107-112;

attempted to evade a lawful ATF seizure order against a pallet of FRT-15s, issued by a different

federal court, by way of Lawrence Demonico "load[ing] the pallet of triggers into a U-Haul, and

dr[iving] hundreds of miles to New Mexico before the ATF intercepted" the triggers, pp. 31,

115-116; and knowingly filed a false declaration about sales in New York to avoid jurisdiction

there, pp. 85-88.

I declare under penalty of perjury that the following facts are true and correct.

Dated this 30th day of January, 2026.

_____*/s/ Ben Woods*_____

Ben Woods

36911128

9

# Exhibit 1

# ⊶ It is time for an introduction. Edit: Nominate charities now! (Page 1 of 26)

Previous Page    1 ∨ / 26    Next Page ⟩



**PartisanTriggers** 🏠
Freedom Accelerated

Joined: Jun 2025      Posts: 8
EE: 0% (0)           🇺🇸 USA

Posted: 9/13/2025 2:09:27 PM EST                                [Last Edit: PartisanTriggers]

Let's introduce ourselves with a backstory.

The P-51 Mustang was an incredible piece of machinery. From signing the contract to first flight, that magnificent bird took 149 days. Five months - with massive brainpower and the production power of a nation at war behind it. That was fast, incredibly fast, when necessity was the mother of invention. But the truth is that everything worth doing always takes longer and costs way more than you first imagine.

Partisan Triggers is a new company configured to incubate the development of innovative triggers and access high quality, high volume manufacturing in order to bring the best possible value for money to the end user. Triggers for all and one for every gun.

Several months ago, Partisan Triggers was shown a new trigger design by @Ben and his weapons company. It promised to be a unique match grade FRT with a light, clean trigger pull and superb reliability over thousands of rounds on a given unit. A deal was done to bring this trigger to market, and Ben was asked to take on the role of public relations spokesman for the company. Amazing what he'll do for a box crayons.

After much consideration, however, we have decided not to release his particular trigger for the time being. Due to the legal actions being taken by a certain FRT company and their Axis of partners, we are deeply concerned about losing control of the design. We don't believe anyone can patent a concept that was developed nearly a century ago, but others do and think they already have. They also think their patents are actually valid and we are damn sure they will try to claim Ben's design falls within their IP rights, steal it and attempt to incorporate it into their open patent applications through amendments. Their track record is all the evidence required to support this opinion. We cannot allow this to happen and are, therefore, adopting a quite different approach.

The new approach has required several long months of intensive work with IP attorneys and insurance companies. It involved hiring special Counsel who have a history of winning billion dollar IP suits. The result is robust insurance coverage and an official Advice Of Counsel Letter that painstakingly covers every detail of concern in the current FRT IP landscape. This Letter, longer than most printed copies of a dictionary, details the legality of releasing our own version of an older trigger which we believe is not protected by any valid patent. It has taken a while and cost a lot of money but we finally have everything needed on the legal side in place. Our distributors and dealers are financially covered for frivolous lawsuits. Even our customers are protected. We are ready to rumble.

Our focus is now on finalizing production, marketing and websites. As we ramp up, we have videos to shoot, samples to get out to your favorite reviewers, contracts to sign and Purchase Orders to fulfill. It's going to take us a few more weeks before we go mainstream.

Finally, we intend to regularly contribute support to 2A charities and causes. To that end, we will begin holding monthly GD threads for nominations and voting on which charities should receive our monthly donations. Once any potential legal issues are settled, we intend to divert even more money towards supporting 2A causes.

Please bear with us and stay tuned here for updates, exclusive behind the scenes peeks and ARFCOM only specials. Get plenty of popcorn ready - it's likely to be highly entertaining.

Cheers,

The Partisan Triggers Team

Edit 15 December 2025

You can buy a Partisan Disruptor right now at

Battlehawk Armory.

Or

Cloak Industries.



CONCEALED CARRY CLASSES

MASTER THE SKILLS, MINDSET, AND LAW YOU NEED TO CARRY RESPONSIBLY.

LEARN MORE

GLOCK | GEN 6

ENGINEERED FOR YOU

BUY NOW

# Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

               Plaintiff,                           MEMORANDUM & ORDER
                                              23-cv-369 (NRM) (RML)

       -against-

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; and KEVIN MAXWELL,

               Defendants.
-------------------------------------------------------x
NINA R. MORRISON, United States District Judge:

      Now pending before this Court is the United States of America's motion for a

preliminary injunction against Defendants Rare Breed Triggers LLC, Rare Breed

Firearms LLC, Lawrence DeMonico, and Kevin Maxwell.  The Court has considered

the parties' pre-hearing briefs; the evidence presented during a two-day preliminary

injunction hearing held on August 1 and 2, 2023; the parties' post-hearing proposed

findings of fact submitted on August 13, 2023; the statements made at oral argument

held on August 15, 2023; and the parties' supplemental briefs submitted on August

18, August 23, August 28, and August 31, 2023.

      On the present record, the Court concludes that the Government is likely to

succeed on the merits of its claims.  The evidence before this Court establishes that

since December 2020, Defendants have sold approximately 100,000 illegal

machinegun conversion devices (known as "FRT-15" triggers) throughout the United

States, taking in $39 million dollars from their customers in under two years.

Defendants fraudulently induced their customers to buy a product that is illegal to

possess—falsely representing that the FRT-15s was "absolutely" legal, while withholding material information in their possession that revealed otherwise.  In the process, Defendants placed tens of thousands of their customers at risk of criminal prosecution and the loss of their right to own firearms.  And even after Defendants were notified by federal officials that they were engaged in the sales of illegal firearms, they used deceptive means to continue to sell thousands of FRT-15s and obstruct law enforcement's legitimate efforts to track and recover these devices.

For the reasons outlined herein, the United States of America's motion for a preliminary injunction is GRANTED.

## PROCEDURAL HISTORY

Defendant Rare Breed Triggers ("RBT") is a limited liability company incorporated in North Dakota and operated out of Austin, Texas by its president, Defendant Lawrence DeMonico.  *See* Preliminary Injunction Hearing Transcript ("Tr.") 421:6–21, 517:4–8; ECF No. 124-1 at 12:11–16, 106:21–107:1.  Though previously co-owned by four managing members, RBT is currently owned exclusively by Defendant Kevin Maxwell, who also serves as the company's general counsel.  Tr. 420:3–421:18, 529:20–22; ECF No. 124-3 at 61:15–19; Defs. Ex. A.  DeMonico is also the president of a design company, Defendant Rare Breed Firearms ("RBF").  Tr. 468:20–469:11, 485:17–18.

RBT's flagship product is a device called the FRT-15, a "forced-reset trigger" that gun owners can install on an AR-15-style rifle to accelerate the weapon's rate of

fire.[1]  In the present action, the parties primarily dispute whether or not the FRT-15 is a device which can convert a semi-automatic weapon into a "machinegun" as defined under federal law.  *See* 26 U.S.C. § 5845(b).  Defendants contend that the FRT-15, though capable of making a weapon fire successive rounds extremely rapidly, is a perfectly legal semi-automatic trigger.  The United States of America ("the Government"), on the other hand, contends that the FRT-15 is an illegal machinegun conversion device which Defendants, despite having received a cease-and-desist letter from the Bureau of Alcohol, Tobacco and Firearms ("ATF") on July 27, 2021 informing them to that effect, have continued to sell.

On January 19, 2023, the Government brought the present action against Defendants seeking an *ex parte* temporary restraining order and a preliminary injunction under 18 U.S.C. § 1345, a statute known as the Fraud Injunction Act.  *See* ECF No. 1 ¶ 18.  The Fraud Injunction Act authorizes the Government to bring an action to enjoin a suspected criminal fraud scheme in order "to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought."  18 U.S.C. § 1345(b).

In short, the Government alleges that Defendants have conspired to use deceitful means to evade and obstruct the lawful jurisdiction of the ATF to regulate and confiscate a device that the agency has determined to be a machinegun,

---

[1]  Defendants also sell a trigger called the "WOT" which all parties agree, for purposes of this litigation, is identical to the FRT-15.  *See, e.g.*, Tr. 150:25–151:14, 278:5–15.  For ease of reference, the Court will refer only to the FRT-15 unless the distinction between the two devices is important.

constituting a conspiracy to defraud the United States under 18 U.S.C. § 371.  ECF No. 1 ¶¶ 195–99.  The Government further alleges that Defendants have repeatedly misled their customers to believe that the FRT-15 is a legal, semi-automatic trigger, despite the ATF's formal classification of the FRT-15 as a machinegun and Defendants' knowledge that the ATF and the courts have classified similar devices as machineguns, which constitutes mail fraud, wire fraud, and conspiracy to commit mail and wire fraud under 18 U.S.C. §§ 1341, 1343, and 1349.  ECF No. 1 ¶¶ 200–215.

After the Court heard argument on the Government's motion for an *ex parte* temporary restraining order on January 24, 2023, it granted the Government's motion in part and denied it in part and directed the Government to serve a copy of the order on Defendants, which the Government did on January 27, 2023.  *See* ECF No. 11.

On February 1, 2023, Defendants appeared through counsel.  *See* ECF No. 15.  On consent of both parties, the Court adjourned the preliminary injunction hearing scheduled on February 2, 2023, *see* Order dated February 1, 2023, extended the temporary restraining order, and set a briefing schedule for Defendants' anticipated motion to dismiss this action for lack of personal jurisdiction.  Minute Entry dated February 3, 2023; *see* ECF No. 15 ¶¶ 5–10, ECF No. 16 at 1.

The parties fully briefed Defendants' motion to dismiss for lack of personal jurisdiction by March 2, 2023, and the Court held oral argument on the motion on March 17, 2023.  *See* ECF Nos. 23, 24, 29; Minute Entry dated March 17, 2023.

Because RBT has a nearly national presence in the firearm accessories market, Defendants "readily agree[d]" at oral argument that personal jurisdiction existed in "any of those states where[] [RBT's] customers [or] dealers are located." March 17, 2023 Oral Argument Tr. 50:5–7. However, Defendants asserted that they had specifically built the RBT website to prohibit any customer with a New York billing or shipping address from purchasing an FRT-15, with similar prohibitions on sales to customers in a handful of other states and territories. *See* ECF No. 23-1 ¶ 13. Defendants also submitted affidavits, including from former RBT co-owner Cole Leleux, stating that, although Defendants did sell the FRT-15 through third-party distributors, they never sold an FRT-15 to a distributor that stated an intention to sell in New York. ECF No. 23-1 ¶ 14, ECF No. 29-1 ¶ 9. Defendants further argued that Defendant RBF should be dismissed from this action because it simply had no connection with the FRT-15: although it is also run by DeMonico, Defendants represented to the Court that RBF is a design company that sells "swag" like t-shirts and hats, not firearms. ECF No. 23 at 29–30; ECF No. 29 at 14–15. Thus, although RBF indeed delivered packages to customers in New York, Defendants maintained that those packages had nothing to do with the FRT-15.

The Government conceded that, as far as it could tell, Defendants had never directly sold an FRT-15 to a customer in New York. However, the Government nonetheless asserted two theories of personal jurisdiction in this Court. First, the Government argued that 18 U.S.C. § 1345, despite not mentioning service of process, implicitly authorizes nationwide service of process by permitting the

Government to bring an anti-fraud injunctive action in "any Federal court," thus conferring personal jurisdiction over Defendants in this court pursuant to Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure.  ECF No. 24 at 14–18.  Second, the Government argued that Defendants have sufficient contacts with the state of New York to satisfy both the statutory and constitutional requirements for a New York court to exercise personal jurisdiction over them because (1) Defendants, while in Florida, opened up a bank account with J.P. Morgan Chase, which is incorporated in New York and processed Defendants' wire transfers through its New York headquarters, and (2) gun owners have purchased FRT-15s through RBT's third-party distributors, and the ATF has recovered FRT-15s in New York.  ECF No. 24 at 18–30.

On March 22, 2023, the Court entered an order directing the parties to show cause as to why this action should not be transferred to one of the numerous districts in which Defendants had conceded that there would be no dispute as to personal jurisdiction.  *See* ECF No. 36.  On March 29, 2023, Defendants responded to the Court's order and asserted that dismissal, rather than transfer, was warranted, but argued that the Western District of Texas, the Middle District of Florida, and the District of North Dakota were "appropriate" venues.  ECF No. 38 at 2.  Two hours later, the Government filed its response, informing the Court that it had conducted an investigation in coordination with the ATF in the preceding week and discovered that, in fact, Defendants *had* sold FRT-15 parts directly to customers in New York.  ECF No. 40.  In support of its letter, the Government filed

6

an affidavit summarizing the conversations that ATF agents had with some of Defendants' New York customers.  *See* ECF No. 40-1.

Defendants initially denied the Government's allegations and requested an evidentiary hearing to contest them.  *See* ECF No. 42 at 5.  The Government then filed additional evidence of Defendants' commercial ties to New York, including a screenshot of a receipt emailed from Rare Breed Firearms to a customer in Collins, New York for an "FRT-15 locking bar."  ECF No. 43-1 at 9.  Shortly thereafter, Defendants withdrew their motion to dismiss for lack of personal jurisdiction, asking the Court to instead construe their letter in response to the Court's Order to Show Cause as a motion to transfer venue to the Western District of Texas.  ECF No. 44.  The Court so construed Defendants' letter and denied Defendants' motion to transfer.  *See* ECF No. 48 at 1.

On May 1, 2023, Defendants' attorneys filed a motion to withdraw as counsel. ECF No. 51.  The Court granted the motion after an *ex parte* hearing, and partially stayed the action to facilitate Defendants' search for new representation.  *See* Minute Entries dated May 4, 2023.

Defendants' new counsel filed notices of appearance on May 24, 2023.  ECF No. 57.  On May 26, 2023, the Court granted Defendants' request for another adjournment of the preliminary injunction hearing and extended the temporary restraining order with Defendants' consent.  *See* Minute Entry dated May 26, 2023. The Court also granted Defendants leave to file a sur-reply through new counsel on the Government's motion for a preliminary injunction to supplement the merits

briefs that Defendants' prior counsel filed before withdrawing, which Defendants submitted on June 16, 2023. *See* ECF No. 70. The parties completed discovery and filed fully briefed motions *in limine* by July 27, 2023.

The Court held a preliminary injunction hearing on August 1 and 2, 2023, and the parties submitted proposed findings of fact on August 13, 2023. ECF Nos. 126, 127. After holding oral argument on August 15, 2023, the Court directed the parties to file letter briefs as to the scope of an injunction that the Court could issue if it granted the Government's motion, as well as to other outstanding legal issues. Minute Entry dated August 15, 2023. The parties submitted supplemental briefs on August 18, August 23, August 28, and August 31, 2023.

## SUMMARY OF THE FACTS

### I. The Functionality of Semi-Automatic Firearms, Automatic Firearms, and the FRT-15

Although the Government's legal claims (and Defendants' defenses to those claims) involve allegations of fraud in Defendants' marketing and sale of the FRT-15, those claims are closely related to foundational question of whether the FRT-15 is—or is not—an illegal machinegun as that term is defined by federal statute. To that end, at the preliminary injunction hearing, the Court heard live testimony from three expert witnesses about the mechanics of the FRT-15, whose testimony was accompanied by an array of demonstrative evidence.

The Government offered expert testimony from Anthony Ciravolo, a current ATF firearms enforcement officer who has performed approximately 300 firearms classifications in his time at the ATF and whom the Court qualified as an expert

without objection from Defendants.  Tr. 20:17–22:19; 27:6–17.  Defendants, for their part, offered expert testimony from former ATF agents Daniel O'Kelly and Brian Luettke, whom the Court also qualified as expert witnesses in the field of firearms without objection from the Government, despite the fact that neither witness had participated in the process of "classification" in their time at the ATF—that is, neither of Defendants' testifying experts, while at ATF, had ever been charged with the task of determining whether or not a device should be formally classified as an illegal machinegun.  Tr. 257:24–259:6, 264:2–11, 385:25–386:10, 392:2–18.  Defendants also presented expert testimony by declaration from Rick Vasquez, a former ATF agent who did conduct such classifications while still at the agency, *see* ECF No. 120-1, and Kevin McCann, a former ATF agent who did not.  *See* ECF No. 107-5.

Importantly, although the parties disagree as to whether the FRT-15 satisfies the legal definition of a machinegun, the parties do agree on how the FRT-15 works as a technical matter, as compared to standard semi-automatic and automatic triggers.  *See* August 15, 2023 Oral Argument Transcript ("O.A. Tr.") 15:23–17:22.  As discussed *infra*, the parties' experts expressed some differing views on how the FRT-15 is either similar to or different from certain other trigger devices that the ATF has variously categorized as (legal) semi-automatic or (illegal) automatic triggers.  But for purposes of understanding the fundamentals of the FRT-15's operations, the Court relies upon the testimony of all three experts who testified at the hearing, without need to resolve any conflicts among them.

A.  **Legal, Semi-Automatic Weapons**

When a standard semi-automatic weapon such as an AR-15 is in the ready-to-fire position, the trigger holds the gun's "hammer" in place by means of each piece's "sear surface."  Tr. 33:14–34:1.  When the shooter initiates the weapon's firing sequence by pulling the "trigger shoe"—that is, the curved metal portion of the trigger that is visible to the shooter—the trigger releases the hammer.  Tr. 34:2–13.  The hammer then strikes the firing pin, which causes a shot to be fired.  Tr. 34:14–18, 269:16–17.  The force of that shot pushes the bolt carrier of the weapon rearwards, which forces the hammer rearwards as well.  Tr. 35:11–25, 269:16–19.  The bolt then hits a spring and travels forwards again into battery as an additional round is chambered automatically from the magazine.  Tr. 37:2–4, 41:20–25, 42:9–14.  In the meantime, a disconnector, which is connected on a shared pivot to the trigger that is still being held rearward by the shooter's finger, retains the hammer, thus preventing the hammer from falling forward again.  Tr. 35:5–7, 36:10–15, 81:18–82:18, 269:19–270:3.

At this point, if the shooter simply maintains constant rearward pressure on the trigger, the gun will not fire a second time, because the hammer remains captured by the disconnector.  Tr. 36:22–37:1, 46:13–18.  Rather, the shooter must reset the trigger and hammer by releasing at least some of the pressure on the trigger shoe.  Tr. 45:14–18, 279:9–14, 279:25–280:6.  Once she does, the trigger will move forward, the disconnector will pivot and release the hammer, and the hammer will drop back into its original position and be retained again by the trigger,

10

rendering the gun ready fire.  Tr. 45:22–25, 269:20–22.  If the shooter pulls the trigger again, the sequence will repeat.  Tr. 46:1–2, 269:20–22, 270:19–21.

### B.   <u>Illegal, Fully Automatic Weapons</u>

In an automatic firearm such as an M-16-style rifle—a weapon which all parties agree satisfies the federal statutory definition of a machinegun and is illegal for private citizens to possess—the process begins in the same way.[2]  In the ready to fire position, the trigger retains the hammer.  Tr. Tr. 50:1–8.  Once the shooter pulls the trigger shoe back, the trigger releases the hammer, which strikes the firing pin, causing a shot to be fired.  Tr. 51:2–11; 58:15–18.  The rearward force of the bolt carrier then pushes the hammer backwards again.  Tr. 52:4–10.  However, unlike in an AR-15, an M-16 in automatic mode has a depressed disconnector, which prevents the disconnector from capturing the hammer after it strikes the firing pin.  Tr. 54:4–13; 55:10–16.  Without a mechanism to constrain the movement of the hammer at this moment, the hammer could quickly fall forward again as the bolt moves forward, striking the firing pin and repeating the firing process.  But if the hammer were, at this instant, permitted to fall forward immediately by the forward momentum of the bolt, it could strike the firing pin before the bullet from the magazine has been properly chambered, resulting in a malfunction.  Tr. 56:12–18.  To prevent this, the hammer is momentarily held in place as the bolt moves rearwards and forwards by means of a mechanism called an "auto-sear"—a device

---

[2]  For purposes of this description, the Court assumes that the firearm is in automatic mode.  Tr. 50:17–51:1.

feature that is not present in legal, semi-automatic weapons.  Tr. 53:16–20, 271:7–
13, 271:24–272:1.  The auto sear "times" the device to make sure that a bullet is in
the chamber by the time the hammer strikes the firing pin again.  Tr. 80:10–19;
81:5–8.  As the bolt moves rearward after a shot is fired, the auto sear pivots
counterclockwise,[3] and the bottom of the auto sear retains the hammer by way of
each piece's sear surface.  Tr. 52:4–53:20; 53:23–54:3; 54:14–55:3, 271:19–23.  These
pieces will remain locked in place until the bolt moves sufficiently forward again
and the "trip surface" of the bolt pushes the top portion of the auto sear forward,
pivoting the auto sear clockwise and releasing the hammer.  Tr. 55:17–56:11,
271:19–23, 273:11–19.  At the same instant, a round is fully chambered, and the
weapon is safe to fire.  Tr. 56:22–25; 80:23–81:4.  The hammer then strikes the
firing pin, a shot is fired, the process repeats, and a cycle of fire begins.  Tr. 57:1–8.

At no point in an automatic weapon's firing cycle does the trigger ever re-
engage the hammer.  Tr. 272:4–6, 275:7–10.  Rather, as long as the shooter
maintains rearward pressure on the trigger shoe, the trigger will remain out of the
way of the hammer and the firing cycle will continue—*i.e.*, as long as the shooter's
finger is holding the trigger shoe rearward, the firearm will rapidly shoot multiple
rounds of ammunition.  Tr. 57:9–14; 59:25–60:6; 60:19–25, 273:25–274:7.  However,
once the shooter releases the trigger shoe, the internal portion of the trigger will
move forward and capture the hammer again, stopping the firing process.  Tr.

---

[3]  Descriptions of clockwise and counterclockwise motions assume that the
weapon is pointed to the right from the perspective of the viewer.

272:6–11, 275:11–20.  If the shooter then pulls the trigger a second time, the automatic firing process will repeat itself.

## C.   The FRT-15

In a firearm outfitted with an FRT-15, the firing process again begins in the same way.  In the ready to fire position, the trigger is engaged with the hammer. Tr. 64:3–8, 169:9–16, 283:13–21.  When the shooter pulls the trigger shoe, the trigger releases the hammer, and the hammer strikes the firing pin, causing a shot to be fired.  Tr. 64:9–12, 71:20–23, 169:17–22, 283:21–23.  However—unlike a trigger in a standard semi-automatic weapon—the FRT-15 has no disconnector.  Tr. 144:23–145:3.  Rather, as the bolt carrier moves rearward after a shot is fired, the force of the bolt pushes the hammer *into* the top of the trigger, rapidly forcing the trigger forward again against the rearward pressure of the shooter's finger on the trigger shoe.  Tr. 66:12–21, 283:20–284:1.[4]  Once the bolt carrier then moves sufficiently forward again, the trigger will re-engage with the hammer by way of each piece's sear surface, returning the trigger and the hammer to their configuration in the ready-to-fire position.  Tr. 68:15–22, 169:23–170:3.

Without a mechanism to constrain the movement of the trigger at this moment, the trigger would immediately release the hammer, which would strike the firing pin again and repeat the firing process.  If the trigger were to do so, however, it could strike the firing pin before the bullet from the magazine has been

---

[4]  The parties agree that if a shooter pulls the trigger of an FRT-15 back with too much force, she may overcome the reset mechanism, causing a malfunction.  Tr. 178:24–179:6, 191:10–20, 294:15–23.  In that scenario, the weapon will fire only one bullet and the firing sequence will cease.  Tr. 179:7–8.

properly chambered, resulting in a malfunction.  Tr. 69:16–25, 77:22–78:8.  To prevent this, after a shot is fired, the FRT-15 trigger is momentarily held in place as the bolt moves rearwards and forwards; that is achieved by means of a mechanism not present in an AR-15 or M-16, called a "locking bar."  Tr. 76:18–23.  The locking bar "times" the device to make sure that a bullet is in the chamber by the time the trigger is free to release the hammer again.[5]  Tr. 79:12–20, 81:5–11, 188:16–189:3, 284:1–5, 324:3–10.  As the rearward force of the bolt forces the trigger forward, the locking bar pivots counterclockwise, and the bottom of the locking bar captures the top rear of the trigger by way of each piece's sear surface.  Tr. 67:3–10, 69:3–20, 283:24–284:5.  These pieces remain held in place, regardless of the shooter's rearward pressure on the trigger shoe, until the bolt moves sufficiently forward and the "trip surface" on the bolt pushes the top portion of the locking bar forward, pivoting the locking bar clockwise and freeing the trigger to move.  Tr. 70:4–10, 281:23–282:4.  At the same instant, a round is fully chambered, and the weapon is safe to fire.  Tr. 78:22–79:5, 284:6–7.  At this moment, as long as the shooter has simply maintained rearward pressure on the trigger, the trigger releases the hammer, the hammer strikes the firing pin, and a cycle of fire begins.  Tr. 70:11–17, 73:21–74:9, 171:18–172:3, 282:6–16.

Like the trigger on a standard semi-automatic weapon, the internal portion of the trigger on an AR-15 outfitted with an FRT-15 releases the hammer with each

---

[5] The locking bar also prevents "hammer follow," a malfunction described elsewhere in this opinion.  *See, e.g.*, ECF No. 129-1 at 125:21–22.

successive shot.  Tr. 172:4–15, 178:7–12, 277:12–16.  Like a machinegun, however, the shooter need only pull the FRT-15 trigger once and maintain rearward pressure for the gun to rapidly fire multiple rounds, requiring no additional input from the shooter.  Tr. 70:20–24, 74:11–16, 280:25–281:8.  In a cycle of fire, the FRT-15, like a standard machinegun, fires each shot in one-tenth to one-fourteenth of a second. Tr. 61:21–22, 87:16–21.  This functionality enables even a novice shooter using an FRT-15 to fire multiple rounds of ammunition in a fraction of a second.  Tr. 345:15– 19.

