**FILED**



*4:04 pm, 2/13/26*

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,

    Plaintiffs,

    vs.

PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,

    Defendants.

Case No. 26-CV-18-R

---

**ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION [6]**

---

ABC IP, LLC and Rare Breed Triggers, Inc. ("Plaintiffs") brought this action against Peak Tactical, LLC d/b/a Partisan Triggers, and its owner Nicholas Norton ("Defendants") for patent infringement and false marking and advertising. [ECF No. 1, at 1, 13]. Both parties make and sell firearms triggers. Plaintiffs assert Defendants' trigger design infringes on four of its registered patents. *Id*. at 3. On January 16, 2026, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. [ECF Nos. 6 & 7]. The Court issued an Order requiring Plaintiffs to serve the Complaint and Motion on Defendants by January 23, 2026. [ECF No. 9]. The Order also required Defendants to respond to the Motion by January 30, 2026, and an in-person hearing was held on the

Motion on February 4, 2026. *Id*. After careful consideration of the briefing and arguments offered at the hearing, the Court denies Plaintiffs' requested relief.

BACKGROUND

Plaintiffs ABC IP, LLC ("ABC") and Rare Breed Triggers, Inc. ("RBT") bring claims of patent infringement, false patent marking, and false advertising under the Lanham Act against Defendants Peak Tactical, LLC ("Peak") and Nicholas Norton ("Norton"). [ECF No. 1]. Plaintiffs' claims are based on four patents they hold related to forced reset triggers ("FRTs"). *Id*. at 3. A FRT is an aftermarket firearms trigger that operates by mechanically resetting the trigger after each shot, allowing the user to make faster follow-up shots without manually releasing pressure on the trigger.

ABC owns the four patents generally related to FRTs that can be retrofitted into existing semi-automatic rifles. *Id*. The asserted U.S. Patent numbers are: 10,514,223 ("'223 Patent"); 11,724,003 ("'003 Patent"); 12,036,336 ("'336 Patent"); and 12,274,807 ("'807 Patent") (collectively, "Asserted Patents"). ABC exclusively licenses the Asserted Patents to RBT, who designs, manufactures, and sells aftermarket triggers, including the RBT FRT-15L3 trigger. *Id*. at 4. Plaintiffs allege Defendants have committed willful acts of direct, contributory, and induced patent infringement in violation of 35 U.S.C. § 271.

Defendants manufacture and distribute the Partisan Disrupter, an aftermarket FRT trigger. *Id*. at 6. Except for minor inconsequential cosmetic features in the outer housing Plaintiffs allege, "the Partisan Disruptor is a direct copy of RBT's FRT-15L3 that one of their distributors, Firearm Systems, sells for $299—$150 (or 33%) cheaper than RBT's FRT-15L3." [ECF No. 7, at 7]. Plaintiffs also allege Defendants have falsely advertised

2

their Disruptor by incorrectly describing it as an "assisted reset trigger," rather than a FRT. [ECF No. 1, at 71–73]. Plaintiffs further allege Defendants have engaged in false advertising by telling the public the Partisan Disruptor implements and is covered by U.S. Patent No. 9,146,067 ("'067"). *Id*. Patent '067 relates to an assisted reset trigger and was issued to Partisan's employee Michael Stakes before the Asserted Patents were filed.

## I.  *Plaintiffs' Motion [ECF Nos. 6 & 7]*

In the instant Motion, Plaintiffs request the entry of a temporary restraining order ("TRO") and preliminary injunction enjoining Defendants' business operations and marketing. FED. R. CIV. P. 65. They ask the Court to enjoin Defendants from: "1. making, using, offering to sell, selling, or importing the accused Partisan Disruptor product, or any substantially identical product; 2. stating publicly . . . the Partisan Disruptor is an assisted reset trigger" and "3. stating publicly . . . the Partisan Disruptor product practices U.S. Patent No. 9,146,067." [ECF No. 6-1, at 2]. Plaintiffs argue all four applicable factors for a preliminary injunction are satisfied.

First, Plaintiffs argue the patent infringement claims are likely to succeed because it is established that, "ABC owns the asserted patents and RBT is their exclusive licensee, that the accused Disruptor meets all the asserted claims and is a copycat of RBT's FRT-15L3 patent-implementing product, and [] the Defendants have never raised a substantial question of invalidity or unenforceability despite being aware of the asserted patents." [ECF No. 7, at 15–16] (citing *e.g.*, *Abbott Lab'ys v. Andrx Pharms.*, *Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007)). Plaintiffs argue their false advertising claim is likely to succeed on the merits because "the evidence establishes that Partisan willfully makes public false

statements about the design and legitimacy of the Disruptor to syphon RBT's would-be FRT-15L3 customers." *Id*. at 16.

Next, Plaintiffs claim they will suffer irreparable harm without the requested injunctive relief because of, "price erosion, loss of market share, harm to its reputation, and a loss of business opportunities." *Id*. at 26. Plaintiffs go on to argue the balance of harms weighs strongly in their favor. In particular, Plaintiffs allege Defendants' actions threaten the long-term viability of their company, while "Defendants would not suffer any legally cognizable harm in light of the fact that their actions sought to be restrained are contrary to law and would maintain the status quo." *Id*. at 29. Last, Plaintiffs argue "public interest strongly favors enforcement and protection of patent rights." *Id*. at 29 (citing *Syntex (USA) LLC v. Apotex Inc*., Nos. C 01-02214 MJJ, C 05-02116 MJJ, 2006 WL 1390435, at *3 (N.D. Cal. May 18, 2006)).

## II. *Defendants' Response in Opposition [ECF No. 27]*

Defendants oppose Plaintiffs' Motion for a TRO and Preliminary Injunction and request it be denied. [ECF No. 27]. Defendants argue their Disruptor trigger does not infringe on the Asserted Patents because its operation does not satisfy several requirements in the asserted claims, and that Plaintiffs' evidence on this issue is conclusory and lacks substance. *Id*. at 6–7. Defendants go on to argue their '067 Patent predates the Asserted Patents. They contend the Disruptor not only practices the '067 Patent, but that Plaintiff's FRT triggers infringe their '067 Patent. *Id*. at 7–8.

