# Exhibit 1

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF WYOMING

3  ─────────────────────────────────────────────────

4  ABC IP, LLC, a Delaware limited    DOCKET NO. 26-CV-018-KHR
    liability company; and RARE
5  BREED TRIGGERS, INC., a Texas
    corporation,
6

7        Plaintiffs,           Cheyenne, Wyoming
                           February 4, 2026
        vs.                  9:08 a.m.
8

9  PEAK TACTICAL, LLC, d/b/a
    Partisan Triggers, a Wyoming
    limited liability company; and
10  NICHOLAS NORTON, an individual,

11        Defendants.

12  ─────────────────────────────────────────────────

13         **TRANSCRIPT OF HEARING PROCEEDINGS**
        **MOTION FOR TEMPORARY RESTRAINING ORDER**
14
        **BEFORE THE HONORABLE KELLY H. RANKIN**
15        **CHIEF UNITED STATES DISTRICT JUDGE**

16

17

18

19

20           *JANET DAVIS, RDR, FCRR, CRR*
           *Federal Official Court Reporter*
21  *2120 Capitol Avenue, Room 2226, Cheyenne, WY 82001*
        *307.433.2154 * jbd.davis@gmail.com*
22

23  Proceedings reported by realtime stenographic reporter;
    transcript produced with Computer-Aided Transcription.
24

25              **INDEX IN REAR**

OPENING - COLVIN                                                    5

1          On behalf of the defendants.

2          MR. GETZOFF:  Good morning, Your Honor, Tim Getzoff on

3    behalf of the defendants.

4          Our may calls would be Mr. Woods, who is present at

5    counsel table, and Mr. Stakes, who is sitting behind us.

6          For efficiency we would, with the Court's permission,

7    just do our redirect at the same time, assuming they're called

8    adversely first.

9          THE COURT:  I think that makes sense.

10         Any objection to that approach for the plaintiffs?

11         MR. COLVIN:  No, Your Honor.

12         MR. GETZOFF:  And I would advise that our technical

13   expert, John Nixon, is not present today.

14         THE COURT:  All right.  Very well.  One less witness,

15   I guess, today.

16         Well, I say we dive in, and I'll turn it over to the

17   plaintiff -- plaintiffs.  You have the burden, and you may

18   either provide a brief summary or however you wish to proceed,

19   I'll leave it up to you.

20         MR. COLVIN:  Thank you, Your Honor.  My plan would be

21   to provide a brief overview, a short opening statement, if you

22   will, and then proceed with witnesses.

23         THE COURT:  Very well.  Mr. Colvin, thank you.  You

24   may proceed.

25         MR. COLVIN:  And I have a set of slides I can hand to

1    LAWRENCE DEMONICO, PLAINTIFFS' WITNESS, DIRECT EXAMINATION

2   BY MR. COLVIN:

3   Q.   Good morning, Mr. DeMonico.

4   A.   Good morning.

5   Q.   Where do you live, sir?

6   A.   Austin, Texas.

7   Q.   And what is your relationship to Rare Breed and ABC?

8   A.   I am the president of Rare Breed Triggers.  ABC IP is an

9   intellectual property holding company that Rare Breed Triggers

10  has access as an exclusive licensee to its portfolio of

11  patents.

12  Q.   How long have you been president of Rare Breed?

13  A.   Since its inception in 2020.

14  Q.   Can you tell us a little bit about Rare Breed's business?

15  A.   Rare Breed Triggers is in the business of manufacturing,

16  designing, developing, and selling forced reset triggers.

17  Q.   And what is a forced reset trigger?

18  A.   A forced reset trigger is a trigger that is forcibly reset

19  by the action of the firearm.

20  Q.   And specifically, what forced reset triggers does Rare

21  Breed offer for sale?

22  A.   Currently Rare Breed Triggers offers two models, the

23  FRT-15L3 and the FRT-MR3.

24  Q.   What do those triggers retail for?

25  A.   The FRT-15L3 retails for 425, that's $425, and the FRT-MR3

DEMONICO - DIRECT - COLVIN                                    17

1    retails for $525.

2    Q.  Does the FRT-15L3 retail for $450 or $425?

3    A.  I apologize.  $450.  Thank you.

4    Q.  How long is a forced reset trigger like Rare Breed's

5    designed to last?

6    A.  So long as a forced reset trigger is made from decent

7    materials, it is expected to last the duration of the firearm

8    that you install it in.

9    Q.  Can you tell us a little bit about the development of Rare

10   Breed's forced reset trigger products?

11   A.  Rare Breed Triggers has been in the development of forced

12   reset triggers for quite some time.  Quite a bit of time was

13   spent in development to bring our original model to market in

14   2020.  That model was the FRT-15.  And since that time, Rare

15   Breed Triggers has continued to design, develop, prototype, and

16   even patent additional technologies for additional models that

17   we have currently brought to market, like the FRT-15L3 and the

18   FRT-MR3, but additional models that we plan to release in

19   coming months.

20   Q.  So let's discuss briefly the FRT-15L3.

21        Specifically, what is that trigger used for?

22   A.  That trigger is designed for the AR-15 platform.

23   Q.  And what does the L3 in that product designation refer to?

24   A.  The L stands for -- it's based on our locking bar

25   technology, and the 3 means that it is a three-position.

DEMONICO - DIRECT - COLVIN                                      18

1   Q.  When you say "three-position," can you explain that for the

2   Court?

3   A.  Sure.  "Three-position" meaning safe, standard

4   semi-automatic, and then forced reset semi-automatic.

5   Q.  Are those different operation modes of the trigger?

6   A.  Yes, sir.

7   Q.  And how does -- how is the FRT-15L3 different from prior

8   models of triggers that Rare Breed has sold?

9   A.  Our original model, the FRT-15, was a two-position, meaning

10  it had safe and forced reset semi-automatic.  It did not have

11  the standard semi-automatic.

12  Q.  Are Rare Breed's triggers patented?

13  A.  Yes, sir.

14  Q.  And who are those patents assigned to?

15  A.  Those patents are assigned to ABC IP.

16  Q.  And what's ABC's relationship with Rare Breed?

17  A.  ABC IP is the intellectual property holding company that

18  Rare Breed has exclusive license -- is the exclusive licensee

19  to its portfolio of patents.

20  Q.  Mr. DeMonico, are you aware of a settlement between Rare

21  Breed and the Department of Justice?

22  A.  Yes, sir.

23  Q.  How was it that you became knowledgeable of that?

24  A.  I was personally involved in the negotiation, drafting, and

25  I ultimately signed that agreement with the Department of

DEMONICO - DIRECT - COLVIN                                    19

1    Justice.

2    Q.  And what were the conditions that the Department of Justice

3    put on Rare Breed in that settlement?

4    A.  Specifically, there were three requirements:  One, that we

5    would not manufacture and sell forced reset triggers for

6    handguns; two, that we would enforce our patent rights; and,

7    three, that we would only employ responsible marketing

8    techniques.

9    Q.  Has Rare Breed developed triggers for use in handguns?

10   A.  No, sir.

11   Q.  Has Rare Breed Triggers enforced its patents?

12   A.  Yes, sir.

13   Q.  About how many patent litigations has Rare Breed entered

14   into?

15   A.  I think we currently have between 20 and 25 open and active

16   patent litigations right now.

17   Q.  What did this DOJ settlement mean for the future of Rare

18   Breed Triggers?

19   A.  Well, specifically, it means that we were able to go back

20   into business without a legal question hanging over our heads,

21   and, two, we no longer needed to be concerned about the machine

22   gun statute being enforced against us or any of our downstream

23   customers as we move forward in business.

24            THE COURT:  Is there any oversight by the Department

25   of Justice in terms of the settlement terms and these ongoing

DEMONICO - DIRECT - COLVIN                                      20

1   patent litigations currently?

