Jeffrey S. Pope (Wyo. State Bar #7-4859)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Phone: 307.778.4200
jspope@hollandhart.com

Andrew Orr (Wyo. State Bar #7-6235)
HOLLAND & HART LLP
P.O. Box 68
Jackson, WY 83001
Phone: 307.739.9741
acorr@hollandhart.com

Timothy Getzoff (admitted *pro hac vice*)
Randy Roeser (admitted *pro hac vice*)
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, CO 80302
Phone: 303.473.2700
tgetzoff@hollandhart.com
jrroeser@hollandhart.com

Paul Swanson (admitted *pro hac vice*)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Phone: 303.295.8000
pdswanson@hollandhart.com

ATTORNEYS FOR DEFENDANTS/COUNTERCLAIMANT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas Corporation, <br><br>     Plaintiffs, <br><br> vs. <br><br> PEAK TACTICAL, LLC, d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual, <br><br>     Defendants. | Civil Action No. 2:26-cv-00018-KHR <br><br> **JURY TRIAL DEMANDED** |

1

PEAK TACTICAL, LLC, d/b/a
PARTISAN TRIGGERS, a Wyoming
limited liability company,

        Counterclaimant,

vs.

ABC IP, LLC, a Delaware limited liability
company, and RARE BREED TRIGGERS,
INC., a Texas Corporation,

        Counterclaim Defendants.

---

### PEAK TACTICAL, LLC'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant Peak Tactical, LLC d/b/a Partisan Triggers ("Defendant" or "Peak Tactical") denies that it infringes any valid and enforceable claim of U.S. Patent Nos. 10,514,223 ("the '223 Patent"), 11,724,003 ("the '003 Patent"), 12,036,336 ("the '336 Patent"), and 12,274,807 ("the '807 Patent") (collectively, the "Asserted Patents") and denies that it has engaged in false patent marking and/or advertising. The accused product, the Disruptor trigger, does not infringe. Moreover, the Asserted Patents are invalid and/or unenforceable in view of prior art and serious prosecution misconduct—including failure to disclose the earlier U.S. Patent No. 9,146,067 ("the '067 Patent") and the commercial Tac-Con 3MR product during prosecution of at least the '223 Patent, and burying material references among voluminous IDS filings in the later prosecutions.

### THE PARTIES

1.     Peak Tactical lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiffs' organization and principal addresses and therefore denies the same.

2.      Peak Tactical lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiffs' organization and principal addresses and therefore denies the same.

3.      Peak Tactical admits that Peak Tactical, LLC d/b/a Partisan Triggers is a Wyoming company that operates the Partisan Triggers brand and website. Peak Tactical denies the remaining allegations in Paragraph 3, including that Peak Tactical maintains the alleged "principal office" address in North Carolina.

4.      Peak Tactical admits that Mr. Norton previously was a resident of North Carolina, has never been a resident of Wyoming, and is a minority owner of Peak Tactical LLC. Peak Tactical denies all other allegations in Paragraph 4 of the Complaint.

## JURISDICTION AND VENUE

5.      Peak Tactical admits the Complaint purports to set forth an action for patent infringement arising under 35 U.S.C. §§ 271(a)-(b), 281, and 283-85. Peak Tactical denies it has committed or is committing acts of infringement, denies that the Asserted Patents are valid and enforceable, and denies Plaintiffs are entitled to any relief. Peak Tactical denies any remaining allegations in Paragraph 5 of the Complaint.

6.      Peak Tactical admits that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Plaintiffs have alleged patent infringement. Peak Tactical denies it has committed or is committing acts of infringement, denies that the Asserted Patents are valid and enforceable, and denies Plaintiffs are entitled to any relief. Peak Tactical denies any remaining allegations in Paragraph 6 of the Complaint.

7.      Peak Tactical does not contest that this Court has personal jurisdiction over Peak Tactical and that venue is proper for Peak Tactical. Peak Tactical denies that personal jurisdiction

3

and venue are proper over Nicholas Norton and denies that Mr. Norton commits and directs infringing activities from Peak Tactical, LLC's principal place of business in Wyoming. Peak Tactical denies that it has committed or is committing acts of infringement, denies that the Asserted Patents are valid and enforceable, denies Plaintiffs are entitled to any relief, and on that basis, denies the remaining allegations in Paragraph 7 of the Complaint.

8. For purposes of this action only, Peak Tactical does not contest that this Court has personal jurisdiction over Defendant Peak Tactical and that venue is proper for Peak Tactical. Peak Tactical denies that venue is proper for Nicholas Norton. Peak Tactical denies that it has committed or is committing acts of infringement, denies that the Asserted Patents are valid and enforceable, denies Plaintiffs are entitled to any relief, and on that basis, denies the remaining allegations in Paragraph 8 of the Complaint.

## BACKGROUND

9. Peak Tactical admits that Plaintiffs purport to assert direct infringement of U.S. Patent Nos. 10,514,223, 11,724,003, 12,036,336, and 12,274,807. Peak Tactical further admits that Exhibits A–D to the Complaint appear to be copies of those patents as issued by the United States Patent and Trademark Office. Peak Tactical denies the remaining allegations in Paragraph 9, including any implication that any asserted patent or claim is valid, enforceable, or infringed.

10. Peak Tactical admits that the '223 Patent appears on the records of the United States Patent and Trademark Office with an issue date of December 24, 2019. Peak Tactical denies the remaining allegations in Paragraph 10, including any implication that the '223 Patent was "lawfully and properly" issued or that each and every claim of the '223 Patent is valid and enforceable.

11.     Peak Tactical admits that the '003 Patent appears on the records of the United States Patent and Trademark Office with an issue date of August 15, 2023. Peak Tactical denies the remaining allegations in Paragraph 11, including any implication that the '003 Patent was "lawfully and properly" issued or that each and every claim of the '003 Patent is valid and enforceable.

12.     Peak Tactical admits that the '336 Patent appears on the records of the United States Patent and Trademark Office with an issue date of July 16, 2024. Peak Tactical denies the remaining allegations in Paragraph 12, including any implication that the '336 Patent was "lawfully and properly" issued or that each and every claim of the '336 Patent is valid and enforceable.

13.     Peak Tactical admits that the '807 Patent appears on the records of the United States Patent and Trademark Office with an issue date of April 15, 2025. Peak Tactical denies the remaining allegations in Paragraph 13, including any implication that the '807 Patent was "lawfully and properly" issued or that each and every claim of the '807 Patent is valid and enforceable.

14.     Peak Tactical lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations in Paragraph 14 of the Complaint.

15.     Peak Tactical lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations in Paragraph 15 of the Complaint.

16.     Peak Tactical denies it has committed or is committing acts of direct, contributory or induced patent infringement, denies that the Asserted Patents are valid and enforceable, denies Plaintiffs are entitled to any relief, and on that basis, denies the remaining allegations in Paragraph 16 of the Complaint.

17.    Peak Tactical denies it has committed or is committing acts of willful patent infringement, denies that the Asserted Patents are valid and enforceable, denies Plaintiffs are entitled to any relief, and on that basis, denies the remaining allegations in Paragraph 17 of the Complaint.

## THE ALLEGED INVENTIONS

18.    Peak Tactical admits that AR-15 pattern firearms are semi-automatic and that, in general terms, standard AR pattern fire control groups include a hammer, trigger, and disconnector that operate as described. Peak Tactical denies the remaining allegations in Paragraph 18 to the extent they imply any novelty attributable to Plaintiffs' alleged inventions, any legal conclusions, or any implication of infringement.

19.    Peak Tactical admits that, in a standard AR pattern fire control group, a disconnector typically retains the hammer in a cocked condition until the trigger is reset and that semi-automatic operation requires a separate trigger function for each shot and prevents hammer follow. Peak Tactical denies the remaining allegations in Paragraph 19 to the extent they imply any novelty attributable to Plaintiffs' alleged inventions, any legal conclusions, or any implication of infringement.

20.    Peak Tactical admits that certain cycle driven or "assisted/positive/forced reset" trigger mechanisms were known in the art and may utilize the bolt carrier's cycling to assist the trigger toward a reset condition and to gate trigger movement—for example, the Tac-Con 3MR and the technology disclosed in U.S. Patent No. 9,146,067. Peak Tactical denies the remaining allegations in Paragraph 20, including any implication that Plaintiffs conceived this functionality, that the Asserted Patents claim any patentable improvement over such prior art, or that the Disruptor infringes.

6

21.    Peak Tactical admits only that the '223 Patent purports to claim a device in which cycling of the action displaces the hammer and, through contact with the trigger member, forcefully urges the trigger member toward reset. Peak Tactical denies that this was a novel or new concept, as such functionality was disclosed and practiced long before the '223 Patent. Peak Tactical denies the remaining allegations in Paragraph 21, including any implication that Plaintiffs conceived this functionality, that any Asserted Patents claim any patentable improvement over the prior art, or that the Disruptor infringes.

22.    Peak Tactical admits only that the '003, '336, and '807 Patents purport to claim a device configured to operate in selectable modes, namely, a standard semiautomatic mode and an assisted/positive/forced-reset semiautomatic mode. Peak Tactical denies that this was a novel or new concept, as such selectable operation and gating were disclosed and practiced long before Plaintiffs' filings. Peak Tactical denies the remaining allegations in Paragraph 22, including any implication that Plaintiffs conceived this functionality, that any Asserted Patents claim any patentable improvement over the prior art, or that the Disruptor infringes.

23.    Peak Tactical states that no response is required to the extent Paragraph 23 of the Complaint asserts a legal conclusion. To the extent a response is required, Peak Tactical admits only that, as a general matter of patent law, the claims define the scope of a patent's protection. Peak Tactical denies any implication arising from Paragraph 23 regarding the validity, enforceability, construction, or infringement of any asserted claim.

## **THE ALLEGED INFRINGEMENT**

24.    Peak Tactical admits that it markets the Disruptor, a drop in trigger for AR-15 pattern rifles, through authorized dealers and via the Partisan Triggers website. Peak Tactical denies the remaining allegations in Paragraph 24, including the characterization of the Disruptor

as a "forced reset trigger assembly" as Plaintiffs define that term, or an "Infringing Device," denies that it is making, using, selling, offering for sale, and/or importing any product that embodies the technology claimed in any Asserted Patent, and denies that the Disruptor meets the limitations of any asserted claim.

25.    Peak Tactical admits that it maintained and interacted with an AR15.com forum thread in or around September 2025 announcing the Disruptor trigger, including general marketing statements regarding anticipated release timing, dealer availability, and review samples. Peak Tactical lacks knowledge or information sufficient to admit the accuracy, completeness, or context of the quoted excerpts and, on that basis, denies the same. Peak Tactical denies the remaining allegations in Paragraph 25, including the characterization of the Disruptor as an "Infringing Device," and denies that any forum postings establish that it is making, using, selling, offering for sale, and/or importing any product that infringes any Asserted Patent.

26.    Peak Tactical admits only that the Partisan Triggers website includes a product page titled "The Disruptor" that provides general product information and directs interested customers to authorized dealers. Peak Tactical denies that it sells the Disruptor directly to consumers through that page, denies that any images or depictions on the page establish that the Disruptor embodies any limitation of any asserted claim, and denies the remaining allegations in Paragraph 26, including the characterization of the Disruptor as an "Infringing Device."

27.    Peak Tactical admits that the Partisan Triggers website includes navigation and hyperlinks directing visitors to authorized dealers, including "Where To Find," "Where can I buy one?" and links to dealers identified as "Available Now" or "Coming Soon." Peak Tactical denies the remaining allegations in Paragraph 27, including the characterization of the Disruptor as an "Infringing Device" and any implication that website content establishes that the Disruptor

embodies any limitation of any asserted claim or infringes any Asserted Patent. Peak Tactical further states that Partisan Triggers sells only through dealers and does not sell the Disruptor direct to consumers through its website.

28.    Peak Tactical admits that it participated in and responded to an AR15.com forum thread in or around September 15, 2025, concerning the Disruptor trigger, including general marketing statements about anticipated pricing, warranty, and dealer availability. Peak Tactical lacks knowledge or information sufficient to admit the accuracy, completeness, or context of the quoted excerpts provided by Plaintiffs and, on that basis, denies the same. Peak Tactical denies the remaining allegations in Paragraph 28, including the characterization of the Disruptor as an "Infringing Device," and denies that any forum postings establish that it is making, using, selling, offering for sale, and/or importing any product that infringes any Asserted Patent. Peak Tactical further states that any references by third parties to "FRTs" in the thread were colloquial and do not reflect any concession by Peak Tactical regarding classifications or infringement.

29.    Peak Tactical admits only that the Disruptor employs a three-position selector that permits a safe position and a standard semi-automatic position in which a disconnector functions consistent with AR pattern fire control, as well as a third position that provides an assisted/positive/forced-reset mode. Peak Tactical denies the remaining allegations in Paragraph 29, including the characterization of the product as an "Infringing Device," any reference to a "forced reset" mode as Plaintiffs use that term, and any implication that the Disruptor meets any limitation of any asserted claim or infringes any asserted patent.

30.    Peak Tactical admits only that, in the Disruptor's assisted/positive/forced-reset selector position, rearward movement of the bolt carrier during cycling can impart a forward reset impulse to the trigger. Peak Tactical denies, however, that the Disruptor operates as alleged such

9

that the trigger member is forced to the claim defined "set position" at that time or that any locking member functions in the manner asserted by Plaintiffs. Peak Tactical further denies the remaining allegations in Paragraph 30, including any implication that the Disruptor meets any limitation of any asserted claim or infringes any Asserted Patent.

31. Peak Tactical admits only that, in a standard AR pattern semi automatic fire control system, a disconnector can retain the hammer until the trigger is reset. Peak Tactical specifically denies that, in the Disruptor's standard semi-automatic selector position, "rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook" at that time, and denies that any "manual" change in trigger pressure as described by Plaintiffs is required or occurs as alleged. Peak Tactical further denies the remaining allegations in Paragraph 31, including any implication that the Disruptor meets any limitation of any asserted claim or infringes any Asserted Patent.