## II.   <u>The History of the FRT-15 and the Incorporation of Rare Breed Triggers</u>

The FRT-15 was invented by non-defendant Jeffrey Cooper Rounds, who received a patent for the device (referred to by the parties as "the '223 patent") on December 24, 2019.  Tr. 488:16–17, 535:1–13; ECF No. 120-2 ¶ 3; Govt. Ex. 77 at 1. Prior to obtaining the '223 patent, Rounds had patented another device that was, in key respects, the same trigger mechanism, referred to in this litigation as the "AR-1."  *See, e.g.*, Govt. Ex. 134 at 21.

On or about August 4, 2017, Rounds submitted the AR-1 to the ATF for classification: that is, Rounds sought the agency's formal, written opinion as to whether the device was a legal semi-automatic trigger or an illegal machinegun. Govt. Ex. 134 at 26.  Although the ATF's classification process is not a mandatory prerequisite to selling a trigger, the parties agree that inventors often submit such devices for classification with the ATF prior to selling the device commercially to receive the agency's assurance that the device is legal.  *See, e.g.*, Govt. Ex. 11 at

7:27–29.  Rounds submitted the AR-1 to the ATF through his company Wolf Tactical

with the help of a private consultant, Rick Vasquez.  Govt. Ex. 134 at 13, 19.

Vasquez had previously worked in the ATF division that performed such

classifications; after leaving the agency, he formed a private consulting firm, Rick

Vasquez Firearms LLC.  Tr. 115:17–23; ECF No. 120-1 ¶¶ 1–3; Govt. Ex. 134 at 13,

21.  Defendants would later retain Vasquez as a paid expert in their efforts to

market the commercial embodiment of the '223 patent: the FRT-15.  *See, e.g.*, ECF

No. 120-1 ¶ 9.

On August 28, 2018, the ATF informed Rounds and Vasquez that it had

indeed classified the AR-1 as a machinegun.  Govt. Ex. 134 at 1, 12–13; Defs. Ex. S

at 41, 52–53.  The ATF explained that "[a] device with a trigger that is mechanically

forced forward during a cycle of operation or firing sequence, which results in more

than one round being fired with a 'single function of the trigger,' is a machinegun."

Govt. Ex. 134 at 12; Defs. Ex. S at 52.  The ATF explained that it had determined

that the AR-1 operated this way by performing a "zip tie test" on the device: an

agent had secured the trigger of a weapon outfitted with an AR-1 in its rearward

position with a thin plastic cable, and, after the agent manually released the bolt

carrier on the rifle, the weapon proceeded to fire multiple rounds with no additional

human input.  Govt. Ex. 134 at 11–12; Defs. Ex. S at 51–52.  The ATF informed

Rounds and Vasquez that, because its examination had revealed that a shooter only

needed to exert "continuous rearward pressure" on the trigger to be able to fire

multiple rounds automatically, the FRT-15 was, in fact, a machinegun.  Govt. Ex.

16

134 at 12; Defs. Ex. S at 52.

In a separate set of findings, the ATF "[a]dditionally" informed Rounds that, when the ATF tested the device, "the hammer was found to have followed the bolt into battery as it chambered a cartridge" in a malfunction called "hammer follow." In the ATF's view, a device that facilitates hammer follow "would also be classified as . . . a machinegun." Govt. Ex. 134 at 13; Defs. Ex. S at 53; *see also* Tr. 114:11–21.

Over the course of developing the AR-1 in 2017, Rounds discussed the invention with DeMonico and Leleux. Tr. 428:16–429:3, 488:16–25, 562:6–17; ECF No. 120-2, ¶¶ 13–14, ECF No. 124-1 at 114:10–20. DeMonico and Leleux expressed their doubts to Rounds about the commercial viability of such a product because the installation of the AR-1 on an AR-15 would require clumsy modified parts, rendering it unfriendly to the average consumer. Tr. 489:3–6, 536:5–15, 563:13–564:17; ECF No. 120-2 ¶ 14; ECF No. 124-1 at 114:21–115:3, ECF No. 124-3 at 23:5–21. Consistent with DeMonico and Leleux's feedback, Rounds designed a new trigger that required far less sophistication to install while awaiting the ATF's classification of the AR-1. ECF No. 124-3 at 23:17–24. On September 29, 2017, Rounds filed a provisional application for what would become the '223 patent—a patent which Defendants would go on to purchase from Rounds and sell to consumers under the name "FRT-15." Tr. 492:16–18; ECF No. 120-2 ¶ 3.

Unlike the AR-1, the FRT-15 was designed as a "drop in" trigger, allowing a user to easily replace an AR-15's original trigger with an FRT-15 trigger without complicated installation. Tr. 112:25–113:2; ECF No. 124-3 at 23:21–24. The

addition of a locking bar also fixed the AR-1's problem with hammer follow.  Tr. 536:21–537:19.

Otherwise, however, the FRT-15 is functionally indistinguishable from the AR-1 with respect to its internal firing mechanism.  Just as in an AR-1-equipped firearm, a firearm equipped with an FRT-15 trigger permits the weapon's bolt carrier to force the trigger forward back into the shooter's finger and thus facilitate rapid fire of multiple rounds as long as the shooter simply maintains pressure on the trigger shoe.  Tr. 110:11–18.  The designs do, however, have two internal differences that change the way that this effect is achieved.  First, in the AR-1 trigger, the bolt carrier forces the trigger forward through direct contact, whereas, in the FRT-15, the bolt carrier forces the trigger forward indirectly by first putting force on the hammer, which in turn forces the trigger forward.  Tr. 107:17–24, 112:17–23; ECF No. 120-2 ¶ 4, ECF No. 124-3 at 86:5–12.  Second, the AR-1 and the FRT-15 use different timing mechanisms.  Tr. 113:7–9.  The AR-1 implements a modified bolt carrier that includes a cut-out slot for the top of the trigger; when the bolt moves rearward and forces the trigger forward after the weapon fires a shot, the trigger, which protrudes into the bolt carrier, cannot be pulled back until the bolt clears the cut-out, which is also the instant when a bullet has been properly chambered and the weapon is safe to fire again.  Tr. 109:10–110:18, 113:10–12.  The FRT-15, on the other hand, includes the addition of the locking bar, which briefly holds the trigger in place while the mechanism resets and a bullet is chambered, and releases the trigger when a bullet has been chambered and the weapon is safe

18

to fire again.  ECF No. 120-2 ¶ 5; ECF No. 124-3 at 86:19–22.

Both the AR-1 and the FRT-15 allow a shooter to rapidly fire multiple rounds by simply maintaining pressure on the trigger shoe, because the rearward force of the bolt carrier automatically pushes the trigger shoe back into the shooter's finger. Tr. 111:6–11; 112:4–10, 113:14–114:1.  And that feature—the capacity to repeatedly and automatically fire multiple rounds with the application of "continuous rearward pressure" on the trigger shoe—was why the ATF classified the AR-1 as a machinegun.  *See* Govt. Ex. 134 at 12–13; Defs. Ex. S at 52–53; *see also* Govt. Ex. 1 at 5 (ATF concluding that the FRT-15 is a machinegun because it can fire multiple rounds with "one continuous pull of the trigger.").

When DeMonico and Leleux learned that Rounds planned to sell the '223 patent, they became interested in the trigger's commercial potential.  Tr. 537:20–538:1; ECF No. 124-1 at 136:1–2.  At the preliminary injunction hearing, DeMonico claimed that, prior to acquiring the '223 patent and launching sales of its commercial embodiment (the FRT-15), he had no knowledge that the ATF had classified the AR-1 as a machinegun; according to DeMonico, he "did not have any real knowledge of [the] AR-1," and its history was "something that [Rounds] just didn't talk to me about."  Tr. 494:7–495:2; *see also* Tr. 430:8–16, 490:4–14; ECF No. 124-1 at 134:25–135:10.  Leleux testified that he "d[id no]t think" that, prior to purchasing the '223 patent, he and Defendants had seen a copy of the ATF's AR-1 classification letter, which all parties to this litigation agree was a non-public report.  Tr. 578:22–579:1, O.A. Tr. 48:10–49:7.

19

Importantly, however, Leleux acknowledged both at the preliminary injunction hearing and during his deposition that Rounds had verbally told Leleux and DeMonico that the ATF had classified the AR-1 as a machinegun, Tr. 539:19–23, 577:25–578:21, that Leleux and DeMonico knew that "one of" the issues that the ATF had with the AR-1 was the device's potential for hammer follow (which Rounds fixed in the '223 patent), ECF No. 124-2 at 23:24–24:2; *see also* Tr. 536:20–537:11, 565:13–566:11, and that Rounds wanted to "dump" the '223 patent, rather than market the device himself, because he knew that the ATF had problems with the AR-1 and would "give him a hard time" with the '223 patent as well.  ECF No. 124-3 at 30:11–24; *see also* Tr. 566:21–567:7; ECF No. 124-1 at 134:10–135:18.

Shortly before purchasing the '223 patent, DeMonico, Leleux, and non-defendant Michael Register reached out to Maxwell, seeking his advice about the legality of the device because of his expertise in firearms law.  Tr. 542:7–12, 588:5–11; ECF No. 124-3 at 43:6–22.  The partners came to an agreement whereby Maxwell would forego his usual hourly fee and render his legal services for free in exchange for an ownership stake in the company that the parties would form to sell the commercial embodiment of the '223 patent.  Tr. 588:12–18.  The partners therefore filed articles of organization for "Rare Breed Triggers" on May 4, 2020,[6] *see* Tr. 588:25–589:3; Govt. Ex. 47, and RBT purchased the rights to the '223 patent

---

[6] The parties later amended RBT's articles of organization, removing DeMonico, Leleux, and Register as LLC members and making Maxwell the company's sole owner on December 9, 2020.  ECF No. 105-1 ¶ 10; Govt. Ex. 49 at 3–6.

from Rounds by written contract for $10,000 on May 7, 2020.[7]  Tr. 420:7–421:5,
492:19–24, 539:4–8; Govt. Ex. 77 at 1.  At the same time, DeMonico and Rounds
also entered into an oral agreement in which Rounds would receive a $25 royalty for
each trigger sold.  Tr. 492:25–493:9, 539:8–12; ECF No. 120-2 ¶ 16; ECF No. 124-1
at 131:25–132:9.  Defendants commercially dubbed Rounds's patent the "FRT-15."
Tr. 492:16–18.  To date, Defendants have paid Rounds $2.4 million in royalties for
sales of the FRT-15.  Tr. 569:12–14.

Unlike Rounds had done with the AR-1, the partners made a "group decision"
that they would not submit the FRT-15 to the ATF for classification.  Tr. 425:17–24,
543:17–19.  DeMonico, Maxwell, and Leleux testified that they came to this decision
because they had reason to believe that the ATF's classification letters were
unreliable, and that the agency has "a history of just changing [its] mind" in the
classification of other devices.  Tr. 425:25–427:9, 543:17–544:1, 590:11–19; ECF No.
124-3 at 92:14–17.  Leleux also testified that because the ATF's classification
process can take a long time, RBT was concerned that another manufacturer would
beat them to market with a similar product, which had happened to Leleux in the
past.  ECF No. 124-3 at 91:20–92:11.

Rather than seek the formal opinion of the ATF, the parties hired four former
ATF agents to provide them with private assessments of the FRT-15's legal status:

---

[7]  Although DeMonico testified that, to his memory, Defendants purchased
the rights to the '223 patent before they incorporated RBT, Tr. 428:12–15, the
contemporaneous documentation indicates that Defendants in fact incorporated
RBT just before purchasing the '223 patent.

Kevin McCann, Daniel O'Kelly, Brian Luettke, and Rick Vasquez.[8]  Tr. 430:19–
431:5, 543:3–5.  Each expert wrote Defendants a letter stating that, in his opinion,
the FRT-15 was not a machinegun.  *See* Tr. 439:7–9; ECF No. 120-1 at 10–12
(Vasquez); Defs. Ex. Y at 27–28; (Luettke); Z at 2–3 (McCann), A1 at 41–45
(O'Kelly).  Each expert recited in his letter that the statutory definition of a
machinegun is a weapon which fires "automatically . . . by a single function of the
trigger," which, in their opinion, the FRT-15 does not do.

Even at the time that Defendants received these expert opinions, however,
they were not without qualification.  Most notably, although O'Kelly gave
Defendants a written opinion that the FRT-15 was not a machinegun, he also told
them privately, "I guarantee you . . . do not be surprised if ATF calls it one", Tr.
370:1-2, because "then you're gonna have to fight it."  Tr. 370:14–15.

Defendants began selling the FRT-15 at a price of $380 in early December
2020.  Tr. 493:12–13.  In none of their marketing materials or responses to
customers' inquiries about the product's legal status did Defendants disclose the
fact that ATF had classified the AR-1 as a machinegun.  Nor did they share with the
public the fact that the ATF had reached this determination for reasons that fully
describe the FRT-15's mechanics: because "a single constant rearward pull will

---

[8]  Defendants retained McMann and O'Kelly prior to selling the FRT-15.  Tr.
430:19–431:5.  In the months after they launched the FRT-15, Defendants also
retained Vasquez and Luettke.  Tr. 487:7–12; ECF No. 120-1 ¶ 9.  DeMonico
testified that he sought additional opinions from Vasquez and Luettke to assess the
factory manufactured version of the FRT-15, rather than the prototype, in light of
minor modifications that were necessary to facilitate mass production.  Tr. 437:18–
438:20.

cause the firearm to fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." Govt. Ex. 134 at 6; Defs. Ex. S at 46.

Within weeks of offering the FRT-15 for sale to the public, on January 8, 2021, Defendants received an email from a firearms developer with the subject line "Potential Legal issue with Rare Breed FRT-15 Trigger system." Govt. Ex. 102 at 1. The developer opened his email by writing, "This is a warning given to you with the best of intentions to protect you." Govt. Ex. 102 at 1. The developer went on to explain that in 2006 he had submitted a very similar device to the ATF—one which, he explained, "had the same forced reset function as your Rare Breed FRT-15 system"—and the ATF had classified it as a machinegun. Govt. Ex. 102 at 1. The inventor then warned Defendants that the FRT-15, similarly, qualified as a machinegun rather than a semi-automatic trigger:

> Your probable question at this point might be "Why would our trigger be determined to be a machine-gun? That would be based on the [ATF] test. For a firearm to be a semi-automatic, the tester will cycle the action to cock the firearm. The trigger will be pulled to release the hammer/striker. When the trigger is pulled it will be held back in the fire position. With the trigger held back under pressure, the action will be cycled. The trigger will then be released. After release, the trigger will be pulled with the expectation the hammer/striker will then fall, showing the function of the disconnector. Your system will immediately drop the hammer when the bolt closes, showing no disconnect and not dropping the hammer when the trigger is pulled again.

Govt. Ex. 102 at 2. The developer closed his email by telling Defendants, "I hope this information is useful and helps keep you *and your customers* out of trouble." Govt. Ex. 102 at 2 (emphasis supplied).

The device referenced in the January 8, 2021 "Potential Legal Issue" email

23

had been designed and submitted to the ATF for classification by a company called
Hunter Kinetic Innovations ("HKI"). *See* Govt. Ex. 33 at 1. When the ATF
classified HKI's trigger as a machinegun on April 27, 2006, the agency cited the fact
that—as with the FRT-15—"as long as rearward pressure is applied to the trigger . .
. the firearm continues to fire until the firing finger is removed." Govt. Ex. 33 at 2.
On January 18, 2021—ten days after receiving the email from HKI's principal
warning of a potential legal issue with the FRT-15—Defendants retained Rick
Vasquez as a consulting expert. *See* June 23, 2023 Status Conference Transcript
3:9–15. Vasquez, while an agent at the ATF, participated in the agency review
process that had classified HKI's trigger as a machinegun. Tr. 140:9–143:5; Govt.
Ex. 33 at 5.

Despite these numerous warnings, DeMonico maintained in this proceeding
that at the time Defendants launched the FRT-15, he had "[a]bsolutely" no reason
to believe that the device was a machinegun. Tr. 432:16–18. Indeed, Defendants
repeatedly made these representations to their customers. On December 2, 2020,
Maxwell published a video on RBT's website in which he introduced himself as
RBT's general counsel, and, while sitting in a suit in front of a bookshelf lined with
law books, told customers, "Let me be abundantly clear. In my legal opinion, the
Rare Breed Triggers FRT is a perfectly legal semi-automatic drop-in trigger." Defs.
Ex. A. Maxwell further stressed in the video that, in reaching these conclusions, he
sought the opinions of "two former ATF employees," whom he called "two of the
most significant subject matter experts in the industry." Defs. Ex. A. Of the two

former ATF agents that Maxwell had consulted at the time he published this video, he informed the viewer that "one literally wrote the book on technical branch training" at the ATF, and "the other is a recently retired supervisor senior agent-in-charge who is now a practicing attorney." Defs. Ex. A.

DeMonico published similar videos on the RBT website unequivocally representing to prospective customers that the FRT-15 was legal. *See, e.g.*, Defs. Exs. B, D. In fact, in one such video published on January 23, 2021, DeMonico interviewed O'Kelly and, after repeatedly emphasizing that O'Kelly was a former ATF agent who had testified numerous times in court as an expert witness, asked him, "Here is the million-dollar question: is the FRT a machinegun?" Defs. Ex. D. O'Kelly—who had privately warned Defendants of the serious risk that the ATF *would* classify the FRT-15 as a machinegun—responded, "Absolutely not." Defs. Ex. D.

When RBT first launched the FRT-15, Defendants received "hundreds if not thousands of questions from customers asking about [its] legality." Defs. Ex. D; *see also* ECF No. 124-1 at 191:24–192:5. In response, Defendants consistently assured their customers by email that their product was "absolutely positively" legal. *See, e.g.*, Govt. Ex. 128 at 1; *see also* Tr. 478:22–479:7. DeMonico often used the same form language when responding to this type of inquiry: "Have we created something innovative? Yes! Have we done anything illegal? No!" *See, e.g.*, Govt. Exs. 103 at 1, 104 at 1; Defs. Ex. I1 at 1. Moreover, in the event that customers specifically asked whether Defendants had first sought the ATF's opinion before bringing the FRT-15 to

25

market—and whether they might be able to have a copy of that opinion letter for their protection, should they be stopped by authorities—Defendants responded that they had not participated in the ATF's classification process, but stressed that they had instead consulted former ATF agents who had uniformly determined that the product was "legal." Tr. 440:22–441:3, 483:3–9, 487:2–19; *see generally* Defs. Ex. I1 (cataloguing many such examples).

RBT, which made roughly $39 million in revenue from sales of the FRT-15 in just two years, ECF No. 105-1 at 2, had a "no refund" policy. Tr. 446:16–24; ECF No. 124-3 at 88:24–89:4; Govt. Ex. 39 at 9; Defs. Ex. R3 at 2–3. DeMonico and Leleux clarified that, notwithstanding the company's formal policy, RBT had in fact issued refunds to certain customers on a case-by-case basis over the years—for example, when a customer purchased two devices but only wanted to keep one. Tr. 446:25–447:17; ECF No. 124-3 at 89:4–22. In his deposition, however, DeMonico explained the reason behind the policy: RBT adopted it because "the last thing we wanted to deal with was, you know, a landslide of customers wanting a refund because, you know, the ATF changed their mind on something." ECF No. 124-1 at 57:18–21.

### III.   The ATF's Cease-and-Desist Letter

The ATF soon caught wind of the FRT-15. *See* Tr. 235:15–22; Defs. Ex. Y2 at 4. As internal email discussions at the agency reveal, the agents were for several months unable to secure an FRT-15 for testing and classification because RBT sold out of FRT-15s almost instantly every time the product was back in stock. Defs. Ex.

U3 at 1.  On June 4, 2021, however, the Firearms Technology Criminal Branch of the ATF finally received an FRT-15 for classification.  Govt. Ex. 1 at 1; Defs. Ex. S at 1.  In a report signed on July 15, 2021, the ATF concluded—consistent with the aim of Rounds's redesign—that the FRT-15 "does not function by 'hammer follow.'"  Govt. Ex. 1 at 3, 6; Defs. Ex. S at 3, 6.  However, the ATF classified the FRT-15 as a machinegun for the same reason it had so classified the AR-1: because "one continuous pull of the trigger allows" a firearm equipped with an FRT-15 "to shoot more than one shot."  Govt. Ex. 1 at 5; Defs. Ex. S at 5.[9]

On July 27, 2021, the ATF served Defendants with a cease-and-desist letter, ordering Defendants to stop "all manufacture and transfer" of FRT-15s and to "[c]ontact ATF . . . to develop a plan for addressing those machineguns already distributed."  Govt. Ex. 2 at 1–2; Defs. Ex. C1 at 1–2; *see also* Tr. 216:1–4.[10]  Craig Saier, who at the time was Special Agent in Charge of the ATF's Tampa Field Division, personally served the ATF's cease-and-desist letter on Maxwell.  Tr. 209:18–21, 214:11–19.  DeMonico claimed at the preliminary injunction hearing that Defendants "were all pretty surprised to receive" the cease-and-desist.  Tr. 448:9–11.  But at the meeting in which Saier provided the letter to Maxwell, Maxwell told Saier that he "expected this letter."  Tr. 217:8.  In fact, Maxwell added,

---

[9]  The ATF classified the WOT as a machinegun for the same reason in a report dated October 20, 2021.  *See generally* Govt. Ex. 4; Defs. Ex. V.

[10]  Although the ATF's cease-and-desist letter is stamped on July 26, 2021, *see* Govt. Ex. 2 at 1; Defs. Ex. C1 at 1, the parties agree that the ATF served the letter on Defendants on July 27, 2021.  *See, e.g.*, Tr. 230:18–19; Defs. Ex. F1 at 1.

he had already drafted the complaint that RBT planned to file against the ATF in court, and had been waiting for the ATF's cease-and-desist to so file. Tr: 217:8–10; *see also* Defs. Ex. V3 at 2.

After the ATF issued its cease-and-desist, Defendants immediately went on offense. Less than a week after being served with the ATF's notice, on August 3, 2021, Defendants filed suit in the United States District Court for the Middle District of Florida, seeking a legal declaration that the agency's classification was erroneous and an order enjoining the ATF from interfering with Defendants' sales of the FRT-15. *See* Defs. Ex. Z1 at 1, 17. Defendants also—both directly and through a public relations firm they hired for this purpose—launched a media campaign to publicize the fact that RBT had sued the ATF. Tr. 450:16–451:20, 548:5–17; ECF No. 107-4 ¶¶ 3–5; *see generally* Govt. Exs. 11, 13, 18; Defs. Ex. G3.

On August 19, 2021, DeMonico issued a public statement by video. Tr. 450:16–20; *see also* Govt. Exs. 12, 13. In it, DeMonico informed his customers that the ATF had issued a cease-and-desist letter after classifying the FRT-15 as a machinegun, but that the cease-and-desist "has zero relevance" to any RBT customers who had already purchased an FRT-15. Govt. Ex. 13 at 2:2–17, 5:7–16. DeMonico also again stressed to his customers that the ATF's classification was wrong in light of the contrary opinions of Defendants' four experts, who were all former ATF agents. Govt. Ex. 13 at 3:9–4:21. In interviews, DeMonico also asserted that he was the only person with the "balls" to sell the FRT-15, and that "when shit hit[] the fan" he wasn't going to "run" or "hide." Govt. Ex. 18 at 4:6–18.

28

But Defendants' much-hyped lawsuit was short-lived.  The federal district judge presiding over the suit promptly denied RBT's request for a temporary restraining order (on August 5, 2021) and, after a hearing, denied RBT's motion for a preliminary injunction on October 12, 2021.  *See Rare Breed Triggers, LLC v. Garland*, 21-cv-1245, 2021 WL 4750081, at *1 n.2, *3 (M.D. Fla. Oct. 12, 2021).  The Court then dismissed the action altogether on October 28, 2021, when the parties failed to file a case management report.  *See* Defs. Ex. B2 at 1–2.  Although the dismissal order informed Defendants that they "may seek reconsideration" of the dismissal if they were not at fault for the apparent noncompliance with the Court's procedures, Defs. Ex. B2 at 2 n.1, they did not do so.

On November 2, 2021, Defendants submitted additional materials to the ATF—including their experts' opinion letters—and requested that the agency reconsider the FRT-15's classification.  Tr. 250:12–16, 252:3–7; Defs. Ex. X1 at 1–2.  Saier informed Maxwell that he would forward his reconsideration application to the ATF's Firearms Ammunition and Technology Division.  At the same time, he reiterated the ATF's position to Maxwell and again directed RBT to (1) stop selling the FRT-15 and (2) contact the ATF about a process for identifying and retrieving FRT-15s that RBT had already sold.  Tr. 220:7–23, 249:24–250:10, 598:19–599:8; Govt Exs. 5 at 1–2, 35 at 1–2; Defs. Ex. D1 at 1–2.  Six weeks later, Maxwell sent a follow-up letter to the ATF inquiring about the status of Defendants' reconsideration request.  Defs. Ex. Y1 at 1.  He received no response, and Defendants continued to sell and actively market the sale of FRT-15s.  Tr. 453:14–

29

15.