In assessing the elements of a TRO and preliminary injunction, Defendants argue Plaintiffs are unlikely to succeed on their patent infringement claim. They argue the

Asserted Patents are likely invalid because of the '067 Patent and insist Plaintiffs' patent claims require claim construction. *Id*. at 11–14. Defendants go on to argue Plaintiffs have not shown likely infringement because the Disrupter does not infringe the Asserted Patents and Plaintiffs' allegations are conclusory and lack the necessary element-by-element analysis. *Id*. Defendants also argue Plaintiffs' false advertising claim is without merit because the terms "'assisted reset,' 'forced reset,' and 'positive reset' are interchangeable descriptors for the same underlying, cycling-driven reset phenomenon," and the Disruptor clearly practices claim 19 of the '067 Patent. *Id*. at 19–21.

Defendants argue Plaintiffs have failed to show irreparable harm because they delayed filing the instant suit for months after the Disruptor was available in the market, while filing six other lawsuits against dealers of the Disruptor. *Id*. at 21–24. Defendants also claim Plaintiffs' own expert analysis shows if Plaintiffs are ultimately successful in their claims, money damages would be sufficient to account for any harm. They reason monetary damages can account for lost profits, reasonable royalty, price erosion, and loss of convoyed sales. *Id*. at 24–27. Defendants assert the public interest does not favor injunctions such as the one requested, and the hardship imposed on Defendants if an injunction preventing sales of the Disruptor would be severe and would likely collapse their business while any hardship to Plaintiffs is compensable. *Id*. at 27. Last, Defendants argue the imposition of an injunction would necessitate a substantial bond to account for Defendants' business losses. *Id*. at 28–30.

## RELEVANT LAW

### I.  *Applicable Law*

Patent issues are governed by law of the Federal Circuit and regional circuit law applies to procedural issues—such as the issuance of preliminary injunctive relief. *See Midwest Indus. v. Karavan Trailers*, *Inc*., 175 F.3d 1356, 1359 (Fed. Cir. 1999) ("In reviewing district court judgments in patent cases, we apply our own law with respect to patent law issues, but with respect to nonpatent issues we generally apply the law of the circuit in which the district court sits."); *All Plastic*, *Inc. v. SamDan LLC*, Civil Action No. 20-CV-01318-NYW, 2021 U.S. Dist. LEXIS 24080, at *10 (D. Colo. Feb. 8, 2021) ("[T]he United States Court of Appeals for the Federal Circuit . . . has also explained that, in matters of procedure, it 'will apply the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law.'") (citations omitted).

### II.  *Temporary Restraining Orders and Preliminary Injunctions*

"The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd*., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (citing 13 JAMES WM MOORE, MOORE'S FEDERAL PRACTICE ¶ 65.36 (3d ed. 2014)). TROs chiefly differ from preliminary injunctions in duration and in that they may be granted without notice to the opposing party. *Id.*; FED. R. CIV. P. 65. The initial timeframe for a TRO is limited to fourteen days from the hour it is issued with narrow exceptions for good cause or consent allowing an extension. FED. R. CIV. P. 65(b)(2). When "a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must

conform to the standards applicable to preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 86 (1974). Additionally, "[t]emporary restraining orders are not ordinarily appealable, but preliminary injunctions are appealable." *Tooele Cnty. v. United States*, 820 F.3d 1183, 1186 (10th Cir. 2016).

A TRO's *ex parte* nature and short duration represent its purpose to preserve the status quo between the parties by preventing irreparable injury until a court can rule on the merits of a preliminary injunction. *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1258 (D. Kan. 2001). "The status quo is defined as the last peaceable uncontested status existing between the parties before the dispute developed." *Miller v. Austin*, 622 F. Supp. 3d 1105, 1108 (D. Wyo. 2022). In contrast, preliminary injunctions "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "In both cases, however, injunctive relief is an extraordinary remedy." *People's Tr. Fed. Credit Union*, 350 F. Supp. 3d at 1138 (quotations omitted). This extraordinary remedy is not awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, courts are required to balance the competing claims of the injury while considering the effect of granting or denying the motion upon each party. *Id*. In doing so, courts utilize a four-prong test to determine if a party is entitled to a TRO or preliminary injunction. *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, 916 F.3d 792, 797 (10th Cir. 2019).

### A. Entitlement to Preliminary Injunctive Relief

The moving party must demonstrate, (1) a substantial likelihood of success on the merits, (2) the movant would suffer irreparable harm if the motion is denied, (3) the threatened injury outweighs the opposing party's injury if the injunction is granted, and (4) granting the injunction is not contrary to public interest. *Id*. These four factors are applicable for preliminary injunctions seeking to enjoin patent infringement. *Natera*, *Inc. v. NeoGenomics Lab'ys*, *Inc*., 106 F.4th 1369, 1375 (Fed. Cir. 2024) ("To obtain a preliminary injunction, a party must establish likelihood of success on the merits, likelihood it will suffer irreparable harm absent preliminary relief, the balance of equities tips in its favor, and an injunction is in the public interest."). Public consequences of granting this extraordinary relief are particularly important for the court's consideration. *Winter*, 555 U.S. at 22. These considerations are within a district court's discretion. *Free the Nipple-Fort Collins*, 916 F.3d at 796.

### RULING OF THE COURT

After hearing testimony and reviewing the briefing on each of the four preliminary injunction factors from the parties, the Court finds each factor weighs against the imposition of a preliminary injunction. The Court will address (I) irreparable harm, (II) the likelihood of success on the merits, (III) the balance of equities between the parties, and (IV) public interest. Because TROs and preliminary injunctions are analyzed under the same structure, the Court will analyze both simultaneously.