2          THE WITNESS:  I know that they're paying attention

3   because they've weighed into one of the litigations that we

4   currently have in Tennessee that I attended a hearing on last

5   week.  They submitted a statement of interest in that specific

6   case, so I know they're paying attention.

7          THE COURT:  Thank you.

8          THE WITNESS:  Yes, sir.

9   BY MR. COLVIN:

10  Q.  Mr. DeMonico, is Rare Breed the only manufacturer of forced

11  reset triggers in the market?

12  A.  No, sir.

13  Q.  Can you name some of the other competitors?

14  A.  There are many individuals that are manufacturing the super

15  safety.  There is the Atrius, they make a super selector.  AS

16  Designs, they make a product called the ARC-Fire.  There is a

17  product on the market called the -- it is known by many names,

18  but most people refer to it as the WOT three-position, and then

19  there is the Partisan Disruptor.

20  Q.  And has Rare Breed initiated litigation against any of

21  these other products in the market?

22  A.  Yes, sir.  I would -- all of them, I believe.

23  Q.  And, to your knowledge, has the Department of Justice or

24  the ATF approved any other manufacturer to make forced reset

25  triggers?

DEMONICO - CROSS - GETZOFF                                    21

1  A.  There is not another manufacturer that has a settlement

2  agreement or an agreement at all with the Department of Justice

3  to manufacture forced reset triggers.

4  Q.  Rare Breed is the only one?

5  A.  Yes, sir.

6         MR. COLVIN:  Pass the witness, Your Honor.

7         THE COURT:  Thank you, Mr. Colvin.

8         Cross-examination, Mr. Getzoff.

9                          **CROSS-EXAMINATION**

10 BY MR. GETZOFF:

11 Q.  Good morning, Mr. DeMonico.

12        I just wanted a couple of follow-up questions based on

13 what your client [sic] asked you already.

14        You were here when -- right before your testimony when

15 your counsel was talking about irreparable harm.  He had a

16 slide that talked about the different kinds of irreparable

17 harm.

18        You saw that slide, right?

19 A.  I was paying attention.

20 Q.  And one of the aspects of irreparable harm that your

21 counsel put on the slide in the court today as well as in your

22 brief was a dealer disruption or disruption to dealer networks.

23        Do you recall that?

24 A.  I don't recall that, but okay.

25 Q.  The fact is Rare Breed does not sell through dealers,

DEMONICO - CROSS - GETZOFF                                    22

1    right?

2    A.   We are currently establishing a dealer network as we speak.

3    Q.   As we speak Rare Breed is not selling through any dealers,

4    correct?

5    A.   I believe we've already set up one.

6    Q.   Do you recall testifying just last week -- you talked about

7    that hearing last week where you sued Mr. Hoffman, right?

8    A.   That's right.  Yes, sir.

9    Q.   And you testified, right?

10   A.   Yes, sir.

11   Q.   Do you remember testifying last week that Rare Breed had

12   no -- had no dealers, and all your sales were retail?

13   A.   Yes, sir, but I would be happy to explain.

14   Q.   Well, let me ask you:  Is the statement that Rare Breed

15   sales are all retail through your website -- is that accurate

16   or not?

17   A.   It was accurate when I made it last week.  But in the last

18   week, as I mentioned, we are currently in the process of

19   setting up a dealer network.  In that last week -- I believe we

20   have set up one in that last week.  So we're in the process of

21   setting up the dealer network currently, like right now.

22   Q.   So at least as of right now, there are no dealers selling

23   Rare Breed products; is that true?

24   A.   I believe that I just stated we have set up one in the last

25   week, so as of right now, I believe we have one.

DEMONICO - CROSS - GETZOFF                                      23

1  Q.  So what's the dealer that I could go to and buy a Rare

2  Breed trigger right now?

3  A.  I'd have to get -- I'd have to get that name.

4  Q.  Okay.  Now, you talked about the settlement agreement with

5  the DOJ that happened just May of last year, correct?

6  A.  Yes, sir.

7  Q.  And you said one of the conditions was the DOJ wanted Rare

8  Breed to enforce its patents?

9  A.  That's correct.

10  Q.  And you have been doing that zealously, fair?

11  A.  We have been active in our enforcement.

12  Q.  Did the DOJ grant Rare Breed any sort of exclusive right to

13  be the only one to sell forced reset triggers beyond its patent

14  rights?

15  A.  I don't think those words were used in the agreement, no.

16  Q.  The DOJ didn't tell you in part of the settlement or part

17  of your discussion that it wanted you to enforce monopoly

18  rights beyond what your patents might protect, right?

19  A.  In order to make sure we're on the same sheet of music, can

20  you rephrase that question.  I want to make sure I answer it

21  accurately.

22  Q.  Yeah.  I just want to make clear that the DOJ said, Enforce

23  your patent rights, but didn't say anything further about, We

24  want you to be the only one in this market beyond what your

25  patent rights give you?

DEMONICO - CROSS - GETZOFF                                24

1    A.  They did not ask us to attempt to enforce patent rights

2    that we did not have a good faith belief that we had, if that's

3    what you're asking.

4    Q.  And you said the DOJ entered a statement of interest in the

5    *Hoffman* case, right?

6    A.  Yes, sir.

7    Q.  And just to be fair, Mr. Hoffman, he's a 25-year-old kid by

8    himself posting plans on the Internet, right?

9    A.  I believe Hoffman is -- I believe he is 25.  I wouldn't

10   consider that a kid.  Yes, that is his model of posting

11   downloadable 3D print files or CAD files in order for others to

12   download and use to manufacture forced reset trigger

13   components.

14   Q.  Mr. DeMonico, you have a pending motion for preliminary

15   injunction against Mr. Hoffman; that hearing was last week, but

16   that hasn't been ruled on, right?

17   A.  That is correct.

18   Q.  And you said the DOJ entered a statement of interest in the

19   *Hoffman* case but has not entered a statement of interest in

20   this case, right?

21   A.  That is correct.

22   Q.  And in the *Hoffman* case, that concerned different patents

23   and different products than the patents and products at issue

24   in this case, right?

25   A.  That is correct.

DEMONICO - CROSS - GETZOFF                                    25

1   Q.  Does it cost you, your company, for these two different

2   models that you make -- your cost to make them are a hundred

3   dollars per item; is that right?

4   A.  Approximately.

5   Q.  So as a profit, you make either $435 or $325, depending on

6   the model?

7   A.  No, sir, that is incorrect.

8           THE COURT:  I think the testimony was $450 and $525.

9           MR. GETZOFF:  I missed -- yes.  Thank you, Your Honor.

10  I'm sure I misstated that.  I'm going to move on.

11  BY MR. GETZOFF:

12  Q.  Mr. DeMonico, did you testify that Rare Breed's FRT-15 was

13  the first commercialization of a forced reset trigger?

14  A.  Yes, sir.

15  Q.  Are you aware of the TacCon 3MR trigger that was

16  commercialized by Michal Stakes back in 2014?

17  A.  Yes, sir, I am.

18  Q.  Are you aware of the patent, the '067 Patent, that Michael

19  Stakes owned when he commercialized and produced that TacCon

20  MR3 product?

21  A.  I am familiar with it now, yes, sir.

22  Q.  In fact, you tried to purchase Mr. Stakes' '067 Patents on

23  two separate occasions, right?

24  A.  No, sir, that's incorrect.

25  Q.  Is it your testimony to this Court that you never attempted

DEMONICO - CROSS - GETZOFF                                    26

1   to purchase the '06 -- the '067 Patent?

2   A.   Yes, sir, that is my testimony.  I never attempted to

3   purchase the patent from Mr. Stakes; that is correct.

4   Q.   Well, I don't want to quibble.

5        Have you -- has your company made any attempt to

6   acquire the '067 Patent at any time?

7   A.   Yes, sir, we have.

8   Q.   Okay.  Tell me about that.  When did you first try to

9   acquire the '067 Patent?

10  A.   A few weeks ago.

11  Q.   Was that the first time or was there an earlier time as

12  well?