32. Peak Tactical admits only that, in the Disruptor's assisted/positive/forced-reset selector position, the selector geometry alters the disconnector's position/function as compared to the standard semi-automatic position. Peak Tactical specifically denies that rearward movement of the bolt carrier causes rearward pivoting of the hammer "causing the trigger member to be forced to the set position" as that term is used in the asserted claims, denies that the safety selector "prevents" the disconnector hook from catching the hammer hook in the manner alleged, and denies that "thereafter" when the bolt carrier reaches a substantially in-battery position "the user can pull" the trigger "without manually releasing" the trigger member as asserted. Peak Tactical further denies the remaining allegations in Paragraph 32, including any implication that the Disruptor meets any limitation of any asserted claim or infringes any Asserted Patent.

33.    Peak Tactical admits only that the Partisan Triggers website includes a "Library" page that provides hyperlinks to various publicly available documents, which may include patents and other materials. Peak Tactical denies that the presence of hyperlinks to publicly available patents (including the '223, '003, and '336 patents) reflects or "shows" Peak Tactical's awareness of Plaintiffs' asserted patent rights as alleged, denies that any such documents are "relevant to" the Disruptor, and denies that the page provides notice or supports any claim of infringement, inducement, willfulness, or wrongdoing. Peak Tactical denies the remaining allegations in Paragraph 33.

34.    Peak Tactical admits that it participated in an AR15.com forum thread in or around mid-September 2025 discussing the Disruptor trigger and general market/legal topics. Peak Tactical lacks knowledge or information sufficient to admit the accuracy, completeness, or context of the specific quotations Plaintiffs attribute to Peak Tactical in Paragraph 34, which appear to be selectively excerpted, and on that basis denies the same. Peak Tactical further denies that any such postings "demonstrated" knowledge of Plaintiffs' ownership of any asserted patent rights, reflected any concession regarding infringement or validity, or evidence any improper intent. Peak Tactical also denies any implication that forum postings establish that the Disruptor embodies any limitation of any asserted claim or infringes any Asserted Patent.

35.    Peak Tactical admits that it participated in and responded to an AR15.com forum thread in or around January 7, 2026, addressing the Disruptor trigger and general litigation-related topics, including statements about prudent risk management (e.g., dealer indemnification and insurance) and Peak Tactical's view that it does not infringe any valid patent. Peak Tactical further admits that Plaintiffs filed a lawsuit in Arizona on or about December 23, 2025, that referenced "John Doe d/b/a Partisan Triggers." Peak Tactical lacks knowledge or information sufficient to

admit the accuracy, completeness, or context of the specific quotations Plaintiffs attribute to Peak Tactical in Paragraph 35 and, on that basis, denies the same. Peak Tactical denies the remaining allegations in Paragraph 35, including any implication that the cited postings "demonstrated" knowledge of Plaintiffs' ownership of enforceable patent rights, reflected any concession regarding validity, enforceability, or infringement, or otherwise evidence any improper intent. Peak Tactical further denies that any forum postings establish that the Disruptor embodies any limitation of any asserted claim or infringes any Asserted Patent.

36.    Peak Tactical admits that it participated in and responded to an AR15.com forum thread on or about January 7, 2026, concerning the Disruptor trigger and litigation-related topics. Peak Tactical lacks knowledge or information sufficient to admit the accuracy, completeness, or context of the specific excerpts quoted by Plaintiffs and, on that basis, denies the same. Peak Tactical specifically denies that any such postings "demonstrated" an intent to infringe any Asserted Patent or that it is making, using, selling, offering for sale, and/or importing any product that infringes any valid and enforceable claim. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as an "Accused Product," denies that statements regarding shipment of products to dealers establish infringement or willfulness, and denies that requests for information relevant to litigation by a serial filer reflect any improper intent. Peak Tactical also states that it sells only through dealers and does not sell the Disruptor directly to consumers through its website.

37.    Peak Tactical denies the allegations in Paragraph 37, including any assertion that its conduct was or is willful. Peak Tactical specifically denies that the existence of hyperlinks on a website "Library" page to publicly available materials or awareness of allegations in the Arizona action demonstrates knowledge of valid and enforceable patent rights, supports any claim of

willfulness, or establishes infringement of any Asserted Patent. Peak Tactical further denies any implication that it has infringed any claim of any Asserted Patent.

38.    Peak Tactical denies the allegations in Paragraph 38 of the Complaint. Peak Tactical specifically denies that Mr. Norton or Peak Tactical has worked with or in concert with Douglas Rios in the development, manufacture, and/or importation of the Disruptor or any product accused in this action, and denies that Mr. Norton or Peak Tactical has any business relationship with Mr. Rios beyond Mr. Rios's company having been an arm's length dealer of the Disruptor.

39.    Peak Tactical lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Mr. Rios's involvement in prior litigation and any consent judgment entered therein, and therefore denies the same. Peak Tactical further denies any implication that it is bound by, or acted in violation of, any order or consent judgment entered in litigation to which it was not a party.

40.    Peak Tactical states that no response is required to the extent the paragraph asserts a legal conclusion regarding the scope of Federal Rule of Civil Procedure 65. To the extent a response is required, Peak Tactical denies any implication that it received actual notice of, is bound by, or acted in active concert or participation with any person or entity subject to any injunction entered in unrelated litigation, and further denies that any such injunction applies to it or the Disruptor.

41.    Peak Tactical lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether Mr. Rios was represented by counsel in the prior litigation or whether he received actual notice of any injunction, and on that basis denies the allegations. Peak Tactical further denies any implication that it received notice of, is bound by, or acted in concert with any person subject to any injunction entered in that unrelated matter.

42.     Peak Tactical denies the allegations in Paragraph 42 of the Complaint. Peak Tactical specifically denies that the existence of any injunction entered in prior, unrelated litigation was "well known" among manufacturers of aftermarket triggers and denies that it is bound by or acted in violation of any injunction to which it was not a party.

43.     Peak Tactical denies the allegations in Paragraph 43 of the Complaint. Peak Tactical specifically denies that Mr. Rios provided it with actual notice of any injunction entered in prior, unrelated litigation, denies that it had or has actual notice of any such injunction, and denies that it or Mr. Norton or Peak Tactical acted in "active concert or participation" with Mr. Rios in connection with the Disruptor or any accused product. Peak Tactical further denies that any injunction entered in litigation to which it was not a party binds Peak Tactical or applies to the Disruptor. To the extent Paragraph 43 asserts legal conclusions regarding the effect of service of the Complaint or the scope of any injunction, no response is required; if a response is required, those assertions are denied.

### ALLEGED FALSE MARKING AND ADVERTISING

44.     Denied. Peak Tactical specifically denies that the claims of U.S. Patent No. 9,146,067 do not cover the functionality at issue; among other things, claim 19 of the '067 Patent claims selector-based adjustment of trigger travel via aligned stop surfaces and covers positive/assisted/forced reset architectures. Peak Tactical further states that the Disruptor practices at least claim 19 of the '067 Patent and denies any implication to the contrary.

45.     Denied. Peak Tactical specifically denies that the Disruptor is a "forced reset trigger" as Plaintiffs use that term, denies that Peak Tactical knew or believed that the claims of U.S. Patent No. 9,146,067 do not cover the Disruptor, and denies any implication of intent to deceive. Peak Tactical further states that industry and regulatory usage—as opposed to Plaintiffs'

14

usage—treats "assisted reset," "forced reset," and "positive reset" as interchangeable descriptors for the same cycling-driven reset phenomenon, and that the Disruptor practices at least claim 19 of the '067 Patent.

46.    Peak Tactical admits that the Disruptor product page includes the statement "The Disruptor (US Patent 9,146,067) is an assisted reset trigger descended from the original Tac-Con 3MR trigger" and that the page may display a banner referring to the Disruptor as an "assisted reset trigger" and referencing U.S. Patent No. 9,146,067. Peak Tactical denies that any such statements are false or misleading, denies that it "falsely promoted" the Disruptor as not being a forced-reset trigger, and denies Plaintiffs' premise that "assisted reset" and "forced reset" are distinct technical categories. Peak Tactical further states that industry and regulatory usage treats "assisted reset," "forced reset," and "positive reset" as interchangeable descriptors for the same cycling-driven reset phenomenon, and that the Disruptor practices at least claim 19 of the '067 Patent. Peak Tactical denies the remaining allegations in Paragraph 46.

47.    Denied. Peak Tactical specifically denies that any statement on the Disruptor product page is false, denies that any statement was made for the purpose of deceiving the public, denies that Plaintiffs have suffered any competitive injury, and denies any violation of 35 U.S.C. § 292. Peak Tactical further states that its reference to U.S. Patent No. 9,146,067 is accurate and made in good faith, and that the Disruptor practices at least claim 19 of that patent.

### COUNT I – ALLEGED INFRINGEMENT OF THE '223 PATENT

48.    Peak Tactical incorporates by reference its responses to the paragraphs above as if fully set forth herein.

49.    Denied. Peak Tactical specifically denies that it has infringed, induced others to infringe, or contributed to the infringement of any claim of the '223 Patent, including claim 4,

whether literally or under the doctrine of equivalents, and denies that it has made, used, offered for sale, sold, or imported any product that infringes the '223 Patent. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as infringing, and denies all remaining allegations in Paragraph 49 of the Complaint.

50.     Denied. Peak Tactical specifically denies that it has willfully infringed, induced others to infringe, or contributed to the infringement of any claim of the '223 Patent, including claim 4, whether literally or under the doctrine of equivalents, and denies that any product made, used, offered for sale, sold, or imported by Peak Tactical infringes the '223 Patent.

51.     Peak Tactical denies that the referenced claim chart accurately compares the Disruptor to claim 4 of the '223 Patent. Peak Tactical specifically denies that the Disruptor, when assembled and used as intended, meets each and every limitation of claim 4 (whether literally or under the doctrine of equivalents), denies that any images or annotations in the chart establish infringement, and denies the remaining allegations in Paragraph 51 of the Complaint.

52.     Denied. Peak Tactical specifically denies that it has taken, or is taking, any active steps to induce, encourage, or facilitate direct infringement of the '223 Patent by others, denies that it has the requisite knowledge or intent to induce infringement, and denies that any customer or dealer has been induced to infringe. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as an "Accused Product." To the extent Paragraph 52 references website content, the cited page speaks for itself; Peak Tactical admits only that the Partisan Triggers website may include general product information and standard installation and safety guidance intended for lawful, non-infringing use. Peak Tactical denies that any such content instructs or encourages infringing conduct or establishes inducement.

16

53.     Denied. Peak Tactical specifically denies that it knew or should have known that any activity would induce infringement of the '223 Patent, denies that any forum postings, hyperlinks to publicly available patents on a website "Library" page, or allegations made in the Arizona action establish the requisite knowledge or intent to induce infringement, and denies that any customer or dealer has been induced to infringe. Peak Tactical further denies any implication that the Disruptor infringes any claim of the '223 Patent.

54.     Denied. Peak Tactical specifically denies that it has contributed to the infringement of any claim of the '223 Patent by any customer or third party; denies that any product or component supplied by it is a material part of any patented combination "specially designed and adapted" for use in infringement with the requisite knowledge and intent; denies that any "components of [an] Infringing Device," including any trigger subassembly, lack substantial non-infringing uses; and denies that any component is designed or adapted to "forcibly reset a trigger mechanism" in the manner alleged or to meet the limitations of the '223 Patent. To the contrary, the Disruptor and its components have substantial lawful, non-infringing uses, including standard semi-automatic operation and an assisted/positive/forced-reset mode, that do not satisfy the asserted claim limitations.

55.     Denied. Peak Tactical specifically denies that it has engaged in "egregious infringement behavior," denies that it had knowledge of the '223 Patent in any manner that establishes willfulness, denies that any belief regarding infringement or validity was objectively or subjectively unreasonable, and denies that it has continued any infringing activities. Peak Tactical further denies any implication that the '223 Patent is valid, enforceable, or infringed.

56.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered any injury caused by Peak Tactical, denies that Peak Tactical is liable to Plaintiffs under 35 U.S.C. § 271 for

17

any alleged infringement of the '223 Patent, and denies that the '223 Patent is valid, enforceable, or infringed.

57.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered or will suffer irreparable injury, denies that any injunctive relief is warranted, and denies that Peak Tactical has infringed any valid and enforceable claim of the '223 Patent. *See* Dkt. No. 39. Plaintiffs have an adequate remedy at law and, to the extent any cognizable harm were proven, such harm would be fully compensable and calculable in monetary damages (e.g., lost profits and any alleged price erosion), particularly given that triggers are durable, one-time purchases.

58.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered any damages caused by Peak Tactical and denies that the '223 Patent is valid, enforceable, or infringed.

59.     Denied. Peak Tactical specifically denies that this case is "exceptional" within the meaning of 35 U.S.C. § 285 and denies that Plaintiffs are entitled to recover attorneys' fees or costs. Peak Tactical further denies that the '223 Patent is valid, enforceable, or infringed.

60.     Denied. Peak Tactical specifically denies that any act by Peak Tactical constitutes infringement, denies that any conduct was willful, and denies that it acted with any purpose to harm Plaintiffs' business, sales, reputation, or goodwill. Peak Tactical further denies that Plaintiffs have suffered or will suffer irreparable harm.

61.     Denied. Peak Tactical specifically denies that Plaintiffs have been substantially harmed by any conduct of Peak Tactical, denies that Plaintiffs are entitled to any of the requested relief, including any preliminary or permanent injunction, damages (whether alleged lost profits, reasonable royalty, or price-erosion), enhanced damages, attorneys' fees, or costs, and denies that the '223 Patent is valid, enforceable, or infringed.