On January 12, 2022, the ATF served a cease-and-desist letter on 3rd Gen
Machine, the company that manufactured and fulfilled orders for RBT.  ECF No.
105-5 ¶ 2–3, 5; ECF No. 120-3 ¶ 2; Govt. Ex. 37 at 1–2; Defs. Ex. E1 at 1–2; *see also*
Tr. 453:17–454:6, 504:22–505:8, 533:11–12.  Upon receiving the ATF's cease-and-
desist, Jonathan Robinson, then-General Manager of 3rd Gen, asked Defendants
about the legality of the FRT-15.  ECF No. 105-5 ¶¶ 5–6.  Defendants assured him
that they were "involved in litigation with the ATF," and that the judge "had shut
the case down, in favor of RBT, because the ATF had not allowed RBT to submit
documents to it concerning the FRT-15."  ECF No. 105-5 ¶ 7.  This was untrue:
Defendants were not, at that time, "involved" in any litigation, in any court,
challenging the ATF's classification of the FRT-15 as a machinegun.  Nor was the
case resolved (or "shut down") in RBT's "favor"—it had been dismissed on
procedural grounds, and RBT had done nothing to refile it, in Florida or elsewhere.
But 3rd Gen apparently relied on those representations and continued to produce
the FRT-15.  *See* ECF No. 105-5 ¶ 8.

On March 22, 2022, the ATF published an open letter to all gun owners who
may have purchased an FRT-15, informing them that the ATF had classified the
FRT-15 as a machinegun, that "ATF intends to take appropriate remedial action
with respect to sellers and possessors of these devices," and that purchasers are
encouraged to voluntarily divest themselves of FRT-15s.  Govt. Ex. 38 at 1–2; Defs.
Ex. G1 at 1–2; *see also* Tr. 245:20–23.

On March 26, 2022, the ATF executed a search of 3rd Gen Machine's premises, pursuant to a warrant issued by Magistrate Judge Jared C. Bennett of the United States District Court for the District of Utah.  ECF No. 117-1 ¶ 2, ECF No. 120-3 ¶¶ 1, 3.  Judge Bennett's warrant authorized the ATF to seize, *inter alia*, "[a]ll . . . FRT-15 machineguns" in 3rd Gen's facilities.  ECF No. 120-3 at 7.  The ATF indeed seized the FRT-15s and component parts in 3rd Gen's possession, as well as 3rd Gen's computers.  Tr. 506:23–507:1; ECF No. 120-3 ¶ 4.  Soon thereafter, however, Defendants learned that, despite the ATF's search, a pallet of FRT-15s remained at 3rd Gen.  Tr. 457:22–458:7; ECF No. 105-5 ¶ 10; ECF No. 120-3 ¶ 5–6.[11]  On March 30, 2022, Maxwell requested by email that 3rd Gen send the pallet of FRT-15s to RBT, to which 3rd Gen, through counsel, responded that it refused to obstruct the ATF, which planned to take possession of these devices as well.  ECF No. 105-5 ¶ 12; ECF No. 124-1 at 175:21–176:1; Defs. Ex. A4 at 1–2.  On April 14, 2022, however, DeMonico flew to Salt Lake City, drove to 3rd Gen, loaded the pallet of triggers into a U-Haul, and drove hundreds of miles to New Mexico before the ATF intercepted him and seized the triggers.  Tr. 457:22–458:7, 459:6–461:12, 463:25–467:21, 508:4–13; ECF No. 105-5 ¶ 13–15; ECF No. 117-1 ¶¶ 5–6; ECF No. 124-1 at 179:15–182:10.[12]

---

[11]  According to Robinson, at the time of the ATF search, this pallet was at a different 3rd Gen facility that the ATF had not entered.  ECF No. 105-5 ¶ 10.  3rd Gen President Evan Jones, however, recalled that the pallet had been delivered to 3rd Gen from an outside vendor after the ATF search.  ECF No. 120-3 ¶ 5.

[12]  At some point after leaving 3rd Gen and before being apprehended in New Mexico, DeMonico switched vehicles.  ECF No. 117-1 at 7.

On May 16, 2022, Defendants again filed suit against the ATF in the United States District Court for the District of North Dakota, where RBT had recently re-incorporated.  *See* ECF No. 124-1 at 104:21–105:1; Defs. Ex. C2 at 1.  The action was dismissed for lack of venue on November 5, 2022.  Tr. 516:17–23.  *See Rare Breed Triggers, LLC v. Garland*, 22-cv-85, 2022 WL 17175089, at *7 (D.N.D. Nov. 4, 2022).

During this time, Defendants and their representatives fielded numerous email inquiries from their customers as to the legality of the FRT-15 and the potential consequences of purchasing one.  For example, when customers expressed concerns that their purchase history would eventually become available to the ATF, Defendants regularly informed them that RBT had a "digital shredding" policy, pursuant to which customer data was automatically deleted after a certain period; Defendants assured their customers that this mitigated any risk that the ATF would be able to identify RBT's customers and seize their FRT-15s, informing them, "we can't turn over what we don't have."  Govt. Ex. 107 at 1; *see also* ECF No. 124-2 at 85:14–18; Govt. Ex. 88 at 1; Defs. Ex. F, Q3 at 1.

In or around November 2022, Defendants, who had previously mailed their triggers largely through the United Parcel Service ("UPS"), a private carrier, began shipping triggers through the United States Postal Service ("USPS").  *See, e.g.*, Tr. 444:22–445:1, 476:19–25.  When mailing triggers using USPS—but only USPS—Defendants wrote on each package's "return" line fictitious company names that shared RBT's initials, such as "Red Barn Tools" or "Red Beard Treasures."  Tr.

32

445:11–446:3, 476:9–477:6; Govt. Ex. 52 at 4.

After the ATF's issuance of the cease-and-desist letter, Defendants apparently no longer informed their customers that the FRT-15 was "absolutely legal," but instead used form language stating that it was "[thei]r position" that the FRT-15 was legal, and that Defendants were "currently in litigation" to challenge the ATF's classification. *See, e.g.*, Defs. Ex. H1 at 3. Yet Defendants sent emails to their customers that included such language even after their action in in the Middle District of Florida was dismissed, and long before they commenced their action in the District of North Dakota seven months later. *See, e.g.*, Govt. Ex. 22 at 5. They also did so after their action in the District of North Dakota was dismissed. *See, e.g.*, Govt. Ex. 92 at 1; Defs. Ex. H1 at 3. Although RBT initially publicized the existence of (and their legal challenges to) the ATF's July 2021 cease-and-desist letter on its social media platforms and in media interviews, they omitted any reference to the ATF's classification of the FRT-15 as a machinegun on RBT's website, which was the only place that customers could actually purchase an FRT-15 from RBT. Tr. 483:11–484:13, 485:1–9.

After the ATF classified the FRT-15 as a machinegun, Defendants were "bombarded" with emails from concerned customers. ECF No. 124-2 at 81:23–83:7. When frustrated customers emailed Defendants demanding a refund—explaining that they had no idea prior to purchase that the ATF had so classified the FRT-15— Defendants routinely repeated "[thei]r position" as to the legality of the FRT-15, reminded the customers that they had agreed to RBT's "no refund" policy at

checkout, and warned the customer that any attempt to refund a purchase would be met with legal action.  *See, e.g.*, Govt. Exs. 22 at 5–6, 80 at 5–6; Defs. Ex. K1 at 3.

## ANALYSIS

Rule 65(a) of the Federal Rules of Civil Procedure permits a district court to issue preliminary injunctive relief to a party while an action proceeds to a final decision.  Fed. R. Civ. P. 65(a).  A preliminary injunction, however, is "an extraordinary remedy never awarded as of right."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Rather, a party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).[13]

---

[13]  The Government asks the Court to apply a standard for the issuance of a preliminary injunction in this case that is lower than the standard typically applied to parties seeking such relief, arguing that 18 U.S.C. § 1345 explicitly contemplates the availability of injunctive relief to stop ongoing frauds, and that the Government therefore need only prove that there is "probable cause" that Defendants are engaged in such a scheme, and need make no showing that they will experience irreparable harm if a preliminary injunction does not issue.  *See, e.g.,* O.A. Tr. 11:4–7.  The Government points to decisions by other courts that have issued preliminary injunctions under 18 U.S.C. § 1345 using the Government's proposed standard.  *See, e.g.*, *United States v. Palumbo*, 448 F. Supp. 3d 257, 260–61 (E.D.N.Y. 2020); *see generally Luis v. United States*, 578 U.S. 5 (2016).  The text of the statute itself does not speak to the appropriate preliminary injunction standard, however, other than to note that "[a] proceeding under this section is governed by the Federal Rules of Civil Procedure."  18 U.S.C. § 1345(b).  Because the Court finds that the Government has met its burden for preliminary injunctive relief under Defendants' preferred standard, *see* ECF No. 50 at 10–15, which is also the standard that

The moving party must also demonstrate that "the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quotation marks omitted); *Khan v. Addy's BBQ LLC*, 419 F. Supp. 3d 538, 552 (E.D.N.Y. 2019). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties . . . but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam) (citations omitted). On a preliminary injunction motion, "the court must . . . state the findings and conclusions that support its" decision, Fed. R. Civ. P. 52(a)(2), which may include an assessment of the witnesses' credibility when necessary to resolve a contested issue of fact. *See, e.g.*, *Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 282 F. App'x 885, 889 n.2 (2d Cir. 2008).

The Fraud Injunction Act is a hybrid civil-criminal statute that authorizes the Government to seek injunctive relief in "any Federal court" upon a showing that a defendant is "violating or about to violate" certain federal criminal fraud statutes. 18 U.S.C. § 1345(a). The crimes covered by § 1345 include conspiracies to defraud the United States under 18 U.S.C. § 371, as well as mail fraud, wire fraud, and conspiracies to commit mail or wire fraud under 18 U.S.C. §§ 1341, 1343, and 1349. The statute requires the court to "proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination,

---

typically governs motions for a preliminary injunction under Fed. R. Civ. P. 65(a), it does not resolve this question here.

enter such a restraining order or prohibition, or take such other action, as is
warranted to prevent a continuing and substantial injury to the United States or to
any person or class of persons for whose protection the action is brought." 18 U.S.C.
§ 1345(b). Actions brought under the Fraud Injunction Act are "governed by the
Federal Rules of Civil Procedure." *Id.*

## I. Likelihood of Success on the Merits

### A. The FRT-15 Is Likely an Illegal Machinegun

The Government's motion for a preliminary injunction—indeed, this entire
action—depends in part on the threshold question of whether the FRT-15 is, in fact,
an illegal machinegun. For instance, the Government alleges that Defendants
knew that the FRT-15 was an illegal machinegun before they brought the device to
market but failed to inform their customers of this fact prior to sale, constituting
mail and wire fraud. The Government further alleges that Defendants have
conspired to interfere with the ATF's attempts to track and confiscate illegal
machineguns, which, the Government asserts, includes the FRT-15. Each of these
arguments thus depends in part on whether the FRT-15 satisfies the statutory
definition of a machinegun under federal law, and both parties agree that the Court
must answer this threshold question in order to assess the Government's fraud
claims. On the present record, the Court concludes that the Government has
demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies
the statutory definition of a machinegun.

The National Firearms Act of 1934 ("NFA") defines a "machinegun" as "any
weapon which shoots, is designed to shoot, or can be readily restored to shoot,

36

automatically more than one shot, without manual reloading, by a single function of

the trigger." 26 U.S.C. § 5845(b).  The NFA, when passed in 1934, did not

criminalize the manufacture or possession of machineguns, but instead subjected

machineguns to a $200 per-unit tax.  *See* National Firearms Act of 1934, Pub. L. No.

73-474, § 3(a), 48 Stat. 1236, 1237 (1934).

In 1968, Congress passed the Gun Control Act ("GCA"), which, among other

things, expanded the definition of "machinegun" to include parts that can convert a

weapon into a machinegun, expanded federal regulation to other firearms such as

rifles and sawed-off shotguns, and required entities that manufacture or sell

covered firearms, including machineguns, to first obtain a federal firearms license.

*See* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1215–23, 1231

(1968).  The Firearms Owners' Protection Act of 1986 ("FOPA"), in turn, amended

the GCA to outright prohibit the sale or possession of any machinegun that was

manufactured after 1986.  Firearms Owners' Protection Act of 1986, Pub. L. No. 99-

308, § 102, 100 Stat. 451, 453 (1986).  The FOPA incorporated by reference the

definition of "machinegun" outlined in 28 U.S.C. § 5845(b).  18 U.S.C. § 921(a)(24).

It is therefore currently illegal to possess or sell any weapon which fires multiples

shots "automatically . . . by a single function of the trigger."  *See* 26 U.S.C. §

5845(b); 18 U.S.C. § 922(o)(1).[14]

---

[14]  Neither party argues that the Second Amendment bears on Defendants'
right to possess or sell the FRT-15.  The Government clearly has the authority to
prohibit the possession of machineguns.  *District of Columbia v. Heller*, 554 U.S.
570, 624 (2008); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012).  The
parties only dispute whether the FRT-15 is such a device.

In the present action, the parties offer contrary interpretations of the phrase "automatically . . . by a single function of the trigger" in § 5845(b)'s definition of an illegal machinegun.  The Government argues that a trigger's "function" is to initiate the firing sequence.  *See, e.g.*, O.A. Tr. 25:21–26:2, 27:13–14.  Once the trigger begins the firing sequence—typically by means of a shooter's pull on the trigger shoe—the trigger will then fire one round if the weapon is a semi-automatic, or multiple rounds if the weapon is an automatic.

As applied to any weapon with a standard pull trigger, therefore, the Government asserts that the word "function" in § 5845(b) is essentially synonymous with the word "pull," since the pull of the trigger begins the firing sequence.  O.A. Tr. 25:21–26:2, 27:13–20.  After the shooter's initial pull, a shooter firing a machinegun need only apply constant rearward pressure to the trigger with his or her finger to rapidly fire multiple rounds of ammunition.  O.A. Tr. 12:12–13, 25:1–8.  In the Government's view, because a weapon equipped with an FRT-15 is also capable of automatically firing multiple bullets with a single pull of the trigger— that is, the shooter need only maintain "constant rearward pressure" on the trigger after an initial pull for the weapon to fire—it is an illegal machinegun.  This is so, the Government argues, regardless of the fact that on the FRT-15, the trigger technically re-engages with the hammer before firing each shot and moves back and forth against the shooter's finger.  O.A. Tr. 25:21–27:2.

Under the Government's proposed definition, the trigger on the FRT-15 only "functions" once to achieve multiple rounds of fire because once the shooter initiates

38

the firing sequence by pulling the trigger, the weapon then fires automatically until the shooter releases the trigger or the ammunition is exhausted.  OA. Tr. 27:3–10. Indeed, out-of-circuit caselaw interpreting the word "trigger" in § 5845(b) supports the Government's proposed interpretation of the phrase "single function of the trigger."  *Cf. United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) ("The ordinary meaning [of] a trigger is a mechanism that is used to initiate the firing sequence."); *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002) ("We join our sister circuits in holding that a trigger is a mechanism used to initiate a firing sequence.").

Defendants' proposed definition of § 5845(b) is not a model of clarity.  It appears, however, that Defendants have offered two alternate, but closely related, interpretations of the phrase "single function of the trigger."  First, Defendants argue that the term "function" refers to the internal workings of the firearm as it loads and expels a projectile, *i.e.*, the role that the trigger plays in the mechanics of a weapon's firing cycle.  Specifically, they argue that a trigger's function is to "release the hammer," which is the mechanism within a gun's firing apparatus which, when released, strikes the firing pin, causing a shot to be fired.  *See, e.g.*, O.A. Tr. 24:9–10.  On a semi-automatic weapon, the trigger must re-engage the hammer by way of each piece's "sear surface" before the process can repeat and the gun can fire an additional round.  On a classic machinegun like the M-16, on the other hand, once the trigger shoe is pulled by the shooter's finger, the trigger only needs to release the hammer a single time before the automatic firing sequence begins: once it does so, the hammer strikes the firing pin, and the force of the initial

39

shot begins a repetitive process between the hammer, the auto-sear, the bolt carrier, and the firing pin, allowing for automatic fire. For this reason, Defendants argue, any gun which fires only one bullet each time the trigger re-engages the hammer fires only one bullet per "function" of the trigger and is not a machinegun—even if, as a practical matter, the weapon is capable of rapidly firing bullets as long as the shooter pulls the trigger once and maintains rearward pressure on the trigger shoe. In other words, Defendants assert that whether the shooter "pulls" the trigger multiple times to fire multiple rounds is irrelevant under § 5845(b). *See* O.A. Tr. 21:1–4, 23:15–17, 33:16–22.

Defendants have also, at points in this litigation, conceded that, in light of Supreme Court caselaw, the word "function" in § 5845(b), as the Government contends, is synonymous with the word "pull," and that a weapon is therefore a machinegun as long as it fires multiple rounds with a single "pull" of the trigger. O.A. Tr. 20:17–24, 21:6–20. But Defendants argue that the FRT-15 nonetheless satisfies that definition. They argue that even though a shooter need only consciously pull the trigger shoe once and maintain constant pressure on the trigger with her finger in order for a weapon equipped with an FRT-15 to fire repeatedly, the trigger is in fact being "pulled" repeatedly and rapidly throughout that process. O.A. Tr. 20:9–16, 22:8–23:3. These "pulls" of the shooter's finger are imperceptible to someone watching an FRT-15 in action. However, at the preliminary injunction hearing, Defendants played a video of an FRT-15 at a rate approximately sixty-one times slower than real-time speed; in extreme slow motion, a viewer can see that

40

the trigger shoe does move slightly back and forth against the shooter's finger with each shot in the firing cycle.[15]  Defendants thus argue that, in the mechanical sense, when the shooter pulls the trigger and then simply maintains pressure on the trigger shoe, the trigger is "pulled" with each additional shot as it resets and re-engages with the hammer inside the weapon—even though the shooter consciously does no additional "pulling" and is instead maintaining pressure on the trigger shoe.  O.A. Tr. 19:19–23, 23:4–11.

The Court concludes that the Government, and not the Defendants, provides the correct interpretation of § 5845(b) as applied to the FRT-15.

### 1.  As Applied to Triggers Such As the FRT-15, the Word "Function" in § 5845(b) Is Synonymous with the Word "Pull"

The Court does not start its statutory analysis on a clean slate.  Rather, the Court is guided by Supreme Court precedent in *Staples v. United States*, 511 U.S. 600 (1994), which all but dooms Defendants' first proposed interpretation of § 5845(b).  In *Staples*, the Court considered a defendant's challenge to his criminal conviction for the illegal possession of an unregistered machinegun; although federal agents determined the weapon had been modified to fire automatically after test-firing it, the defendant contended that he was unaware that the weapon was capable of automatic fire, and that the Government should have been required to prove beyond a reasonable doubt that he knew the weapon had characteristics that made it a machinegun under federal law.  *Id.* at 602.

---

[15]  Defendants recorded this video "at 1461 frames per second" and "replayed [it] at 23.98 frames per second" for the Court.  ECF No. 138 at 1.

The Court reversed the defendant's conviction, concluding that the trial court had improperly instructed the jury as to the *mens rea* that the Government had to prove to secure a conviction for illegal possession of an unregistered machine gun. *Id.* at 602–604.  In its discussion of the federal prohibition on possession of such devices, the Court interpreted § 5845(b) as follows:

> The National Firearms Act . . . defines a machinegun as "any weapon which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger," § 5845(b).  Thus, any fully automatic weapon is a "firearm" within the meaning of the Act. . . . [T]he terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly *with a single pull of the trigger*.  That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted.  Such weapons are "machineguns" within the meaning of the Act.  We use the term "semiautomatic" to designate a weapon that fires *only one shot with each pull of the trigger*.

*Id.* at 602 & n.1 (cleaned up) (emphasis added).

*Staples* arguably renders this Court's analysis of § 5845(b) complete.  District courts do not typically engage in independent exercises of statutory interpretation when presented with an appellate court's interpretation of the same statute.  A weapon is a machinegun within the meaning of § 5845(b), therefore, if it is capable of "fir[ing] repeatedly with a single pull of the trigger." *Id.*  Notably, Defendants conceded at oral argument on August 15, 2023 that this "single pull of the trigger" interpretation of § 5845(b) in *Staples* is binding on this Court.  O.A. Tr. 20:18–21:20.

Perhaps realizing the weight of this concession, Defendants then hastily withdrew it in a supplemental letter brief filed on August 23, 2023.  ECF No. 130 at 1.  They urge the Court to give *Staples* limited weight because, they argue, this

portion of the Court's opinion was set forth in a footnote of the Court's opinion and is merely "dictum." ECF No. 130 at 1–2; *see also* Defs. Ex. U1 at 166:23–167:8. Other courts have offered similar suggestions. *See United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (concluding that "the *Staples* footnote" was not "precedentially binding")[16]; *United States v. Alkazahg*, 81 M.J. 764, 780 (N-M. Ct. Crim. App. 2021) (concluding that the *Staples* "footnote is not the interpretation of a statute").

Defendants' arguments are unconvincing. First, interpretations of law from an appellate court—particularly the United States Supreme Court—even if technically dicta, are entitled to persuasive weight by a district court in the absence of other, binding interpretations of the same law. *Cf. Fischer v. CF & I Steel Corp.*, 657 F. Supp. 1195, 1201 (S.D.N.Y. 1987) ("[E]ven if the *Klinger* holding were dicta for the reasons urged by defendants, such a pronouncement would still serve as powerful guidance for lower courts in interpreting this rarely construed statute.").

---

[16] Despite this language, *Olofson* supports, rather than undermines, the Government's interpretation of § 5845(b). In *Olofson*, a defendant appealed his conviction for the possession of an illegal machinegun to the Court of Appeals for the Seventh Circuit on the grounds that the district court failed to instruct the jury on the definition of a machinegun consistent with *Staples*. 563 F.3d at 656. The weapon that the defendant possessed, though capable of automatic fire, would frequently malfunction, allowing only a few shots to fire before jamming. *Id.* at 655. The defendant argued that such a weapon was not a machinegun since *Staples* held that a weapon is a machinegun if it keeps firing "until its trigger is released or the ammunition is exhausted," but, a shooter could, in principle, hold down the trigger on the defendant's defective weapon yet never exhaust its ammunition. *Id.* at 656 n.3. The Court rejected this argument on the grounds that *Staples* does not necessarily provide a "comprehensive" interpretation of § 5845(b)—that is, weapons which do satisfy the definition in *Staples* are machineguns, yet even those that do not may still be machineguns within the meaning of the statute. *Id.* at 658.

Second, to the extent that Defendants seek to diminish the weight of the *Staples* Court's explication of §5845(b) because it appears in a footnote, that fact alone does not render it unpersuasive or unimpactful.  *See, e.g.*, *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1934) (suggesting that courts employ a tiered system of scrutiny when assessing the constitutionality of a statute).

Assuming that the interpretation of § 5845(b) set forth in *Staples* is not binding, however, then the Court must, as with any act of statutory interpretation, "start[] with the language of the statute itself."  *United States v. Kinzler*, 55 F.3d 70, 72 (2d Cir. 1995); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) ("As with any question of statutory interpretation, we begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning.").  Unless a statute defines a term, or the statute otherwise indicates that a term should be given special meaning, a court typically interprets the statute "applying the ordinary, contemporary, common meaning of the words used." *Kinzler*, 55 F.3d at 72 (citation and quotation marks omitted).  The court may also employ other "traditional tools of statutory construction" after considering the statute's text, including examining the statute's "purpose as reflected in its legislative history." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't. Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017) (citations omitted).

The Court starts its inquiry by considering the plain meaning of the terms "trigger" and "function."  Modern dictionaries variously define the word "trigger" in the context of firearms to mean "a part of a gun that causes the gun to fire when

pressed"[17] and "the part of the action moved by the finger to fire a gun."[18]  These same sources define the word "function" as "the natural purpose []of something,"[19] "the action for which a . . . thing is specially fitted or used or for which a thing exists."[20]  These definitions strongly support the inference that the phrase "function of the trigger" is, as the Government asserts, synonymous with "pull of the trigger," since they describe a trigger as the external interface between the shooter and the firing mechanism that, when pulled, causes the gun to be fired.  *See Cargill v. Garland*, 57 F.4th 447, 452 (5th Cir. 2023) ("The trigger is the interface between the gun's internal mechanism and the human finger.").

The Court also considers the definition of the word "trigger" in 1934, when the NFA was passed.  *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994) (concluding that the statute's year of enactment is "[t]he most relevant time for determining a statutory term's meaning").  In 1934, Webster's dictionary defined a trigger in a firearm as "the part of a lock moved by the finger to release the cock in firing."  *Webster's New International Dictionary of the English*

---

[17] *Trigger*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/trigger (last visited Aug. 30, 2023).

[18] *Trigger*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/trigger (last visited Aug. 30, 2023).

[19] *Function*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/function (last visited Aug. 30, 2023).

[20] *Function*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/function (last visited Aug. 30, 2023).

*Language* (2d ed. 1934).  On the one hand, the definition could support a narrow reading that is consistent with Defendants' position, defining a trigger's function internally as part of the firing mechanism that "release[es] the [hammer]."  On the other hand, the definition could support a broad reading of a trigger's function that is consistent with the Government's position, defining the trigger as the part of the firing mechanism that, true, releases the hammer, but only for the broader purpose of "firing" the weapon, and only when "moved by the finger."

The Court concludes that, in the context of the NFA, the latter interpretation is the correct one.  The Court appreciates that, as Defendants argue, the trigger on a firearm equipped with an FRT-15 does indeed release the firearm's hammer.  Defendants presented two expert witnesses during the Court's preliminary injunction hearing to explain that "releasing the hammer" is the trigger's technical function within a gun's firing mechanism; the Government does not dispute that this is an accurate technical description of how the trigger interfaces with the other internal components of the weapon during the firing cycle.  *See, e.g.*, O.A. Tr. 26:5–10.  However, there is simply no indication in the NFA, or the statutes that adopted the meanings defined in the NFA, that Congress intended the phrase "single function of the trigger" to be given a technical meaning rather than its ordinary, common meaning.  *See Kinzler*, 55 F.3d at 72.  For precisely that reason, other courts have cited approvingly to *Staples*—defining a firearm as a machinegun if it can fire multiple rounds with a single "pull"—as offering a "commonsense" definition for what constitutes a machinegun, rather than one which depends on

46

"hyper-technical adherence to literalism." *Fleischli*, 305 F.3d at 655. *See also*

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 30 (D.C.