## I. *Irreparable Harm*

"Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Trib. Pub. Co.*, *LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003) (citing *Tri-State Generation & Transmission Ass'n v. Shoshone River Power*, *Inc.*, 805 F.2d 351, 355 (10th Cir.1986)). The Tenth Circuit has held a demonstration of probable irreparable harm is the single most important factor to consider before issuing a preliminary injunction. *Hunter v. Hirsig*, 614 F. App'x 960, 962 (10th Cir. 2015) (quoting *Dominion Video Satellite*, *Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). Consequently, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.*

The Court will, therefore, begin its analysis by evaluating the potential for irreparable harm to Plaintiffs. To demonstrate irreparable harm, Plaintiffs must show "a significant risk that [they] will experience harm that cannot be compensated after the fact by money damages." *Mabe*, *LLC v. Wie*, No. 2:25-CV-00319-DBB, 2025 WL 1433910, at *3 (D. Utah May 19, 2025) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)); *see Apple*, *Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). "Erosion of market share, harm to reputation, and loss of business opportunities can constitute irreparable harm." *Mabe*, *LLC*, No. 2:25-CV-00319-DBB, at *3 (citing *Miche Bag*, *LLC v. Thirty One Gifts LLC*, No. 2:10-CV-781 TS, 2010 WL 3629686 (D. Utah Sept. 13, 2010)); *see*, *e.g.*, *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (holding likelihood of price erosion and loss of market position are

evidence of irreparable harm); *Bio-Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (stating loss of revenue, goodwill, and research and development constitute irreparable harm); *Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996) (finding loss of market opportunities cannot be quantified or adequately compensated and is evidence of irreparable harm).

Plaintiffs claim to have already suffered, and continue to suffer, irreparable harm from "price erosion, loss of market share, harm to its reputation, and a loss of business opportunities" without the requested preliminary injunction. [ECF No. 7, at 20] (quotations and citations omitted). In examining irreparable harm, the Court will address (A) loss of business opportunities, (B) price erosion, (C) loss of market share, and (D) reputational harm.

### A. Loss of Business Opportunities

Plaintiffs argue their risk of irreparable harm is heightened because of the "durable, long-lasting nature of the products in question" where an individual gun owner "likely only needs to buy one trigger product for the life of his or her rifle—which can survive generations." [ECF No. 7, at 26]. Defendants contend the products' durability underscores the reality "any lost sales would be fully compensable by lost profit monetary damages." [ECF No. 27, at 9]. The Court finds a demonstration of lost business opportunities is insufficient to independently establish irreparable harm.

During the hearing, Plaintiffs argued Defendants' own sales projections demonstrate Plaintiffs' lost business opportunities. Specifically, Defendants' projections anticipate they will sell more than 1.68 million triggers over the next three years. [ECF No.

33, at 95]. Plaintiffs argue each trigger sold by Defendants results in their loss of sales. *See id.* at 122; [ECF No. 7, at 26]. Plaintiffs' Declaration of Samir P. Warty, Ph.D. furthers this argument, claiming, "[i]n markets for durable or semi-durable goods, lost sales caused by substitution are generally permanent rather than deferred. Unlike consumable goods, which may be repurchased frequently, durable goods are typically acquired on a one-time or infrequent basis." [ECF No. 7-27, at 7]. Plaintiffs offered testimony they collect approximately $350 profit on each trigger sold and allege they will lose over $500 million in profits based on Defendants' own projections. [ECF No. 33, at 95].

However, "lost sales standing alone are insufficient to prove irreparable harm." *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 300 (Fed. Cir. 2009). If lost sales were sufficient, "irreparable harm would be found in every case involving a 'manufacturer/patentee, regardless of circumstances.'" *Id.* at 300–01 (quoting *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed.Cir.2006)). Without more, lost sales "are presumed to be compensable through damages, so they do not require injunctive relief." *Id.* at 301. Consequently, no amount of lost revenue alone may support a finding of irreparable harm. *Id.* The Court now considers price erosion as a basis for irreparable harm.

**B. Price Erosion**

Price erosion refers to a "theory of lost-profits remedy that measures the difference between what an item could have sold for with patent protection and what it actually sold for while having to compete against an infringing team." *Price-Erosion Theory*, BLACK'S LAW DICTIONARY (12th ed. 2024). Plaintiffs suggest Defendants' entry into the FRT market will lead to price erosion because Defendants' $300 trigger price is 33% less than

their $450 price point. [ECF No. 7, at 27]. Plaintiffs again look to the Declaration of Dr. Warty who states, "[o]nce buyers internalize a lower reference price, firms may find it difficult to return to prior price levels without losing sales," suggesting price erosion can lead to irreparable harm in a given market. [ECF No. 7-27, at 11]. While Plaintiffs' argument, including Dr. Warty's Declaration, correctly identifies price erosion as a potential source of irreparable harm, Plaintiffs offer only conclusory statements in support of its potential presence here.

Plaintiffs allude to the price discrepancy between the two products at issue but have not offered (1) any evidence they have or will likely be forced to drop their price nor (2) any projections or analysis of how potential price erosion has or will harm their business. Plaintiffs stated the quantifiable loss of sales it will suffer if not granted injunctive relief does not consider the "harm identified by Dr. Warty addressing issues of price erosion." [ECF No. 33, at 135]. The Court has been presented some data regarding Defendants' sales and future sales projections. *See id*. at 95. While Plaintiffs mentioned their current price of $450 being 33% higher than Defendants' price point, they failed to indicate whether this price point has been static or whether it has already suffered from price erosion. Aside from a cursory statement made in the hearing, no assertions have been made evidencing injury suffered from price erosion. *See id*. at 135 (stating, "[o]ur client has had to lower its prices due to market competition."). Moreover, no evidence of Plaintiffs' sales data before or after Defendants' entry into the FRT market has been presented and no future projections have been provided. *See id*. at 121–22.

Flat assertions of price erosion with no supporting market analysis are insufficient to demonstrate irreparable harm. *See Potato Ventures LLC v. P'ship & Unincorporated Ass'n Identified on Schedule A*, No. 25-2312-DDC-RES, 2025 WL 2256204, at *9 (D. Kan. Aug. 7, 2025) (declining to find irreparable harm where the plaintiff failed to present any sales data or market share before or after the infringing defendant entered the market); *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) (stating, "Courts require more than unsupported factual conclusions to support" a finding of irreparable harm); *Metalcraft of Mayville*, *Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017) (requiring causal nexus between infringement and harm); *Travel Tags*, *Inc. v. UV Color*, *Inc.*, 690 F. Supp. 2d 785, 800 (D. Minn. 2010) (explaining declaration insufficient to show irreparable harm in patent case where declarant assumed without support that defendant's prices "were solely responsible for [plaintiff's] price erosion").