13  A.   No, that was the first time.

14  Q.   You didn't personally make a phone call to Mr. Stakes back

15  in the 2021 time period to try to acquire the '067 Patent?

16  A.   No, sir, I did not.

17  Q.   You talked about the prior litigation with ATF, right?

18  A.   Yes, sir.

19  Q.   That went on for years, correct?

20  A.   Yes, sir.

21  Q.   And in the course of that litigation, the Court, the

22  Eastern District of New York, entered a preliminary injunction

23  against Rare Breed Triggers, right?

24  A.   Yes, sir.

25  Q.   And in that order, that was a 120-some-page order, right?

DEMONICO - CROSS - GETZOFF                                27

1    A.  I'm not sure, sir.

2    Q.  It was a long -- it was a long order, and you read it,

3    correct?

4    A.  I'm not sure how long it was, and, to be honest, I don't

5    really remember reading it either.

6    Q.  Would you remember where the Court found that you had

7    willfully evaded a seizure order?

8    A.  I don't remember those details, sir.

9    Q.  Do you recall when the Court found that you were

10   responsible for filing a false declaration to the Court?

11   A.  I don't remember that either, sir.

12   Q.  You don't -- you don't remember a declaration filed by your

13   business partner, who is in the courtroom with us today, that

14   the Court found was a false declaration that you intentionally

15   and knowingly relied upon?

16   A.  I litigated against the ATF and the DOJ for years.  We

17   currently have more than 20 open and active litigations.  I

18   don't remember what is in each and every one of them.  I

19   apologize for that.

20   Q.  Do you remember the Court -- the New York federal judge

21   finding that you had shredded documents to avoid the ATF?

22   A.  No, sir.

23   Q.  So just to be clear, this conduct that I just described

24   that's spelled out in the order that's a public record, you're

25   saying you don't remember this because you have so many cases

DEMONICO - CROSS - GETZOFF                                    28

1   you can't keep track of when courts find you at fault for such

2   egregious conduct?

3   A.  Well, sir, we don't even own a shredder, so if I'm trying

4   to remember and put pieces together, we had a digital

5   anonymizing capability in our website if individuals, after

6   they purchased, after a given period of time had passed and we

7   weren't expecting a return, that their private information

8   would be anonymized and no longer available in our web system.

9          If that's what you're referring to, I do remember that

10  being an issue.  But, in addition to that, yes, it is my

11  testimony that I have been litigating for years now.  I have

12  been on the stand multiple times in multiple federal courts.  I

13  do my best to keep up with the pleadings.  We have more than a

14  dozen attorneys working on this.  I do my best to keep up, and,

15  no, I cannot keep up with all of the details, and for that I'm

16  sorry.

17  Q.  Do you recall the federal court finding that you

18  intentionally evaded her injunction by continuing to sell

19  triggers through a shell company?

20  A.  I believe that is false.  I don't think that ever happened,

21  and I don't know where you would have heard that because we

22  absolutely did not violate a court-ordered injunction, and I

23  never would violate a court-ordered injunction.

24          MR. GETZOFF:  Thank you, Mr. DeMonico.

25          I have nothing further, Your Honor.

LUETTKE - DIRECT - COLVIN                                        29

1           THE COURT:  Thank you, Mr. Getzoff.

2           Mr. Colvin, anything else?

3           MR. COLVIN:  No, Your Honor.

4           THE COURT:  Mr. DeMonico, thank you for your

5    testimony, sir.  You may step down.

6           THE WITNESS:  Thank you, Your Honor.

7           THE COURT:  Plaintiffs may call their next witness.

8           MR. COLVIN:  Your Honor, plaintiffs call Mr. Brian

9    Luettke.

10          THE COURT:  Very well.  Mr. Luettke, please come

11   forward to be sworn.

12       (Witness sworn.)

13          COURTROOM DEPUTY:  Please state and spell your name

14   for the record.

15          THE WITNESS:  Brian Luettke, L-u-e-t-t-k-e.

16     **BRIAN LUETTKE, PLAINTIFFS' WITNESS, DIRECT EXAMINATION**

17   **BY MR. COLVIN:**

18   **Q.**  Good morning, Mr. Luettke.

19   **A.**  Good morning.

20   **Q.**  Please inform the Court of your current occupation.

21   **A.**  I am a firearms consultant and firearms trainer with

22   Luettke Firearms Consulting, Incorporated.

23   **Q.**  And how long have you worked in the firearms field?

24   **A.**  Over 25 years.

25   **Q.**  And have you previously worked at the ATF?

1    A.  Yes, I did.

2    Q.  What roles have you had at the ATF?

3    A.  I started employment with ATF in 1998.  I was a special

4    agent.  I did criminal investigations for the first 16 years of

5    my career -- actually, first 14 years of my career.

6           I was promoted in 2014 to supervisory special agent

7    for the position of resident agent-in-charge.  I did that

8    position for two years until ATF created a full-time training

9    position on firearms identification and topics, and I was

10   selected for that, and that was housed in the Firearms and

11   Ammunition Technology Division in West Virginia.

12          I ended my career being the branch chief of the

13   Advanced Firearms Interstate Nexus Branch, and I retired in

14   October of 2020.

15   Q.  As a branch chief within the ATF's Firearms and Ammunition

16   Technology Division, what were your responsibilities?

17   A.  My responsibilities, I supervised ATF's armorers, people

18   trained to -- well, they ordered the firearms.  They set

19   firearms up.  They maintained the inventory of firearms.  I

20   supervised the nexus training staff, taught classes nationwide

21   to special agents and firearms enforcement officers to

22   identify, research, classify, and ultimately the goal is that

23   once they pass the course, then they're qualified to be put

24   forward as an expert witness.

25   Q.  Have you also been responsible for the ATF's national

LUETTKE - DIRECT - COLVIN                                              31

1   reference collections?

2   A.   Yes, I supervised that as well.  That fell under my realm.

3   In that reference collection there's well over 10,000 firearms.

4   It is an inventory of firearms that are used for comparison

5   purposes for evidence, for training purposes, and also that's

6   where the undercover guns come from if they're used in an

7   operation.

8   Q.   And has your training included firearm and trigger systems

9   training?

10  A.   Yes.

11  Q.   Have you received training at firearm manufacturing

12  facilities?

13  A.   Yes, I've been to over 40 firearms factories in many

14  different locations, some of them in the United States.  These

15  are the big ones like Colt, Smith & Wesson, Ruger, Sig Sauer.

16  I also received training from a firearms manufacturer in South

17  Africa called Excaliber; Glock in Austria, as well as their

18  Georgia location; Heckler and Koch; Walther in Germany; CZ in

19  the Czech Republic; and besides the Colt factory in

20  Connecticut, also the Colt factory in Canada.

21  Q.   Have you ever attended a firearms armorer's course?

22  A.   Yes, I've attended approximately nine.  Some of them are

23  repeat classes that you go to to get recertified.  I attended

24  my first armorer's class right around, I believe, 1986 when I

25  was a paratrooper in the 82nd Airborne Division, and I was

LUETTKE - DIRECT - COLVIN                                    32

1   selected to be -- to go to the training and help run the arms

2   room for my company.  That was a two-week course given by the

3   18th Airborne Corps.  So that's where my formal education for

4   learning about firearms, taking them apart, fixing, you know,

5   problems at maintenance level before it had to be elevated up.

6           And then throughout my law enforcement career,

7   different armorer's training in Colt, Remington, Smith &

8   Wesson, from revolvers to pistols, Remington shotguns,

9   bolt-action rifles, MP5 submachine guns, things like that.

10  Q.  Since leaving the ATF, what kind of work do you perform?

11  A.  The company, pretty much now it is a consulting company.  I

12  consult for clients who have mainly questions about firearms,

13  firearms classification, in criminal and civil cases.

14  Q.  Have you previously testified as an expert witness or an

15  opinion witness with respect to firearms?