## COUNT II – ALLEGED INFRINGEMENT OF THE '003 PATENT

62.    Peak Tactical incorporates by reference its responses to the paragraphs above as if fully set forth herein.

63.    Denied. Peak Tactical specifically denies that it has infringed, induced others to infringe, or contributed to the infringement of any claim of the '003 Patent, including claim 4, whether literally or under the doctrine of equivalents, and denies that it has made, used, offered for sale, sold, or imported any product that infringes the '003 Patent. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as infringing, and denies all remaining allegations in Paragraph 63 of the Complaint.

64.    Denied. Peak Tactical specifically denies that it has willfully infringed, induced others to infringe, or contributed to the infringement of any claim of the '003 Patent, including claim 4, whether literally or under the doctrine of equivalents, and denies that any product made, used, offered for sale, sold, or imported by it infringes the '003 Patent.

65.    Peak Tactical denies that the referenced claim chart accurately compares the Disruptor to claim 4 of the '003 Patent. Peak Tactical specifically denies that the Disruptor, when assembled and used as intended, meets each and every limitation of claim 4 (whether literally or under the doctrine of equivalents), denies that any images or annotations in the chart establish infringement, and denies the remaining allegations in Paragraph 65 of the Complaint.

66.    Denied. Peak Tactical specifically denies that it has taken, or is taking, any active steps to induce, encourage, or facilitate direct infringement of the '003 Patent by others, denies that it has the requisite knowledge or intent to induce infringement, and denies that any customer or dealer has been induced to infringe. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as an "Accused Product." To the extent Paragraph 66 references website content, the

cited page speaks for itself; Peak Tactical admits only that the Partisan Triggers website may include general product information and standard installation and safety guidance intended for lawful, non-infringing use. Peak Tactical denies that any such content instructs or encourages infringing conduct or establishes inducement.

67.    Denied. Peak Tactical specifically denies that it knew or should have known that any activity would induce infringement of the '003 Patent, denies that any forum postings, hyperlinks to publicly available patents on a website "Library" page, or allegations made in the Arizona action establish the requisite knowledge or intent to induce infringement, and denies that any customer or dealer has been induced to infringe. Peak Tactical further denies any implication that the Disruptor infringes any claim of the '003 Patent.

68.    Denied. Peak Tactical specifically denies that it has contributed to the infringement of any claim of the '003 Patent by any customer or third party; denies that any product or component supplied by it is a material part of any patented combination "specially designed and adapted" for use in infringement with the requisite knowledge and intent; denies that any "components of [an] Infringing Device," including any trigger subassembly, lack substantial non-infringing uses; and denies that any component is designed or adapted to "forcibly reset a trigger mechanism" in the manner alleged or to meet the limitations of the '003 Patent. To the contrary, the Disruptor and its components have substantial lawful, non-infringing uses, including standard semi-automatic operation and an assisted/positive/forced-reset mode, that do not satisfy the asserted claim limitations.

69.    Denied. Peak Tactical specifically denies that it has engaged in "egregious infringement behavior," denies that it had knowledge of the '003 Patent in any manner that establishes willfulness, denies that any belief regarding infringement or validity was objectively

20

or subjectively unreasonable, and denies that Peak Tactical has continued any infringing activities. Peak Tactical further denies any implication that the '003 Patent is valid, enforceable, or infringed.

70.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered any injury caused by Peak Tactical, denies that Peak Tactical is liable to Plaintiffs under 35 U.S.C. § 271 for any alleged infringement of the '003 Patent, and denies that the '003 Patent is valid, enforceable, or infringed.

71.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered or will suffer irreparable injury, denies that any injunctive relief is warranted, and denies that it has infringed any valid and enforceable claim of the '003 Patent. *See* Dkt. No. 39. Plaintiffs have an adequate remedy at law and, to the extent any cognizable harm were proven, such harm would be fully compensable and calculable in monetary damages (e.g., lost profits and any alleged price erosion), particularly given that triggers are durable, one-time purchases.

72.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered any damages caused by Peak Tactical and denies that the '003 Patent is valid, enforceable, or infringed.

73.     Denied. Peak Tactical specifically denies that this case is "exceptional" within the meaning of 35 U.S.C. § 285 and denies that Plaintiffs are entitled to recover attorneys' fees or costs. Peak Tactical further denies that the '003 Patent is valid, enforceable, or infringed.

74.     Denied. Peak Tactical specifically denies that any act by Peak Tactical constitutes infringement, denies that any conduct was willful, and denies that Peak Tactical acted with any purpose to harm Plaintiffs' business, sales, reputation, or goodwill. Peak Tactical further denies that Plaintiffs have suffered or will suffer irreparable harm.

75.     Denied. Peak Tactical specifically denies that Plaintiffs have been substantially harmed by any conduct of Peak Tactical, denies that Plaintiffs are entitled to any of the requested

relief, including any preliminary or permanent injunction, damages (whether alleged lost profits, reasonable royalty, or price-erosion), enhanced damages, attorneys' fees, or costs, and denies that the '003 Patent is valid, enforceable, or infringed.

**COUNT III – ALLEGED INFRINGEMENT OF THE '336 PATENT**

76.     Peak Tactical incorporates by reference its responses to the paragraphs above as if fully set forth herein.

77.     Denied. Peak Tactical specifically denies that it has infringed, induced others to infringe, or contributed to the infringement of any claim of the '336 Patent, including claim 3, whether literally or under the doctrine of equivalents, and denies that it has made, used, offered for sale, sold, or imported any product that infringes the '336 Patent. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as infringing, and denies all remaining allegations in Paragraph 77 of the Complaint.

78.     Denied. Peak Tactical specifically denies that it has willfully infringed, induced others to infringe, or contributed to the infringement of any claim of the '336 Patent, including claim 3, whether literally or under the doctrine of equivalents, and denies that any product made, used, offered for sale, sold, or imported by Peak Tactical infringes the '336 Patent.

79.     Peak Tactical denies that the referenced claim chart accurately compares the Disruptor to claim 3 of the '336 Patent. Peak Tactical specifically denies that the Disruptor, when assembled and used as intended, meets each and every limitation of claim 3 (whether literally or under the doctrine of equivalents), denies that any images or annotations in the chart establish infringement, and denies the remaining allegations in Paragraph 79 of the Complaint.

80.     Denied. Peak Tactical specifically denies that it has taken, or is taking, any active steps to induce, encourage, or facilitate direct infringement of the '336 Patent by others, denies

22

that it has the requisite knowledge or intent to induce infringement, and denies that any customer or dealer has been induced to infringe. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as an "Accused Product." To the extent Paragraph 80 references website content, the cited page speaks for itself; Peak Tactical admits only that the Partisan Triggers website may include general product information and standard installation and safety guidance intended for lawful, non-infringing use. Peak Tactical denies that any such content instructs or encourages infringing conduct or establishes inducement.

81.    Denied. Peak Tactical specifically denies that it knew or should have known that any activity would induce infringement of the '336 Patent, denies that any forum postings, hyperlinks to publicly available patents on a website "Library" page, or allegations made in the Arizona action establish the requisite knowledge or intent to induce infringement, and denies that any customer or dealer has been induced to infringe. Peak Tactical further denies any implication that the Disruptor infringes any claim of the '336 Patent.

82.    Denied. Peak Tactical specifically denies that it has contributed to the infringement of any claim of the '336 Patent by any customer or third party; denies that any product or component supplied by Peak Tactical is a material part of any patented combination "specially designed and adapted" for use in infringement with the requisite knowledge and intent; denies that any "components of [an] Infringing Device," including any trigger subassembly, lack substantial non-infringing uses; and denies that any component is designed or adapted to "forcibly reset a trigger mechanism" in the manner alleged or to meet the limitations of the '336 Patent. To the contrary, the Disruptor and its components have substantial lawful, non-infringing uses, including standard semi-automatic operation and an assisted/positive/forced-reset mode, that do not satisfy the asserted claim limitations.

23

83.     Denied. Peak Tactical specifically denies that it has engaged in "egregious infringement behavior," denies that it had knowledge of the '336 Patent in any manner that establishes willfulness, denies that any belief regarding infringement or validity was objectively or subjectively unreasonable, and denies that Peak Tactical has continued any infringing activities. Peak Tactical further denies any implication that the '336 Patent is valid, enforceable, or infringed.

84.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered any injury caused by Peak Tactical, denies that Peak Tactical is liable to Plaintiffs under 35 U.S.C. § 271 for any alleged infringement of the '336 Patent, and denies that the '336 Patent is valid, enforceable, or infringed.

85.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered or will suffer irreparable injury, denies that any injunctive relief is warranted, and denies that Peak Tactical has infringed any valid and enforceable claim of the '336 Patent. *See* Dkt. No. 39. Plaintiffs have an adequate remedy at law and, to the extent any cognizable harm were proven, such harm would be fully compensable and calculable in monetary damages (e.g., lost profits and any alleged price erosion), particularly given that triggers are durable, one-time purchases.

86.     Denied. Peak Tactical specifically denies that Plaintiffs have suffered any damages caused by Peak Tactical and denies that the '336 Patent is valid, enforceable, or infringed.

87.     Denied. Peak Tactical specifically denies that this case is "exceptional" within the meaning of 35 U.S.C. § 285 and denies that Plaintiffs are entitled to recover attorneys' fees or costs. Peak Tactical further denies that the '336 Patent is valid, enforceable, or infringed.

88.     Denied. Peak Tactical specifically denies that any act by Peak Tactical constitutes infringement, denies that any conduct was willful, and denies that Peak Tactical acted with any

24

purpose to harm Plaintiffs' business, sales, reputation, or goodwill. Peak Tactical further denies that Plaintiffs have suffered or will suffer irreparable harm.

89.     Denied. Peak Tactical specifically denies that Plaintiffs have been substantially harmed by any conduct of Peak Tactical, denies that Plaintiffs are entitled to any of the requested relief, including any preliminary or permanent injunction, damages (whether alleged lost profits, reasonable royalty, or price-erosion), enhanced damages, attorneys' fees, or costs, and denies that the '336 Patent is valid, enforceable, or infringed.

## COUNT IV – ALLEGED INFRINGEMENT OF THE '807 PATENT

90.     Peak Tactical incorporates by reference its responses to the paragraphs above as if fully set forth herein.

91.     Denied. Peak Tactical specifically denies that it has infringed, induced others to infringe, or contributed to the infringement of any claim of the '807 Patent, including claim 1, whether literally or under the doctrine of equivalents, and denies that it has made, used, offered for sale, sold, or imported any product that infringes the '807 Patent. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as infringing, and denies all remaining allegations in Paragraph 91 of the Complaint.

92.     Denied. Peak Tactical specifically denies that it has willfully infringed, induced others to infringe, or contributed to the infringement of any claim of the '807 Patent, including claim 1, whether literally or under the doctrine of equivalents, and denies that any product made, used, offered for sale, sold, or imported by Peak Tactical infringes the '807 Patent.

93.     Peak Tactical denies that the referenced claim chart accurately compares the Disruptor to claim 1 of the '807 Patent. Peak Tactical specifically denies that the Disruptor, when assembled and used as intended, meets each and every limitation of claim 1 (whether literally or

25

under the doctrine of equivalents), denies that any images or annotations in the chart establish infringement, and denies the remaining allegations in Paragraph 93 of the Complaint.

94.     Denied. Peak Tactical specifically denies that it has taken, or is taking, any active steps to induce, encourage, or facilitate direct infringement of the '807 Patent by others, denies that it has the requisite knowledge or intent to induce infringement, and denies that any customer or dealer has been induced to infringe. Peak Tactical further denies Plaintiffs' characterization of the Disruptor as an "Accused Product." To the extent Paragraph 94 references website content, the cited page speaks for itself; Peak Tactical admits only that the Partisan Triggers website may include general product information and standard installation and safety guidance intended for lawful, non-infringing use. Peak Tactical denies that any such content instructs or encourages infringing conduct or establishes inducement.

95.     Denied. Peak Tactical specifically denies that it knew or should have known that any activity would induce infringement of the '807 Patent, denies that any forum postings, hyperlinks to publicly available patents on a website "Library" page, or allegations made in the Arizona action establish the requisite knowledge or intent to induce infringement, and denies that any customer or dealer has been induced to infringe. Peak Tactical further denies any implication that the Disruptor infringes any claim of the '807 Patent.

96.     Denied. Peak Tactical specifically denies that it has contributed to the infringement of any claim of the '807 Patent by any customer or third party; denies that any product or component supplied by Peak Tactical is a material part of any patented combination "specially designed and specially adapted" for use in infringement with the requisite knowledge and intent; denies that any "components of [an] Infringing Device," including any trigger subassembly, lack substantial non-infringing uses; and denies that any component is designed or adapted to "forcibly

26

reset a trigger mechanism" in the manner alleged or to meet the limitations of the '807 Patent. To the contrary, the Disruptor and its components have substantial lawful, non-infringing uses, including standard semi-automatic operation and an assisted/positive/forced-reset mode, that do not satisfy the asserted claim limitations.

97.    Denied. Peak Tactical specifically denies that it has engaged in "egregious infringement behavior," denies that it had knowledge of the '807 Patent in any manner that establishes willfulness, denies that any belief regarding infringement or validity was objectively or subjectively unreasonable, and denies that Peak Tactical has continued any infringing activities. Peak Tactical further denies any implication that the '807 Patent is valid, enforceable, or infringed.

98.    Denied. Peak Tactical specifically denies that Plaintiffs have suffered any injury caused by Peak Tactical, denies that it is liable to Plaintiffs under 35 U.S.C. § 271 for any alleged infringement of the '807 Patent, and denies that the '807 Patent is valid, enforceable, or infringed.