Cir. 2019) ("[A] quite common feature of weapons that indisputably qualify as

machineguns is that they require both a single pull of the trigger and the

application of constant and continuing pressure on the trigger after it is pulled."

(emphasis omitted)).   Federal appellate cases that pre-date *Staples* also reached the

same conclusion. *See, e.g.*, *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir.

1977) ("[I]t is undisputed that the shooter could, by fully pulling the trigger, and it

only, at the point of maximum leverage, obtain automation with a single trigger

function.  We are satisfied the gun was a machinegun within the statutory

definition.").[21]

     This interpretation of the text is also fully grounded in the legislative history

---

[21]   Defendants also argue that the word "function" cannot be read
synonymously with "pull" because the definitions of other firearms in 26 U.S.C. §
5845, such as rifles and shotguns, include the word "pull," yet the definition of
"machinegun" does not. *See* ECF No. 70 at 4–5; 26 U.S.C. §§ 5845(c), (d).  From this
difference, Defendants urge the Court to conclude that the word "function" must
mean something other than the word "pull," invoking a canon of statutory
interpretation that when Congress uses different words in the same statute, that
difference must reflect an intended difference in meaning.
     *Staples* forecloses this argument.  But even if it did not, Congress did not, as
relevant here, statutorily define "machineguns" at the same time it defined "rifles"
and "shotguns."  Although these definitions all appear in 26 U.S.C. § 5845, Congress
defined "machineguns" in the National Firearms Act in 1934 but defined "rifles" and
"shotguns" in the Gun Control Act in 1968.  It seems unlikely to the Court that
Congress, by later using the word "pull" when defining other firearms thirty years
after it had defined machineguns, intended to impliedly narrow the latter category
in a statute called the "Gun Control Act."  Simply, the word "'function' was likely
intended by Congress to forestall attempts by weapon manufacturers or others to
implement triggers that need not be pulled." *Aposhian v. Barr*, 374 F. Supp. 3d
1145, 1152 (D. Utah 2019), *aff'd*, *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020).

of the National Firearms Act.  As the transcript of the hearing before the House

Ways and Means Committee demonstrates, the first draft of the National Firearms

Act defined a machinegun not with reference to the weapon's trigger but as "any

weapon designed to shoot automatically or semiautomatically twelve or more shots

without reloading."  *National Firearms Act: Hearing on H.R. 9066 Before the H.*

*Comm. on Ways and Means*, 73rd Cong. 1 (1934).  However, then-president of the

National Rifle Association Karl Frederick testified before the committee on the first

day of the hearing and, asserting that the working definition of a machinegun was

"wholly inadequate and unsatisfactory," *id.* at 39, recommended what became the

final definitional language of § 5845(b).  *Id.* at 40.  The subsequent colloquy among

Frederick and the members on the committee demonstrates that both the president

of the NRA and the legislators at the hearing all considered the words "function"

and "pull" to be interchangeable:

> MR. FREDERICK: The distinguishing feature of a machinegun is that
> *by a single pull of the trigger the gun continues to fire* as long as there is
> any ammunition in the belt or in the magazine.  Other guns require *a
> separate pull of the trigger for every shot fired*, and such guns are not
> properly designated as machineguns.  A gun, however, which is capable
> of firing more than one shot by *a single pull of the trigger, a single
> function of the trigger*, is properly regarded, in my opinion, as a
> machinegun.
>
> MR. HILL: May I ask you a question there?
>
> MR. FREDERICK: Yes, sir.
>
> MR. HILL: Suppose your definition were adopted. Would it be
> practicable to manufacture a gun that would be classed either as an
> automatic or a semiautomatically operated gun, even with more than
> one function of the trigger, and still answer the purpose, in a large way,
> of a machinegun which requires only one function of the trigger?

MR. FREDERICK: I do not think so.  For purposes of example, you may look at the automatic pistol which is the standard weapon of the United States Army.  That has an automatic discharge of the empty cartridge and a reloading principle which is operated by the force of the gas from the exploded cartridge.  *But with a single pull of the trigger only one shot is fired.  You must release the trigger and pull it again for the second shot to be fired.  You can keep firing that as fast as you can pull your trigger.  But that is not properly a machinegun* and in point of effectiveness any gun so operated will be very much less effective than one which pours out *a stream of bullets with a single pull* and as a perfect stream. . . .

MR. CHOCHRAN: Mr. Frederick, under your proposed definition, would the Colt automatic pistol be a machinegun?

MR. FREDERICK: No, sir.  I do not think that in the eyes of any ballistic engineer it would be so regarded.  I do not think it should be so regarded.

MR. COCHRAN: Does not the Colt automatic pistol continue to shoot *as long as you exert pressure upon the trigger?*

MR. FREDERICK: No, sir.  It requires *a separate pull of the trigger* for every shot fired.

*Id.* at 40–41 (emphasis supplied).  After Frederick's proposed language was adopted,

Assistant Attorney General Joseph Keenan further discussed the meaning of the

phrase "single function of the trigger" with legislators:

MR. HILL: One question relative to the definition of machineguns.  There is a distinction between an auto-loading and automatic gun, I take it?

MR. KEENAN: I think so.

MR. HILL: *An automatic gun is one that fires without pulling the trigger more than once.*  An auto-loading might not be an automatic.  An auto-loading gun might not be an automatic gun; for instance, you have these small rifles, the .22-caliber rifles which are auto-loading, but *you have to pull the trigger each time to fire them.  That is not a machinegun.*

MR. KEENAN: That is right.

MR. HILL: I know in these small rifles, when you fire by pulling the

trigger they reload automatically, but they do not automatically fire again *unless you pull the trigger.*

MR. KEENAN: I appreciate the distinction.

MR. HILL: That is not a machinegun under this definition.

MR. KEENAN: No.

*Id.* at 97 (emphasis supplied).

After the committee changed the statutory definition of a machinegun to one fired automatically by a "single function of the trigger," the Senate Finance Committee and the House Ways and Means Committee both recommended that their respective chambers pass the bill.  In summarizing the bill to the legislators, each committee noted that a "machinegun" in the bill was given its "usual definition" as "a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger."  S. Rep. No. 73-1444, at 2 (1934); H.R. Rep. No. 73-1780, at 2 (1934).

Moreover, Defendants' proposed technical definition of a trigger's "function"— defined solely as the part of the firing mechanism that releases the hammer—is simply so narrow that nearly any machinegun could be modestly redesigned to thwart Congress's ban on machineguns.  *Cf. Kinzler*, 55 F.3d at 72 (noting that statutory interpretations that contradict legislative intent are disfavored); *In re Gusam Rest. Corp.*, 737 F.2d 274, 276 (2d Cir. 1984) (adopting an interpretation after concluding that it "does not contradict[]" the "congressional intent" of the statute).  Suppose the Court adopted Defendants' interpretation of § 5845(b) and concluded that the "function" of a gun's trigger is solely to "release the hammer."  A

50

firearm would only be a machinegun, then, if it fired multiple bullets per single instance of the trigger releasing the hammer.  A firearms manufacturer could well design a weapon identical to an M-16 machinegun except for the fact that the trigger engages not directly with the hammer, but with a widget which in turn releases the hammer and initiates automatic fire.  Such a gun would be, for all practical purposes, a machinegun, since it would continue to automatically fire until the shooter releases his finger from the trigger—which then, instead of retaining the hammer directly, interfaces with the widget which in turn retains the hammer. Yet under Defendants' proposed interpretation of § 5845(b), such a weapon does not "function" when the shooter pulls the trigger, since the trigger never itself releases the hammer.  Indeed, other courts have rejected similar attempts to circumvent the statute.  *Oakes*, 564 F.2d at 388 (concluding that a gun with one trigger that, when pulled, activated a second trigger, which initiated automatic fire, was a machinegun); *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (concluding that a weapon equipped with an electronic switch which, when pushed, caused the gun's factory-made trigger to fire repeatedly was a machinegun); *Fleischli*, 305 F.3d at 655–56 (same).

The Court therefore concludes in light of the above analysis that—as applied to a weapon with a standard pull trigger like the FRT-15—a firearm is a machinegun if it fires multiple rounds automatically with a single "pull" of the

trigger.[22]

## 2.  A Weapon Is a Machinegun If It Is Capable of Firing More Than One Round Per "Pull" of the Trigger Each Time the Shooter Pulls and Holds the Trigger Shoe

The Court turns, next, to Defendants' alternate argument that even if the interpretation of § 5845(b) in *Staples* ("single pull of the trigger") is binding on this Court, the FRT-15 is not a machinegun because it still requires separate "pulls" of the trigger to fire each shot.  At post-hearing oral argument, Defendants conceded that the Supreme Court's interpretation of § 5845(b) in *Staples* is binding on this Court (before retracting that concession in a post-argument letter brief). Nonetheless, however, Defendants argue that the FRT-15 is legal even within the confines of that definition.  O.A. Tr. 21:14–20, 22:21–23:3; ECF No. 130 at 1 (arguing that *Staples* "is consistent with our position in this case but it is not binding on this Court").  Although a shooter firing a weapon outfitted with an FRT-15 consciously pulls the trigger only one time and simply maintains pressure on the trigger shoe in order to fire the weapon repeatedly, the internal mechanics of the FRT-15 rapidly reset the trigger back to the ready-to-fire position over-and-over between each shot.  Thus, Defendants argue, the FRT-15 requires *multiple* "pulls" to fire multiple shots if the Court considers the actual mechanics of the trigger, since the trigger shoe repeatedly moves (albeit only slightly) back and forth against

---

[22]  This result is also consistent with the ATF's regulation interpreting "single function of the trigger" in 26 U.S.C. § 5845(b) as "a single pull of the trigger and analogous motions."  27 C.F.R. § 479.11.  Although the Court need not defer to the ATF's regulation in light of its own analysis, the Court notes the consistency. *Cf. Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 34–35 (2014) (noting that an agency regulation was consistent with the Court's statutory analysis).

the pressure of the shooter's finger, as the interior portion of the trigger repeatedly captures and releases the hammer with each firing cycle.  O.A. Tr. 20:5–16.

There are several problems with Defendants' position.  First, their proposed application of the term "single function" to the FRT-15 is implicitly rejected by *Staples*.  In their sur-reply, Defendants cite *Staples* for the proposition that the Supreme Court, when interpreting § 5845(b), "did not refer to the pressure applied by the user's finger on the trigger, or the user's actions with regard to releasing the trigger."  ECF No. 70 at 5.  That is simply not so.  Defendants' brief notably omits the first sentence of the *Staples* passage in question, defining an automatic weapon as one that "fires repeatedly *with a single pull of the trigger*."  *Staples*, 511 U.S. at 603 n.1 (emphasis added); *see* ECF No. 70 at 5.  It is true that the Supreme Court did not literally say "with a single pull of the trigger *by the shooter*."  But someone or something must be pulling the trigger in order for the weapon to fire.  Defendants argue that "notably absent" from the language of § 5845(b) is "any reference to the weapon's user, his actions, or the actions of his trigger finger."  ECF No. 70 at 4.  In the strictest sense, that is true.  Yet these words are implicit in the very concept of a "trigger."  Indeed, even those courts that have interpreted § 5845(b) with a primary focus on the internal mechanics of the trigger's "function" recognize that "the trigger is the interface between the gun's internal mechanism *and the human finger*."  *Cargill*, 57 F.4th at 452 (emphasis supplied).

The second problem with Defendants' position is that it cannot be reconciled with the complete statutory text of § 5845(b).  Congress defined a machinegun as a

weapon that fires "automatically" by a single function of the trigger.  *See* 26 U.S.C. §
5845(b).  Dictionaries currently define the word "automatic" when applied to
firearms as describing a weapon which "is able to keep . . . shooting continuously *for
as long as the trigger is pressed*,"[23] and can "fir[e] repeatedly *until the trigger is
released*."[24]  Once again, Defendants' proposed definition of § 5845(b) contradicts the
ordinary understanding of what it means for a firearm to operate automatically: it
simply needs to fire repeatedly until the shooter releases the trigger.  The fact that
the trigger might move slightly against the pressure from the shooter's finger before
release is irrelevant.

The definition of the word "automatic" in 1934 does not help Defendants,
either.  When Congress passed the NFA, Webster's Dictionary defined a device to be
automatic if it had "a self-acting or self-regulating mechanism that performs a
required act at a predetermined point in an operation" or "perform[s] work formerly
or usually done by hand."  *Webster's New International Dictionary of the English
Language supra*.  The same dictionary also demonstrates that the phrase
"automatic firearm" existed in the lexicon at that time.  *Id*.  Such definitions cannot
support Defendants' proposed interpretation.  When Congress passed the NFA in
1934, a machine was "automatic" precisely because, once activated, it acted of its

---

[23] *Automatic*, Cambridge Dictionary,
https://dictionary.cambridge.org/us/dictionary/english/automatic (last visited Aug.
30, 2023) (emphasis added).

[24] *Automatic*, Merriam-Webster Online Dictionary, https://www.merriam-
webster.com/dictionary/automatic (last visited Aug. 30, 2023) (emphasis added).

own accord and replaced a task that was previously completed manually.  This

describes the FRT-15 exactly: if the shooter pulls the trigger one time, the repetitive

mechanism in the FRT-15 is entirely self-executing until the shooter releases the

trigger, notwithstanding the fact that the trigger mechanically pushes against the

shooter's finger throughout the process.  Such a device operates "automatically"

within the ordinary understanding of that word.[25]

### 3. The FRT-15 vs. Non-Mechanical Bump Stocks

Defendants urge the Court to follow the interpretive approach employed by

two appellate courts to date in considering whether a different device—called a

"non-mechanical bump stock"—falls within § 5845(b)'s definition of a machinegun.

In particular, Defendants call this Court's attention to *Cargill v. Garland*, in which

the Court of Appeals for the Fifth Circuit invalidated an amendment to 27 C.F.R.

411.79 defining a non-mechanical bump stock as a machinegun within the meaning

of § 5845(b).  57 F.4th at 464.[26]  In so holding, *Cargill* interpreted § 5845(b) as

---

[25]  The Court recognizes that a shooter firing a semi-automatic weapon may not always fully release the trigger in between shots, since the trigger can re-engage the hammer even if the shooter releases some, but not all, of the pressure on the trigger shoe.  Nonetheless, semi-automatic weapons equipped with standard triggers would still not be machineguns within this meaning because the shooter must manually release pressure from the trigger before the trigger can begin the firing sequence again.  Defendants introduced evidence that at least a small cadre of elite advanced shooters (including one whom they identified as "the fastest shooter in the world") can train themselves to manually pull and release a trigger rapidly and fire multiple rounds at a rate comparable to that achieved by a novice shooter using an FRT-15.  *See* Tr. 286:19–287:10.  But even those shooters cannot pull a semi-automatic trigger and fire multiple rounds simply by holding it in place.

[26]  Other circuit courts that have considered the legality of non-mechanical bump stocks have reached the opposite result as *Cargill*, concluding that the ATF

55

excluding such a device from its purview, concluding that § 5845(b) "ties the definition [of a machinegun] to the movement of the trigger itself, and not the movement of a trigger finger."[27]  *Id.* at 460; *see also Alkazahg*, 81 M.J. 764.

For all of Defendants' heavy reliance on *Cargill, see, e.g.*, ECF No. 50 at 3, 7–9, 21–23; ECF No. 70 at 3–5, that case does not ultimately support the result they seek when applied to the FRT-15's trigger function.  Not only is *Cargill* distinguishable for a number of reasons, but its analysis of the distinctions between various firearm-modification devices in fact provides further grounds to find that the FRT-15 is a machinegun.

First, *Cargill* concerned an ATF regulation promulgated after notice-and-comment rulemaking that addressed the legality of "non-mechanical" bump stocks. *Id.* at 450–51.  In short, when a gun owner shoots a weapon equipped with a non-mechanical bump stock and cradles the weapon with the proper technique, the gun is free to slide back and forth in the shooter's arms between shots.  *Id.* at 453–54. As the gun comes forward, the trigger shoe re-engages with the shooter's stationary finger, thereby pulling the trigger and repeating the firing process.  *Id.*  A shooter

---

did not exceed its authority when it classified non-mechanical bump stocks as machineguns within the meaning of 26 U.S.C. § 5845(b).  *See Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1 (D.C. Cir. 2019); *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020); *Gun Owners of America, Inc. v. Garland*, 19 F.4th 890 (6th Cir. 2021); *but see Hardin v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 65 F.4th 895 (6th Cir. 2023) (applying the rule of lenity to exclude non-mechanical bump stocks from classification as machineguns § 5845(b)).

[27] *Cargill* at no point cites the Supreme Court's decision in *Staples*, even to distinguish it on the merits or to construe its "single pull of the trigger" interpretation of § 5845(b) as dicta.

56

operating a weapon equipped with such a device cannot simply pull the trigger and rapidly fire multiple rounds, however: rather, she must, with some skill, "maintain manual, forward pressure on the barrel and manual, backward pressure on the trigger ledge" in order to do so.  *Id.* at 463.

In *Cargill*, the Fifth Circuit invalidated an ATF regulation defining a non-mechanical bump stock as a machinegun within the meaning of § 5845(b).  *Id.* at 464.  In so holding, however, *Cargill* explicitly cabined its opinion to only those devices, and expressly distinguished them from "mechanical" devices that "automatically assist the shooter" in firing multiple rounds of ammunition:

> We note one important distinction.   Some bump stocks—called mechanical bump stocks—are equipped with springs or **other internal mechanical devices that automatically assist the shooter** to engage in bump firing.  For such a bump stock, the shooter does not have to maintain pressure on the barrel and trigger ledge in order to maintain this firing sequence.   **Only non-mechanical bump stocks are at issue in this case**. . . .  **The case might well be different if we were considering a semi-automatic weapon equipped with a *mechanical* bump stock**.

*Id.* at 454, 462 (italics in original, bold supplied).

Even if the *Cargill* analysis of § 5845(b) were correct, therefore, it would by its own terms simply not apply to the FRT-15.  The FRT-15 is a *mechanical* device that automatically "resets" the trigger to repeat the firing cycle until the shooter releases the trigger shoe.  And unlike the non-mechanical bump stock at issue in *Cargill*, the mechanical functionality of an FRT-15 means that even a novice shooter need only maintain finger pressure on the trigger shoe to achieve rapid sequential fire.

Second, *Cargill* cites to and reaffirms the Fifth Circuit's holding in *United States v. Camp*—a case which itself favors the Government's proposed interpretation of the word "trigger" in § 5845(b) as applied here.  57 F.4th at 462.  In *Camp*, the Fifth Circuit concluded that a weapon that was modified with an electric-powered device—one which, when switched on, caused the gun's factory-made trigger to fire in quick succession—was a machinegun, notwithstanding the fact that the gun's original trigger technically re-engaged with the weapon's hammer with each shot.  343 F.3d at 744–45.  In so holding, *Camp* defined trigger function in § 5845(b) in terms virtually identical to those urged by the Government in this case: most notably, the Fifth Circuit reasoned that, unlike legal devices which "require a *user* to *separately pull the [trigger]* each time the weapon is fired," the firearm at issue in *Camp* "required only one *action*—pulling the switch [that the defendant] installed—to fire multiple shots" and was therefore a machinegun.  *Id.* at 745 (emphasis supplied).  *Cargill* reaffirmed *Camp*'s conclusion that a trigger's function is to "initiate the firing sequence" on the weapon by means of a single user action, but it simply concluded that the logic of *Camp*, which involved a modified trigger mechanism, did not apply to bump stocks.  *Cargill*, 57 F.4th at 462.  Whereas in *Camp*, the defendant had replaced the weapon's standard trigger with a trigger that facilitated automatic fire, in *Cargill*, "no party [disputed] that the legally relevant trigger" to the question of whether a non-mechanical bump stock is a machine gun "is anything other than the traditional trigger" on a semi-automatic weapon.  *Id.*  The FRT-15 is much more akin to the trigger mechanism in *Camp* than to a non-

mechanical bump stock: it replaces a semi-automatic rifle's standard trigger and allows for rapid sequential fire as long as the shooter simply pulls and holds the trigger.[28]

Additionally, *Cargill* noted, as this Court does, that the phrase "single function of the trigger" in § 5845(b) specifically modifies the word "automatically." *Id.* at 460. *Cargill* defined the term "automatic" as "self-acting," and concluded that a semi-automatic rifle outfitted with a non-mechanical bump stock was not automatic because it still required simultaneous human input into both the "barrel" and "ledge" of the weapon to achieve automatic fire. *Id.* at 462–63. The Court therefore defined a non-mechanical bump stock as a manual, rather than an automatic, device because "[b]ump firing does not maintain if all a shooter does is initially pull the trigger. Rather, to continue the firing after the shooter pulls the

---

[28] Similarly, *Cargill* cites approvingly to *United States v. Akins*, 312 F. App'x 197 (11th Cir. 2009). *Akins* concerned the legality of a device called an Akins Accelerator, a mechanical device which, when outfitted on a semi-automatic rifle, "maintains tension against the finger stops" such that the rifle "is pushed forward by tension supposed by [a] spring which pushes the trigger into the shooter's finger." *Akins*, 312 F. App'x at 198. The spring-loaded device allows a shooter to "fire continuously . . . until the gunman releases the trigger or the ammunition is exhausted." *Id.* at 200. The *Akins* court, upholding the ATF's classification of the Akins Accelerator as a machinegun, concluded that "[t]he plain language of [§ 5845(b)] defines a machinegun as any part or device that *allows a gunman to pull the trigger once* and thereby discharge the firearm repeatedly." *Id.* at 201 (emphasis supplied). That was true even though the trigger on the device was repeatedly "pulled" when the device automatically pressed the trigger against the shooter's finger. *Cargill*, in turn, concludes that the Akins Accelerator would still be a machinegun under its interpretation of the phrase "single function of the trigger" in § 5845(b) because "a *shooter* using an Akins Accelerator *need only pull the trigger once to activate the firing sequence*" and the weapon would thereafter "maintain[] the bump fire of its own accord." *Cargill*, 57 F.4th at 462 n.8 (emphasis supplied).

trigger, he or she must maintain manual, forward pressure on the barrel and manual, backward pressure on the trigger ledge." *Id.* at 463.  That is decidedly not the case here.  Unlike non-mechanical bump stocks, FRT-15s allow for rapid, automatic firing "if all a shooter does is initially pull the trigger," and the firing cycle will continue until that pressure is released.  *Id.* at 454.[29]

Finally, Defendants call this Court's attention to a recent preliminary ruling applying Cargill in the Northern District of Texas.  *See Nat'l Ass'n for Gun Rights, Inc. v. Garland*, No. 23-cv-830, 2023 WL 5610293, at *1 (N.D. Tex. Aug. 30, 2023) ("*NAGR*").  The plaintiffs in NAGR are three individuals who own or state that they have plans to own FRT-15s, along with two institutional plaintiffs; they filed suit on August 9, 2023, seeking an order temporarily enjoining federal officials from enforcing any criminal or civil prohibitions of the FRT-15 against them personally.

---

[29]  Defendants also cite supportively to *United States v. Alkazahg*, 81 M.J. 764 (N-M. Ct. Crim. App. 2021), but this decision similarly cabins its holding to non-mechanical bump stocks.  In *Alkazahg*, the Court first concluded that a weapon qualifies as a machinegun within the meaning of § 5845(b) if a "single pull of the trigger . . . initiates the process" of automatic fire, and "hold[ing] the trigger" continues that process.  81 M.J. at 782.  However, if a weapon satisfies that definition but also requires additional human input in order to operate—such as the forward pressure that a shooter must place on a rifle with her non-shooting hand to operate a weapon equipped with a bump stock—it is no longer "automatic."  *Id.* at 783.  "That is because the former [weapon] is shooting automatically *by a single function of the trigger*, while the latter is relying on an additional human action beyond the mechanical self-action and impersonal trigger function."  *Id.* (emphasis in original).  This Court is not necessarily persuaded by the definition of "automatic" outlined in *Alkazahg*; but even if it were, an FRT-15 would fall on the "machinegun side" of this distinction, since all parties agree that the FRT-15 simply requires a shooter to pull and maintain pressure on the trigger to automatically fire a steady stream of bullets, with no "additional human action."  *Id.* at 783; Tr. 84:3–5.

60

*Id.* at *3. Shortly thereafter, on August 30, 2023, the district court granted the plaintiffs' motion for a temporary restraining order "to preserve the status quo" pending further proceedings. *Id.* at *13. In so ruling, the *NAGR* Court found that plaintiffs had met their initial burden at the temporary restraining order stage of making out a prima facie case on the merits—*i.e.*, a "substantial likelihood" of success on their claim that the FRT-15 is not a machinegun under § 5845(b). *Id.* at *7. The Court reasoned that this issue appeared to be controlled by *Cargill*. *Id.* at *7–8. However, the Court noted that the parties' arguments regarding *Cargill*'s application to the FRT-15 had not yet been fully briefed in the case's highly expedited posture, and that it would revisit the issue on the motion for a preliminary injunction after they had done so. *Id.* at *8.

This Court has considered the Opinion and Order in *NAGR* and its preliminary assessment of the significance of *Cargill* as applied to the FRT-15. Recognizing that this Court's analysis is considerably aided by the extensive briefing, lay and expert testimony, and exhibits filed by both parties in this action over the last seven months concerning the history, mechanics, and comparative functionality of the FRT-15, this Court respectfully disagrees that *Cargill*'s interpretation of §5845(b) as applied to non-mechanical bump stocks requires the same result as to the FRT-15. Indeed, for the reasons stated *supra*, this Court concludes that much of the reasoning in *Cargill* warrants the opposite conclusion.