Further, Plaintiffs have not adequately rebutted Defendants' assertion price erosion is calculable and redressable by monetary damages. *See Power Integrations*, *Inc. v. Fairchild Semiconductor Intern.*, *Inc.*, 711 F.3d 1348, 1378 (Fed. Cir. 2013) ("Lost revenue caused by a reduction in the market price of a patented good due to infringement is a legitimate element of compensatory damages.") (citations omitted). Defendants argue if Plaintiffs are successful at trial, then economic harm from price erosion can be addressed, "by applying Plaintiffs' pre-litigation market price to the lost units to account for market price erosion, thus making Plaintiffs whole for the lost sales and price erosion resulting from the alleged infringement and other wrongful acts." [ECF No. 27-1, at 11] (footnote omitted). The Court finds any alleged harm to Plaintiffs' consumer perception due to

potential price fluctuation is best addressed under reputational harm below. The Court finds this consideration does not demonstrate irreparable harm because Plaintiffs have not offered evidence indicating harm from price erosion nor shown any damages are not compensable by money damages.

### C. Loss of Market Share

Plaintiffs next argue, "[p]ermanent market displacement in a market like this cannot be resolved after the fact." [ECF No. 33, at 13]. Their expert asserts, "market share influences dealer attention, customer awareness, and expectations about which products are likely to remain available and supported. When substitution persists over time, these secondary effects can reshape the incumbent's competitive position in ways that are not reversed simply by a later change in legal outcome." [ECF No. 7-27, at 8]. Defendants counter, "in the event Plaintiff prevails at trial and obtains a permanent injunction, according to their own expert's description of the market, Plaintiffs will be able to quickly recapture all sales going forward." [ECF No. 27, at 25]. The Court finds consideration of loss of market share weighs against granting the requested relief.

The Court acknowledges, "the right to exclude others from a specific market, no matter how large or small that market, is an essential element of the patent right." *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1262–63 (D. Kan. 2009) (citing *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996)) ("[T]he principal value of patent is its statutory right to exclude, so nature of patent weighs against holding that monetary damages will always suffice to make patentee whole."). For the loss of market share to be irreparable, it must be both difficult to quantify and difficult to repair. *See Salt Lake Trib.*

*Pub. Co.*, *LLC*, 320 F.3d at 1105. "There is an inverse relationship between the potential for price erosion and loss of market share." *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig*., 774 F.3d 755 n.27 (Fed. Cir. 2014). If the company claiming infringement lowers its prices in response to competition, price erosion will be higher, but it will maintain its share of the market—decreasing market share losses. *See id*.

In discussing market displacement, Plaintiffs rely on their expert's contention, "[d]istribution networks are not merely conduits for price transmission but are central to a supplier's competitive position. . . . Once either level of the distribution chain has invested in these product-specific capabilities, those investments may not readily transfer back to the original supplier's product even if the competing product is later enjoined." [ECF No. 7-27, at 10]. This sub-factor again suffers from a fatal flaw in Plaintiffs' allegations. While Plaintiffs include some evidence of Defendants' dealer network, Plaintiffs include no evidence they too have an established dealer network. *See* [ECF No. 33, at 21–23]. Without evidence of an established dealer network, the concept of market position through distribution networks being difficult to "repair" is somewhat misplaced. This omission makes Plaintiffs' claims of displacement appear increasingly attenuated where no evidence of Plaintiffs' sales statistics have been presented and no evidence of shifting dealer loyalty can be produced. The Court finds Plaintiffs' allegations of loss of market share is inadequate support for irreparable harm.

## D. Reputational Harm

Plaintiffs claim, "Defendants' undercutting of RBT's price by itself harms RBT's reputation by incorrectly suggesting to customers that RBT's pricing is uncompetitive."

[ECF No. 7, at 27]. They also mentioned Defendants' alleged attempts to label RBT as a "greedy bully" in online forums. *See id*. When referring to the apparently quantifiable damages, Plaintiffs argued even when a permanent injunction is issued and price erosion is no longer a factor, the prevailing party still suffers reputational harm. [ECF No. 33, at 135]. Defendants claim any assertion of reputational harm is conclusory and speculative. They argue, "there is no claim that customers will be confused between the two products. If Plaintiffs' products are superior, they will enjoy whatever reputational advantage flows therefrom." [ECF No. 27, at 26]. Defendants conclude Plaintiffs may not base reputational harm on their product simply receiving less favorable market reception than its competitors. *Id*.

In this context proving reputational harm does not require a showing of any elements required to prove defamation. Rather than evidence of false statements and publication to third parties, the moving party must offer evidence of a reputational loss stemming from the underlying tort—altering how customers perceive the product and making the resulting harm persistent and difficult to quantify. *See Snyder v. Am. Kennel Club*, 575 F. Supp. 2d 1236, 1242 (D. Kan. 2008) ("finding loss of reputation not irreparable where plaintiff provided no evidence of risk of loss of prestige, academic reputation, or professional opportunities that could not be remedied by money damages.") (parenthetically citing *Schrier*, 427 F.3d at 1267 (10th Cir. 2005)); *Fish v. Kobach*, 840 F.3d 710, 751–52 (10th Cir. 2016). Here, Plaintiffs have presented insufficient evidence of price erosion and loss of market share. While Plaintiffs have provided evidence of the publication of allegedly false statements online, the threshold inquiry for this equitable consideration is whether the

16

harm ultimately stems from the patent infringement or false marking and advertising. *See Limitless Worldwide*, *LLC v. AdvoCare Int'l*, *LP*, 926 F. Supp. 2d 1248, 1254 (D. Utah 2013); *Dominion Video Satellite*, *Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001).