16  A.  Yes.

17  Q.  About how many times?

18  A.  Approximately 40 times.

19  Q.  Did you say 40, 4-0?

20  A.  4-0.

21  Q.  And in what subject areas have courts accepted you as an

22  expert or an opinion witness?

23  A.  Firearms and ammunition identification; firearms

24  classification, from Gun Control Act firearms, regular pistols,

25  rifles, revolvers to NFA firearms, machine guns,

LUETTKE - DIRECT - COLVIN                                    33

1   short-barrelled rifles, shotguns, sawed-off shotguns as some

2   people refer to them as; firearms technology, operability,

3   forced reset triggers.

4           MR. COLVIN:  Your Honor, at this time I would move to

5   tender Brian Luettke as an expert in firearms technology,

6   trigger systems, fire control groups, and the mechanical

7   operation and classification of forced reset triggers.

8           THE COURT:  Any objection to the designation,

9   Mr. Getzoff?

10          MR. GETZOFF:  I don't.  I'll voir dire and

11  cross-examine.

12          THE COURT:  Very well.  Subject to the

13  cross-examination, I will so classify and declare Mr. Luettke

14  as an expert in the firearms field as addressed.

15          MR. COLVIN:  Your Honor, at this time I would like to

16  mark a document as Exhibit 1.

17          THE COURT:  Plaintiffs' Exhibit 1.

18          Does counsel have a copy of the exhibit?

19          MR. COLVIN:  Yes, Your Honor.

20          Your Honor, may I approach the witness?

21          THE COURT:  You may.

22          MR. COLVIN:  Your Honor, I can pass you up a copy as

23  well, but this is just a copy of Mr. Luettke's declaration.  It

24  is in the record.

25          THE COURT:  It is.  But I'll take a hard copy.  Thank

LUETTKE - DIRECT - COLVIN                                    34

1    you.

2    BY MR. COLVIN:

3    Q.  Mr. Luettke, you've been handed Exhibit 1, which was an

4    Exhibit Q to plaintiffs' motion for a Temporary Restraining

5    Order and Preliminary Injunction.

6            Do you recognize this document, sir?

7    A.  Yes.

8    Q.  What is this document?

9    A.  This is my declaration on this case dated and signed

10   January 16th, 2026.

11           MR. COLVIN:  Your Honor, I would move Exhibit 1 into

12   evidence.

13           THE COURT:  Any objection to Plaintiffs' Exhibit

14   Number 1?

15           MR. GETZOFF:  No objection.  I mean, it is already in

16   the record by virtue of the filing, so -- no objection, Your

17   Honor.

18           THE COURT:  As part of the record to today's hearing,

19   I will receive Plaintiffs' Exhibit Number 1, and you may

20   proceed.

21      (Plaintiffs' Exhibit 1 received.)

22   BY MR. COLVIN:

23   Q.  Mr. Luettke, could you summarize the opinions that you have

24   offered in your declaration in this case, Exhibit 1?

25   A.  Yes.  I've analyzed both triggers, the Partisan Disruptor

LUETTKE - CROSS - GETZHOFF                                          35

1   as well as Rare Breed Triggers' 15L3, and throughout my

2   declaration I reviewed the claims and compared the triggers,

3   and I found that the Partisan Disruptor violated at least one

4   claim in each of the '223, the '003, '336 and the '0 -- the

5   '807 patents.

6   Q.  Did you also form an opinion about whether or not the

7   Partisan Disruptor or Rare Breed meets any claim limitations of

8   the '067 Patent?

9   A.  I did.  So when I reviewed the '067 Patent, Claims 1

10  through 18, it requires that the TacCon, the -- later the --

11  was it the MR trigger -- requires a reset lever, and the

12  Partisan Disruptor or the Rare Breed trigger, they do not have

13  the reset lever as indicated in those claims.  They don't have

14  them so they don't use them.

15          And then Claim 19 requires that -- the selector that

16  permits different travel distances, and the Rare Breed trigger

17  and the Partisan Disruptor, their trigger travel is the same in

18  both semi-automatic and semi-automatic FRT position or mode.

19          MR. COLVIN:  No further questions.  I will pass the

20  witness, Your Honor.

21          THE COURT:  Thank you, Mr. Colvin.

22          Cross-examination, Mr. Getzoff.

23                      **CROSS-EXAMINATION**

24  BY MR. GETZOFF:

25  Q.  Good morning, Mr. Luettke.

1    A.  Luettke.

2    Q.  I want to ask you about Exhibit 1, which is what you

3    submitted with plaintiffs' motion.  That was attached as

4    Exhibit Q to the motion, right, so we're talking about the same

5    thing?

6    A.  Yes, this one right here.

7    Q.  In your declaration you attach a number of photos, or, I

8    should say, color-coded depictions that you claimed were the

9    infringing device, right?

10   A.  Correct.

11   Q.  And so this is one of them.  And your -- your declaration

12   goes on and has pictures after pictures of what you claim is

13   the Partisan Disruptor, and then you compared it to the claim

14   elements, right?

15   A.  That's correct.

16   Q.  Now, to be clear, the depiction here, that's not of the

17   Partisan Disruptor, right?

18          THE COURT:  Just for the record, can you reference a

19   page?

20          MR. GETZOFF:  Yeah, thank you, Your Honor.  So I'm on

21   Exhibit 1, and I'm on what I think is --

22   BY MR. GETZOFF:

23   Q.  Well, I am showing you Exhibit W that followed Exhibit Q in

24   the -- in the plaintiffs' filing.  But let me -- let me be

25   consistent here and show you -- this is from Exhibit 1, and

1    this would be page 43.

2          Apologies that I printed this in black and white, so

3    it is not color-coded.

4          But do you recognize these depictions as part of your

5    declaration that's Exhibit 1?

6    A.   No.   There seems to be a problem, 'cause on my page 43 I do

7    not have that picture.

8    Q.   I'm sorry.   It is 41 of the declaration, but when it was

9    filed, it got a different page number.   That's my mistake.

10         Please turn to 41.

11         And my co-counsel has given me the color version.

12         Okay.   Do you see that?

13   A.   Yes.

14   Q.   Is that page 41 of Exhibit 1?

15   A.   Yes.

16   Q.   And you represented that these are depictions of the

17   Partisan Disruptor that you color-coded, right?

18   A.   Correct.

19   Q.   But you understand that these are not depictions of the

20   Partisan Disruptor, right?

21   A.   I do not understand that.

22   Q.   Well, if you look, for example, the red item, that's --

23   what would you call the red toggle there?

24   A.   That is a locking bar.

25   Q.   Does that look like the locking bar of the Partisan

1    Disruptor or the locking bar of the -- your client's Rare

2    Breed?

3    **A.**  Looks the same to me.

4    **Q.**  So your testimony is that the locking bar of the Partisan

5    Disruptor looks exactly the same as the locking bar of the Rare

6    Breed?

7    **A.**  Well, I'm comparing it to page 3 where it shows Rare Breed

8    and the Partisan Disruptor, and the way I look at both of

9    those, I guess there's one slight difference on the hook on --

10   the Rare Breed has a hook but the Partisan doesn't, so it

11   appears to be the same to me.

12   **Q.**  Did you generate these pictures?

13   **A.**  No, I did not.

14   **Q.**  Do you know who did?

15   **A.**  I do not.

16   **Q.**  Okay.

17   **A.**  Are you asking me for a named individual?

18   **Q.**  Yeah.

19   **A.**  I do not know the named individual, no.

20   **Q.**  Is this the first case that you ever did a patent

21   infringement analysis?

22   **A.**  No.

23   **Q.**  What was the first case?

24          Let me rephrase.

25          Do you recall testifying last week that the *Hoffman*

LUETTKE - CROSS - GETZHOFF                                    39

1   case was your first patent case?