99.    Denied. Peak Tactical specifically denies that Plaintiffs have suffered or will suffer irreparable injury, denies that any injunctive relief is warranted, and denies that Peak Tactical has infringed any valid and enforceable claim of the '807 Patent. *See* Dkt. No. 39. Plaintiffs have an adequate remedy at law and, to the extent any cognizable harm were proven, such harm would be fully compensable and calculable in monetary damages (e.g., lost profits and any alleged price erosion), particularly given that triggers are durable, one-time purchases.

100.    Denied. Peak Tactical specifically denies that Plaintiffs have suffered any damages caused by Peak Tactical and denies that the '807 Patent is valid, enforceable, or infringed.

101.    Denied. Peak Tactical specifically denies that this case is "exceptional" within the meaning of 35 U.S.C. § 285 and denies that Plaintiffs are entitled to recover attorneys' fees or costs. Peak Tactical further denies that the '807 Patent is valid, enforceable, or infringed.

27

102.    Denied. Peak Tactical specifically denies that any act by Peak Tactical constitutes infringement, denies that any conduct was willful, and denies that Peak Tactical acted with any purpose to harm Plaintiffs' business, sales, reputation, or goodwill. Peak Tactical further denies that Plaintiffs have suffered or will suffer irreparable harm.

103.    Denied. Peak Tactical specifically denies that Plaintiffs have been substantially harmed by any conduct of Peak Tactical, denies that Plaintiffs are entitled to any of the requested relief, including any preliminary or permanent injunction, damages (whether alleged lost profits, reasonable royalty, or price-erosion), enhanced damages, attorneys' fees, or costs, and denies that the '807 Patent is valid, enforceable, or infringed.

## COUNT V – FALSE PATENT MARKING

104.    Peak Tactical incorporates by reference its responses to the paragraphs above as if fully set forth herein.

105.    Denied. Peak Tactical specifically denies that the claims of U.S. Patent No. 9,146,067 do not cover the functionality at issue and states that, among other things, claim 19 of the '067 Patent claims selector-based adjustment of trigger travel via aligned stop surfaces applicable to positive/assisted/forced reset architectures. Peak Tactical further states that industry and regulatory usage treats "assisted reset," "forced reset," and "positive reset" as interchangeable descriptors for the same cycling-driven reset phenomenon, and that the Disruptor practices at least claim 19 of the '067 Patent.

106.    Denied. Peak Tactical specifically denies that the Disruptor is a "forced reset trigger" as Plaintiffs use that term, denies that the claims of U.S. Patent No. 9,146,067 do not cover the Disruptor, and denies that Peak Tactical knew or believed otherwise. Peak Tactical further states that industry and regulatory usage—as opposed to Plaintiffs' usage—treats "assisted reset,"

"forced reset," and "positive reset" as interchangeable descriptors for the same cycling-driven reset phenomenon, and that the Disruptor practices at least claim 19 of the '067 Patent.

107.    Denied. Peak Tactical specifically denies that all claims of U.S. Patent No. 9,146,067 require a "reset lever" struck by a hammer; for example, independent claim 19 claims selector-based stop geometry that adjusts trigger travel distances and does not recite any separate reset-lever limitation. Peak Tactical further denies that the Disruptor lacks any structure that could satisfy any properly construed limitation of the '067 Patent and states that the Disruptor practices at least claim 19 of the '067 Patent. Peak Tactical denies the remaining allegations in Paragraph 107.

108.    Denied. Peak Tactical specifically denies that all claims of U.S. Patent No. 9,146,067 require "the trigger to be reset less than the full travel of the trigger," and denies that such a characterization exclude the Disruptor. To the extent claim 19 of the '067 Patent recites different selector stop clearances that result in a shorter trigger travel distance in one selector position ($D2 < D1$), Peak Tactical states that the Disruptor presents different selector stop surfaces aligned with the trigger tail in different positions that produce a shorter travel distance, and therefore satisfies that limitation. Peak Tactical denies the remaining allegations in Paragraph 108, including any implication that the Disruptor is not covered by or does not practice at least claim 19 of the '067 Patent.

109.    Denied. Peak Tactical specifically denies that Peak Tactical "falsely promote[s]" the Disruptor as not being a forced reset trigger or as being covered by U.S. Patent No. 9,146,067, denies that any such statements deceive reseller or end-user customers, and denies that any reference to the '067 Patent suggests reduced infringement risk with respect to Plaintiffs' patents.

29

Peak Tactical further denies that the Disruptor falls outside the scope of the '067 Patent and states that the Disruptor practices at least claim 19 of that patent.

110. Denied.

111. Denied. Peak Tactical specifically denies that Plaintiffs have suffered any competitive injury arising from any statement by Peak Tactical, denies that Peak Tactical made any false or deceptive statement or marked any product with intent to deceive, and denies that Plaintiffs are entitled to recover any damages under 35 U.S.C. § 292. Peak Tactical further denies any implication that the Disruptor is outside the scope of U.S. Patent No. 9,146,067 or that any reference to that patent was improper.

## COUNT VI – ALLEGED FALSE ADVERTISING UNDER THE LANHAM ACT

112. Peak Tactical incorporates by reference its responses to the paragraphs above as if fully set forth herein.

113. Denied. Peak Tactical specifically denies that it has violated Section 43(a)(1)(B) of the Lanham Act, denies that it made any false or misleading statements of fact in commercial advertising or promotion, and denies that any statement by Peak Tactical misrepresents the nature, characteristics, or qualities of the Disruptor. Peak Tactical further denies that any challenged statement is material or that Plaintiffs have suffered any cognizable injury proximately caused by any statement by Peak Tactical.

114. Peak Tactical admits that the Partisan Triggers website includes a product page for the Disruptor and that the page contains general product information. Peak Tactical denies that any statement on the website is false or misleading, denies that Peak Tactical "falsely advertise[s] and promote[s]" the Disruptor as an "assisted reset trigger" or as covered by U.S. Patent No. 9,146,067, and denies the remaining allegations in Paragraph 114. Peak Tactical further states that industry

and regulatory usage treats "assisted reset," "forced reset," and "positive reset" as interchangeable descriptors for the same cycling-driven reset phenomenon, and that the Disruptor practices at least claim 19 of the '067 Patent.

115.    Denied. Peak Tactical denies that the Disruptor is "in fact, a forced reset trigger" as Plaintiffs use that term to distinguish it from an "assisted reset trigger." Peak Tactical further states that industry and regulatory usage—as opposed to Plaintiffs' usage—treats "assisted reset," "forced reset," and "positive reset" as interchangeable descriptors for the same cycling-driven reset phenomenon, and that describing the Disruptor as an "assisted reset trigger" is accurate and not misleading. Peak Tactical further denies that the claims of U.S. Patent No. 9,146,067 do not cover the Disruptor. By way of example, independent claim 19 of the '067 Patent claims selector-based adjustment of trigger travel via aligned stop surfaces and does not require a separate "reset lever" struck by the hammer. To the extent claim 19 recites different selector stop clearances that result in a shorter trigger travel distance in one selector position (D2 < D1), the Disruptor presents different selector stop surfaces aligned with the trigger tail in different positions that produce a shorter travel distance. Peak Tactical therefore denies that the Disruptor falls outside the scope of the '067 Patent or lacks structures meeting any properly construed limitation.

116.    Peak Tactical admits only that the Partisan Triggers website includes a product page for the Disruptor and navigation links that direct visitors to authorized dealers (including "Where To Find," "Where can I buy one?" and dealer listings such as "Available Now" and "Coming Soon"), and that the website is accessible across state lines. Peak Tactical denies that any statement on the website is false or misleading or constitutes false advertising or promotion, denies that any such statements are material or likely to deceive, and denies that Peak Tactical sells the Disruptor directly through the website (sales occur through authorized dealers). Peak Tactical denies the

31

remaining allegations in Paragraph 116, including any implication that the cited content establishes a violation of the Lanham Act.

117.    Denied. Peak Tactical specifically denies that any statement by Peak Tactical is material or has a tendency to deceive a substantial portion of the intended audience, denies that the reference to U.S. Patent No. 9,146,067 or the description "assisted reset trigger" misleads consumers into believing the Disruptor possesses qualities it does not have, and denies that any such statement suggests reduced risk of infringement of Plaintiffs' patents. Peak Tactical further denies that Plaintiffs have suffered or will suffer any cognizable injury, loss of sales, or erosion of market share proximately caused by any statement by Peak Tactical.

118.    Denied. Peak Tactical specifically denies that Plaintiffs have suffered or are likely to suffer any injury, competitive harm, lost sales, diverted business, damage to reputation or goodwill, or erosion of market share proximately caused by any statement or conduct of Peak Tactical; denies that any challenged statement is false or misleading; and denies that Plaintiffs are entitled to any relief under the Lanham Act.

119.    Denied. Peak Tactical specifically denies that any conduct was willful or that Peak Tactical was aware of or consciously disregarded any alleged falsity, denies that references to U.S. Patent No. 9,146,067 or the description "assisted reset trigger" are false or misleading, and denies that Plaintiffs are entitled to any enhanced or additional remedies.

120.    Denied.

121.    Denied. Peak Tactical specifically denies that Plaintiffs have suffered or will suffer irreparable injury arising from any statement or conduct by Peak Tactical, denies that any injunctive relief is warranted under the Lanham Act or otherwise, and denies that Peak Tactical

engaged in any false or misleading advertising. Plaintiffs have an adequate remedy at law for any alleged, legally cognizable harm, which Peak Tactical further denies.

122.   Denied.

123.   Denied. Peak Tactical specifically denies that any statement or act by Peak Tactical constitutes false advertising, denies that any conduct was willful, and denies that any conduct was undertaken for the purpose of deliberately or irreparably harming Plaintiffs' business, sales, reputation, or goodwill. Peak Tactical further denies that Plaintiffs have suffered any irreparable harm. Peak Tactical also states that its product descriptions and references to U.S. Patent No. 9,146,067 and to the Disruptor as an "assisted reset trigger" are accurate and were made in good faith based on their understanding of industry usage and the scope of that patent.

124.   Denied. Peak Tactical specifically denies that Plaintiffs have been substantially harmed by any advertising or promotion by Peak Tactical, denies that Peak Tactical engaged in any false or misleading advertising, and denies that Plaintiffs are entitled to any of the requested relief, including a preliminary or permanent injunction, actual damages, disgorgement of profits, treble damages, costs, or attorneys' fees. Peak Tactical further denies that this is an "exceptional case," denies any willful conduct, denies that Plaintiffs have suffered or will suffer irreparable harm, and denies that any alleged harm was proximately caused by any statement or act of Peak Tactical. Plaintiffs have an adequate remedy at law for any alleged, legally cognizable injury, which Peak Tactical further denies.

## RESPONSE TO PLAINTIFFS' PRAYER FOR RELIEF

125.   Peak Tactical denies that Plaintiffs are entitled to any of the relief sought in the Prayer for Relief and request that the Court deny any and all of the relief requested by Plaintiffs.

## PLAINTIFFS' JURY DEMAND

126.    Peak Tactical is not required to provide a response to Plaintiffs' demand for a jury trial. Peak Tactical hereby demands a trial by jury on all issues so triable.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

Without admitting any allegation in the Complaint and expressly denying all liability, Defendant Peak Tactical, LLC d/b/a Partisan Triggers asserts the following additional and affirmative defenses. Peak Tactical's assertion of any defense herein does not mean or impose upon Peak Tactical the burden of proving any such defense. Peak Tactical reserves the right to amend, supplement, or add defenses as discovery progresses.

### Failure to State a Claim

Plaintiffs' Complaint fails to state claims upon which relief can be granted. The patent counts do not plausibly allege that Peak Tactical's Disruptor trigger meets each and every limitation of any asserted claim of U.S. Patent Nos. 10,514,223, 11,724,003, 12,036,336, or 12,274,807, either literally or under the doctrine of equivalents. The false marking (35 U.S.C. § 292) and Lanham Act (15 U.S.C. § 1125(a)) counts do not plausibly allege falsity, materiality, intent to deceive, likelihood of deception, causation, or cognizable injury.

### Non-Infringement (35 U.S.C. § 271)

The Disruptor does not infringe any asserted claim. The asserted claims require, *inter alia*, that during rearward movement of the bolt carrier the disconnector hook catch the hammer hook (in "standard semi-automatic" mode), and that hammer-trigger contact "causes" the trigger to be forced to a claim-defined "set position" and that a locking member be moved "as the bolt carrier reaches a substantially in-battery position." The Disruptor's kinematics differ: (i) any disconnector engagement occurs (if at all) only later during forward travel with subsequent user action; (ii) at

34

the instant of hammer contact the trigger is not in the "set position" (sear/sear-catch engaged) as defined by the claims; and (iii) any gating member does not move in the way or at the time the claims require. Additionally, the "substantially in-battery position" and "set position" limitations, depending on how these terms may be construed by the Court, are not met by the Disruptor's geometry and timing. That gate/timing term requires construction and, under any reasonable construction, is not satisfied by the Disruptor's operation. Furthermore, the Disruptor's three-position selector geometry differs materially from the claimed configurations: its assisted/positive/forced-reset mode alters the disconnector's functional relationship in a manner not encompassed by the asserted claims.

Indirect infringement is also not present. Peak Tactical lacks knowledge and specific intent, and any Disruptor components are capable of substantial non-infringing uses (including standard semi-automatic mode); no underlying direct infringement by any single actor is plausibly alleged.

### **Invalidity (35 U.S.C. §§ 101, 102, 103, 112)**

The asserted claims of the Asserted Patents are invalid because they do not claim any inventive advance over the state of the art at the time of filing. Long before Plaintiffs' earliest asserted priority date (2017 for the '223 Patent and 2022 for the '003, '336, and '807 Patents), the core concepts now claimed (cycle driven (assisted/forced/positive) trigger reset in an AR pattern fire control group; a three-position selector providing safe, standard semi-automatic, and an assisted/forced/positive-reset semi-automatic mode; and an out-of-battery gating/locking member that prevents release until the bolt carrier returns to battery) were all disclosed and, in modern form, commercialized.