\* \* \*

In short, guidance from the Supreme Court, the plain meaning and purpose

61

of the statute, and the interpretive methods applied by other federal appellate courts all support the inference that, for purposes of § 5845(b), the "function" of an FRT-15 trigger is to initiate the weapon's firing sequence by means of a single pull. There is no dispute that an FRT-15 fires automatically as long as the shooter holds pressure on the trigger, notwithstanding the fact that the trigger rapidly pushes against the shooter's finger over the course of automatic firing.

The Court need not, and does not, determine the meaning of § 5845(b) with respect to all replacement-trigger devices. But at least as applied to the FRT-15, this result is plainly consistent with caselaw interpreting this statute. As such, the Government is likely to succeed on the merits of its contention that the FRT-15 is an illegal machinegun.[30]

\* \* \*

---

[30] Despite Defendants' urging, the Court declines to apply the rule of lenity to § 5845(b). Lenity applies when there is a "grievous ambiguity or uncertainty in the language and structure of a statute." *United States v. Trapilo*, 130 F.3d 547, 552 n.8 (2d Cir. 1997) (citing *Chapman v. United States*, 500 U.S. 453, 463 (1991)) (alteration omitted). However, a statute "does not become ambiguous merely because 'it has been applied in situations not expressly anticipated by Congress.'" *Id.* (citing *Nat'l Org. For Women v. Scheidler*, 510 U.S. 249, 262, (1994)) (alteration omitted). The Court recognizes that other courts have found ambiguity in § 5845(b) as applied to non-mechanical bump stocks. *See, e.g.*, *Guedes*, 920 F.3d at 21. However, § 5845(b) is simply not ambiguous when applied to the FRT-15. Outside of the context of non-mechanical bump stocks, every case that the Court can find has held that if a shooter can maintain pressure on a weapon's trigger and the weapon fires multiple shots, then that weapon is a machinegun. A word in a statute does not become ambiguous for purposes of lenity simply because the defendant proposes a different possible meaning to the Court. *Cf. Lockhart v. United States*, 577 U.S. 347, 361 (2016) (noting that the rule of lenity does not apply simply because the court may be able to select more than one interpretation from "multiple, divergent principles of statutory construction").

The Court now turns to the civil claims brought by the Government against Defendants under 18 U.S.C. § 1345. These claims arise from what the Government contends were Defendants' fraudulent sales of what they knew were illegal machinegun-conversion devices, and their efforts to obstruct law enforcement's efforts to prevent further sales of the FRT-15 and recover those devices already in circulation.

### B. The Government is Likely to Succeed on the Merits of Its Claims that Defendants Have Committed Mail and Wire Fraud

18 U.S.C. § 1345 permits the Government to bring a civil action in federal court to enjoin ongoing criminal schemes or conspiracies to commit mail or wire fraud. *See, e.g.*, *United States v. Palumbo*, 488 F. Supp. 3d 257 (E.D.N.Y. 2020). The federal mail and wire fraud statutes respectively prohibit the use of the mails or wires to further "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343.[31] "The essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wire to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (citation and quotation marks omitted). *See also United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991) ("Because the mail fraud and wire fraud statutes use the same relevant language, we analyze them the same way.").

---

[31] The Government also brings claims of conspiracy to commit mail and wire fraud against Defendants under 18 U.S.C. § 1349. In light of the Court's analysis of the Governments claims under 18 U.S.C. §§ 1341 and 1343, the Court need not reach these claims.

The second and third elements of mail and wire fraud as outlined in *Shellef* are not at issue here.  First, the FRT-15 costs $380 per unit, which gun owners paid directly to Defendants.  Therefore, if Defendants' sale of the FRT-15 constituted a scheme to defraud, then money would indeed be its object, as Defendants have conceded.  *See* O.A. Tr. 86:12–19.[32]  Second, all parties also agree that Defendants used both the United States Postal Service as well as the wires—in the form of internet communications and financial transactions, for example—to sell the FRT-15.  O.A. Tr. 86:1–10.

What remains for the Court to decide, therefore, is whether the Government has met its burden of demonstrating that Defendants likely engaged in a "scheme to defraud" their customers.  To meet its burden, the Government must prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (citations omitted).

"In the context of mail and wire fraud, 'the words "to defraud" commonly refer

---

[32] Although in the Government's original merits brief it argued in the alternative that even depriving a consumer of "the relevant facts necessary to make an informed economic decision" without a scheme to otherwise deprive a consumer of her money or property qualifies as mail or wire fraud, ECF No. 5 at 34, the Supreme Court has since rejected this conception of 18 U.S.C. §§ 1341 and 1343. *See Ciminelli v. United States*, 598 U.S. 306, 314 (2023).  In a supplemental brief, Defendants argue that *Ciminelli* defeats the Government's mail and wire fraud claims.  However, this argument is foreclosed by Defendants' concession that the aim of the alleged scheme was not to deprive their customers of economically relevant information, but in fact to take their money.  O.A. Tr. 86:12–19.  *See, e.g.*, *United States v. Pasternak*, 18-cr-51, 2023 WL 4217719, at *2 (E.D.N.Y. June 27, 2023) ("[T]hese victims lost cold hard cash.  This was fraud before *Ciminelli*, and it is fraud today.").

to wrongdoing one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)). "It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim. As a consequence, the deceit practices must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck." *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991).

In sum, to prevail on this claim in its motion for a preliminary injunction, the Government must establish that Defendants executed a scheme to induce their customers to purchase a product they knew was or would likely be illegal; that Defendants acted with requisite intent; and that Defendants' representations or omissions were material to their customers. The Court concludes that the Government has met its burden.

### 1. **Scienter**

To demonstrate a violation of the mail or wire fraud statutes, the Government must demonstrate that the defendant acted with the requisite fraudulent intent. *Pierce*, 224 F.3d at 165. Fraudulent intent, in turn, requires the Government to prove that "the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the

victim."[33] *United State v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (citation omitted) (cleaned up). "It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim." *Schwartz*, 924 F.2d at 420. *See also United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (noting that the Government "need not prove that the victims of the fraud were <u>actually</u> injured, but only that defendants <u>contemplated</u> some actual harm or injury to their victims" (quotation marks omitted) (emphasis in original)). On the other hand, acts done "inadvertently, mistakenly, or in good faith . . . do not satisfy the requirements of the statute." *O'Malley v. New York City Transit Authority*, 896 F.2d 704, 706 (2d Cir. 1990).

"[D]irect proof of defendant's fraudulent intent is not necessary. Intent may be proven through circumstantial evidence, including by showing that defendant made

---

[33] The Government argues in the alternative that a court can find that a defendant engaged in a scheme to defraud solely based on a finding that a defendant was "reckless" with regard to the truth or falsity of his statements. ECF No. 5 at 33; ECF No. 131 at 1–2 (citing, *inter alia*, *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990). In response, Defendants concede that the Government can indeed prove its case by showing that Defendants were merely "reckless" with regard to the truth or falsity of their statements to their customers, but that Defendants did not act recklessly because they believed in good faith that the FRT-15 was legal. *See* ECF No. 135 at 1–6. In light of the Court's conclusion that the Government is likely to prove that Defendants *knew* that they were defrauding their customers, it need not decide whether, as a legal matter, a finding of recklessness is sufficient for purposes of 18 U.S.C. §§ 1341 and 1343. However, were this Court to apply a recklessness standard as both parties suggest it may, it would readily find for the reasons outlined in this opinion that Defendants acted with a reckless disregard to the truth when they informed their customers that the FRT-15 was legal, given everything they knew to the contrary.

misrepresentations to the victim(s) with the knowledge that the statements were false." *Guadagna*, 183 F.3d at 129.  *See also United States v. RW Pro. Leasing Servs. Corp.*, 452 F. Supp. 2d 159, 173 (E.D.N.Y. 2006) ("To establish the requisite fraudulent intent, the government need only produce circumstantial evidence in the form of inferences deduced from facts and situations.").  "When it is clear that a scheme, viewed broadly, is necessarily going to injure, it can be presumed that the schemer had the requisite intent to defraud." *RW Pro. Leasing Servs. Corp.*, 452 F. Supp. 2d at 173 (citing *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir. 1999)).

The core of Defendants' response to the Government's mail and wire fraud allegations is their claim that they acted in good faith.  It is undisputed that Defendants repeatedly told their customers that the FRT-15 was legal.  Maxwell, for example, published a video on the RBT website in a suit, in front of legal books, informing potential customers that the FRT-15 is not an illegal machinegun.  *See* Defs. Ex. A.  DeMonico posted similar videos to the RBT website, including one featuring O'Kelly who, presented to the viewer as an expert, assuaged potential customers that the FRT-15 is "absolutely not" a machinegun.  *See* Defs. Ex. D. Defendants also fielded "hundreds if not thousands" of emails from customers about the FRT-15's legality, Defs. Ex. D, to which Defendants responded that the FRT-15 was "absolutely positively" legal.  *See, e.g.*, Govt. Ex. 128 at 1.  The question is whether Defendants knew that these representations were false.

Defendants DeMonico and Maxwell have repeatedly asserted that they believed in good faith that the FRT-15 was legal based on their own understanding of

how the FRT-15 works and how § 5845(b) had been interpreted by the courts and ATF in analogous contexts.  They cite the opinions they obtained from their retained "experts," all former ATF officials, to that effect, and maintain that they presented their customers with all the relevant information they needed prior to sale.

The record before this Court contains compelling evidence to the contrary. Indeed, it appears clear to the Court that Defendants—far from believing in good faith that the FRT-15 was legal—knowingly sold their customers a device that was very likely illegal and thereby worthless.  Defendants reaped $39 million in sales of the FRT-15 in just two years.  But these enormous profits came only after Defendants intentionally withheld material information in their possession bearing directly on the truth of their marketing claims about the FRT-15's legality.

### a. **Defendants Knew That the ATF Had Classified the AR-1 as a Machinegun and Would Therefore Classify the FRT-15 as a Machinegun as Well**

One thing Defendants knew—but did not tell their customers—when they launched their FRT-15 sales campaign in 2020 was that its predecessor device, the AR-1, had been classified by the ATF as a machinegun.  Certain aspects of the AR-1 were modified in its redesign.  But the essential "forced-reset trigger" feature of the device, enabling automatic fire as long as the shooter maintains pressure on the trigger—which Defendants knew was the reason the ATF had classified it as an illegal machinegun—remained unchanged.

As discussed *supra*, Defendants purchased the '223 patent—the commercial embodiment of which became the FRT-15—from Jeffrey Cooper Rounds.  *See* Govt. Ex. 77 at 1.  Rounds had previously developed and submitted an earlier version of his

device, the "AR-1," to the ATF for review and classification.  *See generally* Govt. Ex.

134.  In August 2018, the ATF informed Rounds and his consulting expert, Rick

Vasquez, in writing that the AR-1 was indeed a machinegun.  *See* Govt. Ex. 134 at 1,

12–13.  The ATF specifically explained that the AR-1 was a machinegun because

"testing indicated that continuous rearward pressure after the initial pull of the

trigger initiates a 'firing sequence' which discharges multiple rounds with a single

function of the trigger."  Govt. Ex. 134 at 12.

The ATF also advised Rounds that, "[a]dditionally," the AR-1's trigger induced

hammer follow "on several occasions during the testing," and the ATF classifies

devices that facilitate hammer-follow as machineguns.  Govt. Ex. 134 at 13.  The '223

patent eliminated the AR-1's problem with hammer follow and utilized a forced-reset

mechanism that added a "locking bar", Tr. 536:21–537:19; ECF No. 120-2 ¶ 4–5,

ECF No. 124-3 at 86:5–12, but nonetheless discharged multiple rounds as long as the

shooter maintained continuous rearward pressure on the trigger.  It was this design

that Defendants purchased from Rounds on May 7, 2020.  Govt. Ex. 77 at 1.

Having heard witness testimony about the AR-1's and the FRT-15's

development and classification, and having reviewed declarations and documentary

evidence as to these devices' history, the Court finds that (1) Defendants were aware

of the AR-1's classification as a machinegun, (2) knew that the FRT had a

functionally indistinguishable forced-reset trigger that would all but certainly lead

the ATF to the same conclusion regarding its illegality, but (3) concealed that

information from their customers in marketing the FRT-15 for sale from December

2020 onwards.

Both DeMonico and Leleux testified that they had not seen the ATF's letter classifying the AR-1 as a machinegun before purchasing the '223 patent in May 2020. Tr. 578:22–579:1; ECF No. 124-1 at 124:8–10.  The Court does not find these assertions credible.  First, Defendants paid $10,000 for Rounds's patent, coupled with a $25-per-unit royalty.  Govt. Ex. 77 at 1; ECF No. 120-2 ¶ 16.  Since purchasing the patent and selling the FRT-15, Defendants have paid Rounds $2.4 million in royalties.  Tr. 569:12–14.  The parties agree that the ATF cannot itself publish letters sent to private individuals who participate in the voluntary classification process when the classification includes a finding that the submitted device is an illegal machinegun.  O.A. Tr. 49:9–50:12.  However, Rounds certainly had a copy, *see* Govt. Ex. 134 at 1, and he was free to share it with whomever he liked.  *See* O.A. Tr. 50:8– 12.  Rounds would have had every reason to provide the ATF's letter classifying the AR-1 as an illegal machinegun to Defendants before finalizing the sale of the '223 patent to them.  Indeed, had he withheld that crucial document, he could well have found himself on the receiving end of a claim that he had failed to disclose material information to DeMonico, Maxwell, and Leleux; whether or not Rounds had "fixed" the problems that led the ATF to so classify the AR-1, Defendants (and their future customers) were surely entitled to evaluate that critical issue for themselves when purchasing the '223 patent from Rounds.

Even more fundamentally, whether or not DeMonico and Leleux saw the actual AR-1 machinegun classification letter before bringing the FRT-15 to market,

70

they certainly knew about it.  During the preliminary injunction hearing, DeMonico claimed a lack of recollection as to whether Rounds ever told him that the ATF had classified the AR-1 as a machinegun.  Tr. 494:7–495:2.  But Leleux had a very clear recollection that he, DeMonico, and Rounds *did* have at least one conversation in which Rounds disclosed that the ATF had classified the AR-1 as a machinegun, and that that conversation took place at "the time we were buying" the '223 patent.  Tr. 539:19–25; *see also* Tr. 535:14–536:19.  In his deposition, Leleux similarly recalled that Rounds had informed Leleux and DeMonico that "one of the problems" that the ATF had with the AR-1 was its "potential for hammer follow," and that Rounds predicted that "the ATF would give him a hard time" with the '223 patent.  ECF No. 124-3 at 30:11–18.  Thus, Rounds did inform Defendants that the ATF had classified the AR-1 as a machinegun, and the Court does not credit what it construes as DeMonico's feigned lack of recollection on this critical point.  Defendants' awareness of the ATF's recent classification of the AR-1 as a machinegun supports a finding that they made representations to their customers about the legality of the FRT-15 with fraudulent intent.

Leleux also testified that, to the extent Defendants were aware of the ATF's classification of the AR-1, their representations to their customers as to the legality of the FRT-15 were nonetheless made in good faith.  He claims they understood that the ATF's classification of the AR-1 was based on the device's potential for "hammer follow," which Rounds corrected in the '223 patent.  *See, e.g.*, Tr. 539:19–25.  In his deposition, DeMonico asserted that that was his limited understanding of the ATF's

classification of the AR-1 as well.  ECF No. 124-1 at 125:4–17.  However, the Court finds this testimony not credible, for two reasons.  First, the ATF's AR-1 classification letter specifically gives *two distinct* grounds for classifying the AR-1 as a machinegun: (1) that a weapon equipped with the AR-1 can fire multiple shots as long as a shooter holds "continuous rearward pressure" on the trigger, and (2) that the weapon had the potential for hammer follow.  Govt. Ex. 134 at 12–13.  Thus, if Defendants had seen this letter prior to purchasing the patent (which, as explained *supra*, the Court finds that they likely did) then they would have known that the '223 patent's correction of the AR-1's hammer follow issue *alone* would not have changed the ATF's classification of the '223 patent as a machinegun—since a '223 patent-style trigger can also, of course, fire multiple rounds as long as the shooter holds continuous rearward pressure on the trigger.  Second, even if Leleux and DeMonico did not see a copy of the AR-1 classification letter before purchasing the '223 patent, Leleux said in his deposition that Rounds verbally told him and DeMonico that "*one* of the problems" that the ATF had with the AR-1 was the potential for hammer follow, ECF No. 124-3 at 30:11–16, and that even after Rounds did the redesign that resulted in the FRT-15, Rounds predicted to Defendants that that the ATF would still "give him a hard time."  ECF No. 124-3 at 30:18.  It strains credulity to think that Rounds would have discussed the "hammer follow" problem in detail with Defendants but would not have given similarly detailed disclosures as to the other reason that the ATF had expressly declared the AR-1 to be an illegal machinegun.  This strongly supports the inference that Defendants knew at the moment they launched RBT that

72

there was a significant likelihood that the FRT-15 was also an illegal device and would be classified as such, because the forced-reset feature of the AR-1 remained a key element of the trigger after its redesign. Yet they nonetheless assured their customers, with no equivocation, that the trigger was "absolutely" legal. *See, e.g.*, Defs. Ex. D.[34]

Moreover, in January or February 2021, Defendants were contacted by Thomas Graves, Mr. Rounds's former business associate, who claimed that the FRT-15 infringed on Mr. Graves's share of a patent for the "Flex Fire" technology that Graves and Rounds allegedly developed together and which provided the mechanical concepts for the AR-1. Tr. 544:10–546:19; *see also* Govt. Ex. 134 at 21. After being contacted by Graves, Defendants say they received a copy of the ATF's AR-1 classification. Tr. 579:9–16; ECF 130 at 2. Therefore, within a few months of launching sales of the FRT-15, Defendants knew exactly why the ATF considered the AR-1 to be a machinegun: not simply because of its potential for hammer follow, but

---

[34] Defendants have also argued that the Government "has presented no evidence that Defendant Kevin Maxwell knew about the AR1, any connection between the AR1 and the FRT-15, or of the ATF's classification of the AR1." ECF No. 133 at 6. But Maxwell was RBT's general counsel, and Maxwell testified that DeMonico, Leleux, and Register specifically made him a partner in their business venture in light of his expertise in firearms law. Tr. 542:7–12, 588:5–11; *see* ECF No. 124-3 at 43:6–22. RBT also featured Maxwell in a marketing video in which Maxwell, seated in front of a wall of law books, touts his legal credentials and assures the public about the FRT-15's legality. *See* Defs. Ex. A. There is no conceivable scenario in which Rounds informed DeMonico and Leleux that the ATF had classified the AR-1 as a machinegun but DeMonico and Leleux did not share that information with Maxwell. That Maxwell knew about the ATF's classification of the AR-1 is a reasonable—indeed, overwhelming—inference from the evidentiary record.

73

also because its "internal mechanism or operation automatically forces the individual's finger forward instead of requiring that the shooter release the trigger" and allows for automatic fire with "continuous rearward pressure after the initial pull of the trigger."  Govt. Ex. 134 at 12.  This description of the AR-1 also perfectly describes the functionality of the FRT-15.  Yet Defendants continued to unequivocally represent to their customers that the FRT-15 was not a machinegun.

In sum, the Court finds that Defendants' knowledge of the AR-1—including not only the ATF's designation of that device as a machinegun but the *reasons* for that designation, and that the key feature leading to that classification remained functionally unchanged in the FRT-15—supports a finding that Defendants lied to their customers when they told them that the FRT-15 was "absolutely, positively" a legal trigger.

> **b.  Defendants Knew That Their "Expert" Opinion Letters Were Incomplete and Misleading, and They Did Not Rely on Them in Good Faith**

Defendants further assert that their belief as to the legality of the FRT-15—and their statements to that effect to their customers—was in good faith, since they hired four "experts" formerly employed by the ATF to give independent opinions as to whether or not the FRT-15 was a machinegun within the meaning of § 5845(b), and all four advised Defendants that it was not.  Defendants' reliance on these experts' opinions is certainly relevant to Defendants' argument that they acted in good faith and without any intent to defraud their customers.  *Cf. United States v. Novis*, 20-cr-335, 2023 WL 4746541, at *2 (E.D.N.Y. July 24, 2023) ("[A]dvice of counsel can be relevant to the jury's determination of whether the Defendants acted in good faith

and lacked an intent to defraud."). However, on the current posture, the Government has presented evidence that amply supports the inference that "despite what their [experts] told them," Defendants "knew that they were tricking and defrauding people." *Id.* at *13. Not only did Defendants have independent reason to know that their experts' opinions about the legality of the FRT-15 were likely incorrect, but at least one (and likely more than one) of these experts warned Defendants of this possibility himself.

First, during the preliminary injunction hearing Daniel O'Kelly told the Court in response to its direct questioning that he had private conversations with Defendants not just about his own opinion on the FRT-15's legality, but how his former employer, the ATF, would likely classify the device. O'Kelly recalled that he told Defendants "I guarantee you, or I may have said, do not be surprised if ATF calls" the FRT-15 a machinegun. Tr. 370:1–3. Having seen O'Kelly's demeanor on the stand, it appears to the Court that in fact O'Kelly "guarantee[d]" to Defendants that the ATF would, if it got its hands on an FRT-15, classify it as a machinegun— but when O'Kelly realized the potential consequences of this admission for Defendants' claims of good faith, he hastily modified his testimony mid-sentence to offer a less damning ("don't be surprised") version of events. Yet however construed, O'Kelly's testimony demonstrates that—at the very least—one of Defendants' own experts had warned them that the ATF would likely classify the FRT-15 as an illegal machinegun. Not only did Defendants proceed to sell it despite O'Kelly's warning: they published an interview between DeMonico and O'Kelly on the RBT website in

which O'Kelly told Defendants' customers that the FRT-15 was "absolutely not"

illegal.  Defs. Ex. D.  And they continued to trumpet the "former ATF" credentials of

their experts in that marketing video and other statements to their customers, even

after the ATF issued its July 27, 2021 cease-and-desist.  *See, e.g.*, Govt. Ex. 13 at

3:9–4:21.

      Defendants' assertions that they relied in good faith on four independent and

neutral expert assessments are further undercut by the fact that they apparently

sent each new expert their previous experts' report(s) when they solicited their

opinions as to the legality of the FRT-15.  For example, Brian Luettke testified at the

preliminary injunction hearing that, before he conducted his examination of the FRT-

15, Defendants had first sent him reports from "the other experts" which had

concluded that the FRT-15 was not a machinegun.  Tr. 390:4–13, 412:1–413:6.  Kevin

McCann, in his expert report, also reveals that he first read O'Kelly's report before

classifying the device himself.  Defs. Ex. Z at 2.  These facts obviously undermine

Defendants' claims that they sought neutral opinions from experts as to the legality

of the FRT-15.  Rather, on the current record, it appears much more likely to the

Court that Defendants, at least once they had O'Kelly's report in hand, presented

their experts with a question to which they signaled a commercially "correct" answer

and at least one analytical route to that end.

      The Court also finds it highly likely that Defendants were given other

material information about the likelihood that the ATF would classify the FRT-15 as

a machinegun by another one of their experts, Rick Vasquez, which they also did not

disclose to their customers.  After being retained as a paid consultant in January 2021, Vasquez provided Defendants with a letter stating that, in his view, the FRT-15 was not a machinegun, declaring that "there is no verifiable history of ATF opinions to support this trigger being classified as a machinegun, both in general and specifically pertaining to the underlying design." *See* ECF No. 120-1 at 10–13.  Yet Vasquez was the very same ATF agent who, while still at the agency, had earlier classified at least one other very similar device that used forced-reset technology as a machinegun, and which Vasquez and his ATF colleagues classified as such for reasons that apply equally to the FRT-15.  *See, e.g.*, Govt. Ex. 33 at 5–6 (showing that Vasquez was a signatory to the classification of a forced-reset-trigger device submitted by Hunter Kinetics Inventions capable of firing multiple shots with "one single pull of the trigger").  Defendants, in their opening statement, asserted that their experts had never before heard of the "continuous rearward pressure" standard applied in the ATF's classification, and Vasquez said by declaration that such a standard is irrelevant to the question of whether a device is a machinegun.  Tr. 14:9–18; ECF No. 120-1 ¶ 13.  Yet in the ATF's prior classification letters, at least one of which Vasquez formally endorsed while at the agency, the ATF classified such a device as a machinegun precisely because the weapon continues to fire "as long as rearward pressure is applied to the trigger."  Govt. Exs. 33 at 6; *see also* Tr. 118:14–119:1, 127:16–128:2; Govt. Ex. 119 at 11–12.[35]

---

[35]  Similarly, Vasquez testified by declaration that his classification of the FRT-15 was consistent with ATF standards because the ATF had concluded that, as a blanket matter, a weapon is a machinegun only if "each *movement* of the trigger

Vasquez testified that he did not recall what role he played in so classifying this device while at the ATF, but that unspecified "political considerations" may have influenced those classifications, and he surmised that he would not make the same determination now.  ECF No. 120-1 ¶ 15–16.  Yet such a caveat is beside the point: even if the Court were to credit Vasquez's claim that he disagreed with the ATF's classification of those device(s) but signed off on them anyway, his history with the ATF put him on notice that the ATF *would* likely consider the FRT-15 to be an illegal device.  Further, the Court finds it highly unlikely that Vasquez was not aware of the ATF's classification of the HKI device classification at the time he gave Defendants his opinion letter, and that he did not advise them of that history.  This is because Vasquez was retained by Defendants on January 18, 2021, *see* June 23, 2023 Status Conference Transcript 3:9–15—just ten days after HKI's principal wrote an unsolicited email to RBT, alerting them to HKI's prior classification and warning them of the serious risk of "trouble" for Defendants "and [their] customers," given the obvious parallels between HKI's and the FRT-15's trigger functionality.  *See* Govt. Ex. 102 at 1–2.  And even if Defendants (or Vasquez) somehow did not connect the proverbial dots between the two devices, the developer's email clearly put them on notice of a potentially serious legal problem with the FRT-15, just weeks after they put the device on the market to customers nationwide.