Plaintiffs have presented evidence of Defendants' negative online statements about their business and price point. They have presented no evidence of how these statements have impacted public perception of their brand—and more directly, any defamatory damage to Plaintiffs is irrelevant to this consideration without demonstrating this reputational harm flows from the underlying torts alleged. The variation in price points between the two products could present a basis for reputational harm as Plaintiffs suggested, but they have included no evidence indicating their reputation has been, or will imminently be, damaged. Speculative harm is not sufficient. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009); *see Lovesac Co. v. www.lovessac.com*, No. 2:22-CV-00056-JNP, 2022 WL 504192, at *4 (D. Utah Feb. 18, 2022).

Because Plaintiffs have not affirmatively demonstrated a resulting injury which could be tied to their alleged reputational harm, the Court finds this consideration does not support a finding of irreparable harm. Despite this finding, the Court will now address Plaintiffs' likelihood of success on the merits. *Amazon.com*, *Inc. v. Barnesandnoble.com*, *Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (emphasis in original).

17

## II. *Likelihood of Success on the Merits*

Plaintiffs include claims for (1) patent infringement and (2) false advertising as the basis for the injunction. In seeking a TRO or preliminary injunction the movant bears the burden of demonstrating a likelihood of success on the merits. *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009). Specifically, as to the first claim, it must be demonstrated, in light of the presumptions and burden that will apply at trial, "(1) the patentee will likely prove the accused infringer infringes the asserted patent; and (2) the patentee's infringement claim will likely withstand the accused infringer's challenges to the validity and enforceability of the patent." *Won-Door Corp. v. Cornell Iron Works, Inc.*, 981 F. Supp. 2d 1070, 1074 (D. Utah 2013) (quoting *Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012)). A court should not issue a preliminary injunction if the accused infringer raises a "substantial question" as to either infringement or validity of the patent. *Amazon.com, Inc.*, 239 F.3d at 1350–51

Second, to demonstrate a reasonable likelihood of success on its false advertising claim under the Lanham Act, Plaintiffs must establish (1) Defendants presented a false or misleading description or representation about a product:

> (2) the misrepresentation is material, in that it is likely to influence consumers' purchasing decisions; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) [Defendants] placed the false or misleading statement in interstate commerce; and (5) [Plaintiffs have] been or [are] likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by lessening of goodwill associated with its products.

*Zoller Lab'ys, LLC. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) (alterations added); 15 U.S.C. § 1125(a)(1)(B); *Wyoming Beverages Inc. v. Core-Mark Int'l, Inc.*, No.

18

17-CV-116-F, 2018 WL 8221068, at *13 (D. Wyo. Jan. 4, 2018). The Court finds Plaintiffs have not demonstrated they are likely to be successful on the merits on their claims. The Court will first address Plaintiffs' claim of (A) patent infringement then (B) false advertising.

## A. Patent Infringement

"A party establishes infringement in one of two ways: literal infringement of the claim language or infringement under the doctrine of equivalents." *FBA Operating Co. v. ETN Capital, LLC*, No. 5:23-CV-505-D, 2023 U.S. Dist. LEXIS 182297, at *4–5 (E.D.N.C. Oct. 10, 2023) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 35 (1997)). "Literal infringement occurs where the allegedly infringing device includes 'each and every limitation of the asserted claim(s).'" *Id.* (quoting *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014)). "Infringement under the doctrine of equivalents occurs where the allegedly infringing device 'performs substantially the same function in substantially the same way to obtain the same result' as the patented product." *Id.* (citations omitted).

To establish a likelihood of success on a patent infringement claim, Plaintiff must show the accused product likely infringes at least one patent asserted. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). This analysis "entails two steps, the first step is determining the meaning and scope of the patent claims asserted to be infringed, the second step is comparing the properly construed claims to the device accused of infringing." *Id.* Plaintiff fails to meet this burden in two ways: (1) the material claim construction disputes preclude a finding of likely infringement and (2)

defendants have raised serious and substantial questions regarding validity. The Court will address (1) claim construction then (2) claim validity.

### 1. *Claim Construction*

"For claim construction, the court must: (1) analyze 'the text of the patent and its associated public record,' (2) apply 'the established rules of construction,' and (3) 'arrive at the true and consistent scope of the patent owner's rights to be given legal effect.'" *FBA Operating Co*., No. 5:23-CV-505-D, at *4–5 (quoting *Markman*, 52 F.3d at 979). The Federal Circuit has made clear, "the interpretation and construction of patent claims . . . is a matter of law exclusively for the court." *Id*. at 970–71. Thus, where the parties present competing interpretations of claim scope, the Court must resolve any fundamental disputes before proceeding with the infringement analysis. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999) (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"). The Court will (i) outline the relevant text of the patents and (ii) apply the established rules of construction.

### i. **Text of the Patents**

"The '003, '336, and '807 Patents are related and share a common specification, as the '336 and '807 Patents are continuations of the '003 Patent." [ECF No. 7, at 10]. "These patents all describe and claim a device similar to that of the '223 Patent, but with the additional feature that it 'provides a 'three position' trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions." *Id*. at 10–11

(citations omitted); *see* [ECF No. 1-1, at 10–11] (claim 4 of '223 Patent); [ECF No. 1-2, at 28] (claim 4 of '003 Patent); [ECF No. 1-3, at 28] (claim 3 of '336 Patent); [ECF No. 1-4, at 28] (claim 1 of '807 Patent).

Defendants identify a portion of the respective claims, stating:

[W]hereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

[W]hereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the ***substantially in-battery*** position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

[ECF No. 1-2, at 28] (claim 4 of '003 Patent) (emphasis added); [ECF No. 1-3, at 28] (claim 3 of '336 Patent) (emphasis added); [ECF No. 1-4, at 28] (claim 1 of '807 Patent) (emphasis added); *see also* [ECF No. 27, at 16] (quoting '807 Patent, claim 1, '336 Patent, claim 3, '003 Patent, claim 4).

Defendants state, "[t]he patents themselves define the 'set position' . . . as the state 'wherein said sear and sear catch are in engagement in said set positions of the hammer and trigger member and are out of the engagement in said released positions of said hammer and trigger member." [ECF No. 27, at 17] (quoting '807 Patent, claim 1, '336 Patent, claim 3, '003 Patent, claim 4).