2   A.   Yes, with clarification, meaning that I testified in an

3   arbitration hearing involving some forced reset triggers, and

4   then we backdated -- so analysis from -- when you say

5   "analysis," you're talking about two different companies or

6   you're talking about a patent that I've analyzed?

7   Q.   I'm talking a case where you rendered an opinion on patent

8   infringement.

9   A.   Last week would have been pretty much the first one, then.

10  Q.   Okay.  And that's the *Hoffman* case?

11  A.   Correct.

12  Q.   But you submitted your declaration in this case before last

13  week, right?

14  A.   Yes.

15  Q.   So this would be the first case?

16  A.   This case right here?

17  Q.   Yes.

18  A.   Well, the declaration would be prior to *Hoffman*.  I did not

19  write a declaration in the *Hoffman* case.

20  Q.   Right.  And the declaration in this case came first in

21  terms of your patent infringement analysis, right?

22  A.   Yes.

23  Q.   So this case would be your very first case in giving an

24  opinion on patent infringement?

25  A.   In a declaration, but not in testimony.

LUETTKE - CROSS - GETZHOFF                                          40

1    Q.  When did you give -- are you talking about the *Hoffman*

2    case?

3    A.  Yes.

4    Q.  Okay.  So we've got the *Hoffman* case, and we have this

5    case, right?

6    A.  Correct.

7    Q.  Do you know the difference between literal infringement and

8    doctrine of equivalence?

9    A.  Can you slow that down, please.

10   Q.  Do you know the difference between literal infringement and

11   infringement under the doctrine of equivalence?

12   A.  Not as I sit here today.  I know I've read those terms,

13   but --

14   Q.  Do you know which kind of infringement analysis you did in

15   this case?

16   A.  I'd -- I'm not exactly sure.  I don't --

17   Q.  In your -- in this exhibit you say on paragraph 9 -- do you

18   see where you said you reviewed publicly available information

19   on the Partisan Disruptor trigger?

20   A.  Yes.

21   Q.  When is the first time you reviewed that publicly available

22   information?

23   A.  I don't know exactly when I first -- I know when there was

24   talk about it before I was ever retained on this -- this case

25   that there was talk on the Internet from AR15.com about these

1    triggers coming out, Partisan Disruptor.  There's a big thread,

2    if you will, on that topic.

3           And then later on before I testified in an arbitration

4    hearing involving conflict, we'll call it, that's when I really

5    started looking and going to different web pages that sold the

6    Partisan, as well as the Partisan Disruptor web page.

7    Q.  That Internet thread that you just mentioned as part of

8    your answer, that started back in September of last year,

9    right?

10   A.  Well, I probably saw that one.  There's multiple threads on

11   forced reset triggers, so . . .

12   Q.  And the public information that you reviewed, that included

13   technical specifications and images of the Partisan Disruptor,

14   right?

15   A.  Yes, that's what they call it on the web page.  I think

16   there's a picture of it on -- on one of these pages.  It is

17   kind of dark, hard to see, but they list the technical

18   specifications.

19   Q.  Sir, let me take you to paragraph 37 of Exhibit 1, your

20   declaration.

21          Do you see that?

22   A.  Paragraph 37, you said?

23   Q.  Yeah.  And I've got it on the screen as well.

24   A.  Can you -- yes.

25   Q.  And just to orient you -- and feel free to flip through

LUETTKE - CROSS - GETZHOFF                                          42

1    your declaration, but this comes -- paragraph 37 comes after

2    pages of you going through the claim elements and comparing it

3    to this depiction -- to these depictions, right?

4    A.   I think it might be pictured twice, if I remember

5    correctly.

6    Q.   Paragraph 37 is, fair to say, your wrap-up on your

7    infringement opinion?

8    A.   Yes.  Do you know what page that is, sir?

9    Q.   It is page 43.

10   A.   Thank you.

11   Q.   And I'm sorry.  Please tell me to slow down if I'm going

12   too fast.

13   A.   Okay.

14   Q.   So you're with me on paragraph 37?

15   A.   Yes.

16   Q.   And 30 -- paragraph 37 follows all of your claim-by-claim

17   element analysis for your infringement opinion, right?

18   A.   Correct.

19   Q.   And this is essentially your wrap-up on why you think the

20   Partisan Disruptor infringes, right?

21   A.   Yes.

22   Q.   And for your wrap-up, you identify what you call is the

23   core functionality of the asserted patents, right?  That's in

24   the first line (indicating)?

25   A.   Yes.

1  Q.  And the core functionality that you identify that you

2  believe means there's infringement is the fact that Partisan

3  uses a three-position safety selector, right?

4  A.  Correct.

5  Q.  And just to be clear, the three-position safety selector is

6  a safety selector that allows the user to switch between safety

7  or can't fire to regular semi-automatic to the forced or

8  assisted reset?

9  A.  The third position is the semi-automatic forced reset,

10  correct.

11  Q.  Right.  And you're aware, aren't you, that the '067 Patent

12  that was filed back in 2013 describes at length a

13  three-position safety selector?

14  A.  Yes.

15  Q.  And the commercial embodiment, the TacCon 3MR trigger that

16  Mr. Stakes commercialized and sold that practiced his '067

17  Patent, that had a three-position safety selector?

18  A.  Yes, I'm aware of that.

19  Q.  And so this core functionality that you identify as being a

20  key reason for infringement was actually found over ten years

21  earlier by Mr. Stakes, right?

22  A.  Well, yes, but those are different -- that patent is

23  totally different than the patents that I wrote about.

24  Q.  Well, it's got the -- it's got a three-position safety

25  selector that switches between safety, regular semi-automatic

1   and assisted reset, right?

2   A.  Assisted reset, yes.  That one doesn't have the forced

3   reset, it is assisted reset, correct.

4   Q.  Because you think there's a difference between assisted

5   reset and forced reset, right?

6   A.  Very much so.

7   Q.  You would agree that in the '067 Patent and Mr. Stakes' 3MR

8   trigger, the bolt carrier action forces the hammer down to the

9   trigger and resets the trigger, right?

10  A.  Well, there's a reset lever in the '067 Patent.  The reset

11  lever plays a very important part.  And Partisan Disruptor and

12  the Rare Breed trigger do not have that reset lever that

13  pushes, then, the trigger forward.  On the Rare Breed and the

14  Partisan it is -- it is the hammer that has direct contact in

15  the semi-automatic FRT mode that forces the trigger forward,

16  not a reset lever.

17  Q.  Well, the reset lever is being struck by the hammer, right?

18  A.  Yes.

19  Q.  And then the reset lever moves that trigger, right?

20  A.  Yes.

21  Q.  So --

22  A.  Partial reset.

23  Q.  So mechanically it's the same principle, it is just one has

24  an additional component in between the mechanics, right?

25  A.  Can you say that again, please?

1  Q.  The mechanical principle is the same:  The bolt carrier is

2  forcing the trigger forward.  The difference is Mr. Stakes'

3  patent and product had an additional component in the chain,

4  right?

5  A.  Yes.  It has an additional component, and that trigger does

6  not reset all the way to a full reset position.  It is a

7  partial reset where the shooter has to still release pressure

8  on the trigger to reset it fully.

9  Q.  Have you ever tested or fired the TacCon 3MR trigger?

10  A.  No, I've just done a lot of research, watched videos of

11  certain individuals -- they might be in this courtroom today --

12  showing videos at the SHOT Show Range Day where they're

13  demonstrating the function of their trigger.  I've watched

14  videos of hobbyists who own their triggers demonstrating it.

15  So I've watched and read as much as I can, including magazine

16  articles.

17  Q.  Are you aware of the -- strike that.

18       You haven't looked at the prior art or come to an

19  opinion for purposes of performing an invalidity analysis,

20  right?