For example, U.S. Patent No. 9,146,067 to Michael Stakes and its commercial embodiment, the Tac-Con 3MR trigger, publicly launched in late 2013 and widely reported in

35

2014–2015. The '067 Patent describes, and the ATF Firearms Technology Branch confirmed in an October 8, 2013 letter, a drop-in AR-15 fire control module with a three-position selector (safe; standard semi-automatic; and a third "positive reset"/assisted/forced-reset semi-automatic mode) in which the cycling bolt carrier, via hammer contact with a reset lever, applies force to the trigger, "forces the shooter's finger forward," and rapidly resets the trigger for the next shot. Trade publications echoed that description and taught the industry how it worked: the third mode provides a "positive reset," "achieved by transferring the force from the bolt carrier through the trigger assembly to assist the trigger back onto the sear," thereby reducing split times. That commercial record, including NRA American Rifleman (Jan. 14, 2014), Gun Digest (Jan. 2, 2014), Small Arms Review (Feb. and May 2014), and Shooting Illustrated (2014–2015), established before the '223 Patent's filing by multiple years, left no doubt about what was already known: a three-mode, drop-in AR trigger in which cycling energy drives the trigger forward toward reset more aggressively than a standard return spring.

The only "differences" Plaintiffs now point to in their claims are not inventive. To the extent the '223 Patent emphasizes hammer-to-trigger "contact" that "causes" the trigger member to be forced to a set position, by 2015–2017 Bonner's U.S. Patent No. 9,829,263 already taught that feature. Bonner described four rapid-reset embodiments, including one with an integral contact surface on the trigger member (Fig. 19) that the hammer surface engages during cycling to cam or drive the trigger forward into reset, and expressly recognized that whether that contact surface is implemented as an insert/lever or as part of the trigger body is a matter of "arrang[ing] and design[ing] in a wide variety of different configurations." A person of ordinary skill in the art would have understood that integrating the reset surface into the trigger body, instead of using a separate lever keyed to the selector, was a packaging choice, not a change in principle.

36

Likewise, the "locking member" that is spring-biased to a blocking position and is "moved" to a permissive position "as the bolt carrier reaches a substantially in-battery position" is nothing more than the century-old out-of-battery gating function that firearms designers have implemented since the turn of the 20th century. Browning's 1900 patent (U.S. Pat. No. 659,507) described a recoiling firearm using an "inertia piece" interlock to keep the action locked until counter-recoil was complete and only then "free" it. Michal's 1936 and 1938 patents (U.S. Pat. Nos. 2,056,975 and 2,139,691) explicitly taught "means, under the influence of the recoil of the slide," to "move the trigger forward against the pressure of the trigger-finger," and "means, under the influence of the counter-recoil of the slide," to "free the trigger" for firing under continued pressure. Hyde's 1945 patent (U.S. Pat. No. 2,367,280) explained that out-of-battery safeties "hold[] the cocking member … against release" until the action returns to battery. And the Remington Model 11 trigger group (still available in museums and private collections) shows the same functional architecture: a rearward projection ("hump") on the trigger that the hammer engages during cycling to force the trigger forward (reset), and a separate safety/sear/out-of-battery interlock that prevents release until the bolt closes. Plaintiffs have simply relabeled these longstanding gating concepts as a "locking member," but the function and result were decades old.

Under *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." That is exactly what the asserted claims do. Each asserted patent arranges, in the AR pattern context, the same small set of familiar elements: (i) a hammer, trigger member, and disconnector pivoting on standard AR pins; (ii) a cycling-driven trigger reset via hammer contact with a trigger-associated surface; (iii) a manual selector with three positions (safe; standard semi-automatic; assisted/forced/positive reset) that alters trigger/disconnector

relationships; and (iv) a gating/out-of-battery member keyed to the bolt carrier's return to battery, without changing their functions. The Tac-Con 3MR/'067 Patent indisputably disclosed (i)–(iii), and the record shows that (iv) was a well-known safety practice, with modern embodiments prototyped in 2015–2016 for the 3MR to address "outrun" timing issues reported by users. Substituting Bonner's integral trigger contact surface for a reset lever, or adding a spring-biased interlock keyed to bolt closure to a 3MR-style design, would have been, at most, a predictable combination yielding the very behavior Plaintiffs tout: faster resets with one-shot-per-trigger-function semi-automatic operation and an out-of-battery block. These incremental changes would have been obvious to a person having ordinary skill in the art ("POSITA") reading the '067 Patent, the 3MR trade-press record, Bonner, and the body of gating art.

The prosecution histories reinforce how little rigor the PTO applied to these claims. For the '223 Patent, the examiner allowed claims after concluding that Foster did not disclose a trigger member surface contacted by the hammer to force the trigger to the set position and that he could find no art teaching that functionality. But Bonner '263, the '067 Patent, and even the 3MR's widely circulated ATF and trade-press materials directly addressed that very concept years earlier. For the later file family ('003, '336, and '807 Patents), the applicant flooded the record with an IDS listing over a hundred references, but the examiners issued no prior art rejections and in the '807 Patent expressly deemed the claims "not patentably distinct" from the earlier patent family. At no point did any examiner engage substantively with the 3MR/'067 Patent record or the classic gating art. If those references had been applied with the ordinary rigor required by §§ 102 and 103, the claims would not have issued.

38

Even if the Court were to accept Plaintiffs' broad constructions (which Peak Tactical disputes) in an attempt to read these claims onto the Disruptor's different mechanics, those constructions raise serious § 112 problems. The claims use ambiguous, timing-dependent phrases such as "substantially in-battery position," as the time at which the locking member must be moved, and define "set position" as a state "wherein said sear and sear catch are in engagement." But the specifications do not supply objective boundaries to inform a POSITA what "substantially in-battery" means in the AR-cycle or when, in the milliseconds of cycling dynamics, the claimed transitions must occur. Plaintiffs' own infringement theory (e.g., that "hammer contact … causes the trigger member to be forced to the set position") cannot square with the claim-defined "set position" (sear/sear-catch engagement) at the claimed time if, in the real world, that engagement cannot occur until later in the cycle, highlighting both a lack of enablement under § 112(a) for the full scope they now urge and indefiniteness under § 112(b).

In short, the asserted claims "simply arrange[] old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement." *KSR*, 550 U.S. at 417 (citation omitted). The '067 Patent and its commercial 3MR embodiment taught the industry how to build an assisted/positive/forced-reset, three-mode drop-in AR trigger years before Plaintiffs filed. Bonner taught hammer-to-trigger contact surfaces (including integral trigger surfaces) that drive reset. And gating/out-of-battery safety mechanisms tied to action closure have been part of the firearms art for generations. Any differences Plaintiffs added, including selectable modes, stop geometry, and gating linked to bolt carrier return, apply well-known components in well-known ways to achieve a predictable result. The claims are therefore invalid under §§ 102 and 103, and to the extent Plaintiffs' expansive reading is required to reach the Disruptor, they run afoul of § 112 as well.

39

**Prosecution Misconduct/Inequitable Conduct/Prosecution Bar Violation (Unenforceability)**

The Asserted Patents are unenforceable because they were procured through a pattern of prosecution misconduct that violates the duty of candor and good faith to the United States Patent and Trademark Office ("USPTO"), 37 C.F.R. § 1.56, and meets the standards for inequitable conduct set forth in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*). Long before Plaintiffs filed the Asserted Patents, the heart of what they now claim was already disclosed and commercialized by the '067 Patent to Michael Stakes and the Tac-Con 3MR trigger launched in late 2013 and widely covered in 2014–2015. Those materials described the same three-position selector (safe/standard semi/positive-reset semi) and the same cycling-driven reset mechanism the asserted claims now recite. The Bureau of Alcohol, Tobacco, Firearms and Explosives' Firearms Technology Branch documented the 3MR's operation in an October 8, 2013, letter: the hammer contacts a reset lever during cycling, "applies force to the trigger, forces the shooter's finger forward, and allows the trigger to reset rapidly." Trade publications explained that the 3MR's "positive reset" is "achieved by transferring the force from the bolt carrier through the trigger assembly to assist the trigger back onto the sear." Plaintiffs, their owners, and their counsel were well aware of this record. Rare Breed publicly acknowledged and tried to purchase the '067 Patent and built a litigation and marketing campaign around distinguishing their products from the 3MR. Yet, when it suited them, the patent applicants and their agents did not put that record before the PTO.

The '223 Patent prosecution proceeded without the examiner ever substantively considering the '067 Patent/3MR record or the Bonner U.S. Patent No. 9,829,263, which as early as 2015 taught the very hammer-to-trigger contact mechanisms (including an integral trigger surface) that Plaintiffs now claim as "novel." The '223 Patent examiner allowed the claims based on an asserted inability to find art teaching a trigger member with a surface contacted by the

40

hammer that "causes" the trigger to be forced to its set position. That conclusion was wrong; it could only have been reached because the most material prior art was never meaningfully presented. In the later continuations, applicants dumped 100+ references into an Information Disclosure Statement, but the examiners issued no prior art rejections, and in the '807 Patent expressly concluded that the claims were not patentably distinct from earlier filings. The burying of the '067 Patent among a sea of references without candor about the 3MR's real-world operation and industry teachings does not satisfy the duty of disclosure. It is the kind of "burying" that the Federal Circuit has recognized may support an inference of intent to deceive when coupled with other misconduct.

In addition, upon information and belief, while receiving confidential information in Rare Breed's 2021–2022 Florida litigation, Rare Breed's litigation counsel, Glenn Bellamy, signed protective orders containing prosecution bars that prohibited him from prosecuting patents on the subject matter at issue. Within weeks of those orders, he secretly filed multiple patent applications directed to forced-reset triggers (including the application leading to the '003 Patent). The contemporaneous documentary record (*see Rare Breed Triggers, Inc. v. Big Daddy Enterprises, Inc.*, Case No. 1:25-cv-00181, ECF No. 78 (N.D. Fla. Aug. 11, 2025)) shows that those filings targeted the very products and design paths at issue in that litigation (e.g., WOT and Alamo-15 triggers) and sought expedited issuance through the USPTO's Track One program. When opposing counsel in that case raised the prosecution bar, Mr. Bellamy downplayed the violation as "forgetting" and then proceeded to hide in discovery the patent filings that bore his name— producing only selected pages of provisional applications and withholding the PTO documents (assignments, data sheets, powers of attorney, receipts) that would have revealed his involvement. His firm then laundered additional filings through a partner, Wayne Jacobs, even as the firm's

customer number and his assistant's filings appeared on the face of the papers. These are the precise hallmarks of a deliberate scheme to evade court-imposed bars and conceal those breaches when it mattered most.

Inequitable conduct requires "but-for" materiality or egregious misconduct. *Therasense*, 649 F.3d at 1292. Both are present here. The '067 Patent/3MR record, combined with Bonner and the long-standing gating/out-of-battery art, was the most material prior art to the asserted claims. Had the examiners been forced to confront that record, they would have rejected the claims. The prosecution histories bear this out: the examiners never rejected on those grounds because the applicants never fairly presented those grounds. Moreover, the egregiousness of the conduct (filing and reviving claims on the accused subject matter while under a prosecution bar; concealing those filings and misrepresenting the completeness of produced records; and making an "unintentional abandonment" revival representation that, given the procedural history of the Blakely U.S. Patent No. 7,398,723, is at best reckless) justifies unenforceability without a separate "but-for" showing. *See Therasense*, 649 F.3d at 1292 (recognizing "affirmative egregious misconduct" as a standalone basis); *see also Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351–53 (Fed. Cir. 2017) (affirming adverse-inference finding of specific intent to deceive based on a pattern of discovery misconduct designed to conceal the prosecution record).

Further, Plaintiffs' pattern of deception and regulatory evasion, already adjudicated by a federal court, confirms the egregiousness of their misconduct and supports an adverse inference of specific intent to deceive the PTO, while independently barring equitable relief under unclean hands. As detailed in *U.S. v. Rare Breed Triggers, LLC, et al.*, No. 23-cv-369 (E.D.N.Y. Sept. 5, 2023), the court found, *inter alia*, that Rare Breed: (i) deliberately used fictitious company names "Red Beard Treasures" and "Red Barn Tools" on USPS mailing labels to evade ATF oversight

(pp. 107–112); (ii) attempted to thwart execution of a federal seizure by loading a pallet of FRT-15 triggers into a U-Haul and driving hundreds of miles before the ATF intercepted them (pp. 31, 115–116); and (iii) knowingly filed a false declaration with the federal court about New York sales to defeat personal jurisdiction (pp. 85–88). Those findings are not isolated lapses; they mirror the same "deceit, craft or trickery" courts condemn when evaluating fraud against the United States and warrant equitable forfeiture. *See Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814–16 (1945) (unclean hands bars enforcement of patents procured or asserted through inequitable conduct); *Regeneron Pharm.*, 864 F.3d at 1351–53 (adverse inference of intent appropriate based on pattern of discovery misconduct concealing prosecution record). In the context of Plaintiffs' prosecution misrepresentations and burying of highly material art, this court-recognized pattern of evasion and falsehood reinforces the inference that Plaintiffs and their agents possessed the specific intent to deceive the PTO. At a minimum, it demonstrates Plaintiffs' unclean hands and lack of entitlement to any equitable relief in this case.

Simply put, Plaintiffs' bad acts are not an isolated misstep. They are a through-line: accelerate issuance while hiding the closest art and the real-world record; enlarge patent portfolios through continuations deemed "not patentably distinct"; violate court-ordered bars to file new applications targeting opponents' products; and then brandish those patents in subsequent cases to suppress competition, all while deliberately lying to the public and other federal courts. Equity does not countenance such tactics. Plaintiffs' Asserted Patents should be held unenforceable for inequitable conduct; at a minimum, this Court should draw an adverse inference that the applicants, through their agents, had the specific intent to deceive the USPTO. Independent of inequitable conduct, these same facts also bar the equitable relief Plaintiffs seek under the doctrines of unclean hands and estoppel.