---

resulted in more than one shot being fired."  ECF No. 120-1 ¶ 8 (emphasis supplied).
However, when working at the ATF, he classified devices as machineguns even
when the trigger on those devices moved with each shot fired, as long as the weapon
continued to fire when the shooter maintained constant pressure on the trigger.  Tr.
126:10–127:7, 141:15–143:3.

Vasquez also, while in private practice, submitted the AR-1 for classification to the ATF, and was copied on the ATF's letter to Rounds informing him of its determination that the AR-1 was a machinegun precisely because it could fire multiple rounds as long as the shooter maintained "continuous rearward pressure after the initial pull of the trigger." Govt. Ex. 134 at 12.  In short, it is difficult to conceive that Vasquez did not disclose this information to Defendants and warn them about the likelihood that the ATF would reach the same conclusion on the FRT-15 when they retained him in 2021.

Finally, Leleux's prior experience with the ATF classification process significantly impeaches Defendants' claims that they bypassed that process with the FRT-15 in favor of privately-retained experts because they had good-faith concerns about delays or "inconsistency" on the ATF's part.  During the preliminary injunction hearing, Leleux testified that his own firearms company Spike's Tactical had sought the ATF's approval of a different device before bringing it to market, and the ATF classified it as an illegal suppressor.[36]  Tr. 556:6–557:7.  In the wake of the ATF's classification, Spike's Tactical then decided (quite understandably) not to sell it at all.  Tr. 557:6–8.  At his deposition, Leleux was asked why RBT's founders chose not to seek ATF classification for the FRT-15.  He cited the ATF's previous classification of Spike's Tactical's silencer as illegal—and explained that their earlier decision to submit the silencer to the ATF led the Spike's Tactical partners

---

[36]  Like machineguns, silencers, defined in 18 U.S.C. § 921(a)(25), are also "firearms" within the meaning of the GCA.  *See* 26 U.S.C. § 5845(a)(7).

"to miss out on huge opportunity to make a lot of money."  ECF No. 124-3 at 92:5–11; *see also* Tr. 557:15–560:14.

The parties agree that the ATF's classification process is voluntary.  A manufacturer can choose to forego the process and risk facing prosecution or civil liability if the device is later declared to be illegal.  Yet Defendants' deliberate decision to bypass that process with the FRT-15, in light of Leleux's knowledge of the enormous financial consequences that the ATF classification process can have on a firearms business and its customers, indicates that Defendants declined to seek ATF classification of the FRT-15 and instead simply assure RBT's customers that the device was "legal" precisely because they knew that allowing ATF to examine their device *before* bringing it to market might kill their proverbial golden goose.

### c. <u>Defendants Did Not Rely in Good Faith on the ATF's Past Classifications of Other Legal Triggers</u>

Defendants further assert that they harbored a good faith belief in the legality of the FRT-15 because they were aware of similar trigger devices that the ATF had *not* classified as machineguns.  In particular, Defendants repeatedly cite their knowledge of the ATF's classification of the Tac-Con 3MR trigger (the "3MR") as a legal device in 2013, *see* Defs. Ex. P. at 1–2, and what they contend are its similarities to the forced-reset functionality of the FRT-15.  All three of the RBT co-founders who testified at the hearing specifically invoked their prior knowledge of the 3MR and its approval by ATF in this regard.  *See* Tr. 436:5–6, 437:1–12 (DeMonico was "very familiar with the [Tac-Con] 3MR" and knew it was "legal and available" when he sold

the FRT-15); *see also* Tr. 540:1–17, 541:6–9 (Leleux knew of 3MR, believed it to be

"similar" to FRT-15, and did not believe the devices' differences made the FRT-15 a

machinegun); *see also* Tr. 592:4–7 (Maxwell owned a 3MR and believed it to be "every

bit as fast as my FRTs" yet the 3MR "hasn't gotten that kind of attention" from

ATF).[37]

Defendants also elicited live testimony from their expert Daniel O'Kelly on this

point.  O'Kelly opined that the ATF's description of the forced-reset feature of the

3MR in its classification letter "describes [the FRT] exactly," Tr. 306:7–307:19, and

that he considers the FRT-15 to be an "apt comparison" to the 3MR when assessing

whether either device is a machinegun.  Tr. 306:7–307:19, 355:12–356:4.  O'Kelly

went on to say that he "can't imagine" why someone familiar with the ATF's approval

of the 3MR would not also believe that the FRT-15 was legal.  Tr. 308:5–15.  The

Government's expert, Anthony Ciravolo, testified to the contrary.  Ciravolo noted that

the 3MR does include a forced-reset trigger function that "reduces the distance the

trigger shoe itself has to travel" when pulled by the shooter, thereby enabling more

rapid firing than a standard AR-15 trigger.  Tr. 147:9–11, 149:9–12.  But the 3MR

---

[37] Each of the testifying co-founders also briefly referenced their familiarity
with various "binary" triggers that ATF had previously classified as legal.  *See, e.g.,*
Tr. 436:5–7, 549:5–10, 592:9–10.  But Defendants relied far more heavily on the
3MR, with good reason.  A "binary" trigger shoots one round of ammunition with
each pull *and* each release of the trigger.  It does allow for more rapid shooting than
a standard trigger, but contains no forced-reset function and is readily
distinguishable from the FRT-15.  While the parties have compared the FRT-15 to
various other devices that also facilitate very rapid fire, both parties agree, as does
this Court, that the capacity for a rapid rate of fire does not make a device a
machinegun.

(like the standard AR-15) has a "disconnector" that stops the firing cycle after each shot, and the cycle will not resume until the shooter manually releases pressure on the trigger shoe and pulls the trigger again. *See* Tr. 147:6–8, 148:6–9, 20–5. Ciravolo underscored this distinction—*i.e.,* that a shooter cannot fire additional rounds simply by holding "constant rearward pressure" on the 3MR's trigger—in his testimony supporting the Government's position as to why the ATF gave the 3MR a different classification than the FRT-15. Tr. 148:16–19, 149:18–150:2.

Defendants' claimed reliance on their knowledge of the 3MR when they took the FRT-15 to market provides no support for their good-faith defense. This is so for several reasons.

First, the Court finds that Ciravolo's comparison of the forced-reset functionality of the 3MR vs. the FRT-15, and his explanation for the ATF's different classifications of the two devices, was logical and credible; O'Kelly's contrary testimony was not. The differences between the 3MR and the FRT-15 for purposes of determining whether the device allows for automatic fire with a "single function of the trigger" are apparent and material. The 3MR trigger (like a standard AR-15 trigger) contains a disconnector that retains the hammer and thereby stops the firing cycle after a round is fired; only when the shooter consciously releases and pulls the trigger will the weapon fire again. Tr. 181:1–5, 183:25–184:13. The FRT-15 has no disconnector, and allows the weapon to automatically fire as long as the shooter holds continuous pressure on the trigger shoe. This credibly explains why the ATF classified the 3MR, but not the FRT-15, as a "legal product." Tr. 150:11–12.

The Court's credibility assessment is also grounded in a significant disparity between these two experts' knowledge and experience.  At the ATF, Ciravolo is specifically charged with (among other things) classification of firearms and making official determinations as to whether such devices are machineguns under §5485(b). Tr. 20:22–21:2, 21:15–22:9.  O'Kelly, though he is a former ATF agent, has no such experience.  Although O'Kelly did prepare training manuals and curricula for other ATF agents on a range of topics relating to firearms, Tr. 259:23–260:13, his duties never included the classification of a device as a machinegun based on its mechanical operations.  Tr. 337:1–339:8.  Further, although O'Kelly has testified as an expert witness on various topics, his experience (and testimony) actually determining whether a firearm is a machinegun was limited to far more rudimentary "field" testing (*i.e.,* upon seizure of a device when executing a warrant), after which a suspected device would be sent to the unit in which other agents (like Ciravolo) examined and formally classified the device.  Tr. 335:8–338:10.  And unlike Ciravolo—who had test-fired and examined the internal mechanics of the 3MR, and brought one to the hearing to demonstrate its functionality, Tr. 145:18–147:8—the foundation for O'Kelly's opinion about the device's purported similarity to the FRT-15 was notably thin.  O'Kelly has never fired a weapon equipped with a 3MR; has never physically examined a 3MR; and has never seen a video or even a diagram of the 3MR.  Tr. 360:2–25.  Instead, his knowledge of the 3MR came exclusively from ATF's classification letter and "[r]esearching the internet."  Tr. 365:19–23.  And he had no recollection of any sources he found or relied upon in this internet research.

Tr. 366:10–13.  For these and other reasons, Ciravolo's comparative analysis of the

3MR and FRT-15 is far more credible than O'Kelly's.[38]

Also undermining Defendants' claim that they relied on the ATF's

classification of the 3MR in concluding that the FRT-15 was "legal" is that *none* of

their four retained experts did so.  Defendants sent the ATF's 3MR classification

letter to at least one former ATF expert, Brian Luettke, whose opinion they sought in

March 2021.  *See* Tr. 390:11–13.  Luettke was previously unfamiliar with the 3MR,

but considered and "research[ed]" the device after Maxwell alerted him to it.  Tr.

412:21–413:6.  Yet he made no mention of the 3MR in his subsequent opinion letter

on the FRT-15's legality, even after noting that he had reviewed "previous ATF . . .

classification letters" before writing the letter.  *See* Defs. Ex. Y at 28.  Nor was there

any mention of the 3MR in the opinion letters written by Defendants' other three

experts in late 2020 and early 2021, even when they, too, wrote that they had

---

[38]  O'Kelly's live and written testimony also provide other reasons to doubt his general credibility.  For example, at one point in the preliminary injunction hearing, Defendants played a video of a professional shooter named Jerry Miculek— whom O'Kelly described as famed for being "the fastest shooter in the world."  Tr. 287:1–3.  In the video, Miculek is able to fire a standard semi-automatic rifle's trigger at such speed, and with such precise timing, that he fires multiple shots as quickly as with an FRT-15.  *See* Defs. Ex. M.  On cross-examination, O'Kelly refused to concede that Miculek is among a small class of truly elite shooters who can achieve such a rapid rate of fire with a standard trigger, *i.e.,* that no novice shooters could do so without an FRT-15 or a similar device.  When asked whether anyone with zero experience firing a weapon might simply pick up a rifle and fire as quickly as Miculek, O'Kelly said, "I'm sure some can."  Tr. 343:5–7.  He then doubled down on this claim by explaining that some people are "insanely dexterous" guitar players, and a novice shooter with such extremely "fast" fingers might well be able to fire a gun with Miculek's speed and skilled timing.  Tr. 343:17–24.  This is akin to claiming that an "insanely dexterous" person who picks up a guitar for the first time could play it as well as Jimi Hendrix.

considered prior ATF classification letters.  *See* ECF No. 120-1 at 10–12 (Vasquez); Defs. Exs. Z at 2–3 (McCann), A1 at 41–45 (O'Kelly).  Were the 3MR's forced-reset function truly as analogous to the FRT-15 as Defendants now claim, it seems reasonable to conclude that at least one—if not all—of the former ATF agents they retained to assess its legality would have said as much.  That is particularly so since Maxwell made sure that at least one of these experts was well aware of the ATF's reasons for classifying the 3MR as a legal device.  Tr. 410:16–18, 412:21–413:6.

### d. Defendants Submitted a False Declaration to the Court Earlier in This Litigation

The Court has concerns about crediting Maxwell's and DeMonico's claims that they acted at all times in complete good faith when selling the FRT-15 for an additional reason: they filed with this Court what they had reason to know was a false witness declaration on a material issue.

The declaration in question was signed by RBT co-founder Cole Leleux and filed by Defendants in support of their (subsequently-withdrawn) motion to dismiss for lack of personal jurisdiction.  Tr. 573:23–574:9.  In the declaration, Leleux outlined his familiarity with RBT's sales history throughout the country, and provided factual support for Defendants' claim that RBT never engaged in any direct or indirect sales of the FRT-15 to New York customers.  Leleux specifically represented to the Court that he knew of *no* instance in which a third-party vendor had sold any FRT-15s to customers in New York.  Tr. 574:13–22.  Yet emails later provided in discovery revealed that when personally responding to customer service inquiries in January 2021, Leleux told New York customers (under the pseudonym

85

"Charles") that RBT did not sell the FRT-15 into New York directly, but that they *could* purchase the device instead from Big Daddy Enterprises, RBT's then-exclusive distributor—since Big Daddy, Leleux assured them, planned to sell FRT-15s in all fifty states.  Tr. 570:14–575:6.

The Court agrees with the Government that Leleux likely knew that this portion of his declaration was false at the time he signed it.  Current defense counsel characterized the statement as the likely product of Leleux's lack of recollection in early 2023 as to Big Daddy's practices. O.A. Tr. 108:18–109:3.  Leleux did not directly claim as much, but explained that he was "trying to get through hundreds of emails" around the time he advised the New York customer about Big Daddy's sales practices.  Tr. 572:24.  Even if Leleux did not specifically recall sending emails to New York customers advising them that they could purchase FRT-15s from Big Daddy in 2021, it is unlikely that Leleux had completely forgotten about Big Daddy's sales practices—that is, selling FRT-15s to customers in the states that Defendants did not—when he signed a sworn declaration on this very topic in 2023.

It also appears all but certain to the Court that DeMonico and Maxwell were themselves fully aware of Big Daddy's distribution practices when they had their former counsel file the Leleux declaration on their behalf.  Leleux speculated that Maxwell "probably had no idea" that Leleux was advising New York customers that they could purchase FRT-15s from third parties.  Tr. 573:1.  But that is a different issue than whether Maxwell and DeMonico knew that Big Daddy sold FRT-15s to

customers in all fifty states.  Notwithstanding the complex corporate structure through which the co-founders distributed their FRT-15 revenues, RBT was a tight-knit enterprise run by a small number of co-founders; each were heavily involved in decisions about sales, marketing, and third-party contractors (some of whom, including Big Daddy, became their adversaries in litigation).  Maxwell was RBT's counsel, and it was his advice that helped lead the company to avoid direct sales to New York and a handful of other states.  DeMonico himself directed a customer to purchase an FRT-15 from Big Daddy in California, where Defendants also did not do any direct business.  *See* Govt. Ex. 97 at 1.  The Court therefore readily concludes that Defendants were aware that Big Daddy sold FRT-15s to customers in New York.

At oral argument, Defendants argued that false statements in Leleux's declaration cannot be imputed to DeMonico and Maxwell.  Yet Leleux submitted his false declaration in support of *their* motion to dismiss this action for lack of personal jurisdiction.  The Court is troubled by the fact that Defendants DeMonico and Maxwell appear to have permitted a sworn declaration from one of their business partners to be filed by former counsel (who were at that time brand new to this litigation, working under extremely tight deadlines, and lacked any prior familiarity with RBT's business practices) containing demonstrably false factual assertions about the sales of FRT-15s—one that the Court had been prepared to credit, and which could have led to the improper dismissal of this action had the Government not garnered independent evidence of Defendants' sales in New York.

Defendants' likely knowledge of the Leleux declaration's falsity is not necessary to nor dispositive of this Court's analysis of whether they acted in "good faith" when they assured their customers that the FRT-15 was, in their view, a "perfectly legal" device.  But it does give the Court further cause for concern about their overall credibility and veracity.

* * *

In sum, the Court finds that the present record contains compelling evidence that Defendants intentionally misled their customers as to the legality of the FRT-15—that is, they knew that the FRT-15 was almost certainly an illegal product, yet they told their customers the opposite.  The Court therefore concludes that the Government is likely to establish scienter at a final trial on the merits.

## 2. <u>Materiality</u>

The mail and wire fraud statutes "do not criminalize every deceitful act, however trivial."  *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019).  Rather, the defendant must have "engaged in a deceptive course of conduct by making *material* misrepresentations."  *Id.* (citing *Neder v. United States*, 527 U.S. 1, 4 (1999)).  A misrepresentation is "material" if it has "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it is addressed."  *Id.* (quoting *Neder v. United States*, 527 U.S. at 16).  On a basic level, the Court's materiality inquiry focuses on this question: "would the misrepresentation actually *matter* in a *meaningful* way to a rational decisionmaker?"  *Id.* (emphasis in original).  *See also United States v. DeFilippo*, 17-cr-585, 2018 WL 11211500, at *3

(S.D.N.Y. July 23, 2018) (applying these principles in the context of a wire fraud conviction).

"Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *Shellef*, 507 F.3d at 108.  When a fraud scheme involves the "solicitation of a purchase," the defendant's misrepresentations to his customers must generally concern the "quality, adequacy or price of the goods to be sold, or otherwise [concern] the nature of the bargain." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970).  "[T]he harm contemplated must affect the very nature of the bargain itself.  Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (citation and quotation marks omitted)).  On the other hand, "[m]isrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution" where the victims "received exactly what they paid for" and "there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received." *Id.* at 98–99.

A scheme to defraud that violates the mail and wire fraud statutes may turn on either an affirmative misrepresentation or "omissions of material information that

the defendant has a duty to disclose." *United States v. Autori*, 212 F.3d 105, 118 (2d Cir. 2000).  A defendant who has no duty to affirmatively disclose information to another may develop such a duty where the defendant "makes partial or ambiguous statements that require further disclosure in order to avoid being misleading." *Id.* at 119; *see Remington Rand Corp. v. Amsterdam-Rotterdam Bank,* N.V., 68 F.3d 1478, 1484 (2d Cir. 1995) (same).  Indeed, under the mail and wire fraud statutes, "it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Autori*, 212 F.3d at 118 (quoting *United States v. Townley*, 665 F.2d 579, 585 (5th Cir. 1982).

The Court concludes on the present record that what Defendants told their customers about the legality of the FRT-15—or indeed, what they failed to tell them—was material.

### a. A Product's Legality or Illegality Is Material to a Retail Transaction

As a threshold matter, the implicit legality of the product being sold is central to nearly every bargain, as a person cannot generally have a property interest in an item that is illegal to possess, at least as against the Government.  *Cf. Akins v. United States*, 82 Fed. Cl. 619, 623 (2008) (concluding that the ATF's classification of a device as a machinegun and its order that the device be turned over to the ATF was not a "taking" within the meaning of the Fifth Amendment); *United States v. Clymore*, 245 F.3d 1195, 1200 (10th Cir. 2001) (noting that a party has no property right in illegal drugs or the proceeds from selling illegal drugs)

(citing 21 U.S.C. § 881(a)).  The Court has no doubt that, had Defendants properly informed their customers that, for $380, they could receive an FRT-15 that was likely subject to eventual seizure by the ATF, with a corresponding risk of criminal prosecution, few, if any, customers would have purchased one.  At the very least, Defendants' repeated assertions that the FRT-15 was legal—when they knew that there was at least a strong likelihood that that statement was not true—created a duty to disclose more information than they did.  *Autori*, 212 F.3d at 118.  Importantly, while Defendants were under no obligation to submit the FRT-15 to ATF for classification, they made a deliberate choice to repeatedly tout the "former ATF" credentials of their experts and the "due diligence" they conducted in their assurances to customers that the device was not a machinegun.  *See, e.g.*, Govt. Exs. 13 at 3:7–4:19; 103 at 1.  These statements heightened the materiality of the undisclosed information in their possession.

For example, Defendants repeatedly told their customers that the FRT-15 was "absolutely, positively" legal—yet never disclosed that the ATF had previously classified the AR-1 as a machinegun for reasons that also applied to the FRT-15.  Defendants emphasized that they consulted four former ATF agents who assured them that the FRT-15 was legal—yet they did not disclose that at least one of those experts privately warned Defendants that the ATF would likely reach the opposite conclusion, and may have even "guarantee[d]" that outcome.  Tr. 370:1–2.  After the ATF issued its cease-and-desist, DeMonico published a video announcing the ATF's position—yet this information was not available on the RBT website, where

customers could actually purchase the FRT-15.[39]

Defendants also led their customers to believe that they were vigorously suing the ATF in court for a judgment that the FRT-15 was legal.  However, the litigation history between Defendants and the ATF tells a different story. Defendants received the ATF's cease-and-desist letter on July 27, 2021, and quickly sued the ATF in the Middle District of Florida.  *See* Defs. Ex. Z1.  However, in Florida, after losing a motion for a temporary restraining order and then a motion for a preliminary injunction, Defendants essentially abandoned their lawsuit, which was dismissed without prejudice on October 28, 2021.  Defs. Ex. B2 at 2. Defendants did not seek reconsideration of the dismissal, even though the Court's form order advised that if they were not at fault for noncompliance with the local rule in question, they could do so.  Defs. Ex. B2 at 2 n.1.  Nor did they simply refile the action in Florida to quickly restart the litigation process.  Instead, they waited seven months before bringing a similar suit in the District of North Dakota on May 16, 2022—and only after the ATF had finally seized their cache of FRT-15s from 3rd Gen at the end of March.  *See* Defs. Ex. C2.  That case, too, was dismissed—this time for lack of venue—on November 5, 2022.  Tr. 516:17–23.

Throughout this period, Defendants repeatedly assuaged customers who sought refunds on the FRT-15 that Defendants were "currently in litigation" or

---

[39]  DeMonico testified that RBT did not post the cease-and-desist on its website because its web host Word Press could not accommodate it, and redesigning the website was a significant undertaking.  Tr. 519:5–522:25.  Given that RBT has made $39 million in two years from the sale of the FRT-15, ECF No. 105-1 at 2, the Court does not find this explanation credible.

"currently involved in the court process"—even when this was not so.  *See, e.g.*,

Govt. Exs. 22 at 5–6; 92 at 1; Defs. Ex. H1 at 3.  One savvy customer who received

this response in December 2021 replied, "[H]asn't the Rare Breed lawsuit against

the ATF been dismissed?"  Govt. Ex. 22 at 6.  Not all of Defendants' customers,

however, were this well-informed.  When Defendants told one customer who had

expressed concerns about the FRT-15's legality that RBT was "currently in

litigation" on December 6, 2022—six weeks after their most recent lawsuit had been

dismissed—the customer responded, "Thanks, keep fighting the battle worthwhile."

Govt. Ex. 92 at 1.

DeMonico testified at the preliminary injunction hearing that all he has

wanted since receiving the ATF's cease-and-desist letter was to have his "day in

court."  Tr. 463:20.  It is clear that Defendants went on offense by filing suit

immediately after the ATF served its cease-and-desist letter in July 2021—as was

their right.  But the litigation history raises a strong inference that this was

nothing more than a way for Defendants to save face with their customers—and

keep the profits rolling in for as long as possible—rather than a good-faith effort to

obtain a court ruling on the FRT-15's legality.

### b.  RBT's "No Refund" Policy

The above point is buttressed by the fact that RBT had an explicit "no

refund" policy.  During his direct examination, DeMonico testified that, despite

RBT's "no refund" policy, he had in fact executed $431,000 worth of refunds.  Tr.

447:5–6.  The Court has no reason to doubt the veracity of this statement—though

this sum would represent around only 1% of RBT's $39 million in sales.  Even if this

is true, however, the *reason* for RBT's policy, as DeMonico explained, revealed that

Defendants knew that the legality of the FRT-15, even as determined by the ATF,

was very important to RBT's customers:

> MS. STAMATELOS: Could you explain [RBT's "no refund"] policy?
>
> MR. DEMONICO: . . . . In our experience—in my experience—the winds change and opinion changes at ATF like at the flip of a coin.  So one day, the ATF is happy with something and the next day they're not.  We've seen it countless times.  We've seen it with bump stocks.  We've seen it with frames and receivers.  We've seen it with, you know, the Akins Accelerators—it's approved, it's not approved.[40]  And the last thing we wanted to deal with was, you know, a landslide of customers wanting a refund because, you know, the ATF changed their mind on something.

ECF No. 124-1 at 56:3–57:21.  Leleux testified to the same effect during his

deposition.  ECF No. 124-3 at 90:8–15.  These statements clearly support a finding

that Defendants' omissions as to the legality of the FRT-15 were material to

customers' decisions whether to purchase one—and Defendants had fashioned their

"no refund" policy specifically to avoid paying customers back when they found out

that they had been misled.

The Court need not speculate on this point in light of numerous emails that

customers sent to the RBT customer service account, to which DeMonico had

drafted standard replies.  Tr. 478:4–11; ECF No. 124-1 at 192:1–5, ECF No. 124-2 at

79:8–16, 102:13–103:19.  First, many customers emailed RBT inquiring as to the

legal status of the FRT-15, especially after hearing about the ATF's cease-and-desist

---

[40]  The Akins Accelerator's initial approval letter was ultimately revoked by an ATF agent named Richard Vasquez.  *See Akins*, 82 Fed. Cl. at 621.

94

letter declaring the FRT-15 to be illegal.  This fact, on its own, supports a finding that customers considered the legality of the FRT-15 to be central to their decision whether to purchase one.  For example, Defendants received the following email from a customer on October 20, 2022:

On Thu, 20 Oct at 10:33 AM , ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ wrote:

Dear sirs;

I'm writing to inquire the status of the suit that Rare Breed Triggers has lodged against the ATF regarding the ATF's determination that the FRT-15 constitutes a "machine gun" and falls under the corresponding regulations.

If Rare Breed Triggers is unsuccessful in this law suit, what provision is there for individuals who may have purchased an FRT-15 directly from Rare Breed Triggers to return the product for a refund?