### ii.  Application of Established Rules of Construction

Claim terms are generally given their "ordinary and customary meaning," the meaning they would have to "a person of ordinary skill in the art at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). "We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." *Schmeisser GmbH v. AC-Unity d.o.o*, No. 21-CV-24-SWS, 2021 WL 7286256, at *5 (D. Wyo. Mar. 19, 2021) (quotations omitted) (quoting *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)). When analyzing claim construction, courts typically rely on intrinsic evidence including a patent's specifications and prosecution history. Extrinsic evidence such as expert testimony or a dictionary definition may also be considered. *Id.* (quoting *Bushnell, Inc.*, 673 F. Supp. 2d at 1250).

A court will not give the words of a claim their ordinary meaning "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed.Cir.1996)). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* (citation omitted). Disavowal of a claim term comes into play, "'[w]here the specification makes clear that the invention does not include a particular feature, [and] that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the

22

specification, might be considered broad enough to encompass the feature in question.'"
*Id*. at 366 (alteration added) (quoting *SciMed Life Sys*., *Inc. v. Advanced Cardiovascular Sys*., *Inc*., 242 F.3d 1337, 1341 (Fed.Cir.2001)).

Here, material disputes exist regarding the meaning of claim terms that are central to the infringement analysis. In particular, Defendants dispute the scope of the phrase "substantially in-battery position." [ECF No. 27 at 14–15]; *see* [ECF No. 33, at 74–75]. Defendants claim this phrase "is 'a timing gate' for when a 'locking member' transitions from blocking to permissive," meaning it determines when the mechanism transitions from a blocked state to one in which firing is permitted. [ECF No. 27, at 14]. Defendants argue this phrase has more than one interpretation when applied to the AR pattern operating cycle. *Id*. Plaintiffs, by contrast, treat the phrase as having an obvious and straightforward meaning. [ECF No. 7, at 23–25]. As such, Plaintiffs do not attempt to offer an express definition of the term, nor do they address Defendants' claimed definition of "set position" from the Asserted Patents. *See* [ECF No. 27, at 17]

Drawing on the patents' specifications, Plaintiffs generally state, "when the trigger is pulled, the hammer contacts the firing pin, thereby causing the ammunition cartridge to discharge. . . This discharge causes the bolt carrier (52) to move rearward, and a lower surface of the bolt carrier hammer pushes against the hammer which in turn forces the trigger . . . to return to its reset position." [ECF No. 7, at 10] (citations omitted). After that, "[a] locking bar (62) prevents the trigger member from being pulled again by the user until the bolt carrier (52) has returned to the original or 'in-battery' position." *Id*. (citations omitted).



FIG. 5

[ECF No. 7, at 10] (citing '233 Patent, Fig. 5 ("showing the bolt carrier 52 forcing the hammer 18 and trigger 26 back into its reset position")).

Defendants' expert argues, "substantially in-battery position" could reasonably be interpreted to include: "(1) a meaning close to fully in battery (i.e., at or essentially at the in-battery condition), versus (2) a meaning that includes a broader band of near-battery positions during forward travel." [ECF No. 27-2, at 38]. He continues, "[t]he phrase also raises a second critical ambiguity: whether the claim requires the bolt carrier contact/unlocking to occur at the moment the carrier 'reaches' that substantially in-battery condition (a narrow dimensional/timing window), or whether unlocking earlier would suffice so long as the carrier later becomes substantially in-battery." *Id*. at 39. Relying in part on the asserted claims' repeated requirement the bolt carrier reach a "substantially in-battery position," he concludes, "the meaning of that phrase is both disputed and potentially outcome-determinative." *Id*.

Neither Plaintiffs nor their expert attempt an express definition of "substantially in-battery position." As relevant to the disputed term, Plaintiffs' expert states, "the trigger described in the Asserted Patents and the Rare Breed trigger operate by the trigger being forcibly pushed into the reset position, with the sear engaging the hammer, each time the action cycles (i.e., each time a shot is fired)." [ECF No. 7-17, at 3–4]. He goes on, "[a]nother shot cannot be fired until the bolt returns to the in-battery position and the trigger is pulled again by the user." *Id*.

Plaintiffs essentially refrain from providing a direct rebuttal to the disputed terms and mechanics presented by Defendants. However, depending on how "substantially in-battery" is construed, the timing requirements of the claims change. Because infringement analysis depends on the Court first resolving the disputed claim term ("substantially in-battery position") the Court cannot properly compare the asserted claims to the accused device without first construing the meaning and scope. *See Markman*, 52 F.3d at 976; *O2 Micro*, 521 F.3d at 1362. The Court finds there is insufficient evidence presented to properly make a comparison between the two products. Accordingly, Plaintiffs cannot demonstrate literal infringement or infringement under the doctrine of equivalents, nor a clear likelihood of success on the merits at this stage. *See Markman*, 52 F.3d at 976; *Amazon.com*, *Inc*., 239 F.3d at 1351 ("Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention."). Nonetheless, the Court will proceed to address the validity of Plaintiffs' patents in demonstrating its likelihood of success on its patent infringement claim.

## 2. *Validity*

At the preliminary-injunction stage, the Court "does not resolve the validity question," but instead assesses the persuasiveness of the parties' evidence "recognizing that it is doing so without all evidence that may come out at trial." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009) (quotations omitted) (quoting *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882–83 (Fed. Cir. 1992)). Patents enjoy a statutory presumption of validity. *Id*. If the alleged infringer responds to a preliminary-injunction motion by "launching an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial." *Id*. "The patentee, to avoid a conclusion that it is unable to show a likelihood of success, then has the burden of responding with contrary evidence, which of course may include analysis and argument." *Id*.

Although invalidity ultimately must be proven at trial by clear and convincing evidence, that evidentiary standard does not apply at the preliminary-injunction stage. *Id*. at 1377–79. Thus, if the challenger presents evidence raising a "substantial question" of validity and the patentee cannot demonstrate it "lacks substantial merit," the patentee has not demonstrated a likelihood of success on the merits warranting preliminary relief. *Id*. (quoting *New England Braiding*, 970 F.2d at 883). Here, Plaintiffs have not shown they are likely to withstand Defendants' invalidity challenges. The Court will address (i) Defendants' theory supporting the invalidity of Plaintiffs' patents and (ii) Plaintiffs' burden to overcome that showing.

i. **Defendants' Substantial Question of Validity**

Defendants' principal invalidity theory is tied to obviousness under 35 U.S.C. § 103, which provides:

> A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.