21  A.  Invalidity of what?

22  Q.  Of the patents.

23  A.  No, I analyzed these products.

24       MR. GETZOFF:  Thank you.  Nothing further.

25       THE COURT:  Thank you, Mr. Getzoff.

1          Mr. Colvin, any redirect?

2          MR. COLVIN:  Brief redirect, Your Honor.

3                    **REDIRECT EXAMINATION**

4    BY MR. COLVIN:

5    Q.   Mr. Luettke, do you still have paragraph 37 of your

6    declaration on page 43 open?

7    A.   You said page 47?

8    Q.   Paragraph 37, page 43.

9    A.   Thank you.

10   Q.   It's the same paragraph that counsel was asking you about a

11   moment ago.

12   A.   One more time on the paragraph.

13   Q.   Paragraph 37.  It's at the top of the page.

14   A.   Yes, got it.  Thank you.

15   Q.   You recall counsel asking you questions about the

16   importance of the three-position safety selector?

17   A.   Yes.

18   Q.   And do you describe the three-position safety selector as

19   the key feature of the Disruptor or a key feature of the

20   Disruptor?

21   A.   It's the -- it's the claim of the Disruptor.

22   Q.   That's right.  And in the last sentence of that paragraph

23   37, are you describing the three-position safety selector as

24   the key feature of the Partisan or as just a key feature of the

25   Partisan Disruptor?

LUETTKE - REDIRECT - COLVIN                                    47

1  A.  It is a key feature.  There's other features.

2           MR. COLVIN:  No further questions, Your Honor.

3           THE COURT:  I might have you elaborate.  Why the

4  distinction there?  Why a key feature?

5           THE WITNESS:  Because it also incorporates the forced

6  reset concept of that video that you saw earlier, Your Honor,

7  where the bolt carrier strikes the hammer and makes contact

8  with the upper part of the trigger and forces it forward.  So

9  it is just -- 'cause that's a forced reset trigger, and there's

10 four patents, and the '223 was the first patent that had that

11 feature.

12          And then the other three patents have the three

13 selector positions for safe, semi-automatic, and semi-automatic

14 FRT.

15          THE COURT:  All right.

16          Any follow-up, Mr. Colvin?

17          MR. COLVIN:  One, Your Honor.

18 BY MR. COLVIN:

19 Q.  In the Partisan and in the Rare Breed trigger, what happens

20 to the disconnector when you move the selector to forced reset

21 mode?

22 A.  The disconnector is no longer in play.

23 Q.  In the 3MR trigger, if you move the safety selector to

24 assisted reset mode, what happens to the disconnector?  Is it

25 moved out of the way?

LUETTKE - RECROSS - GETZOFF                                  48

1    **A.**  I believe it is still present.

2              MR. COLVIN:  No further questions, Your Honor.

3              THE COURT:  Thank you, Mr. Colvin.

4              Recross, Mr. Getzoff.

5              MR. GETZOFF:  Just briefly, Your Honor.

6                        **RECROSS-EXAMINATION**

7    **BY MR. GETZOFF:**

8    **Q.**  Mr. Stakes, on this issue between forced reset and assisted

9    reset, have you heard the word --

10   **A.**  Sir, can I interrupt you?  You called me Mr. Stakes.

11   **Q.**  I'm sorry.  Let me start over.

12             Mr. Luettke, on the question of the difference in your

13   mind between a forced reset trigger and an assisted reset

14   trigger, have you heard the words "positive reset trigger"?

15   **A.**  I have heard that term.

16   **Q.**  Is there a difference in your mind between a positive reset

17   trigger and a forced or assisted reset trigger?

18   **A.**  I think the positive is more in line with an assisted,

19   although I don't use that term.  I've heard the term.  I use

20   the assisted reset and I use the forced reset.

21   **Q.**  But you've heard the public call these triggers that are

22   forcibly moved back from the force of the bolt carrier positive

23   reset, right?

24   **A.**  I don't know the context.  I've heard people talk about,

25   but I haven't gotten into it.  I just -- I -- I recognize the

LUETTKE - RECROSS - GETZOFF                                              49

1    terms of the assisted reset and the forced reset.  That's --

2    that's -- that's how I analyze things on these triggers.

3    Q.  Do you -- sorry.

4         You've also heard the term "active reset," right?

5    A.  Same thing applies.

6    Q.  In fact, Mr. Hoffman, who was in the hearing yesterday or

7    last week, he uses the words "active reset" to describe his

8    triggers, right?

9    A.  Yes, in his terminology, Mr. Hoffman uses the word "active

10   reset trigger" so he doesn't have to call his FRT the forced

11   reset trigger.  He came up with "active reset trigger," but I

12   believe it is the same principle.

13   Q.  So there's multiple words that describe the same principle,

14   right?

15   A.  Somewhat.

16        MR. GETZOFF:  Thank you.

17        THE COURT:  Mr. Getzoff, thank you.

18        Mr. Luettke, thank you for your testimony, sir.  You

19   may step down.

20        THE WITNESS:  Thank you.

21        THE COURT:  Plaintiff may call its next witness.

22        MR. COLVIN:  Thank you, Your Honor.  Plaintiff calls

23   Michael Stakes.

24        THE COURT:  Mr. Stakes, if you'd please come forward.

25     (Witness sworn.)

WOODS - DIRECT - BRUCE                                              87

1   A.   Yes.

2   Q.   And Partisan Triggers posts on AR15.com; is that right?

3   A.   Correct.

4   Q.   And you also post under your own personal account on

5   AR15.com, right?

6   A.   That's correct.

7   Q.   Your user name on AR15.com is "Ben"?

8   A.   Correct.

9   Q.   So I'm going to show you here a post from Partisan

10  Triggers, and for the record, this is Exhibit J to Docket

11  Number 7 in the record, so Docket Number 7-10.

12          Sir, are you familiar with this post?

13  A.   I am.

14  Q.   And what is this post?

15  A.   It's a post introducing Partisan Triggers to the market.

16  Q.   And if I can read it correctly, it is dated September 13th,

17  2025, is that right, or thereabouts?

18  A.   Yes, sir.

19  Q.   Did you draft this post?

20  A.   Not independently, no, sir.

21  Q.   But you were involved in the drafting of it, yes?

22  A.   Yes, sir.

23  Q.   Okay.  And do you control the Partisan Triggers AR15.com

24  account on AR15.com?

25  A.   I am one of the people who does control it.  I am not the

WOODS - DIRECT - BRUCE                                          88

1   sole controller of that account.

2   Q.  Okay.  And what was the purpose of this post in September

3   2025?

4   A.  At the time of the original post, we had been planning to

5   release just a few weeks after that post was made.  Subsequent

6   production delays resulted in the post being drug out for a

7   much longer period of time than we expected.

8   Q.  And when you say "release," you're talking about releasing

9   the Partisan Disruptor product; is that right?

10  A.  Correct.

11  Q.  And in your declaration you refer to a September 20 -- in

12  paragraph 26 of your declaration submitted in this case, you

13  refer to a September 2025 post where you say:  *We posted a*

14  *lengthy announcement of our upcoming trigger referring to*

15  *plaintiffs' litigation approach and describing at a high level*

16  *why defendants were ready to bring the Partisan FRT to market.*

17         Do you recall that from your declaration?

18  A.  I do.

19  Q.  And is this post, Exhibit J to Docket Number 7 -- is this

20  the post to which you refer in your declaration?

21  A.  Exhibit J is the post on the screen?

22  Q.  Yes.

23  A.  I believe it is.

24  Q.  You're not aware of any other posts that your declaration

25  would refer to?

WOODS - DIRECT - BRUCE                                              89

1   A.  Not in that time frame.  Not that I recall.

2   Q.  So Exhibit J is the AR15.com post to which you're referring

3   in paragraph 26 of your declaration, right?

4   A.  Yes, sir.

5   Q.  Now, as we look at this post, there aren't any pictures of

6   the Partisan Disruptor on this post, right?

7   A.  Correct.  We did not post any pictures on this original

8   post.

9   Q.  Okay.  When was the first time that anyone from the public

10  would have been able to see the Partisan Disruptor?