43

**Patent Misuse**

Plaintiffs have engaged in patent misuse by attempting to leverage the asserted patents to monopolize a field of long-known technology (cycle driven/assisted/positive/forced-reset triggers with out-of-battery gating), filing scattershot suits against dealers and competitors to chill lawful competition, and seeking to extend their patent rights beyond any lawful scope (including asserting claims they knew or should have known are invalid and not infringed). Misuse renders the patents unenforceable unless and until purged.

**No Willfulness / No Exceptional Case**

Peak Tactical has not acted willfully. Prior to launch, Peak Tactical conducted extensive diligence, retained insurance underwritten after merits analysis, and relied in good faith on publicly-available art ('067 Patent/3MR) and internal testing. Disagreements about claim scope, validity, and non-infringement, particularly where the PTO never substantively confronted the most relevant art, cannot support willfulness. Nor is this an "exceptional case" under § 285.

**Adequate Remedy at Law / No Irreparable Harm / No Injunctive Relief**

Any alleged harm is fully compensable in monetary remedies (lost profits/royalty/price erosion), particularly given that triggers are durable, one-time purchases and any alleged "price erosion" or "market share" loss is quantifiable. Plaintiffs delayed months before suing Peak Tactical (despite public announcements), opted to sue dealers first in multiple districts without seeking early injunctive relief, and have a demonstrated pattern of using litigation to chill competition rather than to redress cognizable harms. Public interest favors competition and lawful aftermarket innovation.

**No Indirect Infringement / Substantial Non-Infringing Uses**

44

To the extent Plaintiffs allege contributory or induced infringement, Peak Tactical lacked the requisite pre-suit knowledge and specific intent; any Disruptor component is a staple article of commerce with substantial non-infringing uses (standard semi-automatic mode). Peak Tactical does not instruct or encourage any infringing use.

### Waiver, Estoppel, and Laches (Equitable Defenses)

Plaintiffs' conduct, including strategic delay in suing Peak Tactical while filing numerous dealer suits elsewhere; inconsistent enforcement positions; deliberate misrepresentations to the public and other federal courts; and failure to disclose material information to the PTO, waives or estops their claims and bars equitable relief. To the extent laches remains available as an equitable defense to injunctive relief, Plaintiffs' delay weighs against injunctive relief.

### Truth / No Falsity (Lanham Act; 15 U.S.C. § 1125(a))

The challenged statements in Peak Tactical's product page are true or, at minimum, not misleading: describing the Disruptor as an "assisted reset trigger" is accurate and consistent with industry/regulatory usage (ATF and trade press used "assisted," "forced," and "positive" reset interchangeably to describe the same cycling-driven phenomenon) and reference to "U.S. Patent 9,146,067" is accurate because the Disruptor practices at least claim 19 (selector stop surfaces aligned with the trigger tail that alter trigger travel distances). Plaintiffs cannot establish literal falsity or misleadingness, materiality, or likely deception of a substantial segment of consumers; nor can they show proximate causation or cognizable damages.

### No Intent to Deceive (False Marking; 35 U.S.C. § 292)

Peak Tactical lacked any intent to deceive. Any marking/reference to the '067 Patent was made in good faith based on Michael Stakes' inventorship and public disclosures, Peak Tactical's own testing, and the plain language of claim 19. Moreover, the description "assisted reset trigger"

45

reflects common industry usage and is not a mischaracterization. In any event, Plaintiffs cannot show competitive injury proximately caused by any alleged marking.

## Unclean Hands (Lanham Act and Equitable Relief)

As detailed above, Plaintiffs come to this Court with unclean hands: engaging in widespread litigation to suppress a class of lawful aftermarket products; reviving and asserting patents while counsel was subject to a prosecution-bar; selectively withholding prosecution materials in prior litigation; and lying to other federal courts in order to avoid injunctions issued against them. This misconduct bars equitable relief on the Lanham Act claim and weighs heavily against any injunctive relief.

## Failure to Mitigate

Plaintiffs failed to mitigate their alleged damages, if any. Plaintiffs' own pricing and sales strategies, litigation choices, and delays exacerbate any alleged harm. Any recovery must be reduced accordingly.

## Reservation of Rights

Peak Tactical reserves the right to assert additional defenses, including but not limited to inequitable conduct with additional factual detail, once discovery clarifies the full extent of Plaintiffs' prosecution activities (e.g., revival and prosecution of legacy patents, omissions from IDS submissions), and any other defenses that may become applicable.

## COUNTERCLAIMS

Defendant and Counterclaimant Peak Tactical, LLC ("Counterclaimant") asserts the following counterclaims against Plaintiffs ABC IP, LLC, and Rare Breed Triggers, Inc. (together, "Counterclaim Defendants"), and states as follows:

## NATURE OF ACTION

1. This is a Counterclaim for declaratory judgments of patent invalidity and noninfringement arising under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and patent infringement arising under 35 U.S.C. § 271, *et seq.*

## THE PARTIES

2. On information and belief, Rare Breed Triggers, Inc. is a corporation organized under the laws of the State of Texas with an address at 2710 Central Fwy, Suite 150-151, Wichita Falls, TX 76306.

3. On information and belief, ABC IP, LLC is a limited liability company organized under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, DE 19901.

4. Peak Tactical, LLC d/b/a Partisan Triggers is a Wyoming company that operates the Partisan Triggers brand and website, with its principal place of business located in Powell, Wyoming.

## JURISDICTION AND VENUE

5. An actual case or controversy exists between Counterclaimant and Counterclaim Defendants regarding whether Counterclaimant has infringed or is infringing, directly or indirectly, one or more valid and enforceable claims of the Asserted Patents.

6. The Court has subject matter jurisdiction over the claims set forth herein pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

47

7. The Court has personal jurisdiction over Counterclaim Defendants at least because Counterclaim Defendants consented to the jurisdiction of this Court by filing the Complaint.

8. Based on the filing of this action, venue is proper in this Judicial District under at least 28 U.S.C. § 1400(b). Counterclaim Defendants have consented to venue in this Judicial District by filing this action.

## BACKGROUND

### 1. The '067 Patent and Tac-Con 3MR Commercial Embodiment

9. This dispute arises in the long shadow of the true pioneer in the field, Michael Stakes and his Tac-Con 3MR trigger and the '067 Patent, years before Rare Breed existed and years before any of the asserted patents were filed. The 3MR was not conceived in a boardroom or as an exercise in paper patenting; it was forged from a real-world failure in a live gunfight. In 2012, Mr. Stakes's cousin, then a U.S. Customs and Border Protection officer, was forced to fight for his life with an AR pattern rifle whose standard fire control failed under stress: the disconnector hung, the trigger would not reliably reset, and the next shot could not be delivered when it mattered most. The near fatal consequence of that equipment failure impacted Stakes personally and he set out to solve it, not as a theoretician but as an engineer with a mission: make reset rapid, positive, and reliable without converting a semi-automatic firearm into anything it should not be.

10. Stakes bought an AR-15, stripped the lower, and began the hard work. He mapped the kinematics of the hammer, trigger nose, disconnector, and selector, and he iterated in pencil and CAD until the geometry and lever ratios delivered the behavior the field demanded. The key insight that emerged became the spine of the invention: the reset-lever architecture that uses the energy of the cycling bolt carrier, via hammer contact, to positively drive the trigger back to a ready-to-fire set position, then free it only when the action is closed. From the outset, Stakes

48

engineered a three-position selector so the user could choose between safe, standard semi-automatic, and a third "assisted reset" semi-automatic position. He ruthlessly focused on reliability and user adoption: a robust, plug-and-play drop-in cassette that installs with the standard pins in any mil-spec lower receiver.

11. By June 17, 2013, Stakes had reduced his invention to practice and filed for patent protection, which issued as U.S. Patent No. 9,146,067 on September 29, 2015. The '067 Patent claims, among other things, selector-based stop geometry that aligns with the trigger tail and adjusts the travel distance in different modes (claim 19), as well as the reset-lever mechanism that transfers cycling energy to the trigger to accelerate reset. In the '067 specification and the commercial 3MR, the selector's "third mode" shortened the trigger's travel (D2<D1) through aligned stops so the trigger tail contacts a closer stop in the positive-reset mode; translating into faster, more reliable follow-up shots while maintaining one-shot-per-trigger-function semi-automatic operation.

12. Before a single unit shipped, Stakes asked the Bureau of Alcohol, Tobacco, Firearms and Explosives' Firearms Technology Branch to examine the device. In its October 8, 2013, letter, ATF confirmed exactly what Stakes designed and what the '067 Patent taught. In the third selector position, "the reset lever pivots forward, and the hammer engages/contacts the lever during the cycling of the rifle. In this position, the hammer contacts the reset lever during cocking, which applies force to the trigger, forces the shooter's finger forward, and allows the trigger to reset rapidly." ATF then did the decisive test (field and live fire) and concluded the 3MR "functioned only semi automatically." That contemporaneous regulatory confirmation underscores what matters here: the 3MR solved the reset-reliability problem through a lawful, semi-automatic design that accelerated reset using cycling energy.

13. The market took notice. Tac-Con launched the 3MR on November 12, 2013, and the trade press, in 2014 and 2015, explained its operation in precisely the terms Stakes invented and ATF described. American Rifleman (Jan. 14, 2014) reported that the "3rd mode provides a positive reset that dramatically reduces the split times between shots," "achieved by transferring the force from the bolt carrier through the trigger assembly to assist the trigger back onto the front sear." Gun Digest (Jan. 2, 2014) headlined the 3MR as "Aiming at Speed, Accuracy," and Shooting Illustrated repeated the same "positive reset" description ("instantaneously assisting the trigger back onto the sear"). Small Arms Review (Feb. and May 2014) profiled the product as a self-contained drop-in module whose third selector position gives "a very quick and positive reset that dramatically reduces the time between shots." In other words, by 2014–15, the industry understood and embraced Stakes's solution: a three-position, drop-in, positive-reset trigger that uses bolt-carrier energy to drive the trigger forward to reset, and it remained semi-automatic.

14. Stakes did not stop innovating once the 3MR hit the market. In 2015–16, responding to some users who could "outrun" the system in extreme, hard-use conditions, he built and tested an out-of-battery gating safety device that mechanically blocks trigger release until the bolt returns to battery. Out-of-battery interlocks have been used in firearms for generations. When Stakes learned of instances of users experiencing "hammer follow" with his trigger, he adapted that known, safe-timing concept to his architecture to address those users. He ultimately chose not to commercialize the gating prototype at the time out of concern that a cumulative feature-set could be mischaracterized by regulators as simulating automatic fire. But years before Rare Breed filed any patent, Stakes had already conceived, built, and proven the solution, and the gating member was the time-tested, predictable way to make trigger release wait for bolt closure.

50

15. That foundational technology did not retire with the 3MR's commercial run. It lives today in Peak Tactical's Disruptor, and, without license or authorization, in Rare Breed's current product line. The FRT-15L3, FRT-15L3 (FLAT), and FRT-15C3 each employ the selector-stop geometry and cycling-energy reset architecture that Stakes invented, patented, and commercialized years before Rare Breed existed. Rare Breed is selling Stakes's invention while simultaneously trying to conceal and ignore the patent that protects it.

16. The through-line is indisputable: Stakes is the true inventor of the technology at issue. He conceived and built the first commercially successful, positive/assisted/forced-reset, three-position drop-in trigger; he filed for, and obtained, the '067 Patent; he subjected his design to ATF review and received confirmation that it was not a "machinegun"; and he launched a commercial product that the trade press celebrated and explained in detail.

17. Rare Breed's own conduct acknowledges the seniority and superiority of Michael Stakes' technology. Twice, first in 2021, when Rare Breed's then-principal personally telephoned Stakes, and again in 2025 through an intermediary, Rare Breed tried to buy the '067 Patent. Stakes declined both times. Those overtures speak volumes: long before Plaintiffs filed the asserted patents, they recognized that the '067 Patent and its 3MR embodiment were the cornerstone of this field. Plaintiffs' patents are latecomers and their products are derivative. The foundational contributions in this space: selectable, safe/standard/positive-reset modes, cycling-energy-driven trigger reset, and the drop-in cassette architecture, trace directly to Stakes's inventorship and the '067 Patent. Yet rather than license what they twice tried to buy, Rare Breed has simply continued to sell products that infringe it.

18. Counterclaimant Peak Tactical, LLC is the owner of all right, title, and interest in the '067 Patent as a result of a merger of Dark Flame Innovations, LLC, the previous owner by

assignment of the '067 Patent, with and into Peak Tactical, LLC, through which, among other things, Peak Tactical acquired ownership of the '067 Patent, including the right to sue for past, present, and future infringement.

### 2. The Partisan Disruptor

19. Peak Tactical and the Partisan brand were built with a simple, disciplined objective: deliver a lawful, reliable, assisted-reset AR-15 trigger grounded in the technology that first made the concept viable. The effort was led by Ben Woods, a Marine Corps officer and former State Department Diplomatic Security Service Special Agent whose professional life has been spent in high-consequence environments where equipment has to work and has to be safe. Woods formed a tight, transparent operating structure to execute that mission. Dark Flame Innovations, LLC ("DFI"), owned and managed by Woods, acquired Michael Stakes's U.S. Patent No. 9,146,067 and related intellectual property and served as the IP hub for the venture—collaborating on the overall product design vision with design input from the venture's other principals, while actual engineering implementation was outsourced to third-party subcontractors. Peak Tactical, LLC ("Peak") handles brand, marketing and sales under Partisan Triggers, and sells the Disruptor only through authorized firearms dealers—never direct-to-consumer. QOX Consulting, LLC ("QOX") provides program management and manufacturing coordination. Between Peak, QOX, and their manufacturing partners, dozens of Americans have jobs tied directly to the Disruptor's production, and the team has invested nearly $1.5 million of risk capital to bring the product to market.