Sincerely,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Sent from my iPhone

Govt Ex. 86 at 2 (highlight supplied).  Defendants, through their customer service representative Jennifer Pierson, responded that it was "[o]ur position" that the FRT-15 is legal based on the opinion letters they received from former ATF agents and informed the customer that RBT was currently suing the ATF.  Govt. Ex. 86 at 1–2.  The customer, however, was not assuaged:



To:       admin[admin@rarebreedtriggers.com]
From:     Customer Service
Sent:     Mon 10/24/2022 1:20:41 PM
Subject:  Ticket re-opened – ▮▮▮▮▮▮] Status of ATF suit

Hi ▮▮▮▮▮▮▮▮▮▮

Ticket▮▮▮▮▮▮▮ Status of ATF suit" has been reopened, please visit
https://newaccount1611179198205.freshdesk.com/helpdesk/ticke▮▮▮▮▮ to view the ticket.

Ticket comment

Jennifer,

Thank you for getting back to me.

I have seen legal "opinions" that are claiming that in the current situation the ATF considers the FRT-15 a machine gun element and individuals possessing them without a tax stamp are committing a felony. If prosecuted and convicted, individuals would no longer be able to acquire or possess firearms for the rest of their life. This is an extreme outcome especially given the legal situation with RBT and the ATF.

Was this legal "opinion" accurate? Could individuals possessing an FRT-15 be charged with a felony?

Sincerely,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Sent from my iPhone

Govt Ex. 86 at 1 (highlight supplied).

Other customers not only inquired into the legality of the FRT-15 but

explicitly asked for a refund from RBT when they learned that the ATF had

classified the FRT-15 as a machinegun.  For example, Defendants received the

following email from a frustrated customer on December 3, 2021, nearly six months

after the ATF had issued its cease-and-desist letter and two months after the

Middle District of Florida dismissed Defendants' declaratory action:

**Order #76370**

D

reported via email

*a month ago (Fri, 3 Dec 2021 at 12:27 PM)*
To:"CustomerService@RareBreedTriggers.com" <customerservice@rarebreedtriggers.com>

Hello,

==I purchased an FRT 15 trigger on 11/30 with order #76370. Nowhere on your website does it say that the ATF has issued a cease and desist order for all sales of the FRT 15, deeming this trigger to be illegal as the Federal government would consider any rifle with this component to be a fully automatic rifle, subject to NFA restrictions.== The trigger I purchased from Rare Breed Triggers is scheduled to be delivered to me today, 12/3, ==but I can not install it or use it as I would then be in violation of Federal law.== Please refund the full purchase price of $402.14 and let me know how you would like your trigger return shipped to you. Thank you for your help with this.

Sent with ProtonMail Secure Email.

Govt. Ex. 22 at 5 (highlight supplied).  Pierson responded to this customer on the

same day, explaining again that it was "[o]ur position" that the FRT-15 is not a

machinegun, that Defendants "conducted a tremendous amount of due diligence"

prior to launching RBT by consulting former ATF officials, and that they were

"currently involved in the court process" to contest the ATF's classification.  Govt.

Ex. 22 at 5–6.  Pierson then recommended that the customer contact UPS about her

package, reminded the customer of RBT's "no refund" policy, and warned the

customer that any attempt to get her money back would be treated as a breach of

contract to which RBT may respond with "legal action."  Govt. Ex. 22 at 5–6.  The

customer replied:


**replied**
*a month ago (Fri, 3 Dec 2021 at 3:28 PM)*
To:customerservice@rarebreedtriggers.com

Jennifer,
I am sorry but I was unable to refuse delivery as the UPS driver just dropped the package and left. The package is unopened and I will return to your company at my expense for a refund. I will pay the shipping both ways. While your website does indicate no returns it does not indicate that the Federal government has issued an opinion that your product is illegal and that you should cease and desist from selling it. It also does not mention that the Federal government wants Rare Breed Triggers to formulate a plan to address the triggers that have already been sold. That sounds like confiscation. Your company's failure to disclose that it is CURRENTLY ILLEGAL for you to sell your product is a deceptive business practice at best, more realistically fraud. our personal opinions regarding ATF over reach are irrelevant. As are mine.

There is no way for me to legally utilize your product now that I know of the Federal restrictions on its use. I cannot put it in a rifle, I cannot sell it on the secondary market. Your rationale that you need my money for legal fees is not justification for selling an unusable product. In any event, hasn't the Rare Breed lawsuit against the ATF been dismissed? Your threats not withstanding, I am totally willing to let VISA sort out the legalities of charging back the cost of an unusable product, the sales price of which you seem to be requesting as a donation to your company's legal defense fund.

It would be nice to work this out in an amicable and professional manner. Thank you.



Govt. Ex. 22 at 6 (highlight supplied).

Defendants received no shortage of similar emails from customers who sought a refund once they learned that the FRT-15 was illegal, and Defendants regularly replied that it was their position that the FRT-15 was legal, that they were fighting the ATF in court, and that the customer may be liable for breach of contract for seeking a refund. *See, e.g.*, Govt. Exs. 89 at 1–2, 92 at 1–4. The customers' inquiries and responses to Defendants' form email nearly uniformly support the inference that these customers—who are all gun owners—considered the legality of the FRT-15 to be material to their decision to purchase one, with one customer telling Defendants, "Well that's interesting. Your company had better hope that this trigger is finally determined to NOT be a machinegun, or I may need

to take legal action against you for having sold me one.  How is that for standing my ground?" Govt. Ex. 89 at 1.

Still other customers asked RBT if they would simply take the FRT-15 back, for *no* refund, rather than bear the risk of being caught by the ATF in possession of one:

On Thu, 24 Mar at 2:13 PM , ██████████
< ████████████ > wrote:
Thank you for this and I wish you all good luck.

Having said that, I was not interested in a refund, rather, just as the ATF letter said, I simply want to "divest possession" and I figured I'd start with you guys. I really don't want to contact the ATF to surrender the item to them, potentially exposing myself to risk and "remedial action." While fully believe that RBT will fight any attempt to gain access to its sales database, I also fully believe the ATF will ultimately do so.

If you still would rather not accept the item in return without any refund, I can completely understand, but it would ask you to reconsider.

Thanks again,
                              ──────────────

* * *

To:       admin[admin@rarebreedtriggers.com]
From:     Customer Service
Sent:     Fri 1/13/2023 9:06:13 PM
Subject:  Ticket re-opened - [██████████████████

H ███████████████████████

Ticket ███████████████ as been reopened, please visit
https://newaccount1611179198205.freshdesk.com/helpdesk/t ████████ o view the ticket.

Ticket comment

Jen,

I totally get it and would never put you guys in a position to cause you financial issues, you need money to fight back and I get it. But I think I would rather surrender it to you guys and not the ATF. Only reason I brought up money was showing it changed possession (even if $1.00) but if you guys can receive it and give me a receipt, that works too.

Maybe since I am sending it back, and if the ATF ever get shot down in court, I could get a "coupon" to re-purchase.

Let me know if that is a possibility.

Thank you.

99

Govt. Exs. 135 at 1; Defs. Ex. H1 at 9.  When it received a request of this type, RBT informed its customers that they were "welcome to send" their FRT-15 back to Defendants "with the understanding that you will not receive a refund."  Govt. Ex. 135 at 1.

Defendants held themselves out as the only ones, in DeMonico's words, with "the balls" to sell the FRT-15.  Tr. 495:18–22, 496:13–25.  Yet they explicitly crafted RBT's "no refund" policy to shift the risk of an adverse ATF classification onto RBT's customers, knowing that many, if not all, of their customers—should the FRT-15 be classified as a machinegun—would want their money back when the product they bought suddenly became worthless.  As one customer put it: "There is no way for me to legally utilize your product now that I know of the Federal restrictions on its use.  I cannot put it in a rifle, I cannot sell it on the secondary market."  Govt. Ex. 22 at 6.

The legality of the FRT-15 was obviously material to Defendants' customers. Defendants' formal "no refund" policy—coupled with many customer emails explicitly inquiring about the legality for the FRT-15—supports this finding.[41]

---

[41] Defendants correctly point out that their sales "exploded" shortly after the ATF issued its cease-and-desist, Tr. 451:21–24, 549:13–17; Defs. Ex. Q2 at 2, and urge the Court to conclude from this fact that the ATF's legal determination of the FRT-15 was not material to customers' decisions to purchase one.  On the current posture, the Court does not draw that inference.  Defendants, after suing the ATF, increased their marketing and hired a public relations firm.  The Court agrees with the Government that the sales increase is likely attributable to these vastly expanded marketing efforts, and do not reflect any lack of interest on the part of RBT's customers as to the product's legal classification.

Indeed, for all their efforts to publicize their short-lived legal challenge to the ATF's classification, Defendants never included anything on their website—the

\* \* \*

On the present record, the Court concludes that the Government is likely to succeed on the merits of its claims of mail and wire fraud. [42] [43]

---

actual point of purchase—informing prospective customers that the FRT-15 was, in the ATF's view, an illegal machinegun. And even crediting DeMonico's testimony that RBT employed a relatively rudimentary website platform that made it difficult to make extensive changes or add sophisticated features, DeMonico never suggested that Defendants could not have simply added a sentence or two disclosing the ATF's July 2021 classification. Nor, given RBT's tens of millions of dollars in sales, have Defendants suggested that they lacked the resources to upgrade their website, had it been necessary to do so in order to make disclosures to their customers about ATF's classification.

[42] The Court, relying on the same factual basis as in its scienter and materiality analyses, also concludes that the Government is likely to prove the "existence of a scheme to defraud," to the extent that this element of the mail and wire fraud offenses is truly separate from scienter and materiality. *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). The caselaw is less than clear on this point. *See, e.g.*, *DeFilippo*, 2018 WL 11211500, at *3 ("To show the existence of a scheme to defraud, the Government must prove . . . the existence of a scheme to defraud.").

In any event, a "scheme to defraud" can be "described as a plan to deprive a person 'of something of value by trick, deceit, chicane or overreaching.'" *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *McNally*, 483 U.S. at 358). A scheme to defraud is further "characterized by a departure from community standards of 'fair play and candid dealings,'" and the Government can establish the existence of such a scheme through circumstantial evidence. *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992) (citations omitted).

In light of Defendants' actions described *supra*, the Court readily concludes that the Government is likely to succeed in proving that Defendants engaged in a scheme to defraud.

[43] 18 U.S.C. § 1345 by its language is limited to imminent or ongoing frauds. *See* 18 U.S.C. § 1345(a)(1)(A). The Court recognizes that because the temporary restraining order has been in effect since January 19, 2023, any alleged fraud has effectively ceased, and Defendants have agreed not to sell any FRT-15s until it receives a final decision from a court as to the device's legality. Nonetheless, the Court concludes that the prerequisites of 18 U.S.C. § 1345(a)(1)(A) are satisfied both because Defendants sold FRT-15s as late as November 30, 2022, *see, e.g.*, Govt. Ex.

101

**C. The Government Is Likely to Succeed on the Merits of Its Claims that Defendants Have Engaged in a *Klein* Conspiracy**

The Fraud Injunction Act also permits the Government to bring a civil action in federal court to enjoin ongoing conspiracies to defraud the United States in violation of 18 U.S.C. § 371.  *See* 18 U.S.C. § 1345(a)(1)(A).   Section 371 prohibits "two or more persons" from "conspir[ing] either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose" as long as "one or more of such persons do any act to effect the object of the conspiracy."  18 U.S.C. § 371.  The Second Circuit has interpreted this statute as having an "offense" clause—criminalizing conspiracies to "commit any offense against the United States"—as well as a "defraud" clause—criminalizing conspiracies to "defraud the United States."  *See, e.g., United States v. Atilla*, 966 F.3d 118, 130 (2d Cir. 2020).  A so-called "Klein" conspiracy, named after *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), focuses on the latter portion of § 371.

Whereas other anti-fraud statutes, such as those prohibiting mail and wire fraud, define "frauds" only as acts which deprive victims of money or property, "it is well established that the term 'defraud' as used in section 371 'is interpreted much more broadly.'"  *United States v. Ballistrea*, 101 F.3d 827, 831 (2d Cir. 1996) (quoting *United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988)).  That is because § 371 is "designed to protect the integrity of the United States and its agencies" generally, not just the United States' financial interests.  *United States v. Nersesian*, 824 F.2d

---

132 at 1, shortly before the Government brought this action, and because Defendants are currently holding a large cache of triggers in storage.  ECF No. 124-1 at 49:13–22.

1294, 1313 (2d Cir. 1987). Therefore, "even if the Government is not 'subjected to property or pecuniary loss by the fraud,'" a defendant can commit a *Klein* conspiracy if he conspires to "interfere with or obstruct one of [the United States'] lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Ballistrea*, 101 F.3d at 831–32 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)).[44] Although *Klein* itself concerned unpaid taxes, § 371 by its plain terms is not limited to conspiracies to impede the functioning of the IRS, and "the defraud clause has been applied to conspiracies to obstruct the functions of a variety of government agencies and has not been limited to the IRS." *Atilla*, 966 F.3d at 130 (collecting cases). Indeed, other courts have affirmed convictions under § 371 when the defendants have interfered with the lawful jurisdiction of the ATF. *See, e.g.*, *United States v. Rodman*, 776 F.3d 638 (9th Cir. 2015).

To prove a *Klein* conspiracy, the Government must demonstrate "(1) that the defendant entered into an agreement (2) to obstruct a lawful function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in

---

[44] Defendants challenge this broad interpretation of the word "defraud" in 18 U.S.C. § 371, arguing that recent guidance from the Supreme Court regarding 18 U.S.C. §§ 1341 and 1343 urges an interpretation of § 371 limited to schemes that deprive the Government of money or property. O.A. Tr. 77:25–78:4; ECF No. 132 at 2–5 (citing *Ciminelli*, 143 S. Ct. at 1126). Because the Second Circuit has recently reaffirmed its controlling interpretation of § 371, however, this Court is bound to follow it. *Atilla*, 966 F.3d at 130 ("[A]lthough Atilla contends that the defraud clause incorporates the common law meaning of fraud, it has been well established that the term 'defraud' in § 371 is not confined to fraud as that term has been defined in the common law." (citation and quotation marks omitted)).

103

furtherance of the conspiracy." *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012) (quoting *Ballistrea*, 101 F.3d at 832). "[T]he impairment or obstruction of a governmental function contemplated by section 371's ban on conspiracies to defraud need not involve the violation of a separate statute." *Rosengarten*, 857 F.2d at 78.

On the present record, the Court concludes that the Government is likely to succeed on the merits of its claim under 18 U.S.C. § 371.

### 1. <u>Existence of Agreement to Obstruct</u>

"A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (quotation marks omitted). For that reason, "circumstantial evidence alone" can be sufficient to find the existence of a conspiratorial agreement. *United States v. Santos*, 449 F.3d 93, 103 (2d Cir. 2006).

Here, the Court finds that the Government is likely to succeed in demonstrating through both direct and circumstantial evidence—described at length *infra*—that Defendants DeMonico and Maxwell entered into a conspiracy, both among themselves and with non-defendants, to prevent the ATF from carrying out its lawful functions.

### 2. <u>The ATF's Lawful Function</u>

It is undisputed that the ATF is authorized by law to investigate "criminal and regulatory violations of the Federal firearms . . . laws." 28 U.S.C. § 599A(b)(1); *Akins*, 82 Fed. Cl. at 623 ("Congress has granted ATF the authority to investigate criminal and regulatory violations of Federal firearms laws."); *United States v. John*, 20-cr-

341, 2022 WL 1062998, at *9 (E.D.N.Y. Apr. 8, 2022) ("Title 28 of the United States Code (U.S.C.) provides the Bureau of Alcohol, Tobacco Firearms and Explosives (ATF) the authority to investigate criminal and regulatory violations of Federal firearms law."); *see also* Tr. 210:6–13 (ATF Agent Saier, in his capacity as Special Agent in Charge of the Tampa (FL) Field Division, was "in charge of all criminal enforcement and regulatory enforcement activities carried out by ATF" in that division).

Implementing regulations, in turn, give the ATF the authority to "[i]nvestigate, administer, and enforce the laws related to . . . firearms," *see* 28 C.F.R. § 0.130(a), which includes the power to investigate and enforce the federal prohibition on the transfer or possession of a machinegun. *See* 28 C.F.R. § 0.130(a)(1), (2) (citing both 18 U.S.C. chapter 44, which includes 18 U.S.C. § 922(o)(1), and 26 U.S.C. chapter 53, which includes 26 U.S.C. § 5845(b)). These same implementing regulations give the ATF the authority to "seize[] and forfeit property involved in a violation or an attempted violation" of the same firearms laws. 28 C.F.R. § 0.130(b)(1). *See also Akins*, 83 Fed. Cl. at 623 ("The record shows that ATF was acting under this authority when it classified the Akins Accelerator as a machine gun, ordered Plaintiff to register or surrender the devices, and prohibited Plaintiff from selling them to anyone other than law enforcement agencies."). Federal law also requires machineguns to be registered, and that database must be maintained by the National Firearms Act Branch of the ATF. *See Rodman*, 776 F.3d at 640.

The Court has already concluded that the Government is likely to succeed in

proving that the FRT-15 is an illegal machinegun within the meaning of 26 U.S.C. §

5845(b).  The ATF was also of that opinion at the time it served its cease-and-desist

letter on Defendants on July 27, 2021.  The ATF clearly had the authority to

investigate and seek the seizure of FRT-15s where, as here, the ATF had reason to

believe that the sale, possession, and transfer of these devices violated federal law.

This prong of *Klein*, therefore, is not meaningfully at issue.

### 3.  <u>Use of Dishonest Means</u>

The Government has presented evidence that supports the inference that

Defendants conspired to use dishonest means to interfere with the ATF's ability to

track and confiscate FRT-15s.

As a preliminary matter, this Court notes that—in response to direct

questioning by the Court—the Government conceded that neither the ATF's July 15,

2021 classification letter nor its July 27, 2021 cease-and-desist letter were legally

binding on Defendants.  O.A. Tr. 65:25– 66:7.  That is, even after being served with

the cease-and-desist letter and being informed that the ATF had classified the FRT-

15 as a machinegun, Defendants had the right to dispute the ATF's determination

and challenge it in court.  As previously found by the Court *supra,* Defendants

initially did so here, but essentially abandoned their lawsuit after losing two motions

for injunctive relief in its preliminary stages.  What Defendants could *not* do,

however, was use deceitful and dishonest means to deliberately obstruct ATF's

continued efforts to carry out its law enforcement function.  That was true while

Defendants' legal challenge was pending, and was certainly true during the

106

numerous months in which Defendants had no such litigation in progress.

### a. Defendants Used False Addresses on the Packages They Sent Through the United States Postal Service

First, when mailing triggers to customers using the United States Postal Service, Defendants used fictitious return addresses.[45]  Rather than write "Rare Breed Triggers" on the packages, Defendants used false company names with the same initials ("RBT"), such as "Red Beard Treasures" or "Red Barn Tools."  Tr. 445:20–446:3, 476:23–477:6; ECF No. 124-1 at 91:9–92:4, 93:23–94:2.

Defendant DeMonico testified that this company practice has an innocent explanation.  RBT has, at various times, used both UPS and USPS to deliver forced-reset triggers to customers.  *See* Tr. 444:22–23, 445:6–8.  Defendants claim, however, that UPS was a more "reliable" service than USPS: according to DeMonico, UPS would not typically leave packages on someone's doorstep without knocking or physically handing it to the customer, which minimized the chance that the package would be lost or stolen, and UPS offered RBT a more dependable insurance system than USPS.  Tr. 444:14–445:19; ECF No. 124-1 at 91:18–92:14.  Because FRT-15s are expensive devices retailing for $380 each, DeMonico stated, Defendants believed that their packages would be more susceptible to theft when the word "trigger" was written on the package, since such a label would signal to a potential thief that the package contains firearm parts.  Tr. 445:20–23.  Because thieves have an easier time

---

[45]  Defendants only apparently employed this practice when mailing WOTs, not FRT-15s, after they secured a stockpile of WOTs in or around October 2022 pursuant to a settlement agreement with RBT's former distributor Big Daddy Unlimited.  *See* O.A. Tr. 47:17–24.  The parties agree that FRT-15s and WOTs are, for purposes of this lawsuit, identical.  *See, e.g.*, Tr. 150:25–151:14, 278:5–15.

stealing USPS packages than UPS packages, Defendants felt the need to hide the true content of their packages only when mailing a trigger through USPS. ECF No. 124-1 at 91:25–92:4.

This is, perhaps, a plausible explanation. However, a more plausible explanation is that UPS is a private company, whereas USPS is an agency of the United States government. In or around October 2022, Defendants acquired a supply of WOTs as a result of a patent dispute settlement with their former distributor. *See* O.A. Tr. 47:17–24. Because this post-dated the ATF's cease-and-desist letter and seizure of Defendants' property at 3rd Gen Machines, however, Defendants were at that time all-but-certainly aware that their packages could, at some point, be tracked by the Government or confiscated in transit. The Court therefore finds it very likely that Defendants used false company names to avoid Government detection.

DeMonico also explained that the policy was designed to protect his customers' privacy. Tr. 446:4–15; ECF No. 124-1 at 92:15–17. Indeed, the record demonstrates that many of Defendants' customers did wish to protect their information—from the ATF. Defendants had, in the preceding years, received numerous emails from their customers seeking assurances that Defendants were taking steps to prevent the ATF from locating them. This further supports a finding that Defendants used false company names on their USPS packages to hinder the Government from tracking their products' whereabouts:

| To: | admin[admin@rarebreedtriggers.com] |
|---|---|
| From: | ▮▮▮▮▮▮▮ |
| Sent: | Fri 1/1/2021 11:49:16 PM |
| Subject: | Re: Frt-15 trigger |

I have a bunch of guys in a ▮▮▮ facebook gun owner group looking to get one

On Fri, Jan 1, 2021 at 6:42 PM ▮▮▮▮▮▮▮▮▮ wrote:

Just trying to avoid having a sales record for when atf seizes them on something that should be legal but we all know they will be jackasses about.... Any ▮▮▮▮ gunshows coming up you will be at? And I am sorry to be a PITA

* * *

On Mon, 19 Sep at 9:18 AM ▮▮▮▮▮▮▮ wrote:

Hey there boss just checking in to see if I can place an order for one of your FRTs without being denied/or have my dog shot by alphabet boys. I would rather not have a visit from my local gestapo for exercising my Americanism. Also do you shred/burn the dox? I know a few places that get rid of the sales info to protect their customers. Thanks

* * *

On Tue, 23 Aug at 1:06 PM ▮▮▮▮▮▮▮ wrote:

Is my purchase history available to the atf

* * *

109

On Wed, 30 Nov at 9:56 PM ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓ > wrote:

Jennifer,
Thanks for getting back to me.  It's no big inconvenience at all.  I doubt
I will be able to catch the mailman when it arrives, so I'll just drop it off
at the post office when it arrives and send it back.  Sorry for all the
trouble. And thank you for looking into it for me. I do have a question
though. If in the future it is still available, and I have the funds to
purchase it, what do you guys do with your customer records?  The
reason I ask is because I had purchased an FRT trigger off of
GunBroker.com late last year.  But in September the ATF showed up at
my house wanting to confiscate the trigger.  Apparently they had gotten
my information from a certain seller on GunBroker.  I turned the trigger
over to them.  My concern is if i were to purchase another trigger, I
don't want the ATF coming back and wanting to confiscate my new one

Govt Exs. 106 at 1; 87 at 2; 88 at 1, 107 at 1 (highlight supplied).

DeMonico's explanation for this company practice is further undermined by

various emails that customers sent to RBT indicating that their UPS packages had

likely been stolen from their doorsteps, Govt. Ex. 66 at 2, or that UPS drivers had in

fact dropped off packages at customers' homes without knocking.  Govt. Ex. 22 at 6;

*see also* ECF No. 124-2 at 30:13–14.  This evidence suggests that DeMonico's faith in

UPS over USPS for purposes of preventing package theft was perhaps not his true

reason for using false company names on RBT's packages.

DeMonico's version of events is further undermined by the fictitious company

names that he actually chose, particularly "Red Beard Treasures."  If a seller were

concerned that a thief would steal a package whose label reveals that it contains

expensive "triggers," surely the seller would have the same concern when the package

is labeled as containing "treasures."

Finally, Defendants testified that they only started using fictitious names on

their USPS packages in November 2022, well after the ATF's July 2021 cease-and-

desist letter, indicating that there is no connection between the two.  Tr. 524:2–17.

The Government, however, points out that in March 2022, Defendants lost their

entire inventory of triggers after the ATF executed a search warrant at 3rd Gen

Machines, the facility that shipped FRT-15s on Defendants' behalf.  Defendants only

finally had inventory to sell, therefore, in November 2022 after it received a trove of

WOTs in a settlement dispute with a patent infringer—and when Defendants sold

these triggers, they used false names on their USPS packages.  The record supports

the Government's version of events.  *See* Tr. 583:24–584:16, 600:4–12; Govt Ex. 129

at 1.[46]

In sum, it appears likely to the Court that Defendants' practice of using a false

---

[46] In a supplemental brief, Defendants argued that this type of mislabeling to ward off thieves is a common practice within the firearms industry.  ECF No. 130 at 3–4.  Even if that were true, however, it does not explain why a firearms retailer would use different labels on UPS versus USPS packages, especially since the record indicates that Defendants were on notice that UPS packages might also be left without a signature for theft by so-called "porch pirates."  *See, e.g.*, Govt Ex. 22 at 6, 66 at 2.  It also cannot be squared with Defendants' decision to (re)label their packages as containing "treasures"—indeed, in the counterexample that Defendants provide from another firearms manufacturer, the firearm package is mislabeled to make the box look like it contains a broomstick.  ECF No. 130 at 4.