35 U.S.C. § 103.

"[A] patent composed of several elements is not proved obvious by demonstrating that each of its elements was, independently, known in the art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Rather, the appropriate inquiry is "whether the subject matter would have been obvious to a person of ordinary skill in the art at the time of the asserted invention." *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006). Although an incentive to combine prior-art references may be inferred from the nature of the problem to be solved, there must be "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008).

The Court finds Defendants have raised a substantial question of validity. Defendants' validity challenge rests on a multi-layered obviousness theory grounded in, 35 U.S.C. § 103 and *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 415–16 (2007). [ECF No. 27, at 11]. They contend the '067 Patent and the TacCon 3MR long predate the Asserted Patents and disclose the same core forced-reset architecture embodied in the asserted claims. *Id.* at 11–14. They argue longstanding prior art references the claimed locking and

27

gating features, and the Asserted Patents merely combine these familiar elements in predictable ways. *Id.* at 13; *see KSR Int'l Co.*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Defendants contend the prosecution histories also reflect limited consideration by the Patent Office of this prior art, including the TacCon 3MR and the '067 Patent. [ECF No. 27, at 8]. Defendants need to only raise a "substantial question" of invalidity at this stage. *Titan Tire*, 566 F.3d at 1377–79. The Court finds Defendants' evidence of the '067 Patent and their prior-art analysis with added support through expert declaration is sufficient to meet this standard. *Amazon.com, Inc.*, 239 F.3d at 1359 ("Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.").

### ii. Plaintiffs' Burden

Once Defendants have raised a substantial question of validity, the burden shifts back to Plaintiffs to demonstrate the asserted validity defenses lack substantial merit. *Id.* Plaintiffs have not carried their burden. Plaintiffs raised numerous contentions in their closing statements—including the nonexistence of Defendants' expert's claim charts and alleged proof the '067 Patent was looked at and considered by the Patent Office. [ECF No. 33, at 130–32]. Although these arguments call into question some of Defendants arguments, they fail to demonstrate the Defendants validity challenges, "lack substantial merit." *See Titan Tire* 566 F.3d at 1377–79. Additionally, contrary to Plaintiffs' arguments the Defendants need only raise a substantial question of invalidity at this stage and do not need to prove their invalidity by clear and convincing evidence. *See id.*; *Amazon.com, Inc.*,

239 F.3d at 1359 ("The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself."); [ECF No. 33, at 13, 130–31]. Material claim construction disputes preclude a finding of likely infringement, and Defendants have raised substantial questions regarding validity. Collectively, Plaintiffs have failed to meet the burden of demonstrating a likelihood of success on the merits for patent infringement. The Court now turns to Plaintiffs' claim of false advertising.

## B. False Advertising

Under the Lanham Act, a plaintiff must show the defendant made a false or misleading representation by demonstrating the statement was either facially false or likely to have the effect of misleading consumers. *Zoller Lab'ys*, *LLC*., 111 F. App'x at 982. "Where the advertisement is literally false, a violation may be established without evidence of consumer deception" and, "the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." *Id*. (quotations omitted) (quoting *Scotts Co. v. United Indus. Corp*., 315 F.3d 264, 272 (4th Cir.2002), and *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare*, *L.P*., 131 F.3d 430, 434 (4th Cir.1997)). "[F]actfinders usually base literal falsity determinations upon the explicit claims made by an advertisement[.]" *Id*.

Plaintiffs assert two bases for their false advertising claim against Defendants. [ECF No. 7, at 25–26]. First, Plaintiffs state Defendants falsely represent the Partisan Disruptor is an "assisted reset trigger" instead of a forced reset trigger. *Id*. at 25. They assert the labels are mutually exclusive and explain, "the two triggers are designed and operate in different

ways: whereas a forced reset trigger uses a mechanism to ***fully*** reset the trigger, an assisted reset trigger's mechanism only ***partially*** resets the trigger." *Id*. (emphasis in original). Second, Plaintiffs argue, "Partisan incorrectly claims that their Disruptor is covered by the '067, on which Partisan's employee Michael Stakes is a named inventor." *Id*. at 26. They contend this representation is likely to mislead consumers by falsely increasing the perceived legitimacy of the product.

Defendants claim they have not made any false or misleading representations. [ECF No. 27, at 19]. Defendants rely on their expert and Mr. Stakes to assert, "in practice and in the literature, 'assisted reset' and 'forced reset' are used synonymously to describe the same class of mechanisms; the difference is semantics, not mechanics." *Id*. at 20 (citation omitted). Given the context, they conclude no false representation has been made. Defendants rebut Plaintiffs' second contention by stating the Disruptor is in exact compliance with claim 19 of the '067, and claim this conclusion is supported by specific measurements and distances outlined by Mr. Stakes and Mr. Nixon. *Id*. They argue Plaintiffs' expert, "offers only a bare, unsupported assertion to the contrary; he discloses no measurements, photographs, or analysis." *Id*. (citation omitted).

The Court finds Plaintiffs have not demonstrated a likelihood of success on their false advertising claim. The Court holds Defendants have presented adequate counter-analysis to bar an establishment of facial falsity. In considering whether Defendants' representations are misleading, Plaintiffs have not presented any evidence of the actual influence of Defendants' representations on consumers. Such a showing is required absent a demonstration of facial falsity. *Zoller Lab'ys, LLC*, 111 F. App'x at 982; *Wyoming

*Beverages*, *Inc.*, No. 17-CV-116-F, at *13. Accordingly, the Court finds Plaintiffs have not sufficiently demonstrated a likelihood of success on the merits as to false advertising.

### III.    *Balancing of Harms*

The balancing of harms element largely entails inventorying the irreparable harms as outlined above. Plaintiffs argue because Defendants' actions in selling an allegedly infringing product are contrary to law, they could not suffer any legally cognizable harm from the requested relief. [ECF No. 7, at 29]. Plaintiffs also assert, "because Partisan Triggers has procured patent insurance, the Defendants are at minimal risk if any of harm from the preliminary injunction." *Id.* (citations omitted). They conclude, "[t]he balance of equities favors injunctive relief." *Id*.