11  A.  Um, sometime in the summer.  I wouldn't remember exactly.

12  Q.  What do you mean by "summer"?

13  A.  We had units that went out for testing prior to that post,

14  so there were members of the public who had seen it prior to

15  that post.

16  Q.  And when you say "members of the public," you're talking

17  about specific people that you sent the units to for testing,

18  right?

19  A.  We had some number of units -- I don't remember the exact

20  dates, but we had sent units to people for reviews.

21  Q.  Okay.  Did you ask them to keep the information or pictures

22  of the Partisan Disruptor under wraps for a certain period of

23  time when you sent those out?

24  A.  We did.

25  Q.  And when were those -- can we call them beta testers?  Is

WOODS - DIRECT - BRUCE                                          90

1    that a fair word?

2    A.   Sure, yeah, we can say beta testers.  That's fine.

3    Q.   When were those beta testers allowed to disclose the

4    Partisan Disruptor or pictures thereof to the public?

5    A.   I believe the first public sales and disclosure was Black

6    Friday, and subsequently online the first public disclosures

7    were December 15th.

8    Q.   And when you say -- what is your distinction between

9    disclosures on Black Friday versus December 15th?

10   A.   I should correct myself.  Actually, there was a leak of the

11   photos at one point much prior to on social media by a film

12   crew from somewhere in Hollywood, I think.

13   Q.   Okay.  Back to my question, when you talk about a release

14   on Black Friday versus a release on December 15th, how are you

15   distinguishing those two?

16   A.   We had a soft release through local retailers prior to the

17   online release.

18   Q.   And when you say "local retailers," who are you talking

19   about?

20   A.   Primarily gun show sales.

21   Q.   Where?

22   A.   Montana.

23   Q.   Only Montana?

24   A.   I believe so, but I'm not a hundred percent sure.

25   Q.   And then what occurred on December 15th?

1    A.   The public launch of the product.

2    Q.   And those were the first controlled photos from Partisan,

3    would have been with the public launch on December 15th; is

4    that right?

5    A.   Correct.

6    Q.   And on December 15th did Partisan or Peak Tactical or

7    anybody associated with Partisan provide pictures of the

8    internals of the Partisan Disruptor trigger unit?

9    A.   I don't -- I don't remember.  I'm not sure.  I know there

10   was a lot of reviews at various places online, either that day

11   or within days, but I couldn't tell you with any level of

12   certainty whether those included pictures of the internals.

13   Q.   So the internals wouldn't have been shown to the public

14   prior to December 15th, right?

15   A.   Not that I am aware of.

16   Q.   And it could have been after that date, right?

17   A.   Correct.

18   Q.   In preparing to launch the Disruptor trigger, Partisan and

19   DFI and QOX and all the individuals associated with the launch

20   of the Partisan Disruptor, you were all aware of Rare Breed,

21   right?

22   A.   Correct.

23   Q.   And you were aware of the fact that Rare Breed had signed a

24   contract or a settlement agreement with the DOJ that required

25   it to enforce its patents, right?

WOODS - DIRECT - BRUCE                                        92

1   A.  Correct.

2   Q.  And, in fact, you mention the fact in the September 2025

3   post on AR15.com that Partisan is preparing and is prepared to

4   take on Rare Breed and its patents, right?

5   A.  Correct.

6   Q.  Now, as part of that preparation, Partisan never filed

7   what's called an Inter Partes Review of any of Rare Breed's

8   patents with the patent office, right?

9   A.  Correct.  We did not file an Inter Partes Review.

10  Q.  Those are also known as IPRs?

11  A.  Yes, correct.

12  Q.  And Partisan could have filed an IPR on Rare Breed's

13  patents, right?

14  A.  I wouldn't be the right person to ask that question.  I'm

15  not an attorney.  I'm not going to lie.  I don't entirely know

16  how the Inter Partes review works.

17  Q.  But you're not aware of anything that prohibited Partisan

18  from filing an IPR on any of Rare Breed's patents, right?

19  A.  I wouldn't be able to tell you what is or isn't required

20  for an Inter Partes review.  I don't know.

21  Q.  So Partisan has obtained insurance for this case, right?

22  A.  Correct.

23  Q.  Do I understand it is correct that it is two $5 million

24  policies?

25  A.  Correct.  It is two $5 million policies per year.

1  Q.  And who do those policies cover?

2  A.  Everyone involved in the Partisan brand all the way down to

3  consumers.

4  Q.  And what do those policies cover?

5  A.  IP defensive insurance as well as enforcement insurance.

6  Q.  Do they cover any damages that Partisan may be liable for

7  in the event it's found to infringe any claim of Rare Breed's

8  patents?

9  A.  They do cover damages, yes.

10  Q.  Okay.  But only up to, is it, $10 million total?

11  A.  Per year is my understanding, yes.

12  Q.  Do those insurance policies cover willful infringement, so

13  doubling or tripling of damages in the event that Partisan is

14  found to have willfully infringed?

15  A.  I would not be able to tell you whether or not that's in

16  the policy.

17  Q.  Do those policies cover false marketing or false

18  advertising claims?

19  A.  I wouldn't be able to tell you whether that's in the

20  policy.

21  Q.  Do those policies cover Rare Breed's attorneys' fees if

22  this case is declared exceptional based on Partisan's actions?

23  A.  Could you repeat that question?  I'm sorry.

24  Q.  Sure.  Do those policies cover Rare Breed's attorneys' fees

25  if this case is declared an exceptional case due to Partisan's

WOODS - DIRECT - BRUCE                                          94

1    actions?

2    A.  I can't recall.

3    Q.  So with respect to Partisan, and I'm referring to all three

4    entities -- Peak, DFI and QOX -- how much money do those

5    companies have in their bank accounts, in any source?  How much

6    money is available for those companies?

7    A.  Immediately in the company accounts?

8    Q.  Yes.

9    A.  I don't know.  I don't handle accounting.  I'm not sure.

10   Q.  Okay.  How much are the assets worth for all three of those

11   entities?

12   A.  I -- like I said, I don't handle accounting.  I'm not sure.

13   Q.  Any idea?

14   A.  I really wouldn't know.

15   Q.  And you didn't include that information in your

16   declaration, did you?

17   A.  I don't believe so, no, because -- I'm not sure.

18   Q.  So in the event that Partisan is found to infringe a valid

19   claim and Rare Breed is awarded lost profits damages, how would

20   Rare Breed's damages be covered by the Partisan entities?

21   A.  That should be covered by the insurance policy.

22   Q.  Now, you heard your counsel ask Mr. DeMonico a question

23   about the Rare Breed costs that it incurs to manufacture its

24   triggers, right?

25   A.  Correct.

WOODS - DIRECT - BRUCE                                          95

1  Q.  And Mr. DeMonico's testimony was around $100 per unit; is

2  that what you understood?

3  A.  Correct.

4  Q.  And so if the Rare Breed trigger is selling for $450, that

5  would leave $350 per unit profit, correct?

6  A.  Correct.

7  Q.  In your declaration you estimated that Partisan will sell

8  1.68 million Disruptors within the next three years, right?

9  A.  That sounds correct.

10 Q.  And 1.68 million times $350 profit, that's well over $500

11 million in lost profits damages that Rare Breed will incur,

12 isn't it?

13 A.  I can't speculate on how many lost profits Rare Breed will

14 have over three years.  I wouldn't know.

15 Q.  But you estimate sales of 1.68 million, right?

16 A.  Correct.

17 Q.  And Rare Breed's contention is that it would make those

18 sales but for Partisan's infringement, right?

19 A.  That is their contention, yes.

20 Q.  And how would the Partisan entities be able to cover a

21 damages award of over $500 million?

22 A.  I am not, as I said, an accountant, and I am not our lead

23 for counsel that deals with our insurance policies, so I

24 wouldn't be able to tell you.