20. From the outset, the Disruptor was engineered on the proven shoulders of the '067 Patent and the Tac-Con 3MR. It adopts the same design principles that Stakes conceived years earlier: a robust, self-contained drop-in cassette that installs on standard pins; a true three-position selector that allows safe, standard semi-automatic, and an enhanced semi-automatic mode; and a

cycling-energy reset architecture that accelerates trigger reset without changing the firearm's semi-automatic operation: what the industry, the ATF, and the trade press have variously called "assisted reset," "forced reset," or "positive reset." The Disruptor's three-position selector employs geometry and stop surfaces aligned with the trigger tail to change the trigger travel distance in the third mode, just as the '067 Patent claims in independent claim 19 (D2<D1). Rare Breed's current products do the same, and do so without a license.

21. Stakes tested both products and confirmed the selector-stop relationship and shorter travel distance, and Partisan's consulting engineer modeled the kinematics to ensure that, in the "positive reset" mode, cycling energy urges the trigger forward to reset, and the trigger will only release when the bolt has returned to a safe, closed position. Consistent with best practices that firearms designers have followed for generations, the Disruptor incorporates a gating/out-of-battery interlock keyed to the bolt-carrier return to battery, so trigger release is mechanically blocked until the action is ready, addressing the "outrun" timing edge cases that any hard-use, high-cadence trigger must accommodate.

22. The Partisan team brought the Disruptor to market deliberately and openly. On September 12, 2025, Peak introduced the product on AR15.com, one of the largest public forums in the industry, explaining what the Disruptor would do, how it would be sold (exclusively through authorized dealers), and when it would be available. Peak Tactical began taking purchase orders for the Disruptor on November 15 and shipments began mid-December.

23. The marketplace response has matched the engineering. Early reviews, many of them side-by-side with Rare Breed's current product, praise the Disruptor's feel, trigger characteristics and reliability, particularly in standard semi-automatic mode, and characterize it as "flawless" and the "best option for consumers." By contrast, there are contemporaneous threads

53

and videos criticizing Rare Breed's product, with users describing safety and functional issues. The point is not to run down a competitor; it is to underscore what consumers have been missing: a lawful, high-quality, positive-reset trigger built on a proven pedigree.

24. In short, the Disruptor is not a copy of anything Rare Breed did. It is a lawful evolution of Stakes's pioneering invention that the ATF itself described in 2013 and the trade press celebrated in 2014–2015. The Disruptor carries forward what worked: the three-mode selector; the drop-in housing; the cycling-energy reset that "forces the shooter's finger forward" to a quick, positive reset; and adds what experience and the prior art taught was necessary: a gating mechanism keyed to in-battery return. That is the story of the Partisan Disruptor, rooted in the true origin of the technology, engineered with care, sold lawfully through proper channels, and validated by the market.

## 3. Rare Breed

25. Against the backdrop of Michael Stakes's earlier, lawfully commercialized technology, Rare Breed's path into this space has been marked less by genuine invention and more by gamesmanship before the PTO and the courts. Long before Rare Breed filed the asserted applications, the core architecture at issue here (three-position selector (safe/standard semi/positive-reset semi), cycling-energy reset that "forces the shooter's finger forward," and drop-in, cassette-style packaging) was disclosed and publicized by the '067 Patent and its 2013–2015 Tac-Con 3MR commercial embodiment.

26. Yet the prosecution history of Rare Breed's earliest patent shows that the most material art and real-world record were never squarely presented to the examiner. The '223 examiner allowed the claims because he "could not find" any reference teaching a trigger member with a surface contacted by the hammer that "causes" the trigger to be forced to a set position—

54

an error that could only occur if the applicants failed to disclose the '067 Patent/3MR record and contemporaneous trade-press and ATF documents explaining exactly that function.

27. In the later applications, applicants buried 100-plus references in omnibus IDS filings; the examiners issued no substantive prior-art rejections (and in the '807 file expressly deemed the claims "not patentably distinct"), never engaging with the '067 Patent/3MR record or Bonner's 2015 patent teaching hammer-to-trigger contact, including integral trigger surfaces. That pattern—starve the first examiner of the closest art; then flood the later applications—allowed these claims to slip through without the rigorous §102/§103 analysis that a full and candid process would have demanded.

28. Worse, upon information and belief, Rare Breed's lead patent counsel, Glenn Bellamy, repeatedly violated prosecution bars while litigating in Florida, and then concealed those violations in discovery. In October 2021 and April 2022, protective orders with prosecution bars were entered in the Florida litigations. Within weeks, Mr. Bellamy secretly filed multiple applications directed to forced-reset triggers (including the application leading to the '003 Patent), prosecuted a Track One non-provisional patent that issued as U.S. Patent No. 11,346,627, and revived the long-expired Blakely U.S. Patent No. 7,398,723 by asserting an "unintentional" delay—a patent Plaintiffs have recently asserted in their litigation campaign. After opposing counsel called out the violations, Mr. Bellamy downplayed them as a "memory lapse," then laundered later filings through a partner's signature (Wayne Jacobs) even as the firm's customer number and his assistant's filings appeared on the face of the PTO papers. When discovery called for production of the prosecution files, Mr. Bellamy selectively withheld key documents (assignments, filing receipts, powers of attorney, data sheets, eReceipts), producing only those

pages that omitted his name. Those are not inadvertent oversights; they are the hallmarks of a deliberate scheme to evade court-ordered bars and conceal the misconduct.

29. Rare Breed's courtroom conduct mirrors its PTO conduct. Rather than compete on product, Rare Breed has attempted to monopolize the field through a scattershot litigation campaign aimed at bludgeoning competitors and their distribution channels. Over the last year alone, Rare Breed has filed more than two dozen patent suits, including at least nine against retailers stocking Partisan's Disruptor, filing in multiple districts and naming individual dealer owners personally. In none of those dealer cases did Rare Breed seek a TRO or preliminary injunction; instead, it pursued piecemeal filings calculated to chill sales without testing the merits.

30. A federal court has also already adjudicated a pattern of deception by Rare Breed that bears directly on its credibility, or lack thereof. In *United States v. Rare Breed Triggers, LLC, et al.*, No. 23-cv-369 (E.D.N.Y. Sept. 5, 2023), the Eastern District of New York granted the Government's preliminary injunction and found that Rare Breed (i) deliberately used fictitious names ("Red Beard Treasures" and "Red Barn Tools") on USPS mailing labels to evade ATF oversight; (ii) attempted to thwart execution of a federal seizure order by loading a pallet of FRT-15 triggers into a U-Haul and driving hundreds of miles before ATF intercepted the shipment; (iii) maintained a "digital shredding" policy for sales records and told customers "we can't turn over what we don't have"; and (iv) filed a sworn declaration about New York sales that the court found to be false. The EDNY court also chronicled Rare Breed's habit of suing the ATF and then abandoning those suits after losing preliminary motions, while continuing to tell customers that litigation was "ongoing," and its refusal to refund customers once the ATF classified the product as illegal. Those findings are not isolated; they reflect the same "deceit, craft or trickery" we see in Rare Breed's PTO and litigation conduct.

56

31. Finally, Rare Breed's own conduct recognizes where the true innovation lies. Twice, first in 2021 when its then-principal personally called Stakes, and again in 2025 through an intermediary, Rare Breed tried to buy the '067 Patent. Stakes declined. Rare Breed then filed late-coming patents that track the '067 Patent/3MR architecture and has since wielded them as bludgeons. At bottom, Rare Breed is not the pioneer it now claims to be. It is a late entrant that has tried to win through concealment, bullying, and regulatory evasion what it could not secure through genuine invention. Those facts matter: they render the asserted patents unenforceable (inequitable conduct), defeat Rare Breed's claim to equitable remedies (unclean hands), and underscore why declaratory relief is necessary to clear the field for lawful competition.

32. Rare Breed has also, throughout this same period, continued to manufacture and sell trigger products, including the FRT-15L3, FRT-15L3 (FLAT), and FRT-15C3, that practice at least claim 19 of the very '067 Patent it twice tried to purchase and now seeks to invalidate.

## COUNT I – INFRINGEMENT OF THE '067 PATENT

33. Counterclaimant incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

34. U.S. Patent No. 9,146,067 ("the '067 Patent"), titled "Trigger Mechanism," duly and lawfully issued by the United States Patent and Trademark Office ("USPTO") on September 29, 2015. The '067 Patent remains valid and enforceable. A true and correct copy of the '067 Patent is attached to Plaintiffs' TRO papers as Exhibit R (Dkt. No. 7-18).

35. Counterclaimant Peak Tactical, LLC is the owner of all right, title, and interest in the '067 Patent as a result of a merger of Dark Flame Innovations, LLC with and into Peak Tactical, LLC, through which, among other things, Peak Tactical acquired ownership of the '067 Patent, including the right to sue for past, present, and future infringement.

57

36. Counterclaimant has complied with the requirements of 35 U.S.C. § 287, including by marking products practicing the '067 Patent and/or providing actual notice of the '067 Patent and Rare Breed's infringement, at least as of the filing of its response in opposition to Rare Breed's TRO motion, and service of these Counterclaims.

37. Upon information and belief, Rare Breed is currently making, using, selling, offering for sale, and/or importing into the United States aftermarket AR pattern trigger products, including but not limited to the FRT-15L3 and FRT-15L3 (FLAT) (together, "the Accused Rare Breed Products"), without license or authorization from Counterclaimant Peak Tactical.

38. Upon information and belief, and as further detailed in Exhibit A, hereto, the Accused Rare Breed Products embody and practice the technology claimed in at least claim 19 of the '067 Patent. By way of example and without limitation, the Accused Rare Breed Products include: a trigger mechanism, comprising:

    a. a trigger assembly with a hammer having a trigger notch, a trigger body has a trigger nose, a trigger tail, and a trigger, the trigger nose for receiving the trigger notch in a cocked position of the hammer and a set position of the trigger body and for releasing the trigger nose when the trigger body is moved a travel distance from the set position to a fired position, a disconnector coupled between the hammer and the trigger body, and a selector movable between a first position and a second position for adjusting the travel distance of the trigger body;

    b. the selector has a first stop aligned with the tail of the trigger body in the first position, and a second stop aligned with the tail of the trigger body in the second position;

    c.  the first stop is separated from tail of the trigger body a first distance in the set position of the trigger body in the first position of the selector, and the second stop is separated from tail of the trigger body a second distance in the set position of the trigger body in the second position of the selector;

    d.  in the first position of the selector and the fired position of the trigger body the first distance between the first stop and the tail of the trigger body is closed and the tail contacts the first stop, and movement of the trigger body is arrested by the tail contacting the first stop;

    e.  in the second position of the selector and the fired position of the trigger body the second distance between the second stop and the tail of the trigger body is closed and the tail contacts the second stop, and movement of the trigger body is arrested by the tail contacting the second stop; and

    f.  the second distance is less than the first distance, wherein the travel distance of the trigger body in the second position of the selector is less than the travel distance of the trigger body in the first position of the selector.

39. In violation of 35 U.S.C. § 271(a), Rare Breed has infringed and continues to infringe claim 19 of the '067 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing the Accused Rare Breed Products in the United States, including in this District.

40. Upon information and belief, in addition to direct infringement, Rare Breed has induced and continues to induce infringement of claim 19 of the '067 Patent under 35 U.S.C. § 271(b) by actively encouraging, advertising, promoting, and instructing dealers, distributors, resellers, and end users to make, use, offer for sale, sell, and/or use the Accused Rare Breed

Products in a manner that infringes claim 19, including through product manuals, installation and operation instructions, marketing materials, and online content.

41. Upon information and belief, Rare Breed has contributed and continues to contribute to infringement of claim 19 of the '067 Patent under 35 U.S.C. § 271(c) by selling, offering to sell, and/or importing the Accused Rare Breed Products and/or components thereof that constitute a material part of the patented combination and are not staple articles or commodities suitable for substantial non-infringing use, with knowledge that the same are especially made and/or especially adapted for use in an infringement of the '067 Patent.

42. Rare Breed's infringement has been and is willful. Upon information and belief, Rare Breed has had actual knowledge of the '067 Patent for years—including, by way of example, through Rare Breed's efforts to acquire the '067 Patent from its inventor and/or then-owner and through Rare Breed's own allegations in this action attacking the scope and applicability of the '067 Patent—yet Rare Breed has continued to make, use, sell, offer for sale, and/or import the Accused Rare Breed Products that infringe claim 19. Rare Breed's continued infringement after such notice is willful and egregious and warrants enhanced damages under 35 U.S.C. § 284. Rare Breed's acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Counterclaimant Peak Tactical's business, sales, reputation, and good will.

43. By its acts of infringement, Rare Breed has injured Counterclaimant Peak Tactical and is liable for damages pursuant to 35 U.S.C. § 284, in an amount to be determined, together with pre-judgment and post-judgment interest.

44. Unless enjoined by this Court, Rare Breed will continue its infringing acts, thereby causing Counterclaimant irreparable injury for which there is no adequate remedy at law.

45. Rare Breed's infringement of the '067 Patent is exceptional, and Counterclaimant is entitled to recover its attorneys' fees and costs incurred in this action pursuant to 35 U.S.C. § 285.

46. Counterclaimant therefore requests judgment that Rare Breed has infringed and continues to infringe claim 19 of the '067 Patent (directly and/or indirectly), that Rare Breed's infringement is willful, and that Counterclaimant is entitled to all available relief, including a permanent injunction, damages (including enhanced damages), costs, interest, and attorneys' fees.