Defendants also submitted a supplemental declaration on August 29, 2023, *see* ECF No. 136, in which DeMonico offered yet a third explanation for this practice.  The WOT, DeMonico wrote, was a less expensive item than the FRT-15, so Defendants were not concerned about sending it via a less expensive and less reliable carrier like USPS.  ECF No. 136 ¶ 4.  But the WOT was apparently valuable *enough* to warrant using a false company name on the packaging to prevent theft (assuming, of course, that the purpose of the false company name was to prevent valuable packages from being stolen by so-called porch pirates, as Defendants contend).  DeMonico's supplemental declaration does not change the Court's assessment that the likely purpose of the false labelling was, in fact, to obstruct the Government's efforts to track the sales of FRT-15s after the ATF classified these devices as machineguns.

111

company name with USPS, but not with UPS, on packages that post-dated the ATF's seizure of Defendants' inventory at 3rd Gen was a deliberate attempt to interfere with the Government's ability to track and confiscate what it believed to be illegal machineguns.  Although the use of fictitious company names on their USPS packages clearly did not succeed in tricking the Government, it is nonetheless sufficient for purposes of a *Klein* conspiracy.  *Cf. Ballistrea*, 101 F.3d at 833 ("Although the creation of New Millennium ultimately failed to throw the FDA off Ballistrea's scent, such evidence of active concealment and evasion is more than sufficient to establish that Ballistrea agreed with Ricotta and others to obstruct, through deceit, trickery, or dishonest means, the FDA's lawful function.").

### b.   <u>Defendants Destroyed Sales Records that They Knew Were the Subject of an Ongoing ATF Investigation</u>

Second, the Court concludes that Defendants' use of a "digital shredding policy" also constitutes a dishonest act intended to thwart the ATF's jurisdiction to seize FRT-15s, at least insofar as Defendants continued that policy after receiving the ATF's cease-and-desist letter in July 2021.  DeMonico testified that although RBT did have a policy of destroying each customer's name, address, and contact information roughly two weeks after a purchase, he implemented this policy simply because it was a service offered by RBT's web host Word Press, and the policy protected RBT from liability in case the company was hacked in a data breach.  Tr. 442:1–443:24. The goal of this company policy was not, DeMonico said, to hide anything from the Government.  Tr. 444:7–9.

At the beginning of RBT's operations in December 2020, this policy, in a

vacuum, would not constitute a deceitful act that obstructs the ATF's lawful functions. On this record, the Court has no reason to discredit DeMonico's testimony that the "digital shredding policy" was a standard option that a merchant could select in the web-sales platform that RBT used, and that they initially chose it to help protect customers' credit card information from hackers and other thieves. On July 27, 2021, however, Defendants received the ATF's cease-and-desist letter which explicitly informed Defendants of the ATF's conclusion that the firearms they had sold were illegal machineguns, and of the ATF's specific intention to develop "a plan for addressing those [FRT-15s] already distributed." Govt. Ex. 2 at 2; Defs. Ex. C1 at 2. At this point, Defendants became aware that the information in their sales data was the subject of an official investigation by the ATF. Nonetheless, after the ATF issued the cease-and-desist, RBT explained to its customers that it employed a digital shredding policy specifically to prevent customer data from ending up in the hands of the ATF:

On Mon, Sep 12, 2022, 11:29 AM Customer Service <customerservice@rarebreedtriggers.com> wrote:

Hi ███████████████████

I'm sorry for the delayed response. We have not turned over a customer list to the ATF -- we don't even have one to turn over, as we have a digital shredding policy.

\* \* \*

113

On Mon, Nov 7, 2022 at 4:52 PM Customer Service
<customerservice@rarebreedtriggers.com> wrote:

Doing business online in the digital age, it's almost impossible to remove any and all traces of a transaction, but we've put a great deal of thought into this. We have an attorney on staff and plan to defend our position tooth and nail. We will not voluntarily hand over anything to anyone. Additionally, we can't turn over what we don't have. We have a digital shredding policy. Once we no longer need a customer's personal information for legitimate business purposes, it is automatically scrubbed from our system.

Govt. Exs. 88 at 1; Defs. Ex. H1 at 1 (highlight supplied).

Similarly, Defendants knew after the ATF's seizure of their inventory on March 26, 2022 that the ATF was actively attempting to confiscate FRT-15s, and had already obtained at least one federal court order authorizing its agents to do so. Nonetheless, Defendants chose to maintain a practice of "shredding" their sales records well after both of these events.[47]

---

[47] The Government also argues that RBT's corporate structure, which consists of a series of interconnected limited liability companies, evidences Defendants' deceit and dishonesty, since the structure was purportedly designed to shields Defendants' ill-gotten assets. Defendants, for their part, testified that the purpose of this corporate structure was largely to protect the owners of RBT from personal liability lawsuits. *See, e.g.*, Tr. 424:5–22, 529:23–530:22. The Court does note the existence of a photo exhibit taken during a video presentation by RBT's financial advisor in which DeMonico's thumbnail photo is visible, which appears to corroborate Defendants' claim that they adopted their corporate structure at the recommendation of this advisor. *See* Defs. Ex. Z3 at 1. On the other hand, while the Government concedes that the corporate structure Defendants and their business partners adopted was not meaningfully different from the recommendations depicted in this exhibit, it urges this Court to find that they also did so specifically to shield their illegally-obtained profits from ready detection and seizure by the Government. Because the Court relies on other evidence to find that the Government is likely to succeed on its claim of a *Klein* conspiracy, it need not resolve the parties' conflicting interpretations of this evidence.

### 4.  **Overt Act**

The Government has also met its burden of demonstrating that it is likely to satisfy the fourth element of a *Klein* conspiracy—the commission of an overt act by one of the conspirators to interfere with the lawful functioning of a government agency—at a final trial on the merits.  Defendants' use of false names on USPS packages and their digital shredding policy, described *supra*, would each likely constitute such an act.  One more action by Defendants, however, would also likely constitute an overt act in furtherance of their conspiracy to obstruct the ATF's investigation into the FRT-15.

### a.  **DeMonico Traveled to 3rd Gen to Collect a Pallet of FRT-15s, Knowing that the ATF Intended to Seize It**

On March 24, 2022, the ATF received a search warrant from Magistrate Judge Jared C. Bennett of the United States District Court for the District of Utah to seize all FRT-15 devices from 3rd Gen Machine, as well as 3rd Gen's computers.  ECF No. 120-3 at 3–9.  On March 26, 2022, ATF executed that search.  Shortly thereafter, however, a different facility, which had not been searched in the ATF's execution of this warrant, sent 3rd Gen a pallet of FRT-15s that Defendants asserted they had already paid for.  Tr. 460:23–24; ECF No. 120-3 ¶¶ 5, 8.  On or around April 13, 2023, 3rd Gen, through counsel, informed the ATF that it possessed this pallet of FRT-15s and wished to surrender it.  ECF No. 105-4 ¶¶ 3–4.  On April 14, 2023, however, DeMonico flew to Utah, rented a U-Haul van, arrived at 3rd Gen, and told them he was there to take possession of all FRT-15s and component parts.  Tr. 508:4–13; ECF No. 105-5 ¶¶ 13–15.  The managers at 3rd Gen—whom DeMonico said

115

were surprised to see him—said that the FRT-15s had been set aside for the ATF to retrieve, and that they would promptly call the ATF and warn the agents about DeMonico's presence.  Tr. 460:3–461:12, 510:22–24; ECF No. 105-5 ¶¶ 16–17.  DeMonico reiterated that he still intended to take the devices, and told 3rd Gen's staff, "Give me a head start."  Tr. 510:24; ECF No. 105-5 ¶ 17.  He then loaded his van and drove off with the inventory, which consisted of nearly 2,000 triggers and 15,000 FRT-15 component parts.  Tr. 463:25–464:2, 511:18–22; ECF No. 105-5 ¶ 19.[48]  After driving several hundred miles and crossing into New Mexico, DeMonico was stopped and detained by ATF agents, who seized the triggers and let him go.  Tr. 464:15–467:19, 511:10–13

In this proceeding, DeMonico maintained that his actions did not, in fact, interfere with the ATF's ability to execute the search warrant because the warrant had expired by the time DeMonico arrived at 3rd Gen on April 14, 2023.  Strictly speaking, this is true—the warrant had expired on April 7, 2023.  *See* ECF No. 120-3 at 3.  Upon direct questioning from the Court, however, it became clear that DeMonico did not actually know this fact at the time he traveled to 3rd Gen to collect the FRT-15s:

> MR. WARRINGTON: At any time surrounding this post raid to the pick up time, were you ever aware there was a seizure order on those triggers?
>
> MR. DEMONICO: I don't believe there was. Because even the warrant that had been served three weeks prior was already expired. . . .

---

[48]  Maxwell's contemporaneous email correspondence with 3rd Gen indicates that this pallet contained 1,744 FRT-15s.  Defs. Ex. A4 at 2.  At a retail price of $380-per-unit, therefore, the pallet was worth roughly $660,000.

116

THE COURT: Had you seen the warrant that had been executed about three weeks prior, before you went to Utah?  Had you reviewed it yourself?

MR. DEMONICO: I don't believe I had, ma'am.

THE COURT: What is your basis at that time [to believe] that it was expired?

MR. DEMONICO: I didn't know at that time it was expired.  Now I have come to know it was expired.

THE COURT: What is your understanding at the time you got on the plane to Utah about the status of the warrant.

MR. DEMONICO: I did know warrants had a period of time and then they were no good.

THE COURT: Right.  But you didn't know then with respect to this particular[] warrant.

MR. DEMONICO: That's correct.  I felt confident that that time period had expired.

THE COURT: Based on what?

MR. DEMONICO: They can't last for months.  So I just assumed it's got to be a short period of time.

THE COURT: Did you talk to a lawyer, Mr. Maxwell or anybody, about the time frame issue?

MR. DEMONICO: No, ma'am.

Tr. 461:13–462:18.

In addition, DeMonico testified that, as he drove off, he felt certain that the ATF would imminently arrest him, Tr. 463:25–464:16, further supporting the inference that he believed at the time that he took this pallet of FRT-15s that his actions interfered with an ATF investigation.

Contemporaneous emails between Maxwell and 3rd Gen also support the

117

inference that Defendants believed that the ATF intended to seize that pallet and had the authority to do so. On March 30, 2023, Maxwell emailed 3rd Gen's attorney Mitch Vilos and asked 3rd Gen to facilitate the transfer of this pallet to RBT, notwithstanding the ATF's recent search of 3rd Gen's facility. Defs. Ex. A4 at 2. Vilos responded: "I am informing you of 3rd Gen's intent to not obstruct or refuse to cooperate with the government in its intent to seize and complete the process of forfeiture of any and all [FRT-15s] in 3rd Gen's possession." Defs. Ex. A4 at 1.

It appears likely to the Court, therefore, that DeMonico was fully aware that the ATF intended to retrieve this pallet of triggers. DeMonico's assertion that Judge Bennett's warrant had expired by the time he arrived at 3rd Gen, while true, appears to be a convenient *post facto* justification for his actions, not a true reflection of what DeMonico understood at the time. Further, the timing of his sudden flight to Utah (*i.e.,* within one day of when the ATF was informed that 3rd Gen's counsel told the United States Attorney for the District of Utah that 3rd Gen wished to voluntarily surrender all FRT-15s in its possession, *see* ECF No. 105-4 ¶¶ 3–4), along with the fact that DeMonico and Maxwell had specifically been informed by 3rd Gen's counsel that they intended to cooperate with the ATF's efforts to seize these devices, make it highly likely that DeMonico went to Utah as part of a last-ditch effort to prevent ATF from lawfully taking possession of the FRT-15s from 3rd Gen.

DeMonico has implied that retrieval of these triggers did not interfere with the ATF's ability to execute on this search warrant because these triggers were Defendants' property, since RBT had paid 3rd Gen for these triggers. Tr. 459:6–12,

507:14–16.  The Court is unpersuaded by this argument.  A search warrant aimed at seizing evidence from a suspect often involves property belonging to that individual. That fact alone does not make the warrant invalid, or interference with that warrant any less obstructionary.  Were it otherwise, any owner of "property" subject to an otherwise-valid warrant could obstruct law enforcement's efforts to execute that warrant, even when it covers items (for example, prohibited explosive devices) that are indisputably illegal for citizens to possess.

### b.  The ATF Received a Call Threatening Violence at Its Office in Orlando in August 2021

On July 27, 2021, ATF agent Saier served Maxwell with a cease-and-desist letter instructing RBT to stop manufacturing and selling the FRT-15.  A month later, an agent in the ATF's Orlando office received a threatening phone call.  Tr. 221:5–223:7, 248:3–6; ECF No. 105-3 ¶¶ 2–9.  According to the ATF's report, the call proceeded as follows:

> On August 27th, 2021, at 1606 hours, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Senior Industry Operations Investigator (SIOI) James Hitchcock received a threatening phone call. . . .  The caller did not identify himself but stated "It's treasonous", "When are you going to stop trampling on our Second Amendment rights?"  SIOI Hitchcock asked the caller if he had a question and the caller muttered "Second Amendment" and stated "We're coming down . . . Coming down to ATF, your office.  We are going to assemble. Going to assemble and protest at the office."  The caller also said "We are bringing the rocket launcher."

Defs. Ex. P3 at 1.

ATF's investigation revealed that the person who made this threatening call did so from the fax line of Maxwell's law office.  Defs. Ex. P3 at 1.  However, Defendant Maxwell testified that although the call did come from the fax machine

119

at the front desk of his commercial building, he himself never made any such call. Tr. 602:25–605:17.

Maxwell may well be telling the truth. Indeed, because he shares a law office with others, and both he and at least one other attorney who rent space in that office have represented individuals in litigation with the ATF, *see* Tr. 603:19– 605:20, another attorney, law firm client, or other individual with access to the premises could have made the call at issue. Given the timing of the ATF's cease-and-desist letter, the fact that this call was made from a phone line associated with Maxwell's office is a troubling coincidence. Nevertheless, the Government has not demonstrated that Maxwell made this phone call, nor that he directed any other person to do so. Accordingly, the Court does not rely on this evidence in its findings.

\* \* \*

In sum, the Court concludes that the Government is likely to demonstrate at a trial on the merits that Defendants completed at least one overt act in furtherance of a conspiracy to obstruct the ATF's lawful jurisdiction to investigate Defendants' manufacture and distribution of illegal machineguns.

## II. **Irreparable Harm**

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). To demonstrate the existence of irreparable harm, a plaintiff must show that "absent a preliminary injunction they will suffer an injury that is

neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) *(*citation and quotation marks omitted*).* The plaintiff must also show that the alleged harm is "continuing" and "cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotation marks omitted). Section 1345 also specifically authorizes the Government to seek preliminary injunction relief from a court to enjoin mail frauds, wire frauds, and frauds against the United States to "prevent a continuing and substantial injury" to these persons or entities. 18 U.S.C. § 1345(b).

The Court concludes that irreparable harm would befall the United States and Defendants' customers in the absence of a preliminary injunction. First, at oral argument, Defendants conceded that, although they did not believe that the FRT-15 satisfied the statutory definition of a machinegun, if the Court did conclude that the FRT-15 is a machinegun, then the FRT-15's continued illegal sale would constitute *per se* harm to the United States and its citizens. O.A. Tr. 10:9–22. As outlined *supra*, the Government is likely to prove that the FRT-15 is indeed an illegal machinegun. To date, Defendants have not registered their devices with the Government, and do not keep track of the sales of these devices to third parties. The Court agrees with the Government that if Defendants were permitted to continue to sell the FRT-15 while this litigation is pending, the United States would have to

121

spend significant resources retrieving those devices—on top of the approximately

100,000 sold by Defendants since 2020 that are already in circulation, *see* ECF No.

105-1 at 2, and it would likely be impossible to retrieve them all.  O.A. Tr. 11:9–24.

Although Defendants do not currently have a manufacturer, DeMonico testified that

he currently possesses a large number of WOTs in storage.  Tr. 475:4–17.

Similarly, irreparable harm would befall Defendants' prospective customers if

Defendants are allowed to continue to sell the FRT-15.  For Defendants' customers,

such harm is not exclusively monetary.  If the Government proves, as the Court

finds likely that it will, that the FRT-15 is a machinegun within the meaning of §

5845(b), then every owner of an FRT-15 is violating federal law, even if many—if not

most—are currently doing so unknowingly.  By selling the FRT-15 while this action is

pending a final determination, Defendants would expose still more customers, who

may remain under the misimpression that the FRT-15 is unequivocally "legal," to at

least some risk of future criminal prosecution.

Possession of a machinegun is punishable by a maximum of ten years in prison

and a $10,000 fine.  *See* 18 U.S.C. § 922(o)(1); 26 U.S.C. § 5871.  Commission of

certain crimes while using a machinegun is punishable by a statutory minimum of

thirty years.  18 U.S.C. 924(c)(1)(B)(ii).  Under federal law, a person convicted of a

crime punishable by a prison term of more than one year can lose her right to possess

a firearm for life.  18 U.S.C. § 922(g)(1).  Thus, any such convictions would create

downstream consequences particularly harmful to Defendants' customers, whom

Defendants themselves characterize as "sophisticated firearms enthusiasts" who are

"attuned to their Second Amendment Rights and the issues that concern them."

ECF No. 133 at 4.  That harm exists even if the Government ultimately does not

prosecute the vast majority of Defendants' customers.  *Cf. Simonsen v. Bremby*, 15-

cv-1399, 2015 WL 9451031, at *4 (D. Conn. Dec. 23, 2015) ("[T]here is Second

Circuit and out-of-circuit appellate law holding that the mere *threat* of a loss of

medical care, even if never realized, constitutes irreparable harm." (citation

omitted)).  Those who purchase FRT-15s may, understandably, experience fear and

anxiety regarding that possibility and its serious collateral consequences as this

litigation proceeds (and certainly if final judgment is entered declaring the FRT-15s

to be illegal); some may decide to seek their own legal counsel to advise them of how

to safely divest possession or otherwise protect themselves from the risk of criminal

prosecution.  Even the threat of a grievous outcome like a criminal prosecution or

conviction would likely cause Defendants' customers "emotional distress, concern

about potential financial disaster, and possibly deprivation of life's necessities,"

which "taken together . . . show harm that, in this sort of case, is 'irreparable.'"

*United Steelworkers of America, AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir.

1987) (Breyer, J.).

Defendants' profit-driven actions have already put at risk the firearms rights

of tens of thousands of Americans.  Any future sales would expose new customers to

that risk.

The Court therefore concludes that the Government has met its burden of

demonstrating that irreparable harm would befall both the United States and

123

Defendants' customers if a preliminary injunction does not issue.

### III.    **Balance of Hardships**

The Court now turns to the balance of the equities among the parties.  *See Young v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020) (instructing courts to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." (citation omitted)).  First, the Court recognizes that Defendants may face some difficulties from the issuance of a preliminary injunction.  If the Court grants the Government's motion for a preliminary injunction but the Government ultimately fails to meet its burden at a trial on the merits—and, specifically, if a court ultimately concludes that the FRT-15 is a legal device—then Defendants' sales of the FRT-15 will certainly be delayed, since their customers will need to wait months or years before purchasing one.  *Cf. Gov't Employees Ins. Co. v. Wellmark RX, Inc.*, 435 F. Supp. 3d 443, 455 (E.D.N.Y. 2020) ("If the court grants plaintiffs' motion to enjoin . . . and [plaintiff] fails to prove its claims, then, at worst, [defendant's recovery . . . will be delayed.").  Moreover, if an injunction issues, Defendants may forego certain sales altogether if customers seek to buy a similar product instead.  To Defendants, this hardship is not insignificant—although the Court's concern is mitigated by the fact that the Government has made a strong showing that Defendants' entire business is built on the sale of an illegal product anyway.  *Cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 299–200 (E.D.N.Y. 2013) ("Based on the facts before the Court at this time . . . any harm appears to stem from defendants' own wrongful conduct. . . . In such circumstances,

124

the Court cannot say the harm to defendants outweighs the harm to plaintiffs.").

Conversely, the hardships to both the Government and to legal gun owners in the United States would be significant in the absence of a preliminary injunction. If the Court declines to enter preliminary injunctive relief but the Government ultimately succeeds after a final trial on the merits—that is, the Government secures a final judgment after proving that the FRT-15 is indeed a machinegun within the meaning of 26 U.S.C. § 5845(b), that Defendants have interfered with the Government's authority to regulate and confiscate FRT-15s, and that Defendants are engaged in a scheme to defraud their customers—then, during the pendency of this case, thousands of illegal machineguns could be added to the current stockpile of FRT-15s scattered throughout the country. Although Defendants do not appear to currently have a manufacturer for the FRT-15, DeMonico testified during his deposition that he does currently possess a stockpile of "many, many, many" boxes of inventory, each of which contain roughly one hundred triggers. ECF No. 124-1 at 48:2–49:22. The Government would then be required to use its finite resources to track these devices down at the expense of other priorities. Tr. 225:6–229:10.[49]

When comparing these two outcomes, the Court concludes that the balance of

---

[49] Defendants argue that the ATF is partially at fault for the quantity of FRT-15s in the country because they failed to act sooner in stopping Defendants' sales, and did not take more intrusive measures available to them (such as arresting and criminally prosecuting RBT's principals) to do so. Tr. 238:22–239:15; *see also* Tr. 237:22–238:10, 467:14–21. The Court does not find this argument persuasive.

hardships decidedly tips in favor of the Government.[50]

### IV.   Public Interest

"[W]hen a court orders injunctive relief, it should ensure that the injunction does not cause harm to the public interest."  *U.S. Sec. & Exch. Comm'n v. Citigroup Global Mkts, Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012).  For the reasons already stated, the Court readily concludes on this record that the public interest would not be harmed by preliminary injunctive relief.

* * *

For the reasons outlined above, the Court concludes that the Government has met its burden of demonstrating that it is entitled to preliminary injunctive relief. The Government's motion is therefore granted.

### V. Scope of Injunctive Relief

The Government initially urged this Court to order a broad array of injunctive relief against Defendants under 18 U.S.C § 1345 if it granted the motion for a preliminary injunction.  *See* ECF No. 5 at 40–41.  However, after post-hearing

---

[50]  Because the Court finds that the equities decidedly tip in the Government's favor, a preliminary injunction is also warranted because there is at least a "serious question" as to the legality of the FRT-15.  *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (noting that regardless of whether a party moving for a preliminary injunction is likely to succeed on the merits, a court may grant the motion if it concludes that (1) a serious question exists going to the merits of the case and (2) the balance of equities tips decidedly in the movant's favor).  At oral argument, Defendants disputed that the balance of the equities in this case favors the Government, but they all but conceded that, at least, a serious question exists as to the legality of the FRT-15.  O.A. Tr. 3:12–6:10.

oral argument, the Government filed a revised proposed injunction and supporting letter brief. *See* ECF 128. The Court also gave Defendants leave to respond in writing to the Government's new proposal, which they did on August 23, 2023. *See* ECF No. 133.

Currently, the Government seeks two forms of preliminary injunctive relief. First, the Government has moved that the Court's temporary restraining order—which bars Defendants from selling FRT-15s or similar devices and requires them to preserve all business records, *see* ECF No. 11—be converted into a preliminary injunction. ECF No. 128 at 1. For the reasons outlined *supra*, this motion is granted.[51]

Second, the Government has moved the Court to order Defendants to "create and implement a refund program to allow their customers to return FRT-15s or Wide Open Triggers ("WOTs") to them in return for cash payments." ECF No. 128 at 1. This motion is denied. The Court currently has the authority to issue only preliminary injunctive relief. It is true that preliminary injunctions against defendants in cases alleging fraudulent sales may encompass relief that is broader

---

[51] The Court's order applies to both the individual and corporate Defendants to this action. RBT and RBF, as corporate entities, can be liable for the criminal actions of their agents—*i.e.*, Defendants DeMonico and Maxwell. *Cf. United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir. 1989) ("It is settled law that a corporation may be held criminally responsible for antitrust violations committed by its employees or agents acting within the scope of their authority."). Defendants have also conceded that RBT may be held vicariously liable if the Court finds that either DeMonico or Maxwell "had the specific intent to defraud [the Government] or RBT's customers in the course of their duties for RBT," ECF 130 at 7–8, as this Court has in fact found.

than merely enjoining future sales—for example, in some cases, courts have the established authority to freeze at least a portion of a defendant's assets to ensure that sufficient funds will still be available to pay restitution to the defendants' customers after a trial on the merits. *See, e.g.*, *United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1183 (E.D.N.Y. 1991). But the Court agrees with Defendants that it has no authority to order the refund program proposed by the Government at this stage of the litigation. As a practical matter, a refund program would constitute final, not preliminary, relief, because if Defendants ultimately prevail in this action, they could not recover the money they issue in refunds to their customers.

## <u>CONCLUSION AND ORDER</u>

The Government's motion for a preliminary injunction is GRANTED pursuant to this Court's authority under 18 U.S.C. § 1345. Defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them, are:

1. Restrained from engaging in any sales of the FRT-15, the Wide Open Trigger, forced-reset triggers, and other machinegun conversion devices until and unless otherwise ordered by this Court; and

2. Required to preserve all documents related to the manufacture, possession, receipt, transfer, customer base, and/or historical or current sale of FRT-15s, Wide Open Triggers, forced-reset triggers, and/or machinegun conversion devices, including those generated or received

128

after the date of this Order, until and unless otherwise ordered by this

Court.


SO ORDERED.

                                        _/s/ NRM_____
                                        NINA R. MORRISON
                                        United States District Judge

Date:  September 5, 2023
         Brooklyn, New York