Defendants contend the injunction would force their company out of business. [ECF No. 27, at 27]. They claim, "[a]n injunction would put dozens of employees out of work, and create consequential havoc to the various people who are working in Defendants' business. Even with a sizable bond . . . the damage to Defendants would indeed be extreme and irreparable." *Id*. Conversely, Defendants assert, "in the event Plaintiffs prevail in their claims at trial, they can be made whole by monetary damages. And if Plaintiffs do not prevail at trial, the only hardship to Plaintiffs is *lawful* competition in the marketplace." *Id*. (emphasis in original).

The Court finds the balance of hardships favors Defendants. The Court acknowledges, "[a] record showing that the infringer will be put out of business is a factor . . . but does not control the balance of hardships factor." *Aria Diagnostics*, *Inc. v. Sequenom*, *Inc.*, 726 F.3d 1296, 1305 (Fed. Cir. 2013) (citing *Intel Corp. v. ULSI Sys.*

*Tech.*, *Inc.*, 995 F.2d 1566, 1568, 1570 (Fed.Cir.1993), and *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997)). Despite this, because the requested remedy is extreme the Court finds the absence of evidence demonstrating irreparable harm lightens Plaintiffs' proverbial scale—shifting the balance in favor of Defendants. The Court additionally notes Plaintiffs' claim related to Defendants' patent insurance could potentially lessen any concerns it has about Defendants' ability to pay a prospective damages award. *See* [ECF No. 33, at 133].

### IV. Public Interest

The public interest factor, "requires the court to focus on whether 'there exists some critical public interest that would be injured by the grant of preliminary relief.'" *In re BRCA1-, BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 3 F. Supp. 3d 1213, 1275 (D. Utah), *aff'd and remanded sub nom. In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 774 F.3d 755 (Fed. Cir. 2014) (quoting *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1458 (Fed. Cir. 1988)). "Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech Inc.*, 849 F.2d at 1458 (footnotes omitted).

Plaintiffs argue, "permitting the Defendants to flood the market with the accused 3-position forced reset triggers at severely reduced prices serves no legitimate public interest, and only contradicts the public interest." [ECF No. 7, at 30]. They state, "the DOJ under President Trump has permitted RBT to market its triggers on condition that RBT (1)

32

'enforce its patents to prevent infringement that could threaten public safety,' and (2) 'promote the safe and responsible use of its products.'" [ECF No. 7, at 30]; *see* [ECF No. 33, at 14]. Defendants counter, due to the lack of competition in the FRT market, "Plaintiffs have been able to charge the public monopolistic prices for their triggers, and essentially use the additional profits to continue fueling their litigation campaigns." [ECF No. 27, at 28]. They conclude, "[t]he public interest is not served by such tactics and above-market prices but, instead, would be better served by competition." *Id*.

After the hearing, Plaintiffs filed a Supplement to their request attaching the Eastern District of Tennessee's Order granting a preliminary injunction in *ABC IP, LLC et al., v. Hoffman et al.*, Case No. 1:25-00389-CKC-CHS. (Dkt. Nos. 45, 46) (E.D. Tenn. Feb. 11, 2026); [ECF No. 37]. The *Hoffman* case involved ABC's Patent No. 12,038,247 (the "'247 Patent"), ABC's Patent No. 12,031,784 (the "'784 Patent"), and ABC's now-expired Patent No. 7,398,723 (the "'723 Patent"). [ECF No. 37-2, at 3]. There, the defendants were accused of infringing the three patents listed, and digitally releasing free firearm-related designs and 3D print files for public download. *Id*. The government filed a statement of interest in the case. *Id*. at 5.

*Hoffman* is factually distinguishable from the present facts. Here, Defendants note the DOJ entered a statement of interest in the *Hoffman* case, but not in the current litigation. [ECF No. 33, at 24]. The *Hoffman* Court also found "Defendants' unrestricted distribution of Super Safety Files resulted in and would continue to result in widespread copying, third-party manufacturing, and uncontrolled downstream infringement." [ECF No. 37-2, at 11]. But, as mentioned, *Hoffman* Defendants posted allegedly infringing firearm designs online

33

for free public access. *Id*. at 3. Because they freely distributed infringing designs—rather than charging consumers for an allegedly infringing product—this act had the effect of potentially syphoning Plaintiffs' business and also expanding the infringement to potentially countless individuals. The Court correctly concluded the underlying facts presented potentially irreparable public safety and patent infringement concerns. *Id*.

Here, Plaintiffs have failed to demonstrate the current facts present the same public safety and patent infringement concerns. In this case, different patents are at issue, and Defendants have raised a substantial question of validity. *Cf. id*. at 8. Plaintiffs failed to directly and adequately address Defendants' validity and claim construction challenges and Defendants' claims any damages could be resolved through compensatory damages. The Court finds the public interest will not be highly impacted if an injunction is not granted against Defendants. The Court acknowledges the public interest favoring enforcement and protection of patent rights. *See Pfizer*, *Inc*. *v. Teva Pharms*. *USA*, *Inc*., 429 F.3d 1364, 1382 (Fed. Cir. 2005); *Syntex (USA) LLC*, No. C 01-02214 MJJ, at *3, *aff'd sub nom*. *Syntex (U.S.A.) LLC*, 221 F. App'x 1002. But Plaintiffs have not demonstrated irreparable harm will result if the requested relief is not granted. Overall, the Court finds the public interest does not weigh in favor of granting injunctive relief.

### CONCLUSION

The Court finds Plaintiffs have failed to carry the burden of showing irreparable harm in the absence of the requested preliminary injunction. The parties shall proceed under the status quo while the case proceeds on the merits. The findings and conclusions

set forth herein do not constitute a determination on the merits but are findings made in light of the requested preliminary injunction order.

**NOW, THEREFORE, IT IS ORDERED** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 6] is **DENIED**.

Dated this 13th day of February, 2026.

                            Kelly H. Rankin
                            United States District Judge