25 Q.  No idea?

WOODS - CROSS - SWANSON                                          96

1    A.  No idea.

2           MR. BRUCE:  Pass the witness.

3           THE COURT:  Thank you, Mr. Bruce.

4           Cross-examination, Mr. Swanson.

5           MR. SWANSON:  Paul Swanson for the defendants.

6                        **CROSS-EXAMINATION**

7    BY MR. SWANSON:

8    Q.  Good morning, Mr. Woods.

9    A.  Good morning, sir.

10   Q.  To make sure the record is clear, do you have any knowledge

11   about the profitability of Rare Breed's trigger for Rare

12   Breeds?

13   A.  The profitability?

14   Q.  That's right.

15   A.  You mean as far as how much they're making or --

16   Q.  That's right.

17   A.  If I recall correctly, during the EDNY case they said

18   something like $40 million over an 18-month period.

19   Q.  Do you independently know anything about how much profit

20   Rare Breed makes off of each trigger sale?

21   A.  No, we have no way of measuring how many triggers Rare

22   Breed has actually sold.

23   Q.  If Partisan Triggers is able to continue selling and is not

24   enjoined, how many triggers did you say you expect the company

25   would sell in the next three years?

WARTY - DIRECT - BRUCE                                             98

1             THE COURT:  You may.

2             MR. BRUCE:  Would Your Honor also like a copy?

3             THE COURT:  Very well.  Thank you.

4        **SAMIR WARTY, PLAINTIFFS' WITNESS, DIRECT EXAMINATION**

5   **BY MR. BRUCE:**

6   **Q.**  Dr. Warty, you have a copy of your declaration in this

7   case; is that correct?

8   **A.**  Correct.

9   **Q.**  You signed it?

10  **A.**  Correct.

11            MR. BRUCE:  Your Honor, at this point plaintiffs would

12  move for entry of Dr. Warty's declaration into the record.

13  This is Exhibit AA to plaintiffs' motion for TRO and

14  preliminary injunction in the record, Your Honor.

15            THE COURT:  All right.  Any objection to what's

16  previously been filed of record as Dr. Warty's designation?

17            MR. GETZOFF:  No, subject to all our objections and

18  cross that we would have in terms of the foundation.

19            THE COURT:  Very well.  Subject to those objections or

20  concerns, it will be received into the record.  It is already

21  part of the record, so the Court will consider it.

22       (Plaintiffs' Exhibit AA received.)

23            MR. BRUCE:  Your Honor, in the interest of time, at

24  this point plaintiffs will pass Dr. Warty for any cross.  Thank

25  you, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Bruce turns it over for any cross-examination for

3     the defendants.

4          MR. GETZOFF:  No cross, Your Honor.

5          THE COURT:  All right.  Dr. Warty, that was an

6     impressive examination.  Thank you for your appearance here

7     today.  We'll take a close look at your designation, of course.

8     Thank you, sir.  You may step down.

9          THE WITNESS:  Thank you, Your Honor.

10          MR. BRUCE:  Your Honor, at this point this concludes

11     plaintiffs' affirmative evidence, and we pass to the

12     defendants.

13          THE COURT:  Very well.  Thank you.

14          Plaintiffs having rested their presentation, I'll turn

15     it over to the defendants.

16          Any remarks, opening remarks, or would you like to cut

17     right to the chase and call your first witness?

18          MR. GETZOFF:  Your Honor, I'm going to cut right to

19     the chase.

20          By cutting to the chase, Your Honor, I mean all the

21     witnesses to be called have been called.  I think all the

22     evidence is submitted.  I want to use the bulk of my time to

23     discuss the substantive issues before the Court that bear on

24     the Court's determination and analysis of the pending motion

25     for TRO and preliminary injunction.

1   he did not show up.  Remember, we just got these

2   noninfringement issue positions and their invalidity positions

3   on Friday evening, and so this stuff is coming at us pretty

4   quick.  And, obviously, we haven't had a chance to put in a

5   rebuttal paper.  If the Court would like that, we certainly

6   would do that.

7            But we were hoping to cross their expert, and he did

8   not show up.

9            Let me turn to validity.  Partisan raises several

10  references in an attempt to cobble together enough disclosure

11  to try to meet these claims.  But a very important thing is

12  missing from their argument, and it is not even in the Nixon

13  declaration, if you take a look at it.  They don't even provide

14  claim charts that show how these references are cobbled

15  together to try to meet our claim language.

16           Now, the Nixon declaration references claim charts as

17  Exhibits 11 through 14 in his declaration, but those were not

18  attached; they were not submitted to the Court; we've never

19  seen them; we're not sure that they exist.  They provide no

20  mapping of this art to the specific claim language.

21           And if you look at the claims that we present, these

22  are very long claims.  These claims in some cases cover more

23  than a column of the patent page.  In order to show invalidity,

24  they have to prove with clear and convincing evidence that

25  every single limitation is met by a reference for anticipation

1  component here and the lack asserted by defendants -- the lack

2  of evidence regarding what the damages really are.  And I heard

3  your sort of summary a moment ago with regard to the

4  irreparable harm, but can you elaborate a little bit on your

5  onus when it comes to money damages in this -- in this

6  equation?

7          MR. COLVIN:  Your Honor, my colleague Mr. Bruce is

8  really the damages person, so if I could pass it over to him to

9  answer that question.

10          THE COURT:  Fair enough.  Thank you.

11          Mr. Bruce.

12          MR. BRUCE:  Your Honor, I think, given the defendants'

13  actual presentation of -- and assertion of the numbers that

14  they expect to produce over the next three years of 1.68

15  million units and the testimony elicited that our client

16  profits to the tune of $350 per unit, that's where the large

17  numbers are coming from, is defendants' own projections,

18  and that, you know, testimony was that they have no idea --

19  their witness that they presented has no idea if they can pay

20  that.

21          And we would ask Your Honor to look further into the

22  declaration where Mr. Woods specifies that they have only

23  capitalized the companies to something less than $1.5 million.

24          THE COURT:  Aren't the damages claims fairly

25  identifiable in terms of the equity relief that's sought versus

1                    **C E R T I F I C A T E**

2

3

4

5          I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Diplomate Reporter, Federal Certified Realtime

8    Reporter, and Certified Realtime Reporter, do hereby certify

9    that I reported by machine shorthand the foregoing proceedings

10   contained herein on the aforementioned subject on the date

11   herein set forth and that the foregoing pages constitute a

12   full, true and correct transcript.

13

14          Dated this 6th day of February, 2026.

15

16

17

18                              /s/ *Janet Davis*

19                         _____

20                         JANET DAVIS, RDR, FCRR, CRR
                           Federal Official Court Reporter
21

22

23

24

25

1                    I N D E X

2  **OPENING STATEMENTS**                              **PAGE**

3  Opening - Mr. Colvin                                   5

4
   **PLAINTIFFS' WITNESSES**                          **PAGE**
5
   LAWRENCE DEMONICO
6      Direct - Mr. Colvin                                16
       Cross - Mr. Getzoff                                21
7  BRIAN LUETTKE
       Direct - Mr. Colvin                                29
8      Cross - Mr. Getzoff                                35
       Redirect - Mr. Colvin                              46
9      Recross - Mr. Getzoff                              48
   MICHAEL STAKES
10     Direct - Mr. Colvin                                50
       Cross - Mr. Getzoff                                67
11     Redirect - Mr. Colvin                              77
       Recross - Mr. Getzoff                              80
12 BEN WOODS
       Direct - Mr. Bruce                                 85
13     Cross - Mr. Swanson                                96
   SAMIR WARTY
14     Direct - Mr. Bruce                                 98

15
   **PLAINTIFFS'**
16  **EXHIBITS**        **DESCRIPTION**        **IDENTIFIED**  **RECEIVED**

17

18  1            Luettke Declaration              34         34

19  3            CAD Partisan Disruptor           78         80
                 Drawings
20  AA           Warty Declaration                98         98

21

22

23

24

25