## COUNT II – DECLARATORY JUDGMENT OF INVALIDITY (ALL ASSERTED PATENTS)

47. Counterclaimant incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

48. An actual controversy exists between Counterclaimant and Counterclaim Defendants regarding the validity of the asserted claims of U.S. Patent Nos. 10,514,223 ("the '223 Patent"), 11,724,003 ("the '003 Patent"), 12,036,336 ("the '336 Patent"), and 12,274,807 ("the '807 Patent") (collectively, the "Asserted Patents"). For the reasons set forth below, the asserted claims are invalid under one or more provisions of Title 35 of the United States Code, including 35 U.S.C. §§ 102, 103, and 112.

49. The asserted claims are anticipated and/or rendered obvious by prior art that disclosed and, in modern form, commercialized the very features Plaintiffs now claim as novel. The core architecture at issue: (i) a three-position selector providing safe, standard semi-automatic, and a third "positive/assisted/forced-reset" semi-automatic mode; (ii) cycling-energy driven reset in which hammer/trigger contact drives the trigger forward toward reset; (iii) selector stop geometry aligned with the trigger tail that shortens trigger travel in the third mode; and

61

(iv) gating/out-of-battery safety members keyed to bolt closure, was disclosed years before the earliest asserted priority date.

50. By way of example and without limitation, the following references, alone and in combination, anticipate and/or render obvious the asserted claims:

    a. U.S. Patent No. 9,146,067 to Michael Stakes ("Stakes '067") and its commercial Tac-Con 3MR embodiment (2013–15), publicly described in contemporaneous ATF and trade-press materials. ATF's October 8, 2013 letter confirms the 3MR's three-position selector (safe; standard semi-auto; a third mode with "positive reset"), and that "the hammer engages/contacts the [reset] lever during the cycling of the rifle," "applies force to the trigger, forces the shooter's finger forward, and allows the trigger to reset rapidly," while "function[ing] only semi automatically." Trade publications, including American Rifleman (Jan. 14, 2014), Gun Digest (Jan. 2, 2014), Small Arms Review (Feb. and May 2014), and Shooting Illustrated (2014–15), repeatedly described the third mode's "positive reset" "achieved by transferring the force from the bolt carrier through the trigger assembly to assist the trigger back onto the sear," with dramatically reduced split times. Stakes '067 Patent further claims selector-stop geometry aligned with the trigger tail that produces a shorter travel distance in the third mode (D2<D1), matching what Counterclaimants' testing has confirmed.

    b. U.S. Patent No. 9,829,263 to Bonner ("Bonner '263") (filed 2015, issued 2017), which teaches four rapid-reset embodiments, including a trigger member with an integral contact surface ("trigger surface 39") that the

62

hammer engages during cycling to cam or drive the trigger forward into reset. Bonner expressly recognizes that whether the contact surface is implemented as an insert/lever or as part of the trigger body is a matter of design choice, and that the same components "could be arranged and designed in a wide variety of different configurations" to achieve cycling-driven reset.

c. Classic out-of-battery gating art disclosing mechanical interlocks keyed to action closure: John M. Browning, U.S. Patent No. 659,507 (1900) (recoil-operated firearm using an "inertia-piece" lock that "temporarily" keeps the feeding/locking train interlocked until counter-recoil completes, and then "free[s] the trigger" only when the action is closed); Michal U.S. Patent Nos. 2,056,975 (1936) and 2,139,691 (1938) (teaching "means, under the influence of the recoil of the slide, to … move the trigger forward against the pressure of the trigger-finger," and "means, under the influence of the counter-recoil of the slide, to free the trigger for firing" under continued finger pressure); Hyde U.S. Patent No. 2,367,280 (1945) (out-of-battery safety "for holding the cocking member … against release," and automatic return to operative position); and the Remington Model 11 semi-automatic shotgun trigger group demonstrating hammer-to-trigger-member contact that forces the trigger forward to reset, coupled with a safety/sear interlock keyed to bolt closure.

d. Modern "hard/positive reset" triggers predating Plaintiffs' later asserted priority dates, including widely reported products and press releases in

2021–22 (e.g., "Wide Open Trigger" using a spring-carrier that "forces the trigger into a neutral or reset position") and three-position selectors in commercial binary triggers, which underscore that selector-mode variation was routine by 2015.

51. The Asserted Patents do no more than combine familiar elements according to known methods to yield predictable results. Substituting Bonner '263's integral trigger reset surface for a separate reset lever; using the '067 Patent/3MR three-position selector and stop alignment to shorten trigger travel; and adding a spring-biased gating/out-of-battery member keyed to bolt closure—all components and functions well-known in the art—would have been obvious to a person of ordinary skill in the art at the time. The asserted claims thus are invalid under §§ 102 and/or 103.

52. The Asserted Patents also fail to satisfy § 112. The claims recite ambiguous, timing-dependent limitations (e.g., "substantially in-battery position," "set position," "wherein said sear and sear catch are in engagement") and functional relationships that are not adequately described or enabled for their full scope. The specifications do not provide objective boundaries to inform a person of ordinary skill when, and in what mechanical state, the claimed structures must exist relative to the AR pattern cycle; nor do they teach how to achieve, across the breadth of the claims, the recited condition that hammer-to-trigger contact "causes" the trigger member to be "forced to the set position" (i.e., sear/sear-catch engagement) at the claimed time relative to bolt-carrier travel.

53. As a result, the claims are indefinite under § 112(b) (failing to inform, with reasonable certainty, the scope of the invention) and lack written description and enablement under § 112(a) (not describing or enabling the full breadth of the claims). For example, in the asserted

post-'223 Patent family, the "substantially in-battery position" gate determines when the "locking member" must be moved into a permissive state; the specifications variously describe contact "during forward travel" and "when the bolt carrier assembly has reached (or nearly reached) its closed, in-battery position," but do not supply clear, operable boundaries for these critical timing windows. Similarly, the claim-defined "set position" requires that sear/sear-catch engagement exist at a particular moment in the cycling sequence, which the specifications do not teach across the scope of the claims.

54. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., Counterclaimant requests a declaration by the Court that claims of the Asserted Patents are invalid for failure to comply with one or more of the requirements of United States Code, Title 35, including without limitation, 35 U.S.C. §§ 102, 103, and 112, and the rules, regulations, and laws pertaining thereto.

## COUNT III – DECLARATORY JUDGMENT OF NON-INFRINGEMENT (ALL ASSERTED PATENTS)

55. Counterclaimant incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

56. An actual, justiciable controversy exists between Counterclaimant Peak Tactical, LLC and Counterclaim Defendants ABC IP, LLC and Rare Breed Triggers, Inc. concerning whether the accused Partisan Disruptor trigger infringes any valid, enforceable claim of Asserted Patents. Counterclaimant denies infringement and seeks declaratory relief to resolve this controversy.

57. Counterclaimant does not infringe and has not infringed any valid, enforceable claim of the Asserted Patents, under any theory of liability. There is no direct infringement (whether literal or under the doctrine of equivalents), nor is there any indirect infringement

65

(inducement or contributory). The Disruptor's structure and kinematics differ materially from what the claims require, and the accused product has substantial lawful, non-infringing uses.

58. By way of example and without limitation, the Asserted Patents share common limitations that the Disruptor does not meet:

a. Standard Semi-Automatic "Whereupon" Clause. In the '003, '336, and '807 Patents, independent claims recite that "in said standard semiautomatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook" and that "thereafter" the user must manually release to permit sear re-engagement. In the Disruptor's standard semi-automatic selector position, during the hammer's rearward pivot with the trigger held, the disconnector does not transition into the claimed positive latch state during rearward travel. Any disconnector/hammer engagement (if at all) occurs only later, on forward travel, and with subsequent user action. The claimed timing relationship ("rearward movement … such that said disconnector hook catches") is therefore not satisfied.

b. "Hammer-to-Trigger Contact … Causes … Set Position." The asserted claims also require that hammer contact "causes the trigger member to be forced to the set position," and define "set position" as the state "wherein said sear and sear catch are in engagement." In the Disruptor's assisted/positive/forced-reset mode, at the instant of hammer-to-trigger contact that imparts the reset impulse, the trigger's sear and the hammer's sear catch are not in engagement, and the gating member remains in its

66

blocking orientation. The user cannot "pull said trigger member" at that time; permissive firing only occurs later after bolt closure and re-engagement. The claim-defined "set position" is not reached at the claimed time, and this limitation is not met.

c.   Locking Member Timing. The asserted claims further recite a "locking member" (or "locking bar") that is "spring biased" to a blocking position and "adapted to be moved … to said second position by contact from the bolt carrier during forward movement … as the bolt carrier reaches a substantially in-battery position." In the Disruptor, any gating member movement relative to bolt position is not as claimed; the geometry and timing of any unlock differ, and the accused product does not move into a permissive state "as the bolt carrier reaches" a "substantially in-battery" condition within the meaning of the claims.

d.   Selector/Disconnector Configuration. The asserted claims recite a safety selector "configured such that, when … in said forced reset semi-automatic position," it "causes said disconnector to be repositioned" and "prevents said disconnector hook from catching said hammer hook." The Disruptor's selector geometry and functional relationships differ materially from these recitations; the Disruptor's three-position selector employs stop surfaces aligned with the trigger tail to adjust travel, but does not reposition the disconnector and prevent capture in the manner, time, and causal sequence claimed.

67

59. For these reasons, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., Counterclaimant respectfully requests a declaration that Peak Tactical, LLC has not infringed and does not infringe any claim of the '223, '003, '336, or '807 Patents, whether directly (literally or under the doctrine of equivalents) or indirectly (by inducement or contributory infringement), and that Counterclaimant is entitled to judgment of non-infringement as a matter of law.

## REQUEST FOR RELIEF

For all these reasons, Counterclaimant requests that the Court enter judgment in their favor and against Counterclaim Defendants as follows:

a.    A declaration pursuant to 28 U.S.C. § 2201 that each of the asserted claims of the Asserted Patents is invalid under one or more provisions of 35 U.S.C. §§ 102, 103, and 112;

b.    A declaration pursuant to 28 U.S.C. § 2201 that Counterclaimant has not infringed and does not infringe, under any theory (directly, indirectly by inducement or contributory infringement, and/or under the doctrine of equivalents), any claim of U.S. Patent Nos. 10,514,223; 11,724,003; 12,036,336; and 12,274,807 in connection with the design, manufacture, use, sale, offer for sale, and/or importation of the Partisan Disruptor trigger and any substantially similar products;

c.    A declaration that the Asserted Patents are unenforceable against Counterclaimant by virtue of Counterclaim Defendants' inequitable conduct, unclean hands, patent misuse and other prosecution and litigation misconduct, as proven at trial;

d.    An order permanently enjoining Counterclaim Defendants, their officers, agents, employees, attorneys, and those in active concert or participation with them from asserting,

68

enforcing, licensing, or otherwise threatening enforcement of the Asserted Patents against Counterclaimant, its customers, dealers, suppliers, and other downstream partners with respect to the Disruptor and any substantially similar products, unless and until any misuse is purged and the Court orders otherwise;

e.    Dismissal of Counterclaim Defendants' Complaint with prejudice and entry of judgment that Counterclaim Defendants take nothing by their claims;

f.    A finding that this case is "exceptional" within the meaning of 35 U.S.C. § 285 and an award to Counterclaimant of its costs, expenses, and reasonable attorneys' fees incurred in defending against the Complaint and prosecuting these Counterclaims;

g.    An award of Counterclaimant's taxable costs and disbursements pursuant to 28 U.S.C. § 1920 and other applicable law, and pre- and post-judgment interest at the maximum rate permitted by law;

h.    A judgment that Rare Breed Triggers, Inc. has infringed and continues to infringe (directly and/or indirectly) at least claim 19 of U.S. Patent No. 9,146,067 in violation of 35 U.S.C. § 271;

i.    A judgment that Rare Breed Triggers, Inc.'s infringement of at least claim 19 of the '067 Patent is willful, and an award of enhanced damages pursuant to 35 U.S.C. § 284;

j.    An award of damages adequate to compensate Counterclaimant for Rare Breed Triggers, Inc.'s infringement of at least claim 19 of the '067 Patent, including at least a reasonable royalty, together with pre-judgment and post-judgment interest and an accounting of infringing sales pursuant to 35 U.S.C. § 284;

k.    A permanent injunction pursuant to 35 U.S.C. § 283 enjoining Rare Breed Triggers, Inc., and its officers, agents, servants, employees, attorneys, and those in active concert or

participation with it, from further infringement of at least claim 19 of the '067 Patent, including by making, using, selling, offering for sale, and/or importing Accused Rare Breed Products (as defined in the Counterclaims) and any colorable imitations thereof;

l.      A finding that Rare Breed Triggers, Inc.'s infringement of at least claim 19 of the '067 Patent renders this case exceptional under 35 U.S.C. § 285 and an award of Counterclaimant's attorneys' fees and costs incurred in prosecuting the '067 Patent infringement counterclaim; and

m.      Such other and further legal or equitable relief as the Court deems just and proper to remedy Counterclaim Defendants' wrongful conduct and to fully resolve the parties' dispute, including but not limited to any further declarations necessary to protect Counterclaimant's rights and business.

## JURY DEMAND

Counterclaimant demands a trial by jury on all issues so triable.

Dated: March 24, 2026.

/s/ Timothy P. Getzoff
Jeffrey S. Pope (Wyo. State Bar #7-4859)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Phone: 307.778.4200
jspope@hollandhart.com

Andrew Orr (Wyo. State Bar #7-6235)
HOLLAND & HART LLP
P.O. Box 68
Jackson, WY 83001
Phone: 307.739.9741
acorr@hollandhart.com

70

Paul Swanson (pro hac vice)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Phone: 303.295.8000
pdswanson@hollandhart.com

Timothy Getzoff (pro hac vice)
Randy Roeser (pro hac vice)
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, CO 80302
Phone: 303.473.2700
tgetzoff@hollandhart.com
jrroeser@hollandhart.com

*Attorneys for Defendants/Counterclaimant*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2026, a copy of the foregoing was filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s/ Timothy P. Getzoff*
Timothy P. Getzoff

37360612